**RECORD NO. 21-4242**

In The

# United States Court Of Appeals
## For The Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff – Appellee,*

**v.**

## SHANNON MICHELLE DRAKE,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO**

———————————

**JOINT APPENDIX
Volume IX of XIV
(Pages 3961 – 4383)**

———————————

Claire J. Rauscher
WOMBLE BOND DICKINSON
  (US) LLP
301 South College Street
1 Wells Fargo Center
Suite 3500
Charlotte, NC 28202
(704) 331-4961

S. Robert Lyons
  CHIEF, CRIMINAL APPEALS &
  TAX ENFORCEMENT POLICY SECTION
Katie Bagley
Joseph B. Syverson
Gregory S. Knapp
  ATTORNEYS
  TAX DIVISION
  DEPARTMENT OF JUSTICE
P.O. Box 972
Washington, DC 20044
(202) 616-3854

*Counsel for Appellant*

*Counsel for Appellee*

## TABLE OF CONTENTS
### Volume I of XIV

Page:

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Superceding Indictment
     filed August 29, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Transcript of Motions Hearing Before
The Honorable William L. Osteen, Jr.
     on November 9, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Testimony of <u>Bruce Ashley</u>:

Direct Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . . . 201
Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . . . . 241
Cross Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245
Redirect Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 248
Recross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . 254

Testimony of <u>Laura Dildine</u>:

Direct Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . . . 256
Cross Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316
Redirect Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 317

Transcript of Motions Hearing Before
The Honorable William L. Osteen, Jr.
on November 9, 2017, Continued:

Testimony of <u>Stephen Petersen</u>:

Direct Examination by Ms. Barbier........................... 320
Cross Examination by Ms. Rauscher.......................... 334
Cross Examination by Mr. Chut.............................. 348
Redirect Examination by Ms. Barbier........................ 355
Recross Examination by Ms. Rauscher........................ 360

Defendant's Supplemental Memorandum in Support of Her  Motion to
Join Defendant Earnest's Motion for *Ex Parte* Hearing, (*Drake*)
with Exhibit,

filed November 16, 2017........................................ 381

<u>Exhibit</u>:

A.    Letter to Frank Chut from Bruce Ashley
         dated September 18, 2012. ........................ 389

Defendant's Motion to Dismiss for Insufficient Allegations and
Duplicitous and Multiplicitous Charges (*Drake*)

filed December 13, 2017..................................... 392

Defendant's Reply to Government's Response to Defendant's
Motion to Dismiss for Insufficient Allegations and
Duplicitous and Multiplicitous Charges (*Drake*)

filed February 2, 2018...................................... 394

Defendant's Reply to Government's Response to Defendant's
Motion to Dismiss and Suppress Grand Jury Testimony (*Drake*)

filed February 2, 2018...................................... 401

# TABLE OF CONTENTS
## Volume II of XIV

**Page:**

**Transcript of Motions Hearing Before**
**The Honorable William L. Osteen, Jr.**
　　on February 8, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **408**

**Testimony of <u>James Schwiers</u>:**

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . . . **428**
Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . . . **450**
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . **461**
Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . . **462**
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . **468**

**Testimony of <u>Nathan Crystal</u>:**

Direct Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . **472**
Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . . **524**
Cross Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . . . **538**
Redirect Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . **571**
Recross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . **582**
Recross Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . **586**

**Testimony of <u>Michael Knapp</u>:**

Direct Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . **588**
Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . . **602**
Cross Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . . . **604**
Redirect Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . **605**

**Defendant's Motion to Join and Adopt Co-Defendant**
**Ronald Earnest's Motion to Dismiss (*Drake*)**
　　filed March 6, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **656**

**Transcript of Motions Hearing Excerpt Before**
**The Honorable William L. Osteen, Jr.**
> on March 7, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 659

> **Testimony of <u>Mary Blackberry</u>:**

> Direct Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . . . 662
> Cross Examination by Mr. O'Rourke. . . . . . . . . . . . . . . . . . . . . . . . 682
> Cross Examination by Mr. Brooks. . . . . . . . . . . . . . . . . . . . . . . . . . . 684
> Redirect Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 687

> **Testimony of <u>Kyle Myers</u>:**

> Direct Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . . . 693

**Defendant's Supplemental Memorandum in**
**Support of Her Motion to Dismiss (*Drake*)**
> filed March 15, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

**Transcript of Motions Hearing Before**
**The Honorable William L. Osteen, Jr.**
> on April 13, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 716

**Memorandum and Opinion**
> filed April 18, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 812

**Government's Trial Brief,**
**with Attached Appendices,**
> filed December 28, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 881

**Transcript Pretrial Conference Before**
**The Honorable William L. Osteen, Jr.**
> on December 28, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 927

## TABLE OF CONTENTS
### Volume III of XIV

**Page:**

**Transcript of Trial Proceedings of Before**
**The Honorable William L. Osteen, Jr.**
        on January 8, 2019:

        Opening Statement by Mr. Chut . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982

        Opening Statement by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . . 991

        Opening Statement by Mr. O'Rourke.. . . . . . . . . . . . . . . . . . . . . . 1001

        Opening Statement by Mr. Camden. . . . . . . . . . . . . . . . . . . . . . . . 1020

        Testimony of <u>Julie Akers</u>:

        Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . . 1036

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
        on January 9, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1174

        Testimony of <u>Julie Akers</u>:

        Continued Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . 1180
        Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . . 1209
        Cross Examination by Mr. O'Rourke. . . . . . . . . . . . . . . . . . . . . . . 1262
        Cross Examination by Mr. Camden.. . . . . . . . . . . . . . . . . . . . . . . . 1296
        Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . 1310
        Recross Examination by Ms. Barbier.. . . . . . . . . . . . . . . . . . . . . . . 1326
        Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . 1334

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
       **on January 9, 2019, Continued:**

**Testimony of <u>Mickey Jolly</u>:**

**Direct Examination by Mr. McLellan.** . . . . . . . . . . . . . . . . . . . . . . . **1342**
**Cross Examination by Mr. Bannister.** . . . . . . . . . . . . . . . . . . . . . . **1377**
**Cross Examination by Mr. Howard.** . . . . . . . . . . . . . . . . . . . . . . . . **1399**
**Redirect Examination by Mr. McLellan.** . . . . . . . . . . . . . . . . . . . **1405**
**Recross Examination by Mr. Bannister.** . . . . . . . . . . . . . . . . . . . . **1409**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
       **on January 10, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1414**

**Testimony of <u>Virginia Linke</u>:**

**Direct Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . . . . **1417**
**Cross Examination by Mr. Howard.** . . . . . . . . . . . . . . . . . . . . . . . . **1460**
**Cross Examination by Ms. Rauscher.** . . . . . . . . . . . . . . . . . . . . . . **1465**
**Cross Examination by Ms. Poe.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **1476**
**Redirect Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . **1476**
**Recross Examination by Mr. Howard.** . . . . . . . . . . . . . . . . . . . . . . **1478**

## TABLE OF CONTENTS
### Volume IV of XIV

**Page:**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
   **on January 10, 2019, Continued:**

 **Testimony of <u>Matthew Medaloni</u>:**

 **Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . 1483**
 **Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 1522**
 **Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . 1560**
 **Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 1562**

 **Testimony of <u>Matt Carpenter</u>:**

 **Direct Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . . . . 1569**
 **Cross Examination by Ms. Poe. . . . . . . . . . . . . . . . . . . . . . . . . . . 1612**
 **Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . 1615**
 **Redirect Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . . 1623**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
   **on January 11, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1626**

 **Testimony of <u>Douglas Corriher</u>:**

 **Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . 1630**
 **Voir Dire Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 1760**
 **Voir Dire Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . 1765**
 **Voir Dire Examination by Mr. O'Rourke. . . . . . . . . . . . . . . . . . . . . 1769**
 **Continued Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . 1793**

Transcript of Trial Proceedings Before
The Honorable William L. Osteen, Jr.

on January 14, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1836

Testimony of <u>Douglas Corriher</u>: (Continued)

Continued Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . 1843
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 1977

## <u>TABLE OF CONTENTS</u>
### Volume V of XIV

**Page:**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 15, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2019

**Testimony of <u>Douglas Corriher</u>:**

Continued Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . 2022
Cross Examination by Mr. O'Rourke. . . . . . . . . . . . . . . . . . . . . . 2084
Cross Examination by Mr. Camden.. . . . . . . . . . . . . . . . . . . . . . . 2088
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 2113
Recross Examination by Ms. Barbier.. . . . . . . . . . . . . . . . . . . . . . 2126
Recross Examination by Mr. Camden.. . . . . . . . . . . . . . . . . . . . . 2128
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 2129

**Testimony of <u>Elizabeth Byrd</u>:**

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . 2135
Cross Examination by Ms. Poe.. . . . . . . . . . . . . . . . . . . . . . . . . . . 2165
Cross Examination by Mr. Howard.. . . . . . . . . . . . . . . . . . . . . . . 2169
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 2182

**Testimony of <u>Lesley Cannon</u>:**

Direct Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . . . . 2186

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 16, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2243

Transcript of Trial Proceedings Before
The Honorable William L. Osteen, Jr.
      on January 16, 2019, Continued:

Testimony of <u>Lesley Cannon</u>:

Continued Direct Examination by Mr. Montague. . . . . . . . . . . . 2249
Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . . . 2269
Cross Examination by Mr. Bannister.. . . . . . . . . . . . . . . . . . . . . . 2315
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 2340
Redirect Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . 2347

Testimony of <u>William McDaniel</u>:

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . 2354
Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . 2377
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 2386

Testimony of <u>Patricia Elliott</u>:

Direct Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . . . 2392
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 2399

Testimony of <u>Randall Howell</u>:

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . 2405
Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . 2426

Testimony of <u>Mark Gleason</u>:

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . 2436
Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . 2478
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 2485

## <u>TABLE OF CONTENTS</u>
### Volume VI of XIV

**Page:**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 17, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2488**

**Testimony of <u>Catherine Smith</u>:**

**Direct Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . . . . **2493**
**Cross Examination by Mr. Bannister.**. . . . . . . . . . . . . . . . . . . . . . . **2539**
**Cross Examination by Ms. Rauscher.**. . . . . . . . . . . . . . . . . . . . . . . **2558**
**Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . . **2562**
**Redirect Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . . **2572**
**Recross Examination by Ms. Rauscher.**. . . . . . . . . . . . . . . . . . . . . . **2572**

**Testimony of <u>Sue Robinson</u>:**

**Direct Examination by Mr. McLellan.** . . . . . . . . . . . . . . . . . . . . . . . **2578**

**Testimony of <u>Peter Pappas</u>:**

**Direct Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2623**
**Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . . **2641**
**Redirect Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . **2656**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 22, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2665**

**Testimony of <u>Michael Brooks</u>:**

**Direct Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2659**
**Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . . **2688**
**Redirect Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . **2718**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
     **on January 22, 2019, Continued:**

**Testimony of <u>Teresa Driver</u>:**

Direct Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . . . . 2725
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . 2762
Redirect Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . 2783
Recross Examination by Ms. Barbier.. . . . . . . . . . . . . . . . . . . . . 2784


**Testimony of <u>Lawrence Gibney</u>:**

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . 2791
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . 2814


**Testimony of <u>Angela Holland</u>:**

Direct Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . . . 2846


**Testimony of <u>Erick Hoffman</u>:**

Direct Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . . . 2869
Cross Examination by Mr. Howard.. . . . . . . . . . . . . . . . . . . . . . . 2900
Redirect Examination by Ms. Poe. . . . . . . . . . . . . . . . . . . . . . . . 2911
Recross Examination by Mr. McLellan.. . . . . . . . . . . . . . . . . . . . 2914


**Testimony of <u>Katherine Miller</u>:**

Direct Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . . . 2921
Cross Examination by Ms. Rauscher.. . . . . . . . . . . . . . . . . . . . . 2935
Redirect Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . 2942
Recross Examination by  Mr. Montague.. . . . . . . . . . . . . . . . . . . 2945

# TABLE OF CONTENTS
## Volume VII of XIV

Page:

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
> on January 23, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2947

**Testimony of <u>David Switzer, III</u>:**

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . 2950
Cross Examination by Mr. Bannister.. . . . . . . . . . . . . . . . . . . . . 2962
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . 2974
Redirect Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . 2980

**Testimony of <u>Cyndy Ayers</u>:**

Direct Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . . 2985
Cross Examination by Ms. Rauscher. . . . . . . . . . . . . . . . . . . . . 2994
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . 2996
Cross Examination by Mr. Bannister.. . . . . . . . . . . . . . . . . . . . . 2996
Redirect Examination by Mr. Montague. . . . . . . . . . . . . . . . . . 3005

**Testimony of <u>Remonia Felix</u>:**

Direct Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . . 3011
Cross Examination by Mr. Bannister.. . . . . . . . . . . . . . . . . . . . . 3035
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . 3046
Redirect Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . 3054

**Testimony of <u>Jeffrey L. Burgess</u>:**

Direct Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . . 3060
Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . 3072
Cross Examination by Ms. Poe. . . . . . . . . . . . . . . . . . . . . . . . . . 3078

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 23, 2019, Continued:**

  **Testimony of <u>Kyle Myers</u>:**

  **Direct Examination by Mr. McLellan.** . . . . . . . . . . . . . . . . . . . . . . . 3085
  **Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . . 3160

**Excerpt of Transcript Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 24, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3164

  **Testimony of <u>James Schweirs</u>:**

  **Voir Dire Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . 3181
  **Voir Dire Examination by Ms. Rauscher.** . . . . . . . . . . . . . . . . . . . . 3187
  **Voir Dire Examination by Mr. Camden.** . . . . . . . . . . . . . . . . . . . . . 3189
  **Voir Dire Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . 3196

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 24, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3239

  **Testimony of <u>Kyle Myers</u>:**

  **Continued Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . 3243
  **Redirect Examination by Mr. McLellan.** . . . . . . . . . . . . . . . . . . . . 3267

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
**on January 24, 2019, Continued:**

**Testimony of <u>William Timanus</u>:**

**Direct Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . . . . **3273**
**Cross Examination by Mr. Bannister.** . . . . . . . . . . . . . . . . . . . . . . **3288**
**Cross Examination by Mr. Howard.** . . . . . . . . . . . . . . . . . . . . . . . **3310**
**Cross Examination by Mr. O'Rourke.** . . . . . . . . . . . . . . . . . . . . . . **3322**
**Redirect Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . **3327**
**Recross Examination by Mr. Bannister.** . . . . . . . . . . . . . . . . . . . . **3330**
**Recross Examination by Mr. Howard.** . . . . . . . . . . . . . . . . . . . . . **3332**

**Testimony of <u>James Schweirs</u>:**

**Direct Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . . **3339**
**Cross Examination by Mr. Bannister.** . . . . . . . . . . . . . . . . . . . . . . **3406**
**Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . **3411**
**Redirect Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . **3449**

**Testimony of <u>Julia Pace</u>:**

**Direct Examination by Mr. Montague.** . . . . . . . . . . . . . . . . . . . . . . **3459**

# TABLE OF CONTENTS
## Volume VIII of XIV

**Page:**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 25, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3499

**Testimony of <u>Julia Pace</u>:**

Continued Direct Examination by Mr. Montague. . . . . . . . . . . . 3502
Cross Examination by Mr. Bannister.. . . . . . . . . . . . . . . . . . . . . . 3506
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 3545
Redirect Examination by Mr. Montague. . . . . . . . . . . . . . . . . . . 3561
Recross Examination by Mr. Bannister.. . . . . . . . . . . . . . . . . . . . 3565

**Testimony of <u>David Switzer, III</u>: (Recalled)**

Direct Examination by Mr. Chut. . . . . . . . . . . . . . . . . . . . . . . . . . 3578
Cross Examination by Ms. Barbier. . . . . . . . . . . . . . . . . . . . . . . . 3590

**Testimony of <u>Donna Hench</u>:**

Direct Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . . . 3597
Cross Examination by Ms. Poe. . . . . . . . . . . . . . . . . . . . . . . . . . . 3667
Cross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . . . 3672

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 28, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3694

**Testimony of <u>Donna Hench</u>:**

Redirect Examination by Mr. McLellan. . . . . . . . . . . . . . . . . . . . 3697
Recross Examination by Mr. Howard. . . . . . . . . . . . . . . . . . . . . . 3712

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 28, 2019, Continued:**

  **Testimony of <u>David Switzer, III</u>: (Recalled)**

  **Direct Examination by Mr. Chut.** . . . . . . . . . . . . . . . . . . . . . . . . . . 3723
  **Cross Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . . . 3728

  **Testimony of <u>Donna Hench</u>: (Recalled)**

  **Direct Examination by Mr. McLellan.** . . . . . . . . . . . . . . . . . . . . . . . 3736
  **Cross Examination by Mr. Camden.** . . . . . . . . . . . . . . . . . . . . . . . . . 3776
  **Cross Examination by Ms. Rauscher.** . . . . . . . . . . . . . . . . . . . . . . . 3778

**Excerpt of Transcript Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 29, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3785

**Transcript of Ruling on Rule 29 Motions Hearing Before**
**The Honorable William L. Osteen, Jr.**
  **on January 29, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3901

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
  **on January 29, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3916

  **Testimony of <u>Ronald Earnest</u>:**

  **Direct Examination by Ms. Barbier.** . . . . . . . . . . . . . . . . . . . . . . . . 3919

## TABLE OF CONTENTS
### Volume IX of XIV

**Page:**

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 30, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3961

Testimony of <u>Ronald Earnest</u>:

Continued Direct Examination by Ms. Barbier.. . . . . . . . . . . . . 3964
Cross Examination by Mr. Chut.. . . . . . . . . . . . . . . . . . . . . . . . . 4095

**Excerpt of Transcript Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 31, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4183

**Transcript of Trial Proceedings Before**
**The Honorable William L. Osteen, Jr.**
on January 31, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4227

Testimony of <u>Ronald Earnest</u>:

Continued Cross Examination by Mr. Chut. . . . . . . . . . . . . . . . . 4234

**Judgment (*Drake*)**
filed February 4, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4260

**Defendant's Motion for Attorneys' Fees and Expenses (*Drake*)**
filed March 6, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4261

Defendant's Memorandum in Support of Her
Motion for Attorneys' Fees and Expenses, (*Drake*)
with Exhibits,

filed April 8, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4266

Exhibits:

A.   Excerpt of Transcript of Motions Hearing Before
     The Honorable William L. Osteen, Jr.
          on April 30, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4285

B.   Email from Frank Chut
          dated May 5, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4289

B1.  Excerpt of Transcript of Motions Hearing Before
     The Honorable William L. Osteen, Jr.
          on March 7, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4291

D.   Email from Claire Rauscher to
     Jeffrey McLellan and Frank Chut
          dated March 6, 2018. . . . . . . . . . . . . . . . . . . . . . . . . 4297

E.   Excerpt of Transcript of Ruling on Rule 29 Motions Hearing
     Before The Honorable William L. Osteen, Jr.
          on January 29, 2019. . . . . . . . . . . . . . . . . . . . . . . . . 4300

G.   Excerpt of Transcript of Sentencing Hearing Before
     The Honorable James A. Beaty, Jr.
          on March 7, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4310

H.   Defendant's Subpoena to Testify Before a Grand Jury,
     with Attachment,
          dated September 11, 2012. . . . . . . . . . . . . . . . . . . . 4338

I.   Excerpt of Transcript of Trial Proceedings Before
     The Honorable James A. Beaty, Jr. (*Vol. III*)
          on March 7, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4345

**Defendant's Motion for Discovery (*Drake*)**
　　**filed May 14, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4349**

**Defendant's Reply to Government's Response to**
**Defendant's Motion for Attorneys' Fees and Expenses (*Drake*)**
　　**filed May 27, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4359**

**Government's Objection to Defendant's**
**Motion for Discovery (*Drake*)**
　　**filed May 30, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4371**

**Defendant's Reply to Government's Response to**
**Defendant's Motion for Discovery (*Drake*)**
　　**filed June 7, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4377**

**Defendant's Notice of Appeal (*Drake*)**
　　**filed May 17, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4382**

## TABLE OF CONTENTS
### Volume X of XIV - Under Seal

**Page:**

**Defendant's Motion to Dismiss and**
**Suppress Grand Jury Testimony (*Drake*)**
      filed December 13, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4384

**Defendant's Corrected Memorandum in Support of Her**
**Motion to Dismiss and Suppress Grand Jury Testimony (*Drake*)**
      filed December 14, 2017. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4386

**Government's Response to Defendant Motion to**
**Dismiss for Insufficient Allegations, (*Drake*)**
**with Exhibit,**
      filed January 12, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4394

      **Exhibit:**

    1.    **Letter to Shannon Smith from Douglas Corriher**
         dated December 8, 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . 4401

**Government's Response to Defendant's Motion to**
**Dismiss and Suppress Grand Jury Testimony, (*Drake*)**
**with Exhibits,**
      filed January 12, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4402

      **Exhibits:**

    A.    **Excerpts of Transcript of**
        **Grand Jury Testimony of Yolanda Simpson**
         on January 27, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4413

    B.    **Excerpts of Transcript of**
        **Grand Jury Testimony of Cheryl Gustavson**
         on December 14, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . 4419

<u>Exhibits</u> to
Government's Response to Defendant's
Motion to Dismiss and Suppress Grand Jury Testimony, (*Drake*)
     filed January 12, 2018, Continued:

C.     Cover Letter for One of Several Transmittals of
     Voluminous Records Obtained from Defendant.......... 4427

Government's Opposition to
Defendant's Motion to Dismiss the Indictment, (*Drake*)
with Exhibits,
     filed March 29, 2018. ....................................... 4467

<u>Exhibits:</u>

1.     Transcript of Grand Jury Testimony of Cheryl Gustavson,
     with Exhibits,
          on December 14, 2015............................... 4503

2.     Transcript of Grand Jury Testimony of Yolanda Simpson,
     with Exhibit,
          on January 27, 2016................................ 4579

3.     Transcript of Grand Jury Testimony of Shannon Drake
          on September 25, 2012............................ 4629

4.     Notes
          various dates. .................................... 4684

5.     GrandSouth Bank Notes
     Re: IRS Inquiry Involving Bruce G. Harrison
          dated June 20, 2013............................... 4723

<u>**Exhibits**</u> **to**
**Government's Opposition to**
**Defendant's Motion to Dismiss the Indictment, (***Drake***)**
      **filed March 29, 2018, Continued:**

6.     **Transcript of**
      **Grand Jury Testimony of Shannon Drake,**
      **with Exhibits,**
           **on May 29, 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4725**

7.     **Transcript of Motions Hearing**
      **Before the Honorable William L. Osteen, Jr.**
           **on March 7, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4767**

## **TABLE OF CONTENTS**
## **Volume XI of XIV - Under Seal**

**Page:**

**Exhibits** to
**Government's Opposition to**
**Defendant's Motion to Dismiss the Indictment, (*Drake*)**
     **filed March 29, 2018, Continued:**

    8.    **Transcript of Motions Hearing Excerpt**
        **Before the Honorable William L. Osteen, Jr.**
            **on November 9, 2017.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **4815**

    9.    **Notes**
            **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5047**

**Government's Motion in *Limine* to**
**Limit Cross-Examination of Witness**
        **filed December 26, 2018.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **5050**

**Government's Memorandum in Support of Their**
**Motion in *Limine* to Limit Cross-Examination of Witness,**
**with Attachments,**
        **filed December 26, 2018.** . . . . . . . . . . . . . . . . . . . . . . . . . . . **5053**

    **Attachments:**

    A.    **GrandSouth Bank Corrective Action Report**
            **dated March 28, 2013.** . . . . . . . . . . . . . . . . . . . . . . . . **5066**

    B.    **Notes of Claims of Misconduct**
            **various dates.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5068**

    C.    **Government's Motion in *Limine* to**
        **Limit Cross-Examination of Government Witness**
            **dated December 26, 2018.** . . . . . . . . . . . . . . . . . . . . . **5070**

**Exhibits** to
**Defendant's Motion for Attorneys' Fees and Expenses**
        filed April 8, 2019:

   **C.**    **Transcript of Grand Jury Testimony of Kyle Myles**
                on May 31, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5073

   **F.**    **GrandSouth Bank Documents**
                various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5117

**Government's Opposition,**
**with Exhibits,**
        filed May 15, 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5139

   **Exhibits:**

   **A.**    **(Ex. A at 6:14–23; 9:10–13 (Cannon Tr. 1/15/19)**

   **AA.**   **Paid Note Statement for**
             **NC Global Investments, Inc., Line of Credit #7586**
                dated July 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5174

   **AB.**   **Paid Note Statement for**
             **Brooks Labor Line of Credit #54758**
                dated July 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5195

   **AC.**   **Paid Note Statement for**
             **Medaloni, Inc., 17 Line of Credit #54714**
                dated July 29, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5219

   **AE.**   **Loan System Credit Transaction Form (NC Global**
             **Investments, Medaloni, Inc., and Medaloni of SC)**
                dated April 6, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5236

**<u>Exhibits</u> to**

**Government's Opposition to**

**filed May 15, 2019, Continued:**

**AF.   GrandSouth Bank,**
**Collection Report (Format A), Collections**
dated July 29, 2008 - March 31, 2011. . . . . . . . . . . . . . 5246

**AG.   GrandSouth Bank,**
**Collection Report (Format A), Collections**
dated July 29, 2008 - March 31, 2011. . . . . . . . . . . . . . 5287

**AH.   Transaction Management System Report**
dated April 15, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . 5307

**AI.   Account Statement for Medaloni, Inc.**
**GrandSouth Bank DDA Account #17368**
dated July 31, 2008 - January 31, 2011. . . . . . . . . . . . . 5309

**TABLE OF CONTENTS**
Volume XII of XIV - Under Seal

**Page:**

**Exhibits** to
**Government's Opposition to**
>   **filed May 15, 2019, Continued:**

AJ.  **Transcript of Grand Jury Testimony of Cheryl Gustavson, with Exhibits,**
>   on December 14, 2015.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5348

AK.  **Transcript of Grand Jury Testimony of Yolanda Simpson, with Exhibit,**
>   on January 27, 2016. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5424

AM.  **GSB Domestic Outgoing Wire Form - Request For Wire Transfer**
>   dated April 8, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5474

AN.  **CMI Banking Documents**
>   various dates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5476

K.   **Email from Douglas Corriher to Julie Akers and Kathy Miller, with Attachments,**
>   dated January 16, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . 5491

L.   **Email Correspondence Between Kathy Miller and Shannon Drake Re: Credits**
>   dated January 28, 2009. . . . . . . . . . . . . . . . . . . . . . . . . . 5560

**Exhibits** to
**Government's Opposition to**
**filed May 15, 2019, Continued:**

**O.    Email Correspondence Between
Kathy Miller and Shannon Drake
dated February 6, 2009.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5563

**Q.    Email Correspondence Between
Shannon Drake and Kathy Miller
Re: Canceled Check from Bristol Aluminum
dated February 19, 2009 - February 20, 2009.** . . . . . . . . 5566

**R.    Email Correspondence Between
Shannon Drake and Kathy Miller
Re: Hey There
dated February 5, 2009.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5569

**S.    GrandSouth Bank,
Collection Report (Format A), Collections
dated July 29, 2008 - March 31, 2011.** . . . . . . . . . . . . . . 5572

**T.    Memorandum of Interview of Douglas Corriher,
with Attachments,
dated October 23, 2017.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5592

**U.    Grand South Bank Domestic Outgoing Wire Form
dated September 8, 2009.** . . . . . . . . . . . . . . . . . . . . . . . . . . 5683

**V.    Grand South Bank Domestic Outgoing Wire Form
dated October 5, 2009.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5685

**X.    IHT of S.C., Inc. GSB DDA Account #17285 Statements
dated May 29, 2009 - November 30, 2010.** . . . . . . . . . . 5687

**<u>Exhibits</u> to**

**Government's Opposition to**

   **filed May 15, 2019, Continued:**

Y.     **Paid Note Statement for**
       **Green Ideas N Motion Line of Credit #1465**
             **dated July 29, 2008.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5753**


Z.     **Paid Note Statement for**
       **Medaloni of SC, Inc., Line of Credit #54736**
             **dated July 29, 2008.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5775**

## **TABLE OF CONTENTS**
### **Volume XIII of XIV - Under Seal**

**Page:**

**Defendant's Response to Government's Objection to
Defendant's Request for Discovery Concerning Her
Application for Attorneys' Fees and Expenses,
with Exhibit,**

> **filed June 7, 2019.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5790

**Exhibit A; Sections:**

1.  **[Count 1 ¶1] Testimony Excerpt - Douglas Corriher.** . . . . . . . . . . 5803

2.  **[Count 1 ¶2] FDIC Information.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 5805

3.  **[Count 1 ¶4].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5811

4.  **[Count 1 ¶4] Testimony Excerpt - Shannon Drake
    on September 25, 2012.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5817

5.  **[Count 1 ¶7] Incorporation Information.**. . . . . . . . . . . . . . . . . . . . . 5822

6.  **[Count 1 ¶¶8, 10-12] Testimony Excerpt - Julie Akers
    dated March 26, 2013.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5834

7.  **[Count 1 ¶14] Incorporation Information.**. . . . . . . . . . . . . . . . . . . . 5889

8.  **[Count 1 ¶28] GrandSouth Bank Information.**. . . . . . . . . . . . . . . . 5897

9.  **[Count 1 ¶28] FDIC Report for Grandsouth Bank for
    Examination Date as of March 31, 2009.** . . . . . . . . . . . . . . . . . . . 5908

10. **[Count 1 ¶28, 29] FDIC Community Reinvestment Act
    Performance Evaluation
    dated March 31, 2009.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5922

<u>Exhibit A</u>
**Defendant's Response to Government's Objection to
Defendant's Request for Discovery Concerning Her
Application for Attorneys' Fees and Expenses
        filed June 7, 2019, Continued:**

11.    **[Count 1 ¶30] Legal Lending Limits:
       Testimony Excerpt - David Burgess
              on August 27, 2013..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5948**

12.    **[Count 1 ¶32, 33] Factoring.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5957**

13.    **GrandSouth Bank Factoring Department Procedures
       (Multiple Paragraphs).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5965**

14.    **[Count 1 ¶36] Testimony Excerpt - Shannon Drake
              on September 25, 2012.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5971**

15.    **[Count 1 ¶36] Ron Earnest - Title/Position..** . . . . . . . . . . . . . . . . **5976**

16.    **[Count 1 ¶37] Commercial Loan Memo for
       Borrower Bruce Gregory Harrison; Officer Listed as "RKE"
              dated September 6, 2006** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5983**

17.    **[Count 1 ¶38] Testimony Excerpt - Ron Earnest
              on March 27, 2013.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5987**

18.    **[Count 1 ¶41] Lien Position Information.** . . . . . . . . . . . . . . . . . . . . . **5992**

19.    **[Count 1 ¶43] Payroll Tax Information..** . . . . . . . . . . . . . . . . . . . . . . **5998**

20.    **[Count 1 ¶44] Duty of Loan Officer -
       Testimony Excerpt - Ron Earnest
              on March 27, 2013.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6005**

<u>Exhibit A</u>

**Defendant's Response to Government's Objection to Defendant's Request for Discovery Concerning Her Application for Attorneys' Fees and Expenses**
**filed June 7, 2019, Continued:**

21.   **[Count 1 ¶47, 48, 49] Testimony Excerpt - Douglas Corriher . . . 6010**

22.   **[Count 1 ¶48, 49, 50] Corporation Information. . . . . . . . . . . . . . . 6034**

23.   **[Count 1 51] Agreement of Sale and Purchase of Assets Between US Staff Holding Corporation, Bruce Gregory Harrison and StaffCo Management Group, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6085**

24.   **[Count 1 ¶52] Letter from Ronald Earnest to Greg Harrison dated February 26, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6156**

25.   **[Count 1 ¶53, 54, 73] Commercial Loan Memo for Borrower Bruce Gregory Harrison; Officer Listed as "RKE" dated May 30, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6158**

26.   **[Count 1 ¶55] Purchase and Sale Agreement Between US Funding, Inc., Compensation Management, Inc., Staffco Management Group, Inc. and Staffco Outsource Management, Inc. and Bruce Gregory Harrison dated August 15, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6163**

27.   **[Count 1 ¶56, 57, 58, 94]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6184**

# TABLE OF CONTENTS
## Volume XIV of XIV - Under Seal

**Page:**

**Exhibit A**
**Defendant's Response to Government's Objection to**
**Defendant's Request for Discovery Concerning Her**
**Application for Attorneys' Fees and Expenses**
        **filed June 7, 2019, Continued:**

28.    **[Count 1 ¶59, 60].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6204**

29.    **[Count 1 ¶61, 62].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6228**

30.    **[Count 1 ¶63, 64].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6255**

31.    **[Count 1 ¶65, 66].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6262**

32.    **[Count 1 ¶67, 68].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6281**

33.    **[Count 1 ¶70, 83, 84, 85]..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6324**

34.    **[Count 1 ¶71, 79].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6414**

35.    **[Count 1 ¶72].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6438**

36.    **[Count 1 ¶74] Testimony Excerpt - Corriher (Cross).** . . . . . . . . . . **6447**

37.    **[Count 1 ¶75, 86].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6450**

38.    **[Count 1 ¶80].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6471**

39.    **[Count 1 ¶87] Email and Related Attachment**
       **from Douglas Corriher to Greg Harrison and Julie Akers**
       **Regarding "Customer Roster" Breakdown**
              **dated January 2, 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6489**

<u>**Exhibit A**</u>
**Defendant's Response to Government's Objection to**
**Defendant's Request for Discovery Concerning Her**
**Application for Attorneys' Fees and Expenses**
         **filed June 7, 2019, Continued:**

**40.    [Count 1 ¶¶88, 95].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6545**

**41.    [Count 1 ¶91] GrandSouth Bank Domestic Outgoing**
**Wire Form - Request for Wire Transfer in the**
**Amount of $3,281,362.60**
         **dated January 16, 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6551**

**42.    [Count 1 ¶96] Unpaid Accounts Receivable**
**Research Documentation with Payment Instructions**. . . . . . . . . . **6553**

**43.    [Count 1 ¶97] Unpaid Accounts Receivable**
**Research Documentation and Payments.** . . . . . . . . . . . . . . . . . . . . **6567**

**44.    [Count 1 ¶79; Counts 4-15 ¶2].** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6587**

**45.    [Count 30 ¶3] Email from Douglas Corriher to**
**Larry Gibney and cc: Greg Harrison, Kathy Miller and**
**Shannon Drake Regarding Funds in Receipt of US Funding**
         **dated March 11, 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6594**

**46.    [Count 30 ¶4] Email from Douglas Corriher to**
**Larry Gibney cc: Greg Harrison Regarding Funds in**
**Receipt of US Funding**
         **dated April 1, 2009.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6597**

**Amended Memorandum Opinion and Order**
         **filed May 4, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6602**

1

```
1              IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF NORTH CAROLINA
2
UNITED STATES OF AMERICA         ) Greensboro, North Carolina
3                                ) January 30, 2019
      vs.                        ) 9:54 a.m.
4                                )
RONALD KEITH EARNEST             )
5                                ) Case No. 1:16CR205-3
      Defendant.                 )
6  _____)
UNITED STATES OF AMERICA         )
7                                )
      vs.                        )
8                                )
ROBERT THOMAS TAYLOR             )
9                                ) Case No. 1:16CR205-4
      Defendant.                 )
10 _____)

11                        TRIAL TESTIMONY
12              RONALD K. EARNEST, CONTINUED
         BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
13                UNITED STATES DISTRICT JUDGE

14 APPEARANCES:

15 For the Government:  FRANK JOSEPH CHUT, AUSA
                        Office of the U.S. Attorney
16                      101 S. Edgeworth Street, 4th Floor
                        Greensboro, North Carolina 27401
17
                        JEFFREY A. MCLELLAN
18                      U.S. Department of Justice, Tax Division
                        POB 972
19                      Washington, DC 20044

20 For the Government   WILLIAM M. MONTAGUE
                        U.S. Department of Justice, Tax Division
21                      601 D. STREET, NW
                        Washington, DC 20004
22

23

24

25
```

```
 1   Appearances, Continued:

 2   For the Defendant:      DEBORAH B. BARBIER
     Earnest                 Deborah B. Barbier, LLC
 3                           1811 Pickens Street
                             Columbia, SC 29201
 4
                             JOSHUA BRIAN HOWARD
 5                           Gammon, Howard & Zeszotarski, PLLC
                             115 1/2 W. Morgan St.
 6                           Raleigh, NC 27601

 7   For the Defendant:      WES J. CAMDEN
     Taylor                  CAITLIN M. POE
 8                           Ward and Smith, P.A.
                             PO Box 33009
 9                           Raleigh, NC 27636-3009

10                           JAMES W. BANNISTER
                             Bannister Wyatt & Stalvey, LLC
11                           PO Box 10007
                             Greenville, SC 29603

12   Also Present:           Nexsen Pruet
13                           1230 Main Street, 700
                             Columbia, SC  29201

14

15

16

17

18

19

20

21

22   The Reporter:           Joseph B. Armstrong, FCRR
                             324 W. Market, Room 101
23                           Greensboro, NC  27401

24            Proceedings reported by stenotype reporter.
             Transcript produced by Computer-Aided Transcription.
25
```

January 30, 2019

3

```
1                    I N D E X

2  WITNESSES FOR THE DEFENDANT:
                                              PAGE
3  RONALD K. EARNEST
      Direct Examination By Ms. Barbier          4
4      Cross-Examination By Mr. Chut           135

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

January 30, 2019

Earnest - Direct by Ms. Barbier                                4

```
1                    P R O C E E D I N G S
2            (At 9:54 a.m., excerpt as follows:)
3            (Defendants present.)
4            (At 9:54 a.m., jurors arrive.)
5            THE COURT:  All right.  Good morning, ladies and
6   gentlemen.
7            Mr. Earnest, you may return to the witness stand.  As
8   you have heard me do throughout the course of this trial, I
9   will remind you that you are still under oath in this
10  proceeding.  You make have a seat.
11           All right.  Ms. Barbier, you may continue your direct
12  examination.
13           MS. BARBIER:  Thank you, Your Honor.
14                       RONALD K. EARNEST,
15           DEFENDANT'S WITNESS, PREVIOUSLY SWORN
16                       DIRECT EXAMINATION
17  BY MS. BARBIER:
18  Q   Ron, I want to go back to the 90-day aging receivables,
19  the questions I asked you about that.  What happens -- once an
20  invoice is put in the 90-day aging receivables, what happens if
21  it's paid?
22  A   If an invoice that's put into -- goes beyond 90 days, it's
23  deducted from the advance base.  We no longer rely upon it to
24  repay our advances.  However, if it does pay, it's applied to
25  our client's account.  It's given to our customer as a
```

1  non-factored item.

2  Q    Now, we talked about Julia Pace a little bit.  Did she

3  have any responsibilities with respect to legal lending limits?

4  A    She did.  Her job was -- in loan administration was to

5  receive all the approvals, all the loan documentation.  She

6  reviewed that and she reviewed it for legal lending limit

7  purposes as well.

8  Q    Did anybody else in the bank do that?

9  A    David Burgess, my senior chief credit officer.

10  Q    Who did Julia Pace report to?

11  A    She reported to David Burgess.

12  Q    Is there a process by which the invoices that are received

13  in the factoring division are verified?

14  A    Yes.  By policy, our verification procedures require the

15  factoring department to select 10 percent of the invoices they

16  receive randomly.  They contact the client and ask for the

17  client to send copies of those invoices and any backup

18  information.  That would include bills of lading or other

19  supporting documents, time sheets and so forth.

20        The account managers would then take that

21  information, and they would contact the account debtors --

22  that's the customer of our customer, the entity that owes the

23  money on the invoice -- and verify with them that the invoice

24  data that we received is also the invoice data that they have

25  on their books showing what they owe, and they would -- that's

1  how they do verifications to ensure that the invoices we're

2  receiving are accurate and not fictitious.

3  Q    Why do -- what's the purpose of the verification process?

4  A    One of the risks in factoring is fraud and one of the

5  fraud risks is the submission of fictitious or false invoices.

6  So that's the purpose for the identification, is to try to

7  identify any of those issues before they become a loss for us;

8  and by doing so, we're putting our clients on notice that we're

9  going to be checking up on the invoices they provide us.

10 Q    Who -- when the factoring division first started at the

11 bank, who developed the policies and procedures for it?

12 A    I did initially and then over time David Burgess.  You

13 know, we added to it, modified it over the years to make it

14 more effective for managing the risk within our factoring

15 department.  And, of course, each time it's modified or

16 changed, the board of directors has to approve that.

17 Q    Now, when smaller changes are made, do department heads

18 have the ability to implement their own controls?

19 A    The department heads in the various areas of the bank are

20 given the responsibility to manage their departments within the

21 policies of the bank.  They create their own procedures on how

22 to meet those policies.  So, yes, there are procedures that

23 they implement.

24 Q    We saw during this trial a list of responsibilities within

25 the factoring department --

Earnest - Direct by Ms. Barbier                    7

```
 1              MR. CHUT:  Objection, Your Honor, form of the
 2  question.
 3              THE COURT:  I'll overrule as to that.
 4              Watch your commentary, though.
 5              MS. BARBIER:  Thank you.
 6  BY MS. BARBIER:
 7  Q    Do you recall that?
 8  A    I do.
 9  Q    Okay.  Is that a document that you had ever seen?
10  A    No.
11  Q    Okay.  Do you know how it came to be?
12  A    I think it was just something that Mr. Corriher put
13  together, a sign out task of things he wanted done in the
14  department.
15  Q    As the bank grew, did the policies and procedures
16  sometimes evolve?
17  A    They did.
18  Q    And how does that come about?
19  A     It comes about just through experience, through comments
20  made by examiners, by auditors, by employees that come to the
21  bank just as a way to make sure we manage the risk more
22  appropriately, more effectively.
23  Q    Was the factoring department responsible for monitoring
24  tax compliance?
25  A    They were.  They were required under our policies to check
```

1    the tax liens on a frequency of at least once per -- every

2    seven weeks.

3    Q    And why is it seven weeks?

4    A    The Internal Revenue Service files a notice of federal tax

5    lien when a lien is issued against a taxpayer.   In personal

6    property assets -- which would be accounts, inventory,

7    intangibles, non-titled goods -- the Internal Revenue Service,

8    once they file their notice of federal tax lien, on the

9    46th day after that, they become the senior lienholder on those

10   assets.

11         In the case of factoring, that is our only source of

12   repayment.  The principal source of repayment is the collection

13   of those accounts.  So we want to check those liens frequently

14   to ensure that we don't continue to advance funds or purchase

15   invoices beyond that 45-day window, because if we do, then

16   we're actually the second lien.  The Internal Revenue Service

17   has the senior position on those accounts and we would end up

18   advancing funds without having any source of repayment.

19   Q    UCC filings are done where generally?

20   A    They're done centrally, in most states at the Secretary of

21   State's office.

22   Q    Now, can tax monitoring compliance be done by a

23   third-party vendor?

24   A    It can.

25   Q    Did GrandSouth ever move to that?

Earnest - Direct by Ms. Barbier                                9

```
 1  A    We did.  Initially, we utilized Mr. Corriher.  He was
 2  responsible for it the whole time, but initially he would do it
 3  himself personally.  He used other vendors.  Experian would be
 4  one.  But we eventually moved to a company called -- I believe
 5  it's called First Corporate Solutions and they began doing the
 6  tax lien checks for us.
 7  Q    Are you familiar with the IRS Form 941?
 8  A    I am.
 9  Q    Okay.  Did the bank require a factoring client to provide
10  those?
11  A    We did not.
12  Q    Okay.  Did you learn during this investigation that
13  Mr. Corriher had been requiring that?
14  A    I did learn during the investigation that he had those.
15  Q    Had he ever sent you any 941s?
16  A    No.  I was unaware that he had them.  I was not told he
17  had them or any information about them, and my understanding is
18  he didn't tell anybody else either.
19           MR. CHUT:  Objection to "my understanding."
20           THE COURT:  Yeah, I'll sustain as to the witness's
21  understanding.
22  BY MS. BARBIER:
23  Q    Are you also familiar with a Form 8821?
24  A    I am.
25  Q    What is that?
```

Earnest - Direct by Ms. Barbier                          10

1  A    My understanding of it, it's an IRS form that can be

2  executed that would allow the Internal Revenue Service to

3  provide the bank in this case with the same information,

4  letters and so forth, of contact to the taxpayer.

5  Q    Okay.  And why didn't you all use the Form 8821?

6  A    In my experience, the best method of determining if a

7  taxpayer was meeting their obligation was to check for tax

8  lien -- notice of federal tax lien.  If there was a notice of

9  federal tax lien filed by the Internal Revenue Service, then we

10 were certain that there was an issue with taxes with regard to

11 the Internal Revenue Service.

12 Q    Did the bank rely upon the IRS to file tax liens when

13 someone hadn't paid their taxes?

14         MR. CHUT:  Objection.

15         THE COURT:  Well, I'll overrule.

16         THE WITNESS:  Yes.  We relied on -- that's the reason

17 we checked the tax liens.  If there was a failure of a taxpayer

18 to pay their taxes, the -- you know, the belief was there would

19 be a tax lien filed.

20         MR. CHUT:  Objection as to belief, Your Honor.

21         THE COURT:  Well, to the extent it explains his

22 procedures, I'll overrule.

23 BY MS. BARBIER:

24 Q    Ron, is factoring a loan?

25 A    It is not.

1 Q    What is it?

2            MR. CHUT:  Objection.

3            THE COURT:  I'm going to overrule as to that based on

4 earlier testimony.

5            THE WITNESS:  Factoring is the purchase of an asset.

6 It's a -- the factoring agreement is a purchase and sale

7 agreement, and it's specifically not a loan agreement.

8            THE COURT:  I am going to limit that to GrandSouth

9 Bank.

10            MS. BARBIER:  Yes, sir.

11 BY MS. BARBIER:

12 Q    Was that your understanding at GrandSouth Bank?

13 A    That was my understanding at GrandSouth Bank based on our

14 documentation.

15 Q    Now, there are documents in evidence, such as a commercial

16 loan memo.  Do you remember those?

17 A    I do.

18 Q    Okay.  Why is the factoring of line approval on this

19 document?

20 A    That document was a document that we used to approve loan

21 transactions.  Well, we just -- out of convenience.  We didn't

22 really create a separate document just for the factoring

23 department.

24            MR. CHUT:  Your Honor, objection.  That's -- that was

25 a personal loan.  That wasn't a factoring loan.

Earnest - Direct by Ms. Barbier                              12

```
 1          MS. BARBIER:  I was just showing him the form, but I
 2   can show him another one, if you would like.
 3          THE COURT:  Yeah, if that was that personal loan,
 4   I'll sustain on that.
 5   BY MS. BARBIER:
 6   Q    I'll show you Exhibit 464.  Is this for a factoring line?
 7   A    It is.
 8   Q    And is this form being used for the factoring line
 9   approval?
10   A    It was.
11   Q    Now, has it been your experience at GrandSouth Bank that
12   sometimes the employees would conflate the terms "loan" and
13   "factoring"?
14   A    Yes, that happened consistently where we talked about
15   advances as being advances on lines of credit and borrower and
16   loan.  That's just the terminology we were used to using in the
17   bank.
18   Q    Is factoring a higher risk endeavor than just your
19   traditional loan?
20   A    In my opinion, yes, it is.
21          MR. CHUT:  Objection to the opinion, Your Honor.
22          THE COURT:  Well, in his capacity as an officer of
23   the bank, he can answer.
24          You may continue.
25          MS. BARBIER:  Thank you, Your Honor.
```

January 30, 2019

1  BY MS. BARBIER:

2  Q    When you were president of the bank, did you make it a

3  point to find out if your current bank customers were paying

4  their taxes?

5  A    We did not, with the exception of -- of liens we filed

6  on -- Uniform Commerce Code liens and on title searches for

7  real estate mortgages or deeds of trust in North Carolina.  We

8  would search the records just to see if there were any liens

9  outstanding.

10 Q    Did you ever make customers provide tax returns with loan

11 applications?

12 A    We did.

13 Q    Now, how about payroll taxes?  Were you -- was it your

14 responsibility to check or to know whether or not they were

15 paying payroll taxes?

16 A    No.

17 Q    In the factoring world -- well, let me ask you this.  Did

18 GrandSouth Bank have any policy in writing about whether

19 lending limits were applicable to loans made to the bank?

20 A    No, we did not.  Excuse me.  For the loans we did, yes.

21 Q    Did they have a policy or any written memoranda making

22 lending limits applicable to factoring lines?

23 A    No --

24         MR. CHUT:  Objection.

25         THE WITNESS:  -- we did not.

```
 1              THE COURT:  The question was, was there anything in
 2    writing?
 3              MS. BARBIER:  Was there a written policy that made
 4    lending limits applicable to factoring lines.
 5              THE COURT:  All right.  I'll overrule as to that
 6    question.
 7              THE WITNESS:  No, there was not.
 8    BY MS. BARBIER:
 9    Q    What was your understanding of whether lending limits
10    applied to factoring lines?
11    A    Early on we just assumed they did, but during the --
12    during this case, we determined that, after looking at it more
13    closely, they clearly -- the south -- they do not apply based
14    on my understanding of what the law is.
15              MR. CHUT:  Objection, Your Honor.
16              THE COURT:  Yeah, I'm going to sustain as to that.
17    BY MS. BARBIER:
18    Q    Did the issue of whether lending limits applied to
19    factoring lines arise very often?
20    A    No, it did not.  We typically did not concentrate credit
21    or extend factoring lines anywhere near our legal lending
22    limit.  In my opinion, that's -- in my experience, that's the
23    practice that I had at GrandSouth Bank and also at other banks.
24    Q    What is a concentration of risk?  What does that mean?
25    A    Concentration of risk is the concept that you put more of
```

Earnest - Direct by Ms. Barbier                          15

 1  your assets -- you expose yourself more to a fewer number of

 2  borrowers or customers.  We like to -- we would rather have a

 3  larger number of smaller loans than a fewer number of larger

 4  loans just so that we spread the risk across a larger pool of

 5  assets so that if one of those loans or factoring lines default

 6  on us that the impact of the company is lessened.

 7  Q    I'm going to show you some emails.  It's Earnest

 8  Exhibit 42 through Earnest Exhibit 55.  Do you recall reviewing

 9  those?

10  A    Yes.

11          MS. BARBIER:  Your Honor, I believe these are in

12  evidence.  I would like to show them.

13          THE COURT:  All right.

14  BY MS. BARBIER:

15  Q    Would it help for you to have a copy there or can you read

16  this?

17          MR. CHUT:  Ms. Barbier, what number is this?

18          MS. BARBIER:  This is 42.

19          THE WITNESS:  This is an email that I sent back in

20  June of 2005.  It looks like it went to a number of people

21  within the factoring department, as well as Mr. Taylor,

22  Mr. Corriher, and Mr. Burgess.  Mr. Burgess was my chief credit

23  officer.

24          And it's related to deposit accounts that are related

25  to the factoring clients and basically admonishing them not to

January 30, 2019

```
 1  pay any of those accounts into overdraft.
 2  BY MS. BARBIER:
 3  Q    Are you admonishing them about making sure that no
 4  unsecured loans are being made?
 5  A    That's correct.
 6           MR. CHUT:  Objection, Your Honor.
 7           THE COURT:  Well, I'll overrule.
 8  BY MS. BARBIER:
 9  Q    Let me show you 43.  Do you recall this email?
10  A    I do.
11  Q    What is it about?
12  A    This is an email that I sent to Mr. Corriher and
13  Mr. Burgess.  This was in October of 2008.  We were
14  anticipating funding under the licensees of Global Labor and
15  there was some discussion about whether or not the -- Global
16  Labor was going to be the licensor or through someone else.  So
17  I wanted to get that cleared up and make sure our memorandums
18  were accurate before we started.
19  Q    How about 44?  Do you remember this email?
20  A    I do.  This was in November of 2008; and this was to
21  Mr. Corriher, Mr. Burgess, and Mr. Taylor.  It involves account
22  debtor limits and our exposure and really just making sure that
23  everyone was focused on ensuring that we weren't taking too
24  much risk with any one account debtor.  That's that
25  "concentration of risk" issue that I talked about earlier.
```

1  Q    How about Exhibit 45?

2  A    This was in January of 2009, just prior to the initial

3  advance on the licensees of Global Labor.  We had received a

4  document that was the asset purchase agreement and I was just

5  referring that -- that to Mr. Corriher.

6  Q    How about this email?

7  A    This was in April of 2009.  You might need to bring it up

8  a little bit for me.  Okay.  That's good.  We had a customer

9  evidently that we had some exposure with.  At this particular

10 time the economy was becoming quite a problem for everyone, but

11 the great recession was raging on.

12         And my comments here is we needed to get into the

13 portfolio and review it very closely, and I had a list -- if

14 you'll move it down for me, please.  I had a list of things

15 that I wanted the -- Mr. Corriher and the others to look at and

16 make sure that we were following closely to ensure that we

17 didn't take on any -- or we would monitor the risk as closely

18 as possible.

19 Q    How about this one in May of 2009?

20 A    Yes, in -- this is about a month later.  During that

21 period of time, we were seeing lots of delinquency, a lot of

22 stress in our customers -- with our customers because of the

23 economy; and I wanted to make sure that we were doing a really

24 top-to-bottom review of the factoring portfolio and to try to

25 minimize as much as possible the risk of loss from fraud or

1  credit.

2         I list a number of things that I wanted them to do.

3  I wanted a financial review.  I wanted a process review, look

4  through what we're doing in the -- in managing those accounts

5  to ensure that we're doing what we should be doing on advances,

6  on verifications, to look at things like concentrations and

7  trends and collections.

8         Processing time.  The customers of the factoring

9  division always wanted their money as fast as they could get

10 it, and our employees were reacting to that and trying to help

11 our customers get the money as fast as possible.  I was

12 basically saying that they needed to take their time and do the

13 best job they can to ensure that they're doing it correctly.

14        And on credit administration independence, I wanted

15 to make sure that the oversight that Mr. Taylor and Mr. Burgess

16 were doing was independent of the factoring department so that

17 they could step back and make a good decision on credit.

18        I also talked about the external auditor.  We needed

19 to make sure we developed the auditing procedures for our

20 internal auditor to make a much more in-depth review of the

21 factoring.  I mentioned also our CarBucks portfolio, which is

22 an inventory finance area.

23        And then, most importantly, on client audits, I say

24 here that we need to make sure that we have our audit vendor in

25 the larger accounts on a quarterly basis, specifically McCombs

1  and Global staffing companies.

2  Q    In the second page of this email, you discuss which ones

3  to start with.

4  A    Can you pull it out?

5  Q    The smaller or the largest balances first?

6  A    Yes, the largest to the smallest.  We look at the largest

7  accounts first.

8  Q    Would the Global licensees have fit into that category?

9  A    They would.

10         MR. CHUT:  Your Honor, could that go back on the

11  screen?  That came on the screen so fast I didn't have a chance

12  to even look at it.

13         MS. BARBIER:  The second page?

14         MR. CHUT:  Any part of it.  Can we see the second

15  page?

16         THE COURT:  Do you have a copy of it?

17         MR. CHUT:  Well, this becomes difficult when they

18  have their own number for the same documents, Your Honor.  I'm

19  a little concerned about getting a chance to look at it

20  because -- yes, there is a copy with a government

21  exhibit number on it, but this is a document with a defense

22  exhibit number on it, so I just need a chance to -- thank you,

23  Ms. Barbier.

24  BY MS. BARBIER:

25  Q    What about this email in October of 2009?

1          THE COURT:  What number is this?

2          MS. BARBIER:  This is Exhibit 48 -- Defendant Earnest

3    Exhibit 48.

4          THE WITNESS:  This is an email in October of 2009,

5    and it's specifically subject to McCombs Oil company, which was

6    one of the factoring clients of our company.  It was sent to

7    Mr. Burgess, Mr. Corriher, and Mr. Taylor.

8          And what I'm stating in this is that I wanted them to

9    make sure we were reviewing the top account debtors within this

10   customer's account and make sure that we tighten our controls

11   to ensure that we have the capability of reviewing the weekly

12   agings that that customer is providing us.

13   BY MS. BARBIER:

14   Q    How about Exhibit 49, an email from November of 2009?

15   A    Yes, this was -- this was an email in November of 2009 to

16   many of my officers.  It was related to an F -- approaching

17   FDIC examination.  We always get notified by our examiners,

18   whether it be the FDIC or the South Carolina bank of -- or

19   Board of Financial Institutions.  They tell us when they're

20   coming and they send us information, including a questionnaire

21   to complete and provide some information to them.  I send it

22   out to all my officers.

23         First of all, I notify the officers that the

24   examination is approaching and that they need to have all their

25   files prepared and ready for the examiners to review, and then

1   I also send around the questionnaire and assign that -- the --

2   that to various people within the bank who have responsibility

3   for those areas of the questions and to get back to me on the

4   answers regarding those.

5   Q    With respect to what you just mentioned, I'm going to show

6   you Earnest Exhibit 129.  Do you know what this is?

7   A    Yes, this is the officer's questionnaire that's sent

8   around.  I don't know if this was an FDIC or a state.  They're

9   virtually identical.  And as you can see, I assign each of

10  these questions to the officer in the bank that would have the

11  most information to respond to it so I can complete the

12  questionnaire for the examiners.

13  Q    Who is DEB?

14  A    That's Mr. Burgess, David E. Burgess.  He was my chief

15  credit officer at that time.

16  Q    And are these three questions assigned to him?

17  A    They are.

18  Q    And this is the second page?

19  A    Yes.

20  Q    That's another question assigned to Mr. Burgess?

21  A    It is.

22  Q    I'll show you Earnest Exhibit 130.

23  A    This would be the letter that comes from the FDIC

24  notifying us that they are beginning -- they're going to have

25  an examination starting in -- November the 16th of 2009.

Earnest - Direct by Ms. Barbier                    22

1  Q    I want to show you the pages attached to this.  Who's
2  writing is this off on the side?
3  A    That's mine.
4  Q    What are you doing there?
5  A    These are areas that -- of the request list and I'm
6  sending that out to various people in the company who have
7  responsibility over those areas.  JB would be JB Garrett.
8  That's my chief financial officer.  Mr. Burgess is down in the
9  bottom there, and on the next page there's several people.
10 Manning is Manning Garrett.  He was in our accounting area.
11 DEB is Mr. Burgess.  There's one I assigned to myself.  JB is
12 there and Manning down at the bottom.  It looks like most of
13 those are JB's.  And then that's Trina, Trina Smith.  She was
14 my chief operations officer.
15 Q    And this document goes on to assign various people in the
16 bank?
17 A    That's correct.
18 Q    Going back to Earnest Exhibit 50, do you remember this
19 email?
20 A    Yes.  This was in March of 2010.  I determined that we
21 needed to add to our staffing in the factoring area and it was
22 an email from me to Mr. Corriher to tell him that I needed -- I
23 thought we needed to add somebody because we were -- because of
24 the volume and the risk associated with the credit and fraud,
25 and I wanted to make sure we were on top of that.

Earnest - Direct by Ms. Barbier                          23

1  Q    Did you eventually hire somebody?

2  A    I did.

3  Q    Who did you hire?

4  A    I hired David -- I'm having a senior moment.

5  Q    Would that be Mr. Cox?

6  A    Thank you.  David Cox.  He was formerly with First

7  Citizens Bank and was a factoring guy, had a lot of factoring

8  experience.  He eventually became the manager of the

9  department.

10 Q    How about Earnest Exhibit 51?  What's this about?

11 A    This is related to -- this is April of 2010.  I had a

12 question about verification.  I wanted to make sure that I

13 understood what verifications they were doing.  The policy

14 requires what our verifications are.  I had some question

15 evidently as to what we're doing on verifications, and I was

16 asking Mr. Corriher and Mr. Burgess and Mr. Taylor's --

17 Mr. Taylor about that.

18 Q    How about Earnest Exhibit 52?  What are you asking for in

19 this one?

20 A    This is in May of 2010.  We evidently had a discussion.

21 This was to Mr. Corriher with copies to Mr. Burgess and

22 Mr. Taylor.  It's related to the factoring lines related to

23 Harrison as licensor.

24      I was recommending that we increase the verification

25 on the invoices submitted by the licensees and selecting a

1  larger percentage of dollars and invoices and verifying by
2  phone, email, fax directly.  And then I also asked that --
3  Cheryl is the person who was in collections that did a lot of
4  that, to provide us a weekly email or report on that activity.
5  Q    How about Earnest Exhibit 53?  What are you asking
6  Mr. Corriher in this?
7  A    This was a an email that Mr. Corriher sent back to me.  He
8  also sent it to me, Mr. Burgess, and Mr. Taylor regarding
9  verifications and he is stating that the May invoice/account
10 debtor verifications for McCombs and the licensees of Global
11 Labor were done with no discrepancies being found.
12         I asked him -- I sent an email back and I said, "Do
13 the verifications include contact with the account debtors
14 either by phone, fax, or email?"
15         He responded, "Yes."
16         MR. CHUT:  What number is that, Ms. Barbier?
17         MS. BARBIER:  Fifty-three.
18         MR. CHUT:  Thank you.
19 BY MS. BARBIER:
20 Q    Looking at Earnest Exhibit 54, what is this?
21 A    This is an email from Mr. Burgess to a number of people
22 within the bank in a lot of the lending areas and also the
23 areas that would follow the lending area.  We're talking about
24 Mr. Taylor being -- he's assumed the responsibility of the loan
25 review officer for the bank, and Mr. Burgess is listing the

1  objectives of it and what the important aspects of the review

2  would be and the loan officer's responsibility in responding to

3  Mr. Taylor's loan review.

4  Q    And that is to do it within 30 days, report to the

5  president?

6  A    That's correct.

7  Q    How about Earnest Exhibit 55?

8  A    This is a followup email to a lot of the same people, and

9  it's regarding the responses that Mr. Burgess was requiring

10  everybody to provide related to the loan reviews completed by

11  Mr. Taylor.

12  Q    Does it indicate that the board will be receiving copies

13  of them?

14  A    It does.

15  Q    Now, did you send a lot of emails when you were the

16  president of the bank?

17  A    Yeah, a zillion.

18  Q    Is that all of them?

19        MR. CHUT:  Objection.

20        THE WITNESS:  No.

21        THE COURT:  Overruled.

22        THE WITNESS:  No.

23  BY MS. BARBIER:

24  Q    Why did you send emails like these?

25  A    I sent emails out -- communication-wide verbally by

1  telephone and also by email to not just the factoring area but
2  all areas of the bank, particularly during that time period of
3  2009, '10, and '11.  That was a very difficult time in the
4  economy for all banks.  Our customers were having difficult
5  times economically, and banks are only as good as their
6  customers.
7        We saw the results of the stress among our customers,
8  so I sent out a lot of emails to all areas of the bank trying
9  to make sure that we were managing risk to the extent possible
10 and identifying problems as early as we could so that we could
11 address them.
12 Q    Did the bank have a compliance officer?
13 A    We did.  We had a compliance department.  It consisted of
14 two people.  Allison Timmons was our compliance officer.
15 Q    What about the senior credit officer?  What was their role
16 in managing risk at the bank?
17 A    The senior credit officer, Mr. Burgess, was responsible
18 for managing the credit risk throughout the bank.  His job
19 was -- he was a credit approver but a credit reviewer and also
20 was responsible for the loan administration area, which
21 Ms. Julia Pace was the department head of that.
22        That area was critical in terms of receiving all the
23 information from the lenders and from the factoring area in
24 terms of setting up new accounts and also looking at advances
25 and renewals and that sort of thing and ensuring that the

Earnest - Direct by Ms. Barbier                          27

1  appropriate approval was placed on each one of those.

2  Q    Did the bank get reviewed by state regulators?

3  A    We did.  We were reviewed by the examination staff of the

4  South Carolina Board of Financial Institutions every 18 months,

5  and then 18 months later the FDIC would come in.  They

6  alternated on an 18-month schedule.  We also received a

7  compliance exam once every 36 months from the FDIC.

8        The exams on the 18-month schedule were called safety

9  and soundness exams, and those were designed to look at all

10 areas of the bank, including a few compliance areas, but

11 primarily to ensure that the bank was being managed in a safe

12 and sound manner.  They assigned ratings through various areas

13 that they look at, including capital, asset quality,

14 management, earnings, liquidity, and sensitivity to market

15 risk.  That's an interest rate risk issue.  They assigned

16 ratings to that; and at the end of the examination, they assign

17 a composite rating.  The rating that we got was always the

18 satisfactory rating.  We've always had a satisfactory rating

19 throughout the 18 years that I managed the company.

20        In compliance, they look at the compliance with laws

21 and regulations and a lot of consumer laws and also other laws,

22 Bank Secrecy Act and so forth.  We typically always got the

23 satisfactory rating on that as well.  The last rating we got

24 was the top rating, which was very hard to get and very

25 unusual, I would say, because it's a difficult thing to do.

1   But we were very proud we were able to do that.

2   Q    Did your employees get training?

3   A    We did.  We had a training program on compliance.  It was

4   a training program that had to be -- every employee, including

5   our directors, had to complete it within a 12-month time period

6   every year.  So they're getting trained on all the same

7   regulations and same laws every year, as well as any new

8   regulations or modifications in the laws or regulations that

9   come about; and then that information is -- the training -- the

10  employees are actually tested on it; and the results of those

11  tests are reported to the board of directors annually.

12  Q    Did you know a man named Greg Harrison?

13  A    I did.

14  Q    How did you know him?

15  A    Mr. Harrison was a customer of our bank at Anderson

16  National Bank in the mid-'90s.  We provided a factoring line,

17  as I recall, for a company that he owned.

18  Q    And was he a personal friend of yours?

19  A    He was not.  He was a customer.

20  Q    When did GrandSouth Bank begin a relationship with

21  Mr. Harrison?

22  A    We -- the bank started in 1998.  We had a fellow by the

23  name of David Bader who was the first person who managed our

24  factoring division.  And I don't remember when we started the

25  factoring.  It was shortly after the bank started, but it may

1  have been in 1999.  I just don't remember.

2          After some period of time, Mr. Bader left, and we

3  needed to have a new manager for that department.  It was a

4  very small department.  I approached Mr. Corriher because I had

5  known Mr. Corriher from when he worked for us at Anderson

6  National Bank.  He agreed to come on board and be our factoring

7  manager.  And then he pursued bringing Mr. Harrison into the

8  bank.

9  Q    What did he -- when did you all begin factoring with

10 Mr. Harrison at GrandSouth?

11 A    I think -- my memory is we did -- we did a -- initially

12 Mr. Corriher brought -- brought to us the prospect of doing

13 business with Mr. Harrison's company and at that time we only

14 had -- I think we may have only had two or three people in our

15 factoring department and, you know, the volume that he had

16 would have just swamped us.  There was no way we could do it,

17 so we declined to pursue that.

18          At a later date, maybe 2004, 2005, Mr. Harrison --

19 Mr. Corriher brought Mr. Harrison in, along with his attorney,

20 a fellow by the name of Mark Griffin, as I recall, to discuss

21 with us this franchising/licensing arrangement.  That occurred

22 in either late -- well, it must have been in 2004 is when that

23 occurred.

24 Q    Now, when he -- when Mr. Corriher brought you the idea of

25 Mr. Harrison being a factoring client, was he asking for a line

1  bigger than you wanted to take out?

2  A    Oh, yes.  It was larger than we could really manage.  Back

3  in 2000 -- I don't remember the date, but it was -- it was

4  after -- it was just as Mr. Corriher began with the bank, so it

5  might have been 2003.

6  Q    And in terms of concentration of risk, were you concerned

7  about the dollar amount he wanted?

8  A    We were, yes.

9  Q    Do you remember the exact amount that he wanted?

10  A    I don't.

11  Q    But it was more than you were willing to do?

12  A    It was more than we were willing to do, yes.

13  Q    Now, when he brought his lawyer, Mark Griffin, in to talk

14  about this licensor/licensee arrangement, who did he meet with?

15  A    Mr. Corriher brought he and Mr. Griffin in to meet with me

16  and Mr. Burgess.  There may have been some other people in the

17  meeting.  I don't remember.  But I know Mr. Corriher, me, and

18  Mr. Burgess were in the meeting.

19  Q    Did you have other customers at the bank that -- had you

20  had other customers at the bank with a licensor/licensee

21  relationship?

22  A    We had a Manpower franchisee, which was --

23            MR. CHUT:  Objection, Your Honor, time.  I'm not

24  clear if that's the time that Mr. Harrison came or some other

25  time.  He's been in the bank for --

 1          THE COURT:  I think there is a little -- it's a
 2    little confusing as to the time frame.  I'll let you rephrase
 3    the question.
 4          MS. BARBIER:  Okay.
 5    BY MS. BARBIER:
 6    Q    Had you ever heard of the business model licensor/licensee
 7    in the staffing industry?
 8    A    We had, yes.
 9    Q    And what happened, to the extent you can recall, at this
10    meeting in 2004?
11    A    The -- as I recall it, they discussed with us the concept
12    of the franchise/licensee-type arrangement.  We listened.  We
13    asked questions.  We discussed it among ourselves after the
14    meeting, and at some point -- I don't remember if there was
15    another meeting or not.  There probably was, but I just don't
16    recall.  But internally we discussed it and decided that it was
17    something we could pursue if it was structured as individual
18    corporations.  That was what we were told they were going to
19    be, individual corporations owned by individuals, and that they
20    would purchase services from the licensor.
21    Q    Now, did Mr. Harrison and his attorney, Mark Griffin,
22    explain to you why they wanted to do this arrangement?
23    A    They did.  We asked a lot of questions related to that,
24    what was the purpose.  What we were told was that it would
25    allow them to grow --

```
 1            MR. CHUT:  Your Honor, objection to any statements of
 2   Mr. Griffin.  That would be hearsay.
 3            THE COURT:  Sustained.
 4            MS. BARBIER:  State of mind, Your Honor.
 5            THE COURT:  Well -- let me send the jury out.
 6            Ladies and gentlemen, if you'll step back to the jury
 7   room for just a moment, please.
 8            (At 10:35 a.m., jurors excused.)
 9            THE COURT:  All right.  Let me hear the rest of the
10   answer.
11            Mr. Earnest, you were describing what you were told
12   within the meeting with respect to, I think, why they wanted
13   this structure, I believe.
14            THE WITNESS:  Yes, sir.
15            THE COURT:  All right.
16            THE WITNESS:  They -- they -- and that includes
17   Mr. Harrison -- told us that they believed they could grow the
18   company more rapidly; that by having individual owners who
19   managed the segments of the business, they would be responsible
20   for selling in the local markets; and Mr. Harrison indicated
21   that he liked doing business with much larger companies like
22   Del Monte, for example.  They had multiple locations around the
23   country.  That the licensees could service that business and
24   also sell in their local markets, and Mr. Harrison believed he
25   could make more money by doing that and charging a fee for the
```

January 30, 2019

Earnest - Direct by Ms. Barbier                              33

1  services he provided to the licensees.

2          THE COURT:  Mr. Chut?

3          MR. CHUT:  Did Mr. Harrison tell you that or did

4  Mr. Griffin tell you that?

5          THE WITNESS:  Mr. Harrison told me that about -- told

6  us about the growth and his belief that -- well, what he liked

7  to do versus what he was doing, which he didn't -- and I

8  specifically remember he made some comment about "I don't like

9  to be responsible for determining whether the branch manager

10 shows up in Jacksonville, Florida."

11         MR. CHUT:  Your Honor, I'm not objecting to

12 Mr. Harrison's statements, but I want to make sure -- I'm

13 objecting to Mr. Griffin's statement.  So if he wants to say

14 "Mr. Harrison told me," then that's fine.

15         THE COURT:  Do you want to --

16         MS. BARBIER:  Your Honor, this goes to his existing

17 state of mind.  I mean, the Government has put forth their

18 position that he should have known that this was an illegal

19 arrangement and these -- this meeting --

20         THE COURT:  Well, let me explain it this way.  I

21 don't think this evidence is competent to explain legal versus

22 illegal arrangement.  I do -- it seems to me, perhaps I'm

23 wrong, that these statements by Harrison would have predated

24 the conspiracy such that I'm not sure -- maybe they can be

25 considered in furtherance of the conspiracy.  Ultimately, it

1    seems to me that at least Harrison's statements at this point

2    would come in not for the truth of the matter asserted, but to

3    explain what Earnest did next at GrandSouth Bank.

4            So I would give a limiting instruction that it can't

5    be considered for the truth of the matter asserted, they can't

6    find from that the facts as described by Harrison and/or

7    Griffin, but they may consider this evidence to further explain

8    what steps Mr. Earnest took next.

9            Anybody want to be heard on that?

10            MR. CHUT:  No, Your Honor.  Thank you, Your Honor.

11            MS. BARBIER:  Thank you, Your Honor.

12            THE COURT:  All right.  You may bring the jury back

13    in.  Just a second.

14            MR. HOWARD:  Might I have the opportunity to slip

15    in -- slip out and slip back in without delaying them?

16            THE COURT:  You can, yeah.  If it's just for a

17    moment, we'll wait.

18            MR. HOWARD:  Okay.  Thank you.

19            THE COURT:  All right.  If it's going to be a while,

20    we'll --

21            (At 10:42 a.m., jurors arrive.)

22            THE COURT:  All right.  Ladies and gentlemen, with

23    respect to these meetings that are being described at the

24    moment and probably will be described a little bit further, the

25    meeting between Mr. Earnest and Mr. Griffin and Mr. Burgess and

1   others with respect to a potential business relationship, as to

2   the statements that are made by Mr. Harrison and others at

3   these meetings, you may not consider those statements for the

4   truth of the matter asserted; that is, you may not find from

5   the evidence any representations that were made during the

6   meetings were truthful or find those as substantive evidence in

7   the case.  You may consider those statements for the limited

8   purpose of providing context, what steps, if any, or what

9   actions, if any, Mr. Earnest took following the meetings.

10            You may continue, Ms. Barbier.

11            MS. BARBIER:  Thank you, Your Honor.

12            THE COURT:  I think you were in the middle of

13  explaining what Mr. Harrison and perhaps what Mr. Griffin had

14  said.

15            MS. BARBIER:  Thank you, Your Honor.

16            THE COURT:  You can repeat the question.

17  BY MS. BARBIER:

18  Q    Ron, during this meeting when Mr. Griffin, Mr. Harrison's

19  lawyer, and him were explaining the licensor/licensee

20  arrangement they proposed, what did Mr. Harrison say about why

21  he wanted to do this arrangement?

22  A    Mr. Harrison indicated -- Mr. Harrison indicated that it

23  would allow him to grow the business more rapidly and

24  ultimately make more money.  That was his economic reason for

25  doing it.  It allowed him to sell pieces of the company under a

Earnest - Direct by Ms. Barbier                          36

```
 1  license agreement where he collected revenue off of what
 2  services he provided to those customer -- to those licensees
 3  and he could spend time doing what he liked doing, according to
 4  what he told us, like selling to larger companies.  He
 5  specifically mentioned Del Monte that had manufacturing
 6  companies all over the country, and the licensees could service
 7  those accounts while also selling in their local markets.  The
 8  revenues that he produced through the licensing company by
 9  providing the workman's compensation and all the backroom
10  services for those companies he believed would be more
11  profitable than trying to grow the business in a traditional
12  sense.
13  Q    Did Mr. Harrison specifically talk about the difficulties
14  in managing the large region of branches he had?
15  A    He did.  He specifically mentioned that he did not like
16  the -- the personnel management issues where he had to be
17  responsible for determining whether a particular office was
18  staffed adequately in Florida, for example.  That was the
19  example he used.
20  Q    Now, you said Mr. Burgess was in this meeting, too?
21  A    He was.
22  Q    Do you remember anybody else from the bank besides
23  Mr. Corriher, Mr. Burgess, and you?
24  A    That was so long.  I don't remember if there were any
25  others.  I just don't remember.
```

January 30, 2019

1  Q    After this meeting, was this arrangement discussed

2  internally at the bank?

3  A    It was.  We discussed it internally.  We discussed it

4  amongst several of us, the pros and cons and whether we thought

5  it made sense.

6  Q    Who in the bank discussed it?

7  A    We had discussions among me, David Burgess.  Doug Corriher

8  was involved, of course, and then Mason Garrett at some point

9  was brought into that discussion.  I don't recall if JB

10 Garrett, my chief financial officer -- I just don't remember if

11 he was in that discussion or not.  He probably wasn't because

12 at that time he was not on the board and was not in the

13 financial area -- he was in the financial area of the company.

14 Q    What did Mr. Corriher do next?

15 A    After we made the determination that we believed it could

16 be pursued, Mr. Corriher went back to Mr. Harrison and

17 indicated that it looked like it was something we could pursue,

18 and he started gathering information.

19        He started -- the typical information that he gets on

20 all new prospects is he gets a factoring application.  That

21 application contains all the information that we need to

22 understand who the customer is, who the owners are, what the

23 ownership percentages are, the type of accounts that they would

24 expect us to factor; and then on the back of that factoring

25 application, there is a list of information that we ask the

1  prospect to supply us.  A lot of it is personal financial
2  information.  If there were any corporate financials, that they
3  would provide that as well.
4          Mr. Corriher would also try to obtain information on
5  the potential respective account debtors.  That's always his
6  responsibility to determine what kind of a credit limit he can
7  establish for the account debtors and whether or not he can
8  meet the customer's needs in that regard.
9  Q    Was there a corporate resolution that has to be signed?
10 A    Yes.  The steps that would be taken is Mr. Corriher would
11 go out and gather that information, the factoring application.
12 He would bring that back.
13         At some point we typically would develop a term
14 sheet.  We don't do it in every case, but the term sheet is
15 just to tell the customer our ideas of what type of factoring
16 line we would offer as a proposal, the pricing, the advance
17 rate; and if the customer likes that concept, then we would go
18 with it.  If they didn't, if they thought they needed a higher
19 advance rate or whatever their preferences are, we would
20 discuss it at that point.
21         Once that information comes back in, Mr. Corriher
22 would do his job of looking at the lien filings.  He would look
23 for corporate -- in the Secretary of State's office, for
24 example, the corporate filings.  He would take all the account
25 debtor information.  Then he would give to David Burgess or me

1  the financial information and from that we would make a
2  determination as to whether we want to pursue an approval of
3  those accounts.
4  Q    Is an analysis made about how the lines should be
5  structured?
6  A    In terms of the advance rate and the size of the loan,
7  yes.
8  Q    A commercial loan memo, is one prepared after that?
9  A    It is.  There's an approval document.  We do it on what's
10 called a commercial loan memorandum and that document explains
11 all -- the transaction as best we can understand it.  It
12 identifies the amount, the client, the customer; and then
13 there's a -- and it gives the pricing on it and the advance
14 rates.  It also in the "Officer's Comment Section" talks about
15 the relationships.
16          In this particular case -- this was in 2005, I
17 believe -- the relationship that was listed in the approval
18 documents would have been that these were going to be licensees
19 of Global -- was it Global or US Staffing? -- Global Labor.
20 Q    I'm talking about the 2005 period.
21 A    I'm sorry.  2005 was the -- the period before that.  They
22 would have been -- the licensor would have been a different
23 name, but that they were related to Greg Harrison as licensor.
24 Q    Now, at this point in time in the bank's history, did you
25 prepare all the commercial loan memos with approval for the

Earnest - Direct by Ms. Barbier                          40

```
 1  factoring lines?
 2  A    I did.  At some point I turned that over to other people,
 3  but up to a certain point I prepared all of the approval
 4  documents -- approval memorandums for the whole department.
 5  Q    And you did this -- you did this using what?
 6  A    Just a Word -- well, the form -- the format of the
 7  commercial loan memo is a Word document, and really you're just
 8  plugging in the information and typing in the comment section.
 9  But the information comes from the information that I receive
10  from Mr. Corriher and, of course, he gets it from the customer.
11          MR. CHUT:  Objection, Your Honor.
12          THE COURT:  I'll overrule as to that.
13          MR. CHUT:  May we approach, Your Honor?
14          THE COURT:  Um-hum.
15          (Bench conference not reported, technical issues.)
16          THE COURT:  All right.  Overruled.
17          Did you finish your answer?
18          THE WITNESS:  I can't remember, Judge.  Sorry.
19          THE COURT:  Me either.  I think you did.
20          You may ask your next question.
21          MS. BARBIER:  I think he did.  Thank you.
22  BY MS. BARBIER:
23  Q    Why did you want to review the financial information for
24  these factoring lines at this time?
25  A    We obtain financial information on every customer and I
```

1  talked about this a little bit yesterday.  In commercial

2  lending, you're looking at the financial information --

3  historical financial information to try to determine and make a

4  projection as to whether that customer has the capacity to pay

5  the -- to meet all the obligations that they currently have, as

6  well as the obligations that we're proposing to provide them.

7  So we're looking at the cash flow produced by that customer.

8          Factoring is a different animal.  The factoring

9  clients typically are not very well capitalized.  Maybe they

10 have no capital.  They may even have a deficit net worth, which

11 means their liabilities exceed their assets, and they have

12 erratic earnings.  Generally they're not very profitable

13 companies, but what they are are small businesses that

14 typically have the ability to produce a product or a service

15 and issue an invoice and get paid for it, but they need

16 capital.

17         So what we're -- what we're focused on is the account

18 debtors, the customer's customer who is going to pay for that

19 invoice.  We want to make sure that account debtor has the

20 ability to pay for that invoice; and what you're really doing

21 is you're taking the exposure from our customer, the client,

22 and you're spreading it among all of their customers, all their

23 invoices.

24         We still look at their financial information.  We

25 look at the personal financials of the principals.  We pull the

 1  credit bureau report and we -- you know, we make judgments

 2  about whether or not we want to proceed based upon the credit

 3  bureau report and financial information they provide us, but it

 4  really doesn't determine how we're going to get repaid.  That's

 5  determined based upon the account debtors.

 6  Q    Now, prior to entering into the factoring agreements in

 7  2004 -- I'm sorry, 2005, did you -- and following this meeting

 8  with Mr. Griffin and Mr. Harrison, did you and Mr. Burgess and

 9  Mason Garrett and others at the bank have a discussion about

10  the combinability issue?

11  A    We did.

12          MR. CHUT:  Objection.

13          THE COURT:  I'll overrule as to that question.

14          THE WITNESS:  We did.

15          THE COURT:  Did you have a discussion?

16          THE WITNESS:  We did have a discussion, yes.

17  BY MS. BARBIER:

18  Q    And what analysis were you looking at?

19  A    Combinability is a -- the best way to describe it is if we

20  make a loan to a borrower or we advance funds to one customer

21  and then we advance funds or make a loan to -- another loan to

22  that customer, both those loans would be combinable.  In other

23  words, if we make a $100,000 loan to one person -- one company

24  and then we make another $100,000 loan to a company, for

25  combinability purposes, for legal lending limit purposes, you

1  add those two together and you have $200,000.

2          If we make a loan to a customer and then the

3  guarantor of that customer also guarantees another debt, then

4  we combine those together because the potential impact of that

5  guarantor affecting our ability to collect is present in both

6  loans.

7          To make them related, they have to be -- they have to

8  be related in some manner.  In these particular accounts,

9  the -- each of these individual licensees were owned by --

10  they're separate corporations.  They were owned by separate

11  individuals, guaranteed by separate individuals and, most

12  importantly, the source of repayment on those lines was

13  separate.  They weren't common.  So if one of those accounts

14  defaulted, it had no impact on any of the rest of them.  So

15  that's the analysis that you go through.

16          And it's based on the information we're provided by

17  our customer to tell us that they're not related; and then, of

18  course, we look at the repayment sources; and if we're

19  comfortable the repayment sources are not the same, then we

20  agree they're not related.

21  Q    Now, in May/June of 2005, did you and Mr. Burgess hire

22  someone to help Mr. Burgess?

23  A    We did.  We hired Mr. Bert Taylor.

24  Q    And how did you come -- how did you come to hire Bert

25  Taylor?

1   A    At that time we -- you know, we had grown and Mr. Burgess

2   was needing additional help in the credit side of the company.

3   He was formerly with a bank called Palmetto Bank, which was a

4   bank there in South Carolina.  It's been around for a long

5   time.  And he was -- he was the one that was -- who worked with

6   Bert at Palmetto Bank and suggested he would be a good

7   assistant credit officer for him.  And so Mr. Burgess

8   approached Mr. Taylor and hired him into the bank.

9   Q    What division of the bank was he formerly in?

10  A    The credit administration area.

11  Q    Did he have any factoring experience?

12  A    No, not to my knowledge.

13  Q    And what was going to be his job function?

14  A    Was to help Mr. Burgess in his task, managing the credit

15  side of the bank.

16  Q    When he first got there, did you and Mr. Burgess make to

17  him some suggestions about how he could get started to do his

18  job?

19  A    We did.  We wanted him to become familiar and learn what

20  was going on in the factoring area -- in all areas of the bank,

21  but specifically we told him to get into the factoring

22  portfolio and start reviewing those accounts in there and learn

23  what we're doing in there.

24  Q    I'm going to show you what's in evidence with Mr. Taylor,

25  Taylor's exhibit -- I think it's 8.  Is this an email that you

Earnest - Direct by Ms. Barbier                          45

```
 1  sent to Mr. Burgess and Mr. Taylor?
 2  A    It is.  This is June 15, 2005, to Bert Taylor and David
 3  Burgess, and it's -- the attachments are
 4  factorreviewprocedure61505.doc.
 5            MR. CHUT:  Your Honor, what number exhibit is this?
 6            THE COURT:  I don't know.
 7            MS. BARBIER:  This is Taylor's 8.  I'm sorry.
 8  Taylor's 7.
 9            MR. CHUT:  Thank you, ma'am.
10  BY MS. BARBIER:
11  Q    In looking at the second page of this document, what is
12  this?
13  A    This is just some thoughts that I put down on how we might
14  go about reviewing the factoring portfolio and its operations.
15  It's -- item one is review financials on each client account;
16  and the idea was we would rate them into categories, with
17  Category A being the most financially capables and Category C
18  maybe the least financially capable.  And we talk about the
19  reviewing of -- the type of procedures that they might go
20  through in doing reviews for each of those categories.
21            THE COURT:  Ms. Barbier, when we hit a good stopping
22  point, I would like to take a break.
23            MS. BARBIER:  We can do that, Your Honor.
24            THE COURT:  All right.  Ladies and gentlemen, I'm
25  going to excuse you for your midmorning recess at this time for
```

```
 1  15 minutes.

 2              (At 10:58 a.m., jurors excused.)

 3              (At 10:59 a.m., break taken.)

 4              (At 11:15 a.m., break concluded.)

 5          THE COURT:  All right.  We had a little bit of a

 6  technical difficulty on that last bench conference over here

 7  that followed the question about we have a Word document and I

 8  just put it together and then we stopped.  I'll be honest with

 9  you, I can't remember what we discussed over here.  So if

10  anybody remembers and wants to make a record of it, we've got

11  to do it now because I think I ended up overruling the

12  Government's objection, but I can't remember what we said.

13          MR. CHUT:  I think you did, Your Honor.  You asked

14  the defense to frame their questions more carefully and

15  overruled the objection.

16          MS. BARBIER:  It was related, Your Honor, to whether

17  or not Doug Corriher was offering him information about regular

18  loans versus factoring lines.

19          THE COURT:  Yeah, that's right.  Anything else you

20  want to add, because we literally do not have a record of that?

21          MS. BARBIER:  No, Your Honor.  And we're going to

22  draw the distinction for the jury about what Mr. Corriher did

23  and didn't do with regular lines.

24          THE COURT:  Okay.  Yes, sir.

25          MR. CHUT:  And I have two issues for the Court before
```

1  the jury comes in.

2          THE COURT:  All right.  Let me go ahead and tell you

3  all a little bit of scheduling.  We have a bench conference

4  today that's been juggled around.  I'm going to have to stop --

5  12:30 would be good, quarter to 1:00 is my drop-dead time, if

6  it helps you plan.  I'm going to have to send them out for a

7  little bit longer lunch recess.  I'm thinking until 2:15, maybe

8  2:30.  But it will be about a two-hour lunch break and then

9  we'll go again.

10          All right.

11          MR. CHUT:  Two issues, Your Honor.  One, my memory is

12  the Government -- of course, the Court sustained the

13  Government's objection to this post hoc awareness that was

14  claimed by the witness about the lending limits and I'll just

15  ask that his answer be stricken.

16          THE COURT:  There was -- yes, it was particularly to

17  the last part where the answer was something along the lines of

18  "After reviewing the law, I concluded X" or some part like

19  that.  I thought sustained was enough, but -- I'm a little

20  hesitant to go back now.  I thought it was enough at the time,

21  but you may feel otherwise.

22          MR. CHUT:  I'm just concerned, Your Honor.  It's

23  literally almost having his attorney testify from the witness

24  stand.  He's now explained that all his belief was wrong and

25  this was something different, and I'm really concerned that's

Earnest - Direct by Ms. Barbier                              48

 1  very confusing to the jury, Your Honor.

 2          THE COURT:  Okay.  Here's the thing.  I'm not going

 3  to go back now because I run the risk of confusing it even

 4  more.  I thought the way it came out the jury understood it.  I

 5  actually have a tremendous amount of confidence in jurors'

 6  ability to follow my instructions.

 7          If it comes up again -- and I'm assuming this is

 8  likely material that may be pursued on cross-examination.  If

 9  it comes up again and comes out again, I'll give a more

10  specific directive in terms of opinions of others or legal

11  opinions or that type of thing.

12          MR. CHUT:  Thank you, Your Honor.

13          One other issue, Your Honor, is one of the exhibits

14  introduced refers to an email.  I believe -- is this

15  Exhibit 92?  There's a reference to external audit.  "We need

16  to develop auditing procedures for Control Solutions."  I

17  think, Your Honor, that opens the door to the United States

18  calling on rebuttal the Control Solutions auditor, Your Honor.

19          THE COURT:  The United States what?

20          MR. CHUT:  On rebuttal calling the Control Solutions

21  auditor, Beth Hunnicut.

22          THE COURT:  Has that been introduced at this point?

23          MR. CHUT:  Yes, Your Honor, it has.

24          THE COURT:  It has been introduced, but I don't think

25  you've been over it on examination.

January 30, 2019

**-4008-**

Earnest - Direct by Ms. Barbier                    49

```
1            MS. BARBIER:  I specifically didn't go over it
2  because of Your Honor's ruling.  I mean, I thought you said you
3  didn't want to hear people say an audit was --
4            THE COURT:  I did.  I mean, if the audit's not coming
5  in --
6            MS. BARBIER:  I'm not planning to introduce or ask
7  any questions about it based on your ruling and I don't know
8  what there would be to rebut.
9            MR. CHUT:  Well, Your Honor, he's reviewed an email
10 that showed how he's very anxious to get to the truth of the
11 matter about how they're developing audit procedures for
12 Control Solutions.  I mean, that has allowed Ms. Barbier to
13 argue to the jury that he has these external auditors, et
14 cetera, et cetera.  I think, Your Honor, she's opened the door
15 and acknowledged the Court's ruling to the United States
16 rebutting that.  I think she has put Control Solutions into
17 evidence and into contention.
18           THE COURT:  Okay.  So we had Control Solutions -- was
19 that the one engaged by the firm -- by Nexsen Pruet?
20           MR. CHUT:  No, that was engaged by the bank, Your
21 Honor.
22           THE COURT:  That was Cherry Bekaert.  Neither of
23 which at this point, as I understand it -- maybe I'm wrong.
24 Neither of which are able to be presented as evidence.  Is that
25 correct or incorrect?
```

Earnest - Direct by Ms. Barbier                    50

```
 1              MS. BARBIER:  Your Honor, we didn't plan to present
 2    any evidence on that.  And, Your Honor, there's a lot of emails
 3    that talk about bringing in external auditors.
 4              THE COURT:  Yeah.  Hold on.  Let me just work my way
 5    through it and figure out where we are.  Cherry Bekaert,
 6    Control Solutions, two audits, different times, as I understand
 7    it, neither of which at this point are available to be
 8    presented as evidence.
 9              MR. CHUT:  No, Your Honor, they're available.
10    They've actually been turned over in discovery and this is a
11    witness --
12              THE COURT:  Cherry Bekaert?
13              MR. CHUT:  Not Cherry Bekaert.  Control Solutions,
14    Your Honor.
15              THE COURT:  But nobody -- oh, Control Solutions was
16    the one where the individual who performed the audit has passed
17    away or something and we called the other guy in -- the
18    Government called the other individual in.
19              MR. CHUT:  Beth Hunnicut is the actual auditor, Your
20    Honor, and she was the witness the Government was going to call
21    and did not based on the Court's ruling.  So now Control
22    Solutions has been raised for the defense benefit, and she's
23    available to testify on rebuttal, Your Honor, about the process
24    by which -- what information was given to her and she relied
25    on, Your Honor.  So I think it --
```

Earnest - Direct by Ms. Barbier                              51

```
1          THE COURT:  I'm not -- the email -- but the email

2   hasn't been addressed yet on examinations, just been

3   introduced?

4          MS. BARBIER:  That's correct, Your Honor.

5          THE COURT:  All right.  I'm not -- I'll say it this

6   way.  I honestly cannot remember now why I excluded Control

7   Solutions at the time, that audit.  I don't know whether it was

8   later or what.  I'm sure I had a reason.

9          MS. BARBIER:  Your Honor, I think that we were

10  discussing -- and I think Mr. Chut raised it; that we were

11  trying to raise some sort of sunshine defense.  We had this

12  audit.  It was a clean slate.  I mean, the factoring division

13  received an excellent rating in the audit, so there would be

14  reasons to bring it in, but we've decided not to do that.

15         We can't extract from every email when they talk

16  about bringing in external auditors.  All of these emails talk

17  about -- I mean, there's Elliott Davis that comes in on a

18  yearly basis.  There is Control Solutions Plus.  There is

19  Credit Risk Management.  There are the state and federal

20  regulators that do audits.  There's audits galore for a bank.

21  We can't, you know, take that out of every email.

22         THE COURT:  Okay.  This is where I land on this right

23  at the moment.  I don't know that I find the one sentence in

24  the email opens the door willy-nilly to full examination about

25  the results of the audit at this particular juncture, but in
```

January 30, 2019

**-4011-**

Earnest - Direct by Ms. Barbier                    52

1  all candor, at a break -- it won't be over lunch -- I'm going
2  to go back and review that again to help me remember -- for
3  some reason nothing's ringing a bell in terms of why I excluded
4  that at the time.  I'm a little worried about some other things
5  besides what's been mentioned, but I'll take a look at it.
6          This is the way I'll leave it.  If for some reason
7  when I go back and look I become convinced that the door has
8  been opened, then we'll come back and review that again before
9  we take any further steps.  That's the best I can do at this
10 point.
11          MR. CHUT:  Thank you, Your Honor.
12          MS. BARBIER:  Thank you, Your Honor.
13          THE COURT:  All right.  Let's bring the jury in, Leo.
14          (At 11:24 a.m., jury returns.)
15          THE COURT:  All right.  Ladies and gentlemen, I will
16 tell you that we're going to have a little longer lunch break
17 today than usual.  We'll break sometime between 12:30 and
18 quarter to one and probably break until 2:30.
19          You may continue, Ms. Barbier.
20          MS. BARBIER:  Thank you, Your Honor.
21 BY MS. BARBIER:
22 Q   We're still talking about 2005, Ron.  I want you to tell
23 me, were you involved -- when Mr. Taylor came in, were you
24 involved in his training?
25 A   To a limited extent.  David Burgess did most of his

1  training, but, yes.

2  Q    Okay.  And I showed you an email where you all were asking

3  him to review the factoring portfolio?

4  A    Yes.

5  Q    Okay.  Did he do a review?

6  A    He did.

7  Q    Okay.  Did he look at the US Staffing clients?

8  A    As far as I know, yes, he did.

9  Q    Okay.  And we saw a memo earlier in the trial that

10 Mr. Taylor apparently wrote.  Had you ever received a copy of

11 that email?

12 A    I did not.

13 Q    I'm sorry, that memo?

14 A    No, I did not.

15 Q    Okay.  Were you familiar with the issues addressed in the

16 memo?

17 A    Yes, those are the same issues that we addressed prior to

18 starting the relationship with the licensee companies.  We

19 discussed those issues back in late 2004, early 2005.

20 Q    Okay.  Several -- dated a couple weeks later is a letter

21 on your computer that you drafted to Gerald Pell.  Do you

22 recall that?

23 A    I do.

24 Q    And do you know Gerald Pell?

25 A    I do.

Earnest - Direct by Ms. Barbier                              54

1  Q     Who is he?

2  A     He's one of Mr. Harrison's attorneys.

3  Q     Okay.  Do you recall why you drafted that letter?

4  A     You know, it's 15 years ago.  I don't -- I don't recall

5  specifically.  The issues that were raised in Mr. Taylor's

6  memo, and I didn't see that, but it's possible that Mr. Burgess

7  and I discussed it, and that might have been the genesis for

8  starting that.  The result was that I was very comfortable with

9  our position, with what we believed.

10             MR. CHUT:  Objection, Your Honor.

11             THE COURT:  I'll overrule.

12             MR. CHUT:  I'll withdraw that objection, Your Honor.

13             THE COURT:  All right.

14             THE WITNESS:  And so also determined that Mr. Pell

15  wasn't my attorney, he was -- our attorney, he was

16  Mr. Harrison's attorney.  We have our own attorneys and --

17             MR. CHUT:  Objection.

18             THE COURT:  Overruled.

19             THE WITNESS:  And any discussions we needed to have

20  we would have with our own attorneys.

21             MR. CHUT:  Objection.

22             THE COURT:  As to who needed to have a discussion

23  outside of Mr. Earnest, I'll not let you offer an opinion as to

24  who else may have had to have a discussion.

25  BY MS. BARBIER:

January 30, 2019

**-4014-**

1  Q    Were the receivables of the US Staffing licensees

2  factored?

3  A    They were.

4  Q    Okay.  How long did that go on?

5  A    From early 2005 until late 2006.

6  Q    Did the relationship end?

7  A    It did.

8  Q    Do you know why?

9  A    I was told that the licensor, which was -- I don't

10  remember the name of it, lost their workman's comp,

11  compensation insurance policy, or they were unable to get it

12  renewed I think is what I was actually told.

13  Q    What is the importance of workman's compensation policies

14  in the staffing business, if you know?

15  A    All the staffing has to be covered by workman's

16  compensation policy, insurance policy.  It's -- it really is a

17  critical component of how staffing companies operate.  First of

18  all, it's very difficult to get, and it's at a price that

19  allows the staffing company to be competitive.  So it is a

20  critical component of that, and the policy that was provided by

21  the licensor was a critical element for those staffing

22  companies, in my opinion.

23  Q    Was it an umbrella policy, do you know?

24  A    I believe it was, yes.

25  Q    Okay.  And were the factoring lines from the 2006 era,

1  eventually did they become paid off?

2  A    They did.

3  Q    Okay.  Now, how did it come about that Mr. Harrison

4  personally guaranteed the remaining balances on some of those

5  staffing companies for 2006?

6  A    When those licensees left us, and I don't recall if they

7  left us, I just don't know whether they paid out all at once or

8  we collected out receivables, but there were three balances, or

9  three of the accounts had balances remaining, and I mentioned

10 earlier that we have an officer meeting the third Wednesday of

11 every month at 8:30 in the morning, and we go through issues

12 that the officers need to address with the management related

13 to delinquency or other credit issues.  And as I mentioned

14 earlier, I had my board meeting at 4:00 on that third Wednesday

15 every month, and the reason for that meeting is I tried to

16 obtain as much information as I can so I can inform the board

17 of any issues that I need to.

18         During one of those meetings, Mr. Corriher informed

19 us that the remaining invoices on those accounts had moved

20 beyond 90 days, and I don't know if they were delinquent or

21 not, but the invoices were over 90 days, and he was instructed

22 to get those accounts collected.  And he came back to us, to

23 me, and said that Mr. Harrison had offered to provide his

24 guarantee on those accounts and pledge his real estate on those

25 accounts if we would allow him -- them to pay those over the

 1  next few months.

 2          Bankers don't turn down guarantees or --

 3          MR. CHUT:  Objection.

 4          THE COURT:  Yeah, sustained as to bankers generally.

 5  BY MS. BARBIER:

 6  Q    Let me ask you this, Ron:  Why did the bank allow

 7  Mr. Harrison to personally guarantee some of the remaining

 8  balances for these licensees?

 9          MR. CHUT:  Objection as to the bank.

10  BY MS. BARBIER:

11  Q    Why did you?

12  A    I --

13          THE COURT:  You may answer, sorry about that.

14          THE WITNESS:  I allowed the guaranty to be placed on

15  it because Mr. Harrison's financial abilities were substantial,

16  we believed at the time, and --

17          MR. CHUT:  Objection as to we believed, Your Honor.

18          THE COURT:  I'll overrule.

19          THE WITNESS:  And so adding the guaranty, and we

20  didn't -- we didn't release anybody's guaranty.  Adding the

21  guaranty and adding the collateral made that -- made those

22  balances more collectible for us, so it helped our -- it helped

23  our bank ultimately collect those accounts.

24  BY MS. BARBIER:

25  Q    So the people who originally guaranteed those factoring

1  lines were not let out of their guaranties?

2  A    They were not.  They were still obligated on the balances.

3  Q    Okay.  Did -- when you were the president of the bank, did

4  they generally turn down anybody who wanted to personally

5  guarantee something?

6  A    No, I did not.

7  Q    Did those accounts pay off?

8  A    They did.

9  Q    Was it -- do you know how long it took?

10 A    I don't recall; months, several months, I'm sure.

11 Q    Okay.  Do you recall seeing the emails during this trial

12 that were sent by Mr. Corriher to Mr. Harrison asking for

13 interest payments?

14 A    I do.

15 Q    Why were those emails sent, if you know?

16 A    Mr. Corriher was the relationship manager for those -- for

17 that relationship, as a factoring relationship, and he

18 contacted Mr. Harrison frequently by email.  Many of those were

19 copied to me and others to request payments that were due,

20 interest payments that were due on his personal debt as well as

21 the payments that were due on those factoring lines.

22 Q    Okay.  Let's put aside the factoring business for a

23 minute.  Did Mr. Harrison have any other loans with the bank?

24 A    He did.  We had made him two or three loans, and I don't

25 remember -- I remember two in particular, and there may have

1   been a third one, over the years, and those loans were made and

2   paid as agreed.  He performed on those like we expected.

3            In 2006, when he lost -- or was unable to renew his

4   workman's compensation policy, he came to the bank and asked us

5   to finance -- provide him some funds for -- so he could get

6   that policy renewed.  So he offered a mortgage on his property

7   that he owned in Little River, South Carolina.  We got it

8   appraised, and it was a $3 million appraisal.  He also had a

9   contract for sale on it for 2.7 million, as I recall, and he

10  asked us to provide him a million five on that property.  We

11  agreed to do that on a -- I think a 90-day note basis because

12  our expectation was it would get paid off relatively shortly.

13  Q    Now, did Mr. Corriher have anything to do with this loan?

14  A    No, he did not.

15  Q    Okay.  When he was a customer at Anderson Bank, did

16  Mr. Harrison have any loans there?

17  A    Oh, that's a long time ago.  I don't think so.  I think

18  the only relationship we had with Mr. Harrison was a factoring

19  relationship on a company that he was the owner of, and he

20  guaranteed.

21  Q    Okay.  The bank -- the house that you described at the

22  coast that was the collateral, did it have any other liens on

23  it?

24  A    It did.  It had senior liens to our mortgage.

25  Q    Did the bank have the appraisal done?

Earnest - Direct by Ms. Barbier                    60

```
 1  A    Yes, we had an appraisal on it, yes.

 2  Q    Okay.  The one that you said was $3 million?

 3  A    $3 million.

 4            MR. CHUT:  Objection to leading, Your Honor.

 5            THE COURT:  I'll overrule as to that.

 6  BY MS. BARBIER:

 7  Q    At some point during the life of this loan, did the bank

 8  ask for additional collateral on it?

 9  A    We did.

10  Q    And what did you get?

11  A    We asked Mr. Harrison for additional collateral.  You

12  know, this was in 2006.  I don't remember when we did the --

13  got the additional collateral; but, again, the economy was

14  turning south.  Real estate along the coast suffered horribly,

15  and the values declined dramatically, so we asked Mr. Harrison

16  for additional collateral.

17            He indicated to us he owned an aircraft.  It was a

18  twin engine aircraft.  It was actually owned in the name of a

19  corporation that he owned.  There were no liens on the

20  aircraft.  So we made -- we made a loan to that corporation,

21  secured by a lien on the aircraft, and the proceeds of that --

22  of that loan were used to pay down his personal debt.  So at

23  the end of the day, we had the same amount of debt outstanding

24  on the obligations of Mr. Harrison, but we picked up additional

25  collateral of the aircraft.
```

1  Q    Now, did this loan on the -- on the -- that was secured by
2  the real estate go through the normal loan approval process?
3  A    It did.
4  Q    And was it -- would that entail discussion with the loan
5  committee?
6  A    It did.
7  Q    Would it entail discussion with the board members who
8  signed off on it?
9  A    Yes.  We did multiple renewals and a number of those were
10 approved through the board.
11 Q    Now, within the first 30 days of this loan, did
12 Mr. Harrison make a large payment?
13 A    He did.  The original loan was, I believe, for 90 days,
14 which would call for the principal and interest to be due at
15 the end of that term.  He sent in a check for $375,000, which
16 was a big downstroke on that loan, which we were very pleased
17 with.  It wasn't expected, but that that check was returned
18 NSF.  So we applied it to the loan, and it came back.  And very
19 shortly thereafter he sent us another check for 125,000.  That
20 check cleared and was applied to the loan.
21 Q    Do you recall who came to tell you about this insufficient
22 funds check that Mr. Harrison had?
23 A    I was contacted by Trina Smith, my chief deposit
24 officer --
25 Q    Okay.

1  A    -- or, excuse me, chief operations officer.

2  Q    And did she deal with getting another payment in from

3  Mr. Harrison?

4  A    We received another payment.  I don't know if she

5  contacted him and to tell him about the NSF or not, I just

6  don't recall.

7  Q    Okay.  Now, the house that Mr. Harrison said was going to

8  sell, did it sell?

9  A    It did not.  The contract that he had on it fell through.

10 We renewed the loan for another 90 days, and then at some point

11 he got another contract for sale, we were told, for the same

12 amount, 2.7 million.  That failed to close as well.

13 Q    Now, you indicated that Mr. Corriher managed the

14 relationship with Mr. Harrison for factoring lines?

15 A    That's correct.

16 Q    Okay.  Why did you -- did Mr. Corriher have loan

17 authority?

18 A    He did not.

19 Q    Why were you the loan officer on that loan?

20 A    Harrison came to us and asked for that financing to help

21 him renew the -- his workman's comp policy.  We expected it to

22 be a short-term loan.  I was involved in that discussion, and

23 several of us who had to sign off on that discussed it and

24 agreed that we would make that loan.  At the time we made the

25 loan, we believed Mr. Harrison was a capable borrower.

1          MR. CHUT:  Objection to any belief outside of the

2     witness, Your Honor.

3          THE COURT:  Outside -- you can testify as to what you

4     believed.

5          THE WITNESS:  Yes, sir.  I believed that Mr. Harrison

6     was a capable borrower based on the financial information he

7     gave us, and also based on his performance.  He had made -- we

8     had made him two or three loans, don't recall the exact number,

9     but they were as high as $555,000, and they all performed

10    exactly like they should.  And based on what I saw in his

11    financial information, I believed he'd be able to perform on

12    this loan as well.

13    BY MS. BARBIER:

14    Q    Did Mr. Harrison make payments on this loan?

15    A    He did.

16    Q    And did the loan turn out to be longer term than you

17    expected?

18    A    Much longer.  We renewed it multiple times, always for

19    short terms because that was our expectation.  We really -- we

20    were not interested in having a long-term loan on a beach

21    property that was a number of miles away from our market.

22    Q    What happened to the real estate market on the coast of

23    South and North Carolina in 2008?

24          MR. CHUT:  Objection.

25          THE COURT:  Well, based on your experience in that

Earnest - Direct by Ms. Barbier                    64

```
 1  market, you may --
 2            THE WITNESS:  I have a lot of experience with that,
 3  unfortunately.  The real estate along the coast -- real estate
 4  generally suffered tremendously during the great recession
 5  period beginning really from 2008 to 2011.  Fortunately for our
 6  bank, we didn't have a whole lot of exposure on the coast, but
 7  every property that we had ended up being a problem.  There
 8  were very few that weren't, because the customers who owned
 9  those properties, and who would try to sell those properties,
10  there just was no market for them.  So that particular property
11  declined in value --
12            MR. CHUT:  Objection, Your Honor.
13            THE COURT:  Basis?
14            MR. CHUT:  He testified broadly about the market,
15  Your Honor, with no foundation at all except a brief statement
16  about experience.
17            THE COURT:  Well, he's testified about his experience
18  at GrandSouth Bank during this particular juncture.  I'm going
19  to allow that testimony with respect to his experience.
20            You may continue your answer.
21            THE WITNESS:  My experience on those properties is
22  they declined in value dramatically, and we ended up owning a
23  number of properties down there, and we lost a lot of money as
24  a result, as did all other banks in South Carolina and probably
25  in North Carolina.
```

```
 1          MR. CHUT:  Objection.
 2          THE COURT:  Yeah, as to what happened to other banks,
 3  that's sustained.
 4  BY MS. BARBIER:
 5  Q    So I want to show you Government's Exhibit 417.  Is this
 6  an approval memorandum on this house loan?
 7  A    It is.
 8  Q    And it's dated what?
 9  A    September the 6, 2006.
10  Q    Okay.  And in the narrative of this, what do you explain
11  to the people who are signing it?
12  A    Explaining who this borrower is, which is Greg Harrison.
13  He's the owner of a temporary personnel and related businesses
14  in Greensboro, North Carolina, and he's been a customer of the
15  bank for years.  He operates -- he originated the licensees
16  that operate under the name of US Staffing.
17  Q    Okay.  And it goes on to describe, I guess, the detail of
18  that relationship in these next --
19  A    It does, and also describes some of his financial -- a
20  financial analysis of the financial information we had on him.
21  Q    Okay.  I guess it's actually four pages, is that right?
22  A    It looks like it, yes.
23  Q    I'm sorry, three.
24  A    Yeah.
25  Q    Can you tell me who the signatures are on -- for the loan
```

Earnest - Direct by Ms. Barbier                    66

1  committee and the board?

2  A    Yeah, starting with the loan committee, there's David

3  Burgess, me, Hal Garrett, Mason Garrett, and Blanton Phillips,

4  SB Phillips.

5        And for the board it's me, Mike Gault, Hunter -- not

6  Hunter -- Hal Garrett, that is Hunter Howard and -- no, excuse

7  me, that's Calhoun Pruitt and then SB Phillips, which would be

8  Blanton Phillips.

9  Q    Now, were there a series of renewals of this loan?

10 A    Yes.

11 Q    And do those loan memos contain signatures as well of loan

12 committee and the board?

13 A    They do.

14 Q    Okay.  I'm showing you Government's Exhibit 1430, and this

15 one's dated April 6, '07?

16 A    That's correct.

17 Q    And I'm not going to show you each one of them, but just

18 tell us generally, are these -- how often does the loan get

19 renewed?

20 A    For a number of time -- for a number of renewal periods,

21 it was 90 days.  And, you know, what we were -- what our intent

22 was was to hopefully this --

23        MR. CHUT:  Objection as to intent of anyone besides

24 the witness, Your Honor.

25        THE COURT:  Our intent.

January 30, 2019

**-4026-**

1              THE WITNESS:  My intent?

2              THE COURT:  You may confine your answer to your

3  intent.

4              THE WITNESS:  Yes, sir.  My intent was to hopefully

5  have the home sell, and we would be -- the debt would be

6  liquidated from that source.

7  BY MS. BARBIER:

8  Q    Did the -- after Mr. Harrison had his troubles with the

9  IRS and got convicted, did that loan pay off?

10 A    No.

11 Q    So do you know exactly how much the bank lost on it?

12 A    I don't know the exact number.  We charged off -- and

13 "charged off" means we lost money -- on the remaining balance

14 outstanding, and I think we made that entry into our books as

15 of year-end 2011.  That's when Mr. Harrison was convicted and

16 sent to jail.

17 Q    So do you know approximately how much it was?

18 A    Somewhere around a million dollars roughly combined among

19 the two loans.

20 Q    Okay.  So did the factoring business with Mr. Harrison,

21 after the 2006 relationship, come back to GrandSouth Bank?

22 A    It did.

23 Q    Tell us how that occurred.

24 A    After they left, Mr. Corriher stayed in contact.  One of

25 his responsibilities is to continue to look for new

Earnest - Direct by Ms. Barbier                                    68

1   opportunities for our factoring division.  He was an officer of

2   the bank, and among his duties of managing the factoring

3   department, he also went out and prospected for new customers.

4           He stayed in contact with Mr. Harrison and eventually

5   brought back the idea that the licensees would return to the

6   bank.  I think some time in early 2007 maybe, I don't recall,

7   some time later maybe in 2007, early 2008, is when Mr. Corriher

8   was telling us that that was a possibility.

9   Q    Okay.  Do you know whether there was another meeting with

10  Mr. Harrison during this time period?

11  A    I don't -- I don't recall, but I wouldn't swear that there

12  wasn't.

13  Q    What was your understanding about what Mr. Corriher was

14  proposing in terms of the licensor/licensee relationship again?

15          MR. CHUT:  Objection.

16          THE COURT:  What was his understanding --

17          MR. CHUT:  Mr. Corriher proposing?

18          THE COURT:  I'm kind of working my way through.  I'll

19  sustain as to the form.  I don't know where that's coming from.

20  Source of -- basis of knowledge, I'm not clear on that.

21  BY MS. BARBIER:

22  Q    Who informed you that Mr. Harrison's factoring business

23  may possibly come back to the bank?

24  A    Mr. Corriher.

25  Q    Okay.  And what did he tell you about how that would be

1  structured?

2  A    He indicated to me that it would be a licensee structure

3  very similar to the licensee structure that we financed in 2005

4  and '06.

5  Q    And who gathered the necessary paperwork for the

6  licensees?

7  A    Mr. Corriher does.  He -- he does that on all customers,

8  all factoring customers.

9  Q    And did he bring you information about these licensees?

10 A    He did.

11 Q    Okay.  And did you prepare factoring agreements based on

12 those?

13 A    I did.

14 Q    Okay.  Did you prepare loan memorandums based on those?

15 A    Yes, I did.

16 Q    Okay.  And what kind of information did you review in that

17 process?

18 A    It was the application information, financial information,

19 personal financial statements, credit bureau reports.  I think

20 they had some projections.  You know, I didn't look at any of

21 the account debtor information.  Mr. Corriher looks at that

22 information.

23 Q    Well, you've seen some -- in this trial some term sheets

24 that were proposed, do you recall that?

25 A    I do.

1  Q    Okay.  What is a term sheet?

2  A    Term sheet is nothing more than a discussion document

3  proposal.  It's -- we don't use it in every case, but we use it

4  in a lot of cases where we go to a customer, a prospect,

5  provide them with a letter basically that says here's how we

6  would propose to do business with you.

7          It gives information such as how the advance rate,

8  the pricing, which is very important, of course, and then we

9  ask the customer to tell us if that looks like that'll work for

10 them, and if the answer is, yes, then we move forward to try to

11 gather information and determine if we can underwrite the

12 factoring relationship.

13 Q    Now, in order to prepare the term sheet, did you have to

14 have some preliminary information?

15 A    Yes; name and address basically of who the prospective

16 customer would be.  That's about all the information that you

17 really need to prepare the letter.

18 Q    How do you know what factoring line to put in there?

19 A    It's really a guess.  You know, the amount on the

20 factoring line -- and, again, it doesn't -- when we put

21 together a factoring line, there's no money advanced.  The

22 advance only occurs when the receivables are submitted to the

23 bank for purchase, and Mr. Corriher approves those invoices for

24 purchase.

25          So typically what we try to do is ask a prospective

1  client what their annual sales are and ask them if they know or

2  if they can provide information on how fast those invoices turn

3  over, and then it's just arithmetic to determine what size of

4  line you need.

5  Q    Now, I'm going to show you Government's Exhibit 464.  Do

6  you recognize this?

7  A    I do.

8  Q    Okay.  What is this?

9  A    This is an approval memo, commercial loan memo, for Green

10  Ideas N Motion.

11  Q    And what's it dated?

12  A    It's dated July the 25th, 2008.

13  Q    Okay.  Now, if you -- I'm not going to have you read the

14  narrative here that goes on for two pages.

15            THE COURT:  Let's just point him to what you want him

16  to read.

17            MS. BARBIER:  Okay.

18  BY MS. BARBIER:

19  Q    Can you tell us generally in this narrative what

20  information you're giving about Green Ideas N Motion and the

21  relationship to Mr. Harrison?

22  A    Talking about Green Ideas N Motion is a corporation in

23  North Carolina, a newly formed corporation.  It's a licensee of

24  Global Labor.  That's a Greensboro-based Delaware incorporated

25  staffing company, and that the principals of the licensee and

1  the licensor are former factoring clients of GrandSouth Bank

2  under the US Staffing moniker, and it talks about how

3  Mr. Harrison's related to that -- this entity or the global

4  licensee -- Global Labor licensor.

5  Q    And does it relate back to the StaffCo, 2006

6  licensor/licensee factoring arrangement?

7  A    It does.

8  Q    And does it discuss the workman's compensation issue?

9  A    It does.

10 Q    And this information related to who is running Green

11 Ideas, did you receive that information from Mr. Corriher?

12 A    It did -- we did.  It came from the customer.  They

13 provide the factoring application and all the financial

14 information to Mr. Corriher, and Mr. Corriher provides that to

15 me.

16 Q    Okay.  And then you've got a summary paragraph there, too,

17 correct?

18 A    Correct.

19 Q    Now, can you tell us who is on the signature page, the

20 loan committee and the board for this memorandum?

21 A    Baety O. Gross is one of our directors, an attorney.  I'm

22 a signature -- signer on that.  Mr. Mason Garrett's our

23 chairman and CEO of the holding company.  SB Phillips is

24 Blanton Phillips; he's a director.  Over on the right is Mike

25 Gault, me again, Mason Garrett, Baety Gross, and SB Phillips.

Earnest - Direct by Ms. Barbier                      73

1   Q    Now, is this one of the memorandums that circulated before

2   or during a board meeting?

3   A    Yes.

4   Q    And is there discussion that takes place about these

5   memorandums?

6   A    Yeah, any time -- any time someone is asked to sign the

7   memorandum, there's discussion.  Typically what happens is

8   whoever's going to sign it is going to read it, and then

9   they're going to ask a few questions.  What's this about?

10  David Burgess would have been the person who would have

11  circulated this for signatures.

12  Q    Do you recall the buyout or the asset purchase agreement

13  that was related to these transactions?

14  A    I don't remember it specifically, but I remember that

15  that -- that we did have an agreement that we reviewed.  I

16  think in mid-2008.

17  Q    Okay.  I'm going to show you -- and, Your Honor, this is

18  the issue that we previously discussed.

19              THE COURT:  All right.  Is this the bills?

20              MS. BARBIER:  Yes.

21              THE COURT:  Okay.

22              MR. CHUT:  Your Honor, I'm going to renew my

23  objection, Your Honor, and ask this be done outside the

24  presence of the jury.

25              THE COURT:  Ladies and gentlemen, I'm going to ask

1  you to step back to the jury room for just a few moments.

2            (At 11:52 a.m., jurors excused.)

3            THE COURT:  Okay.  You go ahead and ask your

4  questions.

5            MS. BARBIER:  Okay.

6  BY MS. BARBIER:

7  Q    Ron, do you recall this buyout asset purchase assignment

8  agreement related to this?

9  A    I remember -- I remember that we had an agreement, yes.

10 Q    Okay.  And what were you interested in in terms of this

11 agreement between Global Labor and the licensees?

12 A    Well, what I was most interested in was make sure that our

13 security interest was the priority security interest.

14 Q    And so in terms of when the assets were going to be

15 transferred from -- in these transactions, what were you --

16 what were your concerns or what were you thinking of?

17 A    I just wanted someone to look at it and make sure that our

18 priority lien was going to be what we thought it was after the

19 transaction.

20            THE COURT:  And that would be first position?

21            THE WITNESS:  Yes, sir.

22 BY MS. BARBIER:

23 Q    So I'm going to show you Earnest Exhibit 126.  Do you

24 remember this?  Do you recall this?

25 A    Yes.

 1  Q    Okay.  What is it?

 2  A    This is a billing from Leatherwood, Walker, Todd & Mann,

 3  PC.  That's the -- that was prior to them going in with Smith

 4  Moore Leatherwood, but it was -- Marion Hughes is the attorney,

 5  FMH is F. Marion Hughes.  That's the attorney that I used or we

 6  used at the bank.

 7  Q    Now, if you look at the entry dated July 30, 2008, FMH?

 8  A    Um-hum.

 9  Q    Do you recall this email that you sent to Mr. Hughes

10  describing the situation?

11  A    I don't recall the email, and -- but he says I sent an

12  email to him and described the situation and the receipt and

13  review of the proposed buyout assignment agreement.

14  Q    And with respect to the situation, are you referring back

15  to the first lien priority issue?

16  A    Yes.

17  Q    Okay.  And is that why you wanted him to look at it?

18  A    Yes, that's why I would have sent it to him.

19  Q    Okay.  Now, the next entry's on July 31, 2008.  Do you see

20  that?

21  A    I do.

22  Q    Okay -- let's go back to the 30th.  It says, "Receipt and

23  review of proposed buyout assignment agreement."  Did you send

24  it to him?

25  A    Evidently I did.

Earnest - Direct by Ms. Barbier                    76

1  Q    Okay.  And the next entry, "Consideration of the issues

2  involved; conference with paralegal about INS fine; discussion

3  with Jerry Pell about the proposed transaction; discussion with

4  Doug Corriher," can you tell us what this INS issue was?

5  A    That's Immigration Naturalization Service.  As I recall,

6  StaffCo ran into difficulty with Del Monte out in the Pacific

7  Northwest somewhere where they -- I believe they were fined

8  like $300,000.  And my memory of this is from a publication,

9  reading something in a publication, and it involved someone in

10 the Del Monte company hiring illegals into the temporary

11 staffing pool of employees that StaffCo used up there.

12 Q    And how about this discussion with Jerry Pell about the

13 proposed transaction?  Do you know, is that referring to the

14 buyout agreement?

15 A    Yes.  Jerry Pell was Mr. Harrison's attorney.

16 Q    And then discussion with Doug Corriher.  Do you know what

17 that entailed?

18 A    I don't know what it entailed.  I assume -- well, he

19 obviously called him and talked to him.

20 Q    Okay.  Now, I'm going to show you another exhibit, Earnest

21 Exhibit 127, this detailed invoice from Leatherwood.  Do you

22 see where it says the amount of time that Mr. Hughes spent on

23 the first entry?

24 A    Yes, 1.7 hours.

25 Q    Okay.  And then the next entry, consideration of the

Earnest - Direct by Ms. Barbier                    77

```
 1  issues --
 2  A    Yes.
 3  Q    -- one hour?
 4  A    One hour.
 5  Q    Okay.  Now, do you recall Mr. Corriher -- I'm going to
 6  show you Earnest Exhibit 128.  Do you recall Mr. Corriher
 7  putting Mr. Harrison in touch with Marion Hughes about these
 8  issues?
 9  A    Yes, I remember seeing that email.
10  Q    Do you -- after sending this email to Mr. Hughes, what
11  happened?  What did you all decide to do with these factoring
12  agreements?
13  A    The -- we went ahead and pursued the factoring arrangement
14  with these licensees.  The funding actually didn't occur until
15  January, but we continued with the plan that we had started and
16  the approvals that we had on these factoring lines.
17  Q    Now, during the time period that you were the president of
18  the bank, was it your habit of consulting the bank's lawyers on
19  issues just like this?
20  A    Yes.
21  Q    And did you generally always follow their advice?
22  A    I did.
23         MS. BARBIER:  That would be the extent of the
24  proffer, Your Honor.
25         THE COURT:  All right.  Any --
```

Earnest - Direct by Ms. Barbier                    78

```
 1            MR. CHUT:  I don't have any questions, Your Honor.  I
 2     just want to be heard.
 3            THE COURT:  All right.  Yes, sir?
 4            MR. BANNISTER:  I have a few questions if I could,
 5     Your Honor.
 6            THE COURT:  All right.
 7            MR. BANNISTER:  So when this issue came up initially
 8     in 2004, roughly that time frame, and there were discussions
 9     with the attorneys, David Burgess was part of those discussions
10     at least with you?
11            THE WITNESS:  That's correct.
12            MR. BANNISTER:  All right.  Would he also have been
13     part of the discussions here prior to the loan memo of 2008?
14            THE WITNESS:  Yes.
15            MR. BANNISTER:  In terms of his knowledge, and him
16     being the supervisor for Bert Taylor, would the expectation
17     have been that he would have passed that information down to
18     Mr. Taylor?
19            THE WITNESS:  I don't know.  I don't know if he would
20     have discussed that with Mr. Taylor or not.  I just don't know.
21            MR. BANNISTER:  Had Mr. Taylor had a question about
22     the relationship between Mr. Harrison and these entities, who
23     would have been the person he would have gone to to ask about
24     that?
25            THE WITNESS:  It would've been David Burgess.
```

January 30, 2019

**-4038-**

 1              MR. BANNISTER:  All right.  And so if David Burgess

 2    was in the discussions with you about this 2008 renewing the

 3    relationship, then he would have had the same information

 4    roughly that you did?

 5              THE WITNESS:  Mr. Burgess, you mean?

 6              MR. BANNISTER:  Yes, Mr. Burgess.

 7              THE WITNESS:  Yes, I think so.

 8              MR. BANNISTER:  Okay.  All right.  I don't have any

 9    further questions, Your Honor.

10              MR. CHUT:  Just to be heard, Your Honor.

11              THE COURT:  All right.  Mr. Earnest, I'm going to ask

12    you to step out of the courtroom, if you don't mind.

13              THE WITNESS:  Okay.

14              THE COURT:  I think you probably heard two or three

15    times why.

16              THE WITNESS:  I have.  You can go ahead and talk

17    about me, Your Honor.

18              (Witness steps out of the courtroom.)

19              THE COURT:  All right.

20              MR. CHUT:  Your Honor, this testimony has no purpose

21    except to bootstrap a reliance defense.  That's certainly shown

22    by the fact that now there's going to be evidence that he had

23    the habit of conferring with his attorneys.  The only -- we

24    have no idea what actually took place.  It's only 2.7 hours of

25    conversation apparently, some of which involved this INS issue.

Earnest - Direct by Ms. Barbier                    80

1   The idea is that -- for all we know Mr. Hughes told him, this

2   is nuts, don't do it.  That's not going to -- there's no way

3   for the Government to rebut that without extracting priv --

4   asking about privileged information from the bank's counsel.

5           This is only there, Your Honor, for the purpose of

6   sort of a bastardized reliance defense with no evidence except

7   that 2.7 hours of billing, and it should be excluded; and if

8   it's not going to be excluded, Your Honor, I think we have to

9   go through the in camera proceeding of piercing the bank's

10  privilege.  I mean, this is a way to get around the privilege.

11          THE COURT:  Well, if it needs to come in, I'm not too

12  worried about that part of it.  Ms. Barbier, do you want to be

13  heard?

14          MS. BARBIER:  Just briefly, Your Honor.  Your Honor,

15  good faith is a defense, and Mr. Earnest's habit of consulting

16  with the bank's lawyers on these issues in furtherance of his

17  job and res -- his job and his responsibilities.

18          THE COURT:  What are "these issues"?

19          MS. BARBIER:  The buyout agreement between Global

20  Labor and its licensees and the flow of the assets and whether

21  or not the bank was going to be in --

22          THE COURT:  That's not what he said his interest was

23  in talking to counsel.  What he said was making sure we had a

24  first lien position, and the most, it seems to me, you could

25  conclude, even if I let all this stuff in, is that he was

January 30, 2019

Earnest - Direct by Ms. Barbier                           81

1  satisfied they got the first lien position, because that's what
2  he was interested in asking about, and the first lien position
3  isn't at issue at this point, is it?
4           MS. BARBIER:  It is, Your Honor, because if this
5  company -- if these companies were fake, and he knew they were
6  fake, and Mr. Hughes knew they were fake, they wouldn't have
7  any position.  The only UCC they have filed is on Green Ideas N
8  Motion.
9           THE COURT:  There's nothing to suggest from whatever
10 was sent that they didn't have a first lien position on Green
11 Ideas N Motion, right?  Isn't that the best --
12          MS. BARBIER:  It would be valueless if they -- if
13 this was a fake sham company.
14          THE COURT:  Isn't that the best way to -- I mean,
15 isn't that really the only way to frame what happened here
16 within reason?
17          MS. BARBIER:  Your Honor, I think that his state of
18 mind in terms of what he was -- he wasn't asking Mr. Hughes, is
19 this -- do you think this looks like a fake company.  I mean,
20 I'm not suggesting that.  It never entered their mind.
21          What they were concerned about is, okay, these people
22 are going to be -- these assets are going to be flowing between
23 these licensees and Global Labor and CMI, and we want to make
24 sure we're protected in this transaction.
25          THE COURT:  Um-hum, with the first lien position.

Earnest - Direct by Ms. Barbier                      82

```
 1              MS. BARBIER:  That's correct.
 2              THE COURT:  And according to him, at least some of
 3    the testimony he's given, CMI didn't have anything to do with
 4    this relationship, right?  Isn't that what he said in the grand
 5    jury testimony?
 6              MS. BARBIER:  No, no, Your Honor.  His understanding
 7    is that --
 8              THE COURT:  Didn't he call CMI a third party for
 9    which we would have no reason --
10              MS. BARBIER:  Yes.
11              THE COURT:  -- to review --
12              MS. BARBIER:  He does, Your Honor.
13              THE COURT:  -- payroll tax records?
14              MS. BARBIER:  He does.  He said, CMI's not our
15    client.
16              THE COURT:  Is he -- are you now saying that he was
17    interested in whether or not they had a first lien position as
18    to CMI?
19              MS. BARBIER:  No, Your Honor.  What I'm saying, and I
20    know this is inartful, because this is a complicated
21    transaction, but CMI is selling its assets to the -- to US
22    Funding, okay, and US Funding is who they send this
23    $3.2 million wire transfer to, okay.
24              THE COURT:  That was to pay off those receivables,
25    wasn't it?
```

Earnest - Direct by Ms. Barbier                                    83

```
 1          MS. BARBIER:  Right.  And his understanding is that
 2  the licensees are going to be buying those CMI receivables from
 3  Global Labor, and what he's asking Marion Hughes is, when that
 4  happens, are we still going to be in first position priority?
 5  Can anybody else come in?  Could US Funding, could anybody --
 6  any other third party come in and say that we're not first.
 7  That's what he's asking.
 8          THE COURT:  Um-hum.
 9          MS. BARBIER:  And it's not -- it's part --
10          THE COURT:  What's that got to do with anything in
11  this case, the first position?
12          MS. BARBIER:  It's got everything to do, Your Honor,
13  because the genesis of why they would never do a transaction
14  where they're not first is because they don't know that these
15  companies aren't real.  If the only UCC filing they have is on
16  these five licensees, at the end of the day, they have nothing.
17          THE COURT:  So now you're saying, as a result of this
18  conversation with Marion Hughes, whatever it may have been, we
19  don't know, nobody remembers, he can testify that he walked
20  away from that satisfied that these were all real companies,
21  because the lawyer reviewed it?
22          MS. BARBIER:  No, he will not testify to that because
23  it never entered his mind that these weren't real companies.
24          THE COURT:  All right.
25          MS. BARBIER:  What he will say is that after
```

1  discussing the buyout asset purchase agreement with Mr. Hughes,

2  as evidenced by this invoice, he was comfortable --

3       THE COURT:  We don't know what he discussed.  There's

4  nobody remembers.  According to you, Mr. Hughes doesn't recall.

5  He doesn't recall.  All he can say is I want to make sure we

6  have first position, I sent all this stuff to Hughes, and then

7  something happened, but I can't remember.  And I relied on

8  whatever it was I can't remember.  Isn't that the crux of the

9  testimony?

10       MS. BARBIER:  The crux of the testimony is that the

11  lawyers were consulted on this buyout asset purchase agreement

12  before any moneys were advanced.

13       THE COURT:  And the only way that is relevant is for

14  somebody to assume that the lawyers offered some opinion

15  relevant to this case, which neither Mr. Earnest, nor,

16  according to you, Mr. Hughes recalls at all.

17       MS. BARBIER:  Well, Your Honor, I'm basing that on my

18  conversations with the bank's lawyers who have talked to

19  Mr. Hughes, I understand.

20       THE COURT:  Call the bank's lawyers then.

21       You had something you wanted to say, Mr. Bannister.

22       MR. BANNISTER:  Yeah, just briefly, Judge.  Obviously

23  the Government has relied very heavily on our 2005 memo that

24  was --

25       THE COURT:  As to Mr. Taylor?

Earnest - Direct by Ms. Barbier                        85

1    MR. BANNISTER:  As to Mr. Taylor, right.  And so part
2    of the reliance on that is that -- or the inference that is
3    being drawn is that Mr. Taylor had knowledge that there was
4    something wrong with the relationship or not aggregating the
5    companies together for legal lending limit purposes.
6         What happens in 2008 is the companies come back.
7    Obviously Mr. Taylor's not part of those conversations that are
8    going on when it comes back, but if they have had consultation
9    again with counsel about this relationship again --
10        THE COURT:  What's the consultation?  Nobody
11   remembers.  Here's the mystery.  How do we -- how do we take a
12   conversation with a third party, nobody remembers what it is,
13   and turn it into some kind of -- well, the lawyers said
14   everything was okay.
15        MR. BANNISTER:  Well, from our standpoint is what did
16   David Burgess walk out of there with.
17        THE COURT:  Burgess wasn't part of this, was he?
18        MR. BANNISTER:  I think he said he would have been
19   part of those discussions, yes.
20        THE COURT:  I don't -- did he put him in those
21   discussions?
22        MR. BANNISTER:  I thought that was the question I
23   asked him.
24        THE COURT:  I understood the question you asked a
25   little more broadly.  We can narrow it down when we get back in

January 30, 2019

**-4045-**

Earnest - Direct by Ms. Barbier                    86

1   here, but when you said "those discussions," I don't -- I

2   didn't understand that to be limited simply to this legal

3   discussion with counsel, if that's what you intended, because

4   as I understood it, there were a number of discussions

5   internally, according to Mr. Earnest, as we moved back into

6   this deal.

7           MR. BANNISTER:  And I'll just say regardless of how

8   inartfully I asked the question, whether the discussions with

9   Mr. Burgess were -- included Mr. Hughes and his discussions

10  with Mr. Earnest, or whether it was simply discussions between

11  Mr. Burgess and Mr. Earnest, if what came out of there from

12  Mr. Burgess was this asset purchase agreement is going to be

13  sufficient to cover our interests --

14          THE COURT:  At this point, there's nothing -- there's

15  no evidence as to what Mr. Earnest learned from this meeting,

16  is there?  That's my fundamental issue.  There's two issues:

17  One is that this is not the witness who can testify about what

18  somebody else told him.  That's just hearsay pure and simple.

19          So for Mr. Earnest to say, well, Mr. Hughes approved

20  this or did this or did that is pure and simple hearsay.  Even

21  if we get around the hearsay question, at this point as I

22  understand it, Mr. Earnest says, well, what I was interested in

23  was being in the first position, which can be a lot of

24  different things.  It can be a lien search.  It can be a review

25  of the records -- I mean, the transactional records, it can be

Earnest - Direct by Ms. Barbier                                87

1   any one of a number of different things.  But he doesn't

2   recall, at least as I understood his testimony, what was in his

3   email or what he learned from Marion Hughes.  That's the way I

4   understood the testimony.

5           So to turn that into, well, Marion Hughes blessed

6   this transaction, I don't see that there's a foundation for

7   that.

8           MR. CHUT:  Your Honor, there's --

9           THE COURT:  Hold on.  I'm not -- Mr. Bannister's been

10  dying to say something.

11          MR. BANNISTER:  Well, so the document itself, though,

12  is -- it can -- you can draw the inference from what's in the

13  bill that that is what happened.  I realize nobody has

14  testified that that is exactly what happened, but the -- the

15  entry is so specific, and the timing of it is so specific, that

16  you can move from there to say --

17          THE COURT:  Can you put it up on the screen again.

18          MR. BANNISTER:  I think you can move from there to

19  say, look, this is a reasonable doubt from where Bert Taylor is

20  sitting --

21          THE COURT:  Bert Taylor never saw this.

22          MR. BANNISTER:  No, no, and that's absolutely

23  correct.  I'm not suggesting that.

24          THE COURT:  Okay.  So we've got an email from Ron

25  Earnest describing the situation.  This is July 30, so I think

1   it's a fair assumption that this is something relating to this

2   new agreement, the purchase agreement.

3           MR. CHUT:  Although, Your Honor, it is almost six

4   months before whatever was signed was signed, which is another

5   issue.

6           THE COURT:  Was that in November?

7           MR. CHUT:  No, Your Honor, the actual asset purchase

8   agreement was signed in January of '09, so that's another

9   issue, Your Honor.

10          THE COURT:  Okay.  Receipt and review of proposed

11  buyout assignment agreement.  So we've got two things that

12  could be -- yes, sir?

13          MR. BANNISTER:  I'm sorry, I wasn't trying to

14  interrupt you.

15          THE COURT:  I mean, I'm not trying to be cute, I

16  thought you wanted to say something.

17          MR. BANNISTER:  I do not intend to interrupt a

18  federal judge.

19          THE COURT:  Okay.  And then consideration of the

20  issues involved.  What were the issues?  Was it INS?  Was it

21  Del Monte?  Was it first lien position?  Was it future signing

22  of a buyout assignment agreement?  Was it factoring agreements

23  executed the day before, or whatever the date was?  What was

24  it?  Now, explain to me how to infer from that where you are.

25          MR. BANNISTER:  All right.  So if you'll look at

1  Jerry Pell's name --

2          THE COURT:  Um-hum.

3          MR. BANNISTER:  -- if you recall back in 2005, Bert

4  Taylor does his memo and says there might be a combinability --

5          THE COURT:  I remember the letter from Earnest, which

6  he says was not the product of Taylor's memo, was addressed to

7  Jerry Pell, whoever Jerry Pell is.

8          MR. BANNISTER:  Right.  On July 25 it was the product

9  of discussions with David Burgess, which is the individual

10  who's between Bert Taylor and Mr. Earnest.

11          THE COURT:  I got that.

12          MR. BANNISTER:  All right.  So in that initial letter

13  to Jerry Pell, they're talking about the combinability and the

14  conclusion Bert -- or Mr. Earnest is talking about.

15          THE COURT:  The letter that wasn't set.

16          MR. BANNISTER:  Correct, but he's talking about this

17  is not combinable in his opinion under the banking regulations.

18          THE COURT:  Agreed.

19          MR. BANNISTER:  So I think I'm entitled to draw the

20  inference that they're having another set of discussions with

21  Jerry Pell, Mr. Harrison's attorney, about the transactions

22  that are coming up that are the memorandums that are dated

23  July 2008.

24          THE COURT:  Already signed and done.

25          MR. BANNISTER:  I -- well, yeah, I think that's

Earnest - Direct by Ms. Barbier                    90

1   right.  The date on them is July 30, 2008.

2           THE COURT:  Yeah, and they were up there for the

3   signing the 28th or 29th or something like that --

4           MR. BANNISTER:  In my mind --

5           THE COURT:  -- whatever the date is.

6           MR. BANNISTER:  I think the dates are not -- I mean,

7   they're relevant to put it in the same time frame, but

8   whether --

9           THE COURT:  I'll give you same time frame.

10          MR. BANNISTER:  Whether one came first or second, to

11  me, really doesn't seem to make much difference since no --

12          THE COURT:  Isn't that kind of critical though to

13  your inference?

14          MR. BANNISTER:  Well, no, because the money's not

15  being advanced until months later.  I mean, we've had the

16  testimony that says, you know, we'll sign these and then it

17  doesn't really get serious until we start buying accounts

18  receivable.

19          The other part of this, the transaction relating to

20  the proposed transactions, I don't see how you can see that as

21  being anything other than the asset purchase which is I think

22  discussed, the buyout assignment, in the prior entry.

23          THE COURT:  Um-hum.

24          MR. BANNISTER:  So if North Carolina Global is

25  supposed to be buying CMI, which is what we think the asset

1  purchase agreements contractually seem to do, then it's much

2  like the way the bank bought CarBucks.  The bank's still

3  operating under the name of CarBucks, but the bank owns

4  CarBucks.  It's just a d/b/a.  If you remember when -- oh, who

5  was the account -- if you remember, Carpenter had drawn out his

6  handwritten diagram that's got Global Labor at the top, and CMI

7  as one of the d/b/a's listed underneath that.

8              THE COURT:  I do.

9              MR. BANNISTER:  The Government takes the position

10 that we saw, that is Bert Taylor, saw invoices with the name

11 CMI on it --

12             THE COURT:  Right.

13             MR. BANNISTER:  -- and that that should have been the

14 red flag that said we don't have a first lien position.

15             THE COURT:  Um-hum.

16             MR. BANNISTER:  If we're right about the way this

17 transaction was supposed to work, then the buyout, by Global

18 Labor or CMI, they can use that name all they want to.

19             THE COURT:  I agree with you on that.

20             MR. BANNISTER:  Okay.  So this sort of ties it all,

21 for me and Bert Taylor, from where he's sitting, it kind of

22 ties it back into the fact that David Burgess, if Burgess had

23 any issues about this arrangement going forward again, he's

24 hearing about this -- we've got lawyers involved, and it's

25 okay.  So --

1    THE COURT:  It's okay why?  What did the lawyers say?
2  That's the absent piece.  You want to assume that they gave --
3  to make it all fit together, you're assuming, it seems to me,
4  that they gave some kind of blanket approval for the
5  transaction.
6    MR. BANNISTER:  Well, I think what happened was they
7  got the asset purchase agreement put together, I think there
8  was an email that came -- that went from Mr. Earnest up to
9  Mr. Harrison that says, you know, this is some of the
10 documentation we need.
11    Now, I may be stepping -- getting a little over my
12 skis on that, but I think I'm entitled to make that inference
13 for my client as it relates to reasonable doubt, the one I was
14 saying.  The one you said where I'm assuming, yes, let's just
15 face it like it is.  There are a lot of inferences that can be
16 drawn from here, and I think it'd be fair for the Government to
17 say they were told absolutely don't do this, it's illegal, but
18 that's argument.
19    THE COURT:  I mean, that's -- yeah --
20    MR. CHUT:  May --
21    THE COURT:  I understand your position.
22    MR. BANNISTER:  Thank you, Your Honor.
23    MR. CHUT:  Your Honor, two points:  One, we filed a
24 pretrial motion addressing this issue of Mr. Earnest's attempt
25 to use a reliance defense.

Earnest - Direct by Ms. Barbier                    93

1          Second, let me make a point, Your Honor.

2          THE COURT:  We haven't gotten to a reliance defense.

3          MR. CHUT:  Well, this is less than three hours of

4     legal work.  This is Marion Hughes from Smith Moore

5     Leatherwood, so we're going to suggest that Smith Moore

6     Leatherwood blessed this $10 million transaction in less than

7     three hours of legal work?  That's ludicrous, Your Honor.

8     That's ridiculous.

9          THE COURT:  I understand your point on that.  I think

10    in terms of drawing a reasonable inference from this entry, in

11    light of the testimony that was given as to I was interested in

12    a first position, I can't remember what my email said, and I

13    can't recall what was said at the meeting, I think it's pure

14    speculation, not a reasonable inference, to allow the jury to

15    speculate as to what Marion Hughes may have done in response to

16    an unknown email from Mr. Earnest, and what Marion Hughes may

17    have opined about and what he may have called -- was it Jerry

18    Pell?  Was he the one -- what he may have called Jerry Pell

19    about.

20          So I don't think at this point, given the lack of a

21    foundation to make whatever occurred in this conversation

22    relevant, I don't find that this rises to the level of

23    presenting a reasonable -- a potential reasonable inference

24    that somehow the information that was received and conveyed

25    from counsel is exculpatory.

Earnest - Direct by Ms. Barbier                    94

1          At the end of the day, I'm not even sure that the

2  information received by counsel and conveyed from counsel is

3  even relevant to this case.  If it was Del Monte fines as an

4  issue at that particular juncture, I mean, I don't know what

5  that has to do with anything in this case, the INS fines.

6          MR. BANNISTER:  Last thing I'll say on this is,

7  you'll note that Mr. Burgess's initials are on this document up

8  in the upper right-hand corner, DEB.

9          THE COURT:  Oh, there on -- yeah, I see that now.

10         MR. BANNISTER:  And JB Garrett, that's his signature

11 up there as well.

12         THE COURT:  Um-hum.

13         MR. BANNISTER:  So even if Mr. Burgess wasn't a part

14 of this, doesn't know what Marion Hughes said, he gets a

15 heads-up that his boss --

16         THE COURT:  Something is taking place.

17         MR. BANNISTER:  -- is talking to an attorney about

18 it, which even if all he tells Bert is, look, that's not

19 your -- you don't need to worry about that because they're

20 talking with the lawyers, that's -- I mean, it goes to our

21 element of intent.  Knowingly and intentionally engaging in

22 (inaudible, coughing) --

23         THE COURT:  This, in my mind, would go to the

24 question of the absence of Mr. Burgess, but I'm -- I don't --

25 based on the evidence in the case, there's no evidence that

1  Mr. Taylor actually had any type of conversation like that,

2  right?

3          MR. BANNISTER:  That's correct.  And I guess I am

4  doing it for two purposes.  One, I'd like to go into it on

5  cross, ask some of the questions I just asked; but, two, it

6  certainly goes back to our --

7          THE COURT:  I think in terms of the undue delay

8  question, this -- something like this may have relevance, and

9  I'll consider it for that.

10         All right.  The objection is sustained.  You can

11 bring Mr. Earnest back in.

12         MS. BARBIER:  Your Honor, I just would like to state

13 on the record that we would like to add this as an additional

14 basis to our pre-indictment delay motion.  If we -- if the

15 delay hadn't occurred, we'd have this email probably, and we'd

16 have Mr. Burgess, and I think it would have greatly helped

17 Mr. Earnest and his defense, and I'd just like to make it a

18 Court exhibit for the record.

19         THE COURT:  All right.  I mean, it's in the record.

20 We'll list it as -- we'll call it proffer exhibit.  Have you

21 got anymore of these you want to put in?

22         MS. BARBIER:  No, Your Honor, that was -- what I

23 showed during the proffer would be it.

24         THE COURT:  All right.  What number was that?

25         MS. BARBIER:  That would be 126, 127, 128.

```
 1              THE COURT:  Oh, I can't remember what they are.  You
 2   mind handing them up, let me take a look at them.
 3              MS. BARBIER:  Yes.  It's the invoice, the detailed
 4   invoice, and then the note from Doug Corriher to Harrison
 5   saying, you know, our lawyers --
 6              THE COURT:  Okay.  I will just note for the record
 7   that Defendant's Exhibits 126, 127, and 128 were tendered for
 8   purposes of a proffer as well as Mr. Earnest's testimony with
 9   respect to his recollection or lack thereof with respect to
10   this meeting that took place on July 30 and then any additional
11   work that is reflected in the invoice as to Mr. Hughes and
12   apparently a paralegal as well.
13              All right.  Ms. Welch will keep those.  Are those the
14   clerk's copy or are they yours?
15              MS. BARBIER:  Yes, sir, you can have that.  Your
16   Honor, it's 12:21.  I don't know, do you want to break for
17   lunch now or do you want --
18              THE COURT:  Have you got about 10 or 15 minutes you
19   can do?
20              MS. BARBIER:  Sure.
21              THE COURT:  All right.  Let's bring Mr. Earnest back
22   in, and we'll go on for about 10 or 15 minutes.
23              (Witness returns.)
24              THE COURT:  All right.  Mr. Earnest, you may return
25   to the witness stand.
```

```
 1                Leo, you may bring the jury in, please, sir.
 2                (At 12:22 p.m., jurors arrive.)
 3                THE COURT:  All right.  You may continue your
 4   examination.
 5                MS. BARBIER:  Thank you, Your Honor.
 6   BY MS. BARBIER:
 7   Q    Ron, we're still in the July 2008 time frame, okay.
 8   A    Okay.
 9   Q    After these factoring arrangements were entered into in
10   July of 2008, did the bank begin immediately factoring the
11   receivables of the licensees?
12   A    No, it was approximately six months later.
13   Q    Okay.  And do you know what the initial advances were for
14   in these factoring arrangements?
15   A    The initial advances were to purchase the invoices that
16   were owned by US Funding that had purchased those from
17   Compensation Management, Inc.
18   Q    Okay.  Can you explain your understanding of that purchase
19   agreement and how it worked with -- between US Funding, CMI,
20   Global Labor, and the licensees.
21   A    My understanding was that Global Labor purchased
22   Compensation Management, Inc. as a corporation, both were owned
23   by Harrison -- Mr. Harrison, and the transaction that we
24   participated in that we funded to our licensees in January 16,
25   I believe, 2009, the advance was made for them to purchase
```

1  those accounts from the lienholder, which was US Funding.

2  Q    Now, how did you perceive Mr. Harrison during this time

3  frame?  Did you think he was successful?

4  A    My perception of him was he was capable.  He had proven

5  himself capable in all the obligations that we had with him on

6  a direct basis, and the licensee relationship had worked in

7  satisfactory manner previously.

8  Q    Okay.  In the 2008, 2010 time period, did you see

9  Mr. Harrison often?

10 A    Yes, he came to the bank frequently.  I don't know how

11 frequently, but he would come in and -- my understanding is he

12 would come in and meet with Mr. Corriher, and from time to time

13 Mr. Corriher would bring him down, and he'd show up at my

14 office.

15 Q    Okay.  And when you said your understanding was that he

16 would go up and meet with Mr. Corriher, where is Mr. Corriher's

17 office?

18 A    Mr. Corriher was on the second floor; I was on the first

19 floor.

20 Q    And you said from time to time when he came down to your

21 office, describe just generally those meetings.

22 A    They would just show up.  It wasn't a planned meeting.

23 They would just show up at my door and, you know, as with any

24 customer, I'm going to get up and shake hands and say, hello,

25 how you doing, how's your business, that sort of thing.  I do

1  that all the time, particularly with customers who are in the

2  bank a lot.  Those would typically be local customers, but

3  generally speaking, it was just, you know, just general

4  chitchat.  It wasn't anything -- there was no purpose of the

5  meeting other than just saying hello.

6  Q    Now, when -- from time to time when it came down, were

7  there ever questions asked of you?

8  A    Ever questions asked of me?

9  Q    Yeah.

10 A    Sure, yes.

11 Q    Okay.  And you had a calendar during some of this time

12 period, electronically?

13 A    Yes, sometime, yes.

14 Q    Okay.  Now, you saw a calendar that had all blanks on it,

15 do you remember that?

16 A    Yes.

17 Q    Were you doing nothing during that time period?

18 A    No, I was -- I'm an old guy.  I was dragged kicking and

19 screaming into the computer world, so at some point I started

20 using an electronic calendar.  Prior to that I used a paper

21 calendar on my desk that was a pad.

22 Q    Okay.  And we saw some entries with Mr. Harrison's name on

23 that.  Do you remember that?

24 A    Yes.

25 Q    Okay.  Tell us what your habit was with regards to when

Earnest - Direct by Ms. Barbier                    100

```
 1  you added those entries.
 2  A    When I started using the electronic, I think it was
 3  Microsoft Outlook, everybody's probably familiar with that, I
 4  used it to plan things into the future, but I also used it to
 5  identify things that I did during that particular day as a way
 6  of just understanding what -- how I was using my time.
 7  Q    And so when Mr. Harrison from time to time would drop in
 8  during that time frame, did you sometimes make a note of it on
 9  your calendar?
10  A    I did.
11  Q    Okay.  And during that time period, when these factoring
12  lines were going, 2008 to 2010, who was the primary contact
13  with Mr. Corriher on that?
14  A    Mr. Corriher was the primary contact with Mr. Harrison.
15  Q    I'm sorry, with Mr. Harrison?
16  A    Yes.  Mr. Corriher was the primary contact with
17  Mr. Harrison.
18  Q    Okay.  Now, we've seen numerous emails between
19  Mr. Harrison and Mr. Corriher.  Do you recall that?
20  A    Yes.
21  Q    Okay.  Did you and Mr. Harrison typically ever email?
22  A    No, I don't recall ever having an email either to him or
23  from him.
24  Q    Okay.  Do you recall ever being copied on an email to him?
25  A    Yes, from Mr. Corriher.
```

1  Q    Okay.  Now, you've seen also some wire forms.  I'm going

2  to show you -- these are in evidence -- do you recognize this

3  form?

4  A    I do.

5  Q    I think you've seen this form.  This has some signatures

6  on it?

7  A    Yes.

8  Q    Do you see that?  Okay.  In the middle of this particular

9  form, I guess it's a wire for $125,000, right?

10 A    Yes.

11 Q    Okay.  Whose signature is in the middle of the form?

12 A    The employee taking the request is Doug Corriher, and

13 that's his DAC in that authorization.

14 Q    Okay.  And whose is below that?

15 A    I believe that's Mr. Taylor's.

16 Q    Okay.  And you had -- had you seen this form with the five

17 signatures before?

18 A    I did see it, yes.

19 Q    Had you signed one?

20 A    I signed a few.  I don't recall how many, but, yes, I

21 signed a few.

22 Q    Okay.  And how about this one?  Do you know whose

23 signatures are on these?

24 A    I believe that's Mr. Corriher and Mr. Taylor.

25 Q    I'll show you this one.  Do you know whose initials those

```
 1  are?

 2  A    Shannon Drake.

 3  Q    Okay.  Whose is this?

 4  A    It's Lesley Cannon.

 5  Q    Okay.  And who's to the right of hers?

 6  A    Douglas Cor -- DAC is Doug Corriher.

 7  Q    We heard some testimony about --

 8         MR. CHUT:  Objection to the form, Your Honor.

 9         THE COURT:  I'll overrule.

10  BY MS. BARBIER:

11  Q    About the location of Mr. Taylor's office --

12  A    Yes.

13  Q    -- do you recall that?

14  A    Yes.

15  Q    Where was it in relation to the factoring department?

16  A    It was very near the factoring department.

17  Q    And so if -- did he have approval to make signature -- I

18  mean, sign these over a certain amount?

19  A    Yes, he was one of the signers, signature authority on

20  that.

21  Q    So was his office convenient to the factoring division?

22  A    Yes, I suspect that's the reason he's on that is they went

23  to the closest person they could find.

24         MR. CHUT:  Objection as to what other people did,

25  Your Honor.  Speculation.
```

1              THE COURT:  Yeah, I'll -- yeah, I'll sustain.

2    BY MS. BARBIER:

3    Q    You reviewed the wire forms yesterday that are listed in

4    the indictment.  Do you recall that?

5    A    Yes.

6    Q    Okay.  Of the ones that you reviewed, did you see any with

7    your signature on them?

8    A    No.

9    Q    Okay.  Now, can you explain what an advance is?

10   A    Yes.  The advances -- the advances under the factoring

11   lines, all factoring lines, are approved through the advance

12   request form, and it's just simply a calculation of the total

13   of invoices that are on the factoring system less those that

14   are over 90 days, and then the net number is taken times the

15   advance rate, which, say, 85 percent, and then what's deducted

16   from that is the balance outstanding to arrive at the amount of

17   advance that's available.

18              And that form -- on that form, there is a place to

19   indicate what the advance will be, and then that document is

20   approved by someone in the factoring department.  That

21   represents the approval for the advance.

22   Q    Is there a difference between a wire transfer form and an

23   advance form?

24   A    Yes.  One is -- a wire form is authorization to move funds

25   at the direction of the customer, and the other is an advance

1  of the funds on the factoring line.

2  Q    Okay.  Now, when you -- generally speaking, when someone

3  brought you a wire -- a wire transfer form --

4  A    Yes.

5  Q    -- what information would you need to know in order to --

6  so that you would sign it?

7  A    Any wire form that was brought to me, and wire forms were

8  brought to me from time to time from all over the bank, not

9  just in factoring, but I would ask where the funds are coming

10 from being, and the answer would be either from an advance on a

11 line of credit or a factoring line, or it would be from a

12 deposit account.

13          If it was from a deposit account, I would ask, are

14 the funds good, and in banking parlance, that means were

15 they -- were they collected and not subject to being reversed

16 or reduced by a return of a deposited item, which might be

17 returned for non-sufficient funds.  And if the answer was, you

18 know, yes, I'd sign it.

19 Q    Now, are you familiar with a $3.2 million advance that was

20 made in July of 2009 to US Funding?

21 A    It was in January of 2009, yes.

22 Q    I'm sorry, I'm sorry, January of 2009?

23 A    Yes, I am.

24 Q    Okay.  What do you know about that wire transfer?

25 A    That was the initial wire transfer for the -- that we

January 30, 2019

**-4064-**

Earnest - Direct by Ms. Barbier                    105

1  funded the licensee accounts to purchase the invoices owned by

2  US Funding of Compensation Management, Inc.

3  Q    Okay.  At some point did you learn that some of those

4  invoices were not being paid to the bank after you sent that

5  $3.2 million?

6  A    Yes, yes.  I don't recall exactly when I learned that, but

7  at least by June of 2009 because there's an email from me that

8  references that.

9  Q    And what is the -- what was the issue there?

10 A    Whenever we pay off another factor, the account debtors

11 are used to sending their checks to the same place every single

12 time they write a check to pay invoices, and so it's the --

13 what we call the remit to address.  It usually takes 30 days,

14 60 days, sometimes 90 days to get the account debtors to change

15 their remit to address to us, to GrandSouth Bank.  We send them

16 notification and tell them that we are the assignee, that's a

17 legal term, that we're the assignee on the accounts, and -- but

18 it usually takes a little while to get them to change that

19 remit to address.

20 Q    Does it -- does it reduce the amount that can be advanced?

21 A    It does.  If an invoice is paid to someone other than us,

22 and we find out about it, we deduct it -- we should deduct it

23 from the advance base.  If it goes over 90 days, we deduct it

24 from the advance base, but it does reduce the amount that's

25 available for the next advance to that customer.

January 30, 2019

**-4065-**

Earnest - Direct by Ms. Barbier                    106

1  Q    Now, in some -- some time in September of 2009, did
2  Mr. Corriher come to you with some concerns?
3  A    He came to me in late September of 2009 and indicated that
4  US Funding had sent out a notice letter to the account debtors
5  that we were -- that we believed were our account debtors
6  telling them that they should direct their payments to US
7  Funding.  And I -- and when Mr. Corriher brought that to my
8  attention, I asked, go get me the payoff quote from US Funding,
9  and that's what we typically do.
10           When we pay somebody off, we get a quote from that
11  customer -- from that other institution which states how much
12  we need to send them to satisfy the debt or the obligation that
13  they have.  Mr. Corriher told me didn't have one, which was an
14  error, a big mistake.  He should have -- we shouldn't have been
15  in that position.
16  Q    Okay.  Now, did US Funding and a company called Acquient
17  get into litigation over this?
18  A    They did.  Actually, I think that was the genesis of this
19  issue.  The Acquient, LLC, was a lender to US Funding, and
20  their allegation was that US Funding had defaulted on the
21  obligation that they owed Acquient, LLC, and so we became aware
22  of that litigation.
23           MR. CHUT:  Objection to we, Your Honor.
24           THE COURT:  Well, as understood to be you.
25           THE WITNESS:  Yes, sir.

January 30, 2019

**-4066-**

Earnest - Direct by Ms. Barbier                        107

```
 1                THE COURT:  All right.
 2                THE WITNESS:  I became aware.
 3   BY MS. BARBIER:
 4   Q    So did the bank get brought into that litigation?
 5   A    Eventually, the bank was brought in as a third-party
 6   defendant at some point.  I don't recall when.
 7   Q    Who represented the bank in that litigation?
 8                MR. CHUT:  Objection.
 9                THE COURT:  I'll overrule as to that.
10                THE WITNESS:  Smith Moore Leatherwood.  F. Marion
11   Hughes and also Bruce Ashley of Smith Moore Leatherwood.
12   BY MS. BARBIER:
13   Q    Okay.  And ultimately did GrandSouth Bank finish factoring
14   these lines?
15   A    Excuse me?
16   Q    Finish factoring the Harrison license -- the Global Labor
17   licensee lines?
18   A    Yes, we continued to factor.
19   Q    Okay.  And when did that ultimately end?
20   A    Some time in 2010.
21   Q    Okay.
22                THE COURT:  Is now a good point?
23                MS. BARBIER:  Yes.
24                THE COURT:  Okay.  Ladies and gentlemen, I'm going to
25   excuse you for a luncheon recess.  I apologize.  It's going to
```

January 30, 2019

**-4067-**

Earnest - Direct by Ms. Barbier                          108

1  have to be a little longer than usual.  I'll ask you to return

2  at 2:30.  The jury is excused until 2:30 for lunch.

3          (At 12:37 p.m., jurors excused.)

4          THE COURT:  All right.  We'll be in recess until

5  2:30.

6          (At 12:38 p.m., break taken.)

7          THE COURT:  All right.  We'll be in recess until

8  2:30.

9          (At 12:38 p.m., break taken.)

10         (At 2:28 p.m., break concluded.)

11         THE COURT:  We're here a couple minutes early.  So

12  while we have a couple of minutes, in light of the Hunnicut

13  testimony and the Control Solutions audit, we did find where we

14  had addressed that after Mr. Corriher testified, a couple of

15  different things.

16         I think that -- well, let me just go back and say, at

17  the time, the way I understand it, Ms. Hunnicut was -- as

18  Mr. Howard represented, Ms. Hunnicut was interviewed after

19  trial had started and provided new information.  I think,

20  during the course of trial, there is always the possibility

21  that witnesses pop up during trial and are added.  We've all

22  seen that before.

23         I think my initial problem with Ms. Hunnicut flows

24  from the second point that Mr. McLellan indicated was going to

25  be raised through Ms. Hunnicut is the next point would be to

January 30, 2019

**-4068-**

1   ask her questions that if she were informed about a particular

2   phenomenon in the factoring department, whether that would

3   affect the results of her audit.  An example would be if the

4   UCC 1s were filed on something other than the companies whose

5   receivables were being factored.

6          Now, this is being discussed against the backdrop of

7   Mr. Corriher identifying an audit conducted by Ms. Hunnicut,

8   but, at least as I recall the testimony at this point, I may be

9   wrong, I thought Ms. Hunnicut said -- Mr. Corriher, at least as

10  I understood it, didn't give any indication that the audit

11  related to the Harrison receivables.  I may be wrong about

12  that.  You all may recall otherwise.

13         Yes, sir?

14         MR. McLELLAN:  Well, we're going to check the

15  transcript on that point, Your Honor.

16         THE COURT:  I'm good with that.

17         MR. McLELLAN:  However, the -- at any event, the --

18         THE COURT:  Let me finish my thought.

19         MR. McLELLAN:  I apologize, Your Honor.

20         THE COURT:  I thought you were standing up to say,

21  wait a minute, Corriher did say something specific about --

22  that he learned from the Hunnicut audit in relation to the

23  receivables.

24         So, at that point, it seemed to me a couple of

25  things.  One, that, as I said, at least this is the rough, I'm

Earnest - Direct by Ms. Barbier                          110

1  not persuaded at this point that her outside opinion doesn't

2  cross the line from lay to expert testimony; that is,

3  specifically, when Ms. Hunnicut moves into opining about how

4  various things would affect the audit.

5         Now, I will confess that I was laboring under the

6  assumption that Ms. Hunnicut was some kind of CPA or had some

7  kind of specialized training that allowed her to conduct these

8  outside audits.  And, frankly, my perception was that she

9  conducted outside audits in the manner she chose.  It was a

10 little different from the regulators in that the regulators are

11 doing the audit pursuant to schemes and regulations that are

12 set up by BOFI and FDIC, and so on and so forth.

13        Now -- so, before going a little bit further.  The

14 2010 audit that I understood, at least based on the proffer,

15 that Ms. Hunnicut had done and provided to Mr. Corriher, at

16 least at that point, I didn't see there to be any relevance,

17 other than, perhaps, the legal lending limit, which, in my

18 opinion, at that time, would definitely ease into expert

19 testimony because she's making a decision outside of

20 regulations established as to what legal lending limit applies

21 and how things are grouped together, if at all.

22        So, I'm saying all that to say that's generally why I

23 didn't allow her testimony at that point, those two reasons.

24 It may very well be, as we got into a little bit later, that

25 Ms. Hunnicut, in 2010 and 2011, provided information to the

Earnest - Direct by Ms. Barbier                    111

1    bank that would act as notice to the bank, contrary to some of
2    the things that have been alleged.

3           I think, so long as -- and I'm not reversing myself,
4    I'm just explaining.  So long as Ms. Hunnicut is not opining on
5    things that would be only proper under expert testimony, for
6    which no notice has been given, it seems to me that, to the
7    extent -- the report itself is some evidence to notice of
8    relevant individuals -- is evidence of notice to relevant
9    individuals within the bank of certain facts that are relevant
10   to this case, and that was a record maintained by the bank in
11   the normal course of records, then it would seem to me that
12   record could be relevant.

13          That's the way I saw it -- well, the last part, as I
14   indicated after we talked about Mr. Ruffin for a while, I
15   think, in fairness, this comment was only directed to
16   Mr. Ruffin, but I think it ultimately probably applies to both
17   Ruffin and Hunnicut with respect to Control Solutions, where I
18   said -- I forgot to think about this alternative, that these
19   were records produced at the direction of the bank during the
20   course of this relationship and presented to the bank.  That's
21   a completely different thing if those -- information in those
22   records is relevant to the knowledge that some pertinent
23   individual within the bank held.

24          I went on to say I'll think about it, let's call
25   somebody else and keep this trial moving, and I don't think it

1   ever came up again.

2         So, in light of what I perceive to be as perhaps some

3   confusion, I did sustain the objection to keep out

4   Ms. Hunnicut's testimony at that particular juncture, primarily

5   because I thought the purpose for which it was proffered

6   crossed into expert testimony given the additional opinions

7   that we would be provided.  At that particular juncture, it

8   wasn't clear to me that information in the report would be

9   relevant to the knowledge that either Mr. Earnest or others may

10  have, because I only understood it to have been provided to

11  Corriher and not related to Harrison.

12        That's -- so does that help everybody understand

13  that?  Anybody want to be heard on that?

14        MR. McLELLAN:  Well, Your Honor, external auditors

15  were adduced by the defense in opening.  And the -- this email

16  today raises, again, a prescription of a review process, which

17  includes -- by Mr. Earnest.

18        THE COURT:  What's the date of that email?

19        MR. McLELLAN:  This is May the 4th, 2009.

20        THE COURT:  Okay.

21        MR. McLELLAN:  And it prescribes --

22        THE COURT:  Whose audit is that?  I thought that

23  Hunnicut was '10 and '11.

24        MR. McLELLAN:  Your Honor, this is the email that

25  gave rise to our renewed motion to be able to put on

Earnest - Direct by Ms. Barbier                        113

```
1   Ms. Hunnicut, that the defense -- the defense has now put into
2   the record and had --
3           THE COURT:  No, but what I'm -- I understand that's
4   the date of the email, but what audit is that referring to,
5   because I thought Hunnicut, as you described it, was audits in
6   2010 and '11.  Am I missing something?
7           MR. McLELLAN:  I believe Ms. Hunnicut was a
8   long-standing external auditor over the bank for a long period
9   of time.
10          THE COURT:  That, I don't disagree.  But, in our
11  colloquy that we had earlier, at least according to the rough
12  notes, I've got "the 2010 audit."  She can speak for herself as
13  far as who would know about it.  The 2010 audit, on its face,
14  says she reported them to Doug Corriher.  The 2011 audit says
15  we discussed the findings with Ron Earnest, David Burgess, JB
16  Garrett, Bert Taylor, and Doug Corriher.
17          MR. McLELLAN:  Those are two Proposed Government
18  Exhibits, Your Honor.
19          THE COURT:  Okay.  So what do they have to do with an
20  '09 email?  That's my question.
21          MR. McLELLAN:  The '09 email says with regard -- with
22  regard to the factoring portfolio, that we need to develop
23  auditing procedures for Control Solutions that include much
24  more in-depth review of the factoring.
25          THE COURT:  Okay.
```

Earnest - Direct by Ms. Barbier                    114

```
 1          MR. McLELLAN:  And that's a prescription from --
 2   contained in an email from Mr. Earnest to his staff.  So that's
 3   what gives rise to our renewed motion to be able to have the
 4   jury know exactly what was entailed in that audit.
 5          THE COURT:  All right.  So we'll see how the rest --
 6   so -- okay.  So I think I understand what you're saying now.
 7          Whether or not the email standing alone, as Mr. Chut
 8   suggests, is enough to open the door to the Control Solutions
 9   audits in '10 and '11 is a close call, but Mr. Earnest's
10   examination is not concluded yet, and so I'll visit this again
11   upon the conclusion of his examination.
12          MR. McLELLAN:  And what -- there's one other -- there
13   were also questions to Mr. Corriher about external auditors.
14          THE COURT:  That's the key point.  And I think -- I'm
15   not trying to defend myself when I ruled the way I ruled, and
16   the record will -- you know, what the record says is what the
17   record says.
18          But did Corriher -- I guess the big question in my
19   mind, Corriher gets it.  Did he pass -- I don't understand
20   Corriher to have testified he passed it along or that the audit
21   had anything to do with Harrison.  That's a key point, I think.
22          MR. McLELLAN:  Yes, Your Honor.  Just on the Court's
23   other observation on the nature of the testimony that could be
24   elicited from this witness?
25          THE COURT:  Right.
```

January 30, 2019

**-4074-**

Earnest - Direct by Ms. Barbier                    115

```
1           MR. McLELLAN:  There is a Second Circuit case on
2  point that deals with this situation, and the holding is that:
3           "An accountant's testimony, in response to
4  hypothetical questions as to how withheld information would
5  have affected their accounting of proceeds from fraudulent
6  transactions was admissible both as factual testimony and,
7  alternatively, as lay opinion."
8           THE COURT:  All right.
9           MR. McLELLAN:  I could give the Court the citation.
10          THE COURT:  Yeah.  Better let me look at that.
11          MR. McLELLAN:  That's United States vs. Cuti,
12  C-U-T-I, and it's 720 F 3rd 453.  That's a 2013 Second Circuit
13  case.
14          THE COURT:  All right.  Here's what I -- yes, sir?
15          MR. HOWARD:  Your Honor, I just -- I want to --
16  that's been my issue all along.  The main argument we raised
17  early on was that we got a stack of documents that was
18  approximately this big.  Some of this is not hers, but this
19  much is.  She'd been interviewed, I think, on the 15th and
20  18th.  We'd been in trial for, like, eight days.
21          THE COURT:  Where did those documents come from?
22          MR. HOWARD:  She produced them to the Government and
23  they produced them to us in the second week of trial.
24          THE COURT:  All right.
25          MR. HOWARD:  And so, when you look at these two
```

1  letters, first of all, she's not an accountant, she's the CIA.

2  The 2010 letter says she discussed the findings with Doug

3  Corriher and only Doug Corriher, and found the reviews were

4  excellent.

5          Now, the 2011 letter -- keep in mind the 2008

6  factoring letters closed in 2010.  She discussed it with a

7  broader array of management, Earnest, Burgess, Garrett, Taylor,

8  and Corriher, and that got a satisfactory rating.  The only

9  purpose of this testimony to try to backdoor in her opinion.

10         THE COURT:  Wasn't -- the records didn't come through

11  the bank's production originally?

12         MR. McLELLAN:  Your Honor, I could tell the story of

13  our dealings with Ms. Hunnicut.  On the eve of trial, we got

14  discovery from Mr. Earnest that included one of these reports.

15         THE COURT:  A report?

16         MR. McLELLAN:  One of the exhibits that we proposed.

17  And that was in defense reciprocal discovery the week before

18  trial, could have been Friday before trial.

19         THE COURT:  It was at that hearing when they handed

20  you that disk.  It was shortly before trial, if it was on that

21  disk.

22         MR. McLELLAN:  It was -- I believe we received it

23  later than that, Your Honor.  So we -- so, basically, as trial

24  was starting, we -- the special agents located Ms. Hunnicut and

25  interviewed her.  And she -- there were memoranda of interview

Earnest - Direct by Ms. Barbier                    117

1  produced, which, as soon we got those, we turned them over to

2  the defense.

3         And we issued a trial subpoena to Ms. Hunnicut, and

4  she produced that stack of records, which we, the next day, we

5  copied it all and gave it to the defense.  So basically, as

6  this stuff was coming in, we were supplying it to the defense.

7  There was no delay in any of this.  We were -- you know, we

8  were producing it as best we could.

9         So it's not that we had Hunnicut in our back pocket

10 for a long time, Your Honor, and we're just springing it.  We

11 learned about Hunnicut on the eve of trial.

12        THE COURT:  So was she on the witness list, or she

13 was just in that -- let me see what you're referring to was in

14 the list of exhibits.

15        MR. McLELLAN:  It was one of those, Your Honor.  I

16 don't remember which one.  Your Honor, apparently, she was also

17 on the defense witness list.

18        THE COURT:  You want to be heard in response to that?

19        MR. HOWARD:  Your Honor, I don't understand the

20 timing -- how the timing of our production of reciprocal

21 discovery with them has anything to do with anything.  They're

22 the proponents.

23        And the work of Control Solutions was in the board

24 minutes for years and every time they did their work.  This has

25 been a relevant issue that they've had far more time and power

Earnest - Direct by Ms. Barbier                    118

1  to look into than we've ever had.  This is -- the factoring

2  audits, themselves, come out good.  It's just an effort to

3  backdoor an expert opinion.

4          THE COURT:  All right.  Well, this is a little bit

5  more information than I had when I was making this

6  determination initially.  I'm struggling to find unfair

7  surprise if Ms. Hunnicut was on your witness list and you

8  provided to the Government the reports for which those work

9  papers relate.

10          MR. HOWARD:  Your Honor, our argument on that point

11  is it's unfair surprise as to the expert testimony.  There's

12  been no notice of --

13          THE COURT:  Yeah.  We're not going to have expert

14  testimony.  I mean, she wasn't noticed as an expert, but I do

15  think to the extent information contained in these audits

16  that -- for which it appears everyone was on some kind of

17  notice, good, bad or indifferent, are relevant to facts at

18  issue.

19          And, specifically, all I'm going to say at this

20  point -- I'm not saying they come in, but all I'm saying is my

21  ruling at the time after Corriher's testimony sustaining the

22  objection was based on the facts as I understood them at that

23  particular juncture.

24          With respect to the late disclosure, which wasn't, in

25  all candor, a basis then because I was thinking in terms of lay

Earnest - Direct by Ms. Barbier                     119

```
 1  versus expert testimony.  Given what was being described, I'm
 2  not sure what a CIA is or is not competent -- what is a CIA?
 3          MR. McLELLAN:  It's -- I think it's an association of
 4  internal auditors.
 5          THE COURT:  Okay.
 6          MR. McLELLAN:  And she's a long-time bank worker,
 7  Your Honor, who is now in the line of work of performing
 8  external audits for -- for banks.
 9          THE COURT:  I don't know what's lay and what's
10  expert.  I've never had a CIA testify in the courtroom.  I'll
11  take a look at your case on a Certified Public Accountant.  I'm
12  not -- to get back to the point, to the extent there was expert
13  testimony offered, there was no notice given prior to trial.
14  And at the late juncture that was disclosed, it seems to me
15  that allowing an expert at that point, that's just too late in
16  the absence of any notice whatsoever.
17          On the other hand, looking at it now, to the extent
18  there is information that she provided through these reports to
19  the bank on a regular basis is relevant to this case.  Maybe it
20  is relevant, maybe it isn't.  I'm not going to give you a
21  ruling in advance without, certainly, at least hearing the rest
22  of Earnest's testimony.
23          I'm still left in a position where she may have been
24  doing audits, but I'm not sure how -- it looks like, now,
25  contrary to my understanding, that her audit was of the
```

1 factoring operation as a whole.  I don't know what the heck --
2 I don't know.

3        But anyway, my ruling was limited -- is now limited
4 to the facts as I understood them at that point.

5        Yes, sir?

6        MR. CAMDEN:  If the Court ultimately believes it's
7 going to go down the road of introducing the evidence --

8        THE COURT:  I'm not introducing anything.

9        MR. CAMDEN:  -- or allowing the evidence to be
10 introduced, Your Honor, I would point out, you know, we've
11 closed the case.  The Court made some rulings.  I don't think
12 there's any way you can interpret Defendant Taylor's defense
13 raised anything that would implicate this as rebuttal.

14        THE COURT:  No.  And there's a couple of things to
15 consider on that.  One, if, through Earnest's testimony,
16 somehow the door gets opened or if the Government decides to
17 present it in rebuttal, then I'd be inclined to consider one of
18 two things.

19        One, that the jury's instructed that they can't
20 consider it as to Taylor; or two, give Taylor an opportunity to
21 reopen his evidence, should he choose to, in light of the
22 admission of this evidence.

23        This is something that can happen any time there are
24 multiple defendants, and one defendant chooses to present
25 evidence a certain way, and the other does something different.

Earnest - Direct by Ms. Barbier                    121

```
1          MR. CAMDEN:  Obviously, we'll revisit the issue as we
2   need to, Your Honor.  I would suggest, even with a limiting
3   instruction, the fact that Mr. Taylor is named on at least one
4   of the two exhibits that the Government has identified, I
5   think, is problematic even in that light.
6          And I would further say that I believe the -- as the
7   Court has just noted, my understanding of Ms. Hunnicut's audit
8   is that she audits processes.  She's a process auditor.  She's
9   looking at, are your procedures, are your policies, are these
10  things in place to adequately manage this department?  Which
11  means, I think, by definition, she's not reviewing the Harrison
12  entities.  She's reviewing the process.  I think it's
13  incredibly -- I just don't think that's terribly probative of
14  anything.
15         THE COURT:  It may not be.  I mean, I don't know.
16         MR. CAMDEN:  So I just leave it at this.  With
17  respect to Mr. Taylor anyway, I think allowing this in at this
18  point opens an enormous can of worms on any number of levels
19  for very low probative value.
20         THE COURT:  I can understand that.  It may be
21  limited; I don't know.  But I will say this is different from
22  what I was understanding when the arguments were being made
23  with respect to who knew what when about Ms. Hunnicut and the
24  full scope of what might be presented in terms of her
25  testimony.  So the ruling stands.  I'm not reconsidering in
```

January 30, 2019

**-4081-**

1  terms of the Government's case.  I'm letting the Government

2  reopen its case.

3            But on the other hand, to the extent anybody's

4  relying on that never coming in, I want to be clear that the

5  facts appear to me to be a little different than what I

6  understood back then.

7            All right.  Is Mr. Earnest in the courtroom?

8            MS. BARBIER:  Yes, he is, Your Honor.

9            THE COURT:  All right.  Anything else?  All right.

10  Leo, bring the jury in, please, sir.

11           MS. BARBIER:  Can he go ahead and take the stand?

12           THE COURT:  Since we had lunch, just wait until they

13  come in.

14           MS. BARBIER:  Okay.

15           THE COURT:  He can come up and I'll remind him he's

16  still under oath.

17           (At 2:52 p.m., jurors arrive.)

18           THE COURT:  All right.  Mr. Earnest, you may

19  return -- have you got your water?  You may return to the

20  witness stand.  You're still under oath in this proceeding.

21           THE WITNESS:  Yes, sir.

22  BY MS. BARBIER:

23  Q    Ron, during your time at GrandSouth Bank, do you ever

24  recall meeting with Mr. Greg Harrison alone, one-on-one?

25  A    No, I don't recall that, no.

January 30, 2019

Earnest - Direct by Ms. Barbier                    123

1   Q    When you met with him from time to time, as you've

2   described, who would have been present?

3   A    Doug Corriher would have been present most of the time --

4   well, he'd been present all the time.  Other times, maybe David

5   Burgess, and maybe even once or twice, Mason Garrett.

6   Q    Okay.  Do you recall meeting a fellow named Matthew

7   Medaloni?

8   A    I do.

9   Q    Can you tell us about that, please.

10  A    Matthew Medaloni was the principal of Medaloni of South

11  Carolina.  He -- I believe it was in March of 2010,

12  Mr. Corriher brought him to my office and introduced him to me.

13  It was a very short conversation.  I shook his hand, and as I

14  do with all customers, I asked him how his business was.  And

15  he told me it was improving.

16            MR. CHUT:  Objection.

17            THE COURT:  I'm sorry?

18            MR. CHUT:  Objection.

19            THE COURT:  Basis?

20            MR. CHUT:  Hearsay.

21            THE COURT:  From Medaloni?

22            MR. CHUT:  Yes, sir.

23            THE COURT:  Overruled.  Matthew?

24            MR. CHUT:  Yes, sir.

25            THE COURT:  Didn't he testify?

 1            MR. CHUT:  He did, Your Honor.

 2            THE COURT:  All right.  Overruled.

 3            THE WITNESS:  So, Mr. Medaloni told me that his

 4   business was improving, which, during that period of time, we

 5   weren't hearing that from very many customers, so I was real

 6   happy to hear about that.  He told me something about his

 7   business was staffing construction in the Georgia market,

 8   Atlanta market.

 9            So that was a very short conversation, just a few

10   minutes.  I shook his hand, told him we appreciated his

11   business, and asked him if there was anything else we could do

12   for him.  And then he and Doug left my office.

13   BY MS. BARBIER:

14   Q    How do you equate that to March of 2010?  What do you

15   associate it with?

16   A    In March, he executed a modification agreement, an

17   amendment to his factoring line, and I believe that's when he

18   did it.  I didn't see him do that, but that's -- that was the

19   date in March of 2010.

20   Q    Do you know a person named Matt Carpenter?

21   A    I know of Matt Carpenter, yes.

22   Q    Okay.  And what had the bank used him for?

23   A    He was used as a -- what we call a field auditor, but it's

24   really a field review.  He goes out -- we used him in the case

25   of McCombs Oil company a couple of times, where he goes out and

```
 1  looks at the books and records of our clients, in this case,
 2  one client, and verifies the information that has been provided
 3  to the bank.
 4  Q    Okay.  And did you, at any point in time, tell
 5  Mr. Corriher that you wanted a field review done of the Global
 6  Labor licensees?
 7  A    I did, yes.
 8  Q    Why did you do that?
 9  A    It was -- it was an email that was put up earlier where I
10  directed the staff, and it was to several people, including
11  Mr. Corriher and Mr. Burgess, saying that we needed to do,
12  like, a top-to-bottom review of the factoring portfolio.  And
13  there were several items on that that I wanted him to look at.
14          Included in that was we needed to get our field
15  auditor out -- field auditor out on a quarterly basis to our
16  larger accounts, including, specifically, McCombs Oil and the
17  Global licensees.
18  Q    Now, is that something you also put in the loan memo in
19  July of 2008?
20  A    That's correct, yes.
21  Q    Okay.  How was Matt Carpenter chosen?  Did you know him?
22  A    I didn't know him.  I don't remember meeting him, but I
23  understand that he believes he came to the bank in --
24          MR. CHUT:  Objection.
25          THE COURT:  Yeah, I'll sustain as to that.  You can't
```

Earnest - Direct by Ms. Barbier                    126

1   offer your opinion about what he might believe.  Do you recall

2   meeting him?

3            THE WITNESS:  I don't recall, Your Honor.

4            THE COURT:  All right.

5   BY MS. BARBIER:

6   Q    Do you know whether this field review that you ordered on

7   the Global Labor licensees got off the ground?

8   A    My understanding is it did not.

9   Q    And what did Mr. Corriher report to you on that field

10  review that you asked to be done?

11  A    Well, after I directed him to do that, I really didn't

12  think about it again until Mr. Corriher sent me an email in

13  December of 2009.  He sent it to me and Mr. Burgess and

14  Mr. Taylor, stating that he had received some financial

15  information from one of the account debtors from McCombs Oil,

16  and also, that the field auditor was going to be going to

17  McCombs Oil, I think he said, next week or some date in the

18  future, that it had been scheduled.

19            And I sent him back an email, copied my Chief Credit

20  Officer, David Burgess, and asked Mr. Corriher to send both

21  David and I the financial information he referenced.  And then

22  I asked him whatever happened to the audit that Carpenter was

23  going to be doing on the Global licensees.

24            Mr. Corriher sent both Mr. Burgess and me an email

25  back and said that the -- Mr. Harrison's attorney had advised

January 30, 2019

**-4086-**

Earnest - Direct by Ms. Barbier                          127

1  him not to provide anymore information because of civil

2  litigation.

3  Q    Okay.  I'm going to show you Earnest Exhibit 58.  Is this

4  the email you were describing?

5  A    Yes, that's it.

6  Q    Okay.  And, if you can, read in the middle of the page

7  where it says, "Let DEB and me look at the statements on

8  Owens."

9  A    Right.  It's an email from me to Doug on December the 2nd,

10  2009, with a carbon copy to David Burgess.  The subject is

11  "Account Debtor Credit Limits."

12          "Let DEB," initials for David E. Burgess, "and me

13  look at the statements on Owens.  Also, whatever happened to

14  the audit Matt was to do on the licensee companies?"

15  Q    Okay.  And how does Mr. Corriher respond to you?

16  A    He says that, "The info Matt was obtaining was on CMI, not

17  the licensees.  Greg's attorney advised him not to give Matt

18  anything else -- anymore documents related to CMI and GSB due

19  to the lawsuits/subpoenas."

20  Q    Okay.  Did you ever have a conversation with Mr. Corriher

21  about work papers that he disseminated, allegedly?

22  A    No.  I was not aware of any of that.

23  Q    Okay.  You heard Mr. Corriher testify that he left some

24  papers on Bert's chair?

25  A    That's what -- I heard that testimony, yes.

Earnest - Direct by Ms. Barbier                    128

1  Q    Okay.  So did you ever receive these papers that he
2  referenced?
3  A    No, I -- if I ever saw them, it was in the grand jury.  I
4  don't remember seeing them.
5  Q    Now, other than this email that we just saw, did you have
6  any conversations with Doug Corriher about Matt Carpenter's
7  attempted field review?
8  A    No.
9  Q    And did Mr. Corriher ever tell you that Matt Carpenter was
10 concerned because he could not find proof that Greg Harrison's
11 licensees were paying taxes?
12 A    No.
13 Q    Did Doug Corriher ever tell you that Greg Harrison's
14 licensees were not paying payroll taxes?
15 A    No.
16          MR. CHUT:  Objection.
17          THE COURT:  Basis?
18          MR. CHUT:  That's not what those papers were about.
19 They're about CMI, and that's what the document talks about.
20 It's rephrased in a way that's misleading.
21          THE COURT:  Well, she asked if he ever told him, and
22 I'll overrule.
23 BY MS. BARBIER:
24 Q    Did he ever tell you that there was any issue with Greg
25 Harrison and payroll taxes?

January 30, 2019

Earnest - Direct by Ms. Barbier                    129

```
 1  A    No, he never told me that.
 2  Q    Were you aware that Greg Harrison and/or his licensees
 3  were not paying payroll taxes?
 4  A    No, I was not aware -- I had no knowledge of that.
 5  Q    When is it you found out that Mr. Harrison had an issue
 6  with the IRS?
 7  A    I believe, in 2010, he was indicted, and I don't know --
 8  probably Mr. Corriher told me.  I don't remember.  We heard
 9  that he was indicted for something tax related, but we didn't
10  know what it was.
11          MR. CHUT:  Objection to the "we," Your Honor, as
12  opposed to who the "we" is.
13          THE COURT:  Using "we" in the singular as "I," right?
14          THE WITNESS:  Yes, sir.
15  BY MS. BARBIER:
16  Q    So I believe we've already talked about 941s, but were
17  you -- did you ever -- were you ever made aware, did you ever
18  receive any 941s on CMI for Mr. Corriher?
19  A    I did not, no.
20  Q    Moving to Mr. Corriher.  Who hired him?
21  A    I hired him.
22  Q    Okay.  And why did you hire him?
23  A    He was -- he worked for us at the Anderson National Bank
24  back in the '90s.  The factoring manager that we had in the
25  early part of our history at GrandSouth Bank left the bank, and
```

January 30, 2019

Earnest - Direct by Ms. Barbier                          130

1  so I needed to fill that position, and so I called David -- or

2  excuse me -- Doug Corriher to fill that position.

3  Q    Was he ever compensated based on the amount of factoring

4  being done by his department?

5  A    No.  And as a matter of fact, I did not have any

6  compensation for anyone in the bank that was related on any

7  formula to growth, profitability, assets, or anything else,

8  that causes extra risk taking, so I did not allow that in the

9  bank at all, for anybody.

10 Q    Okay.  What did you -- what did you believe Mr. Corriher's

11 relationship was with Mr. Harrison?

12 A    Well, he was a customer -- a long-time customer of

13 Mr. Corriher's.  I didn't know how close they were, but I

14 assumed they were friends as well.

15          MR. CHUT:  Objection to the "assumed," Your Honor.

16          THE COURT:  Sustained.

17 BY MS. BARBIER:

18 Q    I believe you testified that you knew he came to the bank

19 frequently?

20 A    Yes.

21 Q    Okay.  And, in 2005, did you discover that Mr. Corriher

22 had received a payment from one of Mr. Harrison's companies?

23 A    Yes.  My Chief Financial Officer, one of the duties he has

24 is to look through the accounts of employees, including my own

25 account, and just looking for any irregularities that he might

January 30, 2019

Earnest - Direct by Ms. Barbier                        131

1   find.  And he found a check that had been deposited into

2   Mr. Corriher's account from one of -- some company related to

3   Mr. Harrison, I don't recall which one it was.

4   Q    Okay.  What did you do when you found that out?

5   A    I addressed it with him initially and told him that I had

6   to take it to the board of directors.  That was, in my opinion,

7   a violation of our Bank Bribery Act policy, and so I took it to

8   the board of directors.

9   Q    You said that the CEO -- I mean, the CFO found this, who

10  was the CFO?

11  A    It was JB Garrett.

12  Q    And he's the one that brought it to your attention?

13  A    He was, yeah, he did, yes.

14  Q    Okay.  Did you talk to Mason Garrett about this?

15  A    Yes.

16  Q    And did you take it to the board?

17  A    I did.

18  Q    Okay.  Did the board have discussion about that?

19  A    We did.  We discussed it for a lengthy period, as a matter

20  of fact.

21  Q    And what did the board ultimately decide to do about this?

22  A    The discussion was -- I addressed it with the board and

23  told them that it was a violation of our Bank Bribery Act and

24  that I was unsure if it was a violation of law, but it was

25  certainly a violation of our policy, and that the remedy for

1    that could be termination, and that that's what we needed to
2    decide.
3            The board discussed it a number of -- we had a --
4    like I said, a fairly lengthy discussion.  It was ultimately
5    decided through the recommendations of the board members that
6    we'd give him an alternative.  The alternative would be to
7    return the money to the customer or give the money to the bank,
8    because we already paid him for his services, and he was
9    performing those services as an employee of the company.
10           And so, that's what we did.  We went back to him and
11   told him that he could be -- you know, he would either have to
12   leave or he'd have to return the money or give the money to the
13   bank.
14           MR. CHUT:  Objection to the "we," Your Honor.
15           THE WITNESS:  I told him that -- excuse me, Your
16   Honor.
17           THE COURT:  All right.
18   BY MS. BARBIER:
19   Q    Did you talk to Mason Garrett about it?
20   A    Yes, Mason Garrett was involved in that discussion before
21   and during the board meeting.
22   Q    Did you ultimately decide to give Mr. Corriher another
23   chance?
24   A    I did.
25   Q    And did you ever, during the time period he worked at the

Earnest - Direct by Ms. Barbier                    133

```
 1  bank, discover anything similar happening?
 2  A    I did not.  And during that period, I told him he was on
 3  thin ice, and that he -- that should never happen again.
 4  Q    Did your CFO continue -- did the CFO continue to monitor
 5  everybody's account?
 6  A    He did, yes.
 7  Q    Now, Ron, during the time period that Mr. Harrison and his
 8  licensees were doing business with the bank, did you ever agree
 9  with Mr. Harrison to defraud your bank?
10  A    Absolutely --
11           MR. CHUT:  Objection.
12           THE COURT:  Overruled.
13           THE WITNESS:  Absolutely not.
14  BY MS. BARBIER:
15  Q    Did you ever, during this time period, agree with
16  Mr. Harrison to help him not pay his payroll taxes?
17  A    No, I did not.
18  Q    And, during this time, did you ever agree to misapply your
19  bank's funds for Mr. Harrison and his licensees?
20  A    No, I did not.
21           MR. CHUT:  Objection.
22           THE COURT:  Overruled.
23  BY MS. BARBIER:
24  Q    And during this time, did you ever agree to make false
25  entry in your bank's books?
```

Earnest - Direct by Ms. Barbier                    134

```
 1  A     No, I absolutely did not.
 2            MS. BARBIER:  Beg the Court's indulgence.
 3            THE COURT:  All right.
 4  BY MS. BARBIER:
 5  Q    And let me ask you this.  Ron, during this time period,
 6  did you ever bury your head and ignore anything that you saw
 7  related to Mr. Harrison or his licensees?
 8  A     No; quite the contrary.  I directed efforts throughout my
 9  tenure as president of the bank to all areas of the bank, not
10  just the factoring area, to ensure that we were looking into
11  the actions we were taking to reduce risk, manage the risk of
12  the company, for the benefit of the company.  So, no, I never
13  buried my head regarding Mr. Harrison or anyone else.
14            MS. BARBIER:  Beg the Court's indulgence.
15            THE COURT:  All right.
16            MS. BARBIER:  Ron, please answer any questions the
17  Government asks.
18            THE COURT:  Any questions on behalf of Mr. Taylor?
19            MR. BANNISTER:  Your Honor, I must confess, you've
20  caught me just a little bit flatfooted.  I thought the
21  Government would go next.
22            THE COURT:  I'll give you another -- do you
23  anticipate any questions?
24            MR. BANNISTER:  I do, I do, yes, Your Honor.
25            THE COURT:  All right.  The order -- all right.  I'll
```

 1  let -- I'll let the Government proceed, and you may proceed

 2  after, but I'll give the Government an opportunity to respond

 3  to any questions you may ask as well.

 4              MR. BANNISTER:  That's fair, Your Honor.  I don't

 5  have any objection to that.

 6                          CROSS-EXAMINATION

 7  BY MR. CHUT:

 8  Q    Mr. Earnest, money advanced by GrandSouth Bank on

 9  factoring advances comes from the depositors of the bank; isn't

10  that correct, sir?

11  A    No, it comes from the capital of the bank.  It's --

12  deposits are used to fund it.

13  Q    So, ultimately, the source of GrandSouth Bank's lending

14  funds or funds to advance on factoring accounts comes from the

15  depositors of the bank?

16  A    It doesn't come from depositors.  The depositors have

17  money in the bank that the bank uses to fund its assets.

18  Q    So the bank funds its assets it uses to make the advances

19  with its depositors' money?

20  A    With funds that are on deposit with the company as well as

21  its capital.

22  Q    Funds that people put in their checking and savings

23  accounts?

24  A    Yes, and the bank's capital.

25  Q    And those deposits are insured by the FDIC?

Earnest - Cross by Chut                                    136

1  A    Deposits are insured up to 250,000 per account by the

2  FDIC.

3  Q    Now, let me draw your attention to Exhibit 680, which has

4  already been exhibited, Ms. Collins.  If you'll pull that up

5  for Mr. Earnest.  And if you'll blow up the very top portion.

6          Mr. Earnest, is this the factoring agreement signed

7  on July 29, 2008, between Medaloni, Incorporated, and

8  GrandSouth Bank?

9  A    It appears so, yes, sir.

10 Q    Let me draw your attention to paragraph 8.4 on page 4 of

11 the exhibit.  If we can blow that up, Ms. Collins.  And can you

12 read that, Mr. Earnest?

13 A    You want me to read it, sir?

14 Q    Yes, sir.

15 A    Paragraph 8.4:  "Seller shall pay when due all payroll and

16 other taxes and shall provide proof thereof to purchaser in

17 such form as purchaser shall reasonably require."

18 Q    And you prepared this factoring agreement, isn't that

19 correct, sir?

20 A    I did not prepare it.  It was a document prepared for the

21 bank.

22 Q    It's a standard form of the bank, isn't it?

23 A    It is a standard form, yes, sir.

24 Q    So the bank is interested in whether it's clients pay

25 payroll taxes, is that correct, sir?

```
 1  A    I'm sorry, I didn't understand.
 2  Q    The bank is concerned whether its clients pay payroll
 3  taxes, is that correct, sir?
 4  A    We do tax lien searches to verify there are no tax liens
 5  in existence for our clients, yes, sir.
 6  Q    Well.  8.4 says:  "Seller shall pay when due all payroll
 7  and other taxes...," correct?
 8  A    Yes, sir.
 9  Q    And that's the bank's form, correct?
10  A    Yes, sir.
11  Q    And this factoring agreement gives the bank a security
12  interest in the collateral and assets of Medaloni, Inc., is
13  that correct?
14  A    Yes, sir.  There's a paragraph that identifies that.
15  Q    And you never had a written factoring agreement with
16  Compensation Management, did you, sir?
17  A    No, sir.
18  Q    Nor did the bank?
19  A    No, sir.
20  Q    And you prepared the commercial loan memos for the
21  Harrison staffing companies, is that correct, sir?
22  A    In July of 2008, yes, sir.
23  Q    And there's no separate form for factoring memos.  It's
24  all just one commercial loan memo?
25  A    We use the same document for an approval memo, that's
```

January 30, 2019

1  correct.

2  Q    Now, if I can draw your attention to Exhibit 1418 already

3  admitted into evidence, and if you can blow up the top portion,

4  Ms. Collins.  And who is the officer listed on this loan, sir?

5  A    It's me.

6  Q    And who is the borrower?

7  A    Bruce Gregory Harrison.

8  Q    And is this a memo regarding the personal loan for over a

9  million dollars that you testified about?

10 A    It appears so, yes, sir.

11 Q    And you were the loan officer for that loan, were you not,

12 sir?

13 A    That's correct.

14 Q    And looking at the originating officer's comments, this

15 memorandum memorializes for the bank's records a receipt of a

16 payment of $500,000 and release of collateral on the loan, is

17 that correct, sir?

18 A    Yes, there were two payments actually totaling 500,000,

19 one for 375,000 and one for 125,000.

20 Q    And the $375,000 payment is the one that bounced, is that

21 correct, sir?

22 A    That's correct.  It came back nonsufficient funds.

23 Q    And let me draw your attention to Exhibit 1479, and blow

24 up the top portion of this.  And is this document loan history

25 for the personal loan you were the loan officer for for Bruce

Earnest - Cross by Chut                                    139

1  Gregory Harrison?

2  A    It appears so, yes, sir.

3  Q    And drawing your attention, Ms. Collins, to the top part,

4  the loan to date portion.  Now, do you see a wire dated

5  September 14, 2006, for $125,000?

6  A    Yes, sir.

7  Q    And do you see a principal payment of $375,000 on

8  September 18?

9  A    Yes, sir.

10 Q    And going down a little bit, Ms. Collins.  Do you see an

11 entry for October 20, 2006, marked "NSF Check" with a value of

12 $375,000?

13 A    Yes, on October 20, yes.

14 Q    Now, looking at this loan history, your testimony that the

15 $125,000 came in -- payment came in after the 375,000

16 nonsufficient fund payment, that's not accurate, is it, sir?

17 A    I don't know when it came in.  What's the date on it?

18 Q    Look at the wire, sir.

19 A    There's a wire that came in on September the 14th, and

20 then the other payment looks like it came in on -- I can't see

21 that -- the 18th, so four days later.

22 Q    So your testimony that the $125,000 payment came in second

23 after the nonsufficient funds check is not accurate, is that

24 correct, sir?

25 A    My testimony based on what I'm looking at here would be

January 30, 2019

1   that the wire came in on the September the 14th, and the check

2   that was returned NSF came in on the 18th of September.

3   Q    Now, I'm going to draw your attention to what's marked as

4   Exhibit 1454, and is this another commercial loan memo for the

5   personal loan to Greg Harrison?

6   A    Yes, sir.

7   Q    And, again, you're marked as the loan review officer?

8   A    Correct.

9   Q    And what address is listed for the borrower?

10  A    4309 Hoke Lane.

11  Q    And in Greensboro?

12  A    Yes, sir.

13  Q    And let me draw your attention to the middle portion, if

14  you can blow it up, Ms. Collins, with the total of approved.

15  And what's the amount listed for amount requested, sir?

16  A    $1,384,402.85.

17  Q    And what's the related debt?

18  A    The number is $176,090.10.

19  Q    So looking at the total there for approved, what was the

20  total amount of personal debt that Mr. Harrison had to

21  GrandSouth Bank on the date of this memo, November 30, 2008?

22           MS. BARBIER:  Objection.

23           THE COURT:  Overruled.

24           THE WITNESS:  The total number there is

25  $1,560,492.95.

1  BY MR. CHUT:

2  Q    And let me draw your attention to the originating

3  officer's comments, first starting at the very bottom,

4  Ms. Collins.  Do you see that last sentence -- and did you

5  write this memo, Mr. Earnest?

6  A    I believe I did, yes, sir.

7  Q    And what did you write in that very last line that starts

8  "We have been told"?

9  A    "We have been told that the business will be moved back to

10  Mr. Harrison's company and GSB on October the 15th, '08; and if

11  it does not, Mr. Harrison's ability to continue to service the

12  subject debt may be strained.  See attached."

13  Q    And drawing your attention to the second line that starts

14  out, "A 125,000 reduction was made."

15  A    "A $125,000 reduction was made during the first 30 days of

16  the loan, and the borrower requested additional time to pay the

17  balance in full."

18  Q    So in the first memo we looked at, it was a $500,000

19  reduction, is that correct, sir?

20  A    It was -- that's correct, yes, sir.

21  Q    And here you backed out the $375,000 NSF payment, correct?

22  A    That's correct.

23  Q    Without making any further reference to it?

24  A    I did not, no.

25  Q    Let me draw your attention, sir, to the second page of

Earnest - Cross by Chut                    142

1  this document, and blow up the top portion, Ms. Collins.  And

2  these are US Staffing companies listed as related debt to

3  Mr. Harrison, is that correct?

4  A    It's related by the fact that we added Mr. Harrison as a

5  guarantor on those debts, yes, sir.

6  Q    And that's a total related debt of over $176,000?

7  A    That's correct.

8  Q    Now, let me draw your attention to -- again, back to

9  Exhibit 1479.  And Ms. Collins, the fourth page, to the very

10 bottom.  If you would blow up the very bottom portion of the

11 column.

12         The total charge-off principal listed here, sir, on

13 January 18,2012, is $828,291.11, is that correct, sir?

14 A    That's correct.

15 Q    And that's approximately six years after you initially

16 made what was supposed to be a 60-day loan?

17 A    Ninety days, I think, but, yes, sir.

18 Q    Let me draw your attention to -- you've testified about a

19 further loan made involving an airplane, is that correct?

20 A    That's correct.

21 Q    Was that the airplane you flew to visit Arvato with Greg

22 Harrison on?

23 A    One time I was on that airplane along with David Burgess

24 and Doug Corriher, that's correct.

25 Q    And where is Arvato located?

1   A    Weaverville, Asheville.

2   Q    North Carolina?

3   A    Yes, sir.

4   Q    And was Mr. Harrison on the airplane?

5   A    I don't know.  I don't remember if he was there or if we

6   met him at the plant.  I just don't remember.

7   Q    So he might have sent the airplane to pick you up?

8   A    I'm sorry?

9   Q    He might have sent his airplane to pick you up?

10  A    He did, yes, sir.

11  Q    Now, looking at what's marked Exhibit 1460.  Did you write

12  this commercial loan memo, sir?

13  A    I believe so, but you're going to have to blow it up a

14  little bit.

15  Q    If you'll blow the top portion up, please, Ms. Collins.

16  A    Yeah, I believe this is the aircraft loan.

17  Q    And what's the company listed there as the borrower?

18  A    Innovative Hiring Technology, Inc.

19  Q    And Bruce Gregory Harrison is the 100 percent owner and

20  president, is that correct?

21  A    That's what we were told, yes, sir.

22  Q    Were you told that, or was some "we" told that?  Were you

23  told that, sir?

24  A    That was what I was told by Mr. Harrison.

25  Q    And --

1  A    Or told or supplied information.  I don't remember which.

2  Q    How many years after Mr. Harrison bounced that $375,000

3  check did you rely on him to write this memo?

4  A    Well, this memo was dated November 3, 2009.

5  Q    So almost three -- just a little bit over three years?

6  A    Yes, sir.

7  Q    Now, look at the middle part of this, please, where it

8  says, "collateral."  If you can blow that up, Ms. Collins.  And

9  do you see the line "Valued at cost of 350,000 per borrower"?

10  A    Yes.

11  Q    Is that the value Greg Harrison told you the plane was

12  valued at?

13  A    It must be, because that's what I put down there.

14  Q    So you relied on him to value the airplane?

15  A    No, sir.  This was additional collateral that we acquired.

16  We wanted additional collateral to help us with the loans to

17  Greg Harrison.  We used the proceeds of this loan to pay down

18  the other loan.  At the end of the day, we had no more debt

19  outstanding to Mr. Harrison than we did before we picked up the

20  airplane.  We were picking up additional collateral to better

21  secure the bank's position.

22  Q    And this was a 1973 airplane, wasn't it, sir?

23  A    I don't know what it was.  I don't remember.  It was an

24  aircraft.  I don't remember how much it was worth.  Don't know

25  what the type was.  We had it secured -- had our lien affixed

1  to it through the FAA.

2  Q    And, in fact, it was worth nowhere near $350,000, is that

3  correct, sir.

4  A    That's correct.  It was worth less.

5  Q    In fact, it was worth about $70,000, is that correct?

6  A    I think it was worth more than that, sir, but I don't

7  recall, sir.  I don't remember.

8  Q    Well, let's look at Exhibit No. 1494.  And if we can go to

9  the second page, Ms. Collins, and if you'll blow up the very

10 bottom.  And do you see a notation, sir, for May 09, 2012, for

11 "sale of aircraft"?

12 A    Yes.

13 Q    And what's that amount, sir?

14 A    78,285.

15 Q    Now, Innovative Hiring Technology, Inc., was

16 administratively dissolved in 1995, sir, is that correct?

17 A    I saw that -- yes, I saw that, but I wasn't aware of that.

18 Q    Well, you were the loan officer, weren't you, sir?

19 A    I was.

20 Q    So the fact is you made a $500,000 loan to a company that

21 hadn't been in business since 1995?

22 A    I made a $500,000 loan which I used to pay down another

23 loan to the same borrower, and I picked up the aircraft as

24 collateral.  That was the purpose of the loan was to acquire

25 additional collateral to secure the bank's position.

Earnest - Cross by Chut                                    146

```
 1  Q    Under the false pretense this airplane was used by a
 2  company that simply didn't exist, sir?
 3             MS. BARBIER:  Objection.
 4             THE COURT:  Overruled.  If you can answer.
 5             THE WITNESS:  What was the question, sir?
 6  BY MR. CHUT:
 7  Q    The pretense of this loan was that you were loaning money
 8  to a company that supposedly used this airplane, correct?
 9  A    The pretense of the loan was we were acquiring the
10  collateral and using the proceeds of that loan to pay down in
11  equal amount another loan that was directly to Mr. Harrison.
12  Q    What entity is the bank loaning money to, sir?
13  A    In this particular case, it was Innovative Hiring
14  Technology, Inc.
15  Q    And that company was dissolved in 1995?
16             MS. BARBIER:  Objection.
17             THE COURT:  Overruled.
18             THE WITNESS:  That may be correct, sir.  I don't
19  know.
20  BY MR. CHUT:
21  Q    You're the loan officer, correct?
22  A    I'm the loan officer, that's correct.
23  Q    Let me have you look at page 3 of this exhibit, sir.
24  Exhibit 1460, page 3.  Do you see where you wrote, "The
25  aircraft is used exclusively in the business as Mr. Harrison
```

1  travels daily to customers utilizing CPU model..."?

2  A    Yes, sir.

3  Q    But this company wasn't functioning in 2009, was it, sir?

4  A    I don't know, sir.  The aircraft was functioning.  We did

5  repossess the aircraft.

6  Q    And outside the $78,000, the rest of the loan was a loss,

7  is that correct, sir?

8  A    Of this loan?

9  Q    Yes, sir.

10 A    I would have to look back, but you may be right, sir.  I

11 don't know.

12 Q    Now, let me draw your attention to -- so strike that.

13        So in 2006, Mr. Harrison provided the bank with a

14 $375,000 worthless payment, correct?

15 A    The loan that we had to Mr. Harrison in 2006 started out

16 as a million five secured by his real estate.  We had a lien on

17 that real estate through a mortgage.  The terms of that loan

18 were, I think, 90 days, a short-term loan.  That's what our

19 expectations were.

20        We expected that the contract he had on the property

21 would close and the proceeds of that would largely liquidate

22 our debt, if not totally liquidate our debt.  That did not

23 occur, so we renewed it again at the end of 90 days, and we did

24 subsequent renewals beyond that.  Our intent was always to have

25 a short-term loan to Mr. Harrison.  We did not plan on having

 1  the long-term loan with Mr. Harrison.  Unfortunately, the

 2  economy turned, the real estate values declined dramatically,

 3  and we ended up with a problem asset on our hands.

 4  Q    But you didn't declare him in default when he provided the

 5  bank with a $375,000 worthless payment, did you, sir?

 6  A    The payments that he provided, both the 125,000 and the

 7  375,000, neither were required under the loan terms, nor were

 8  they expected.  The $125,000 reduction that we got in the first

 9  30 days, we were pretty happy to have.  It demonstrated

10  performance, even though the $375,000 check was returned.

11  Q    So your testimony is that bouncing a $375,000 check is

12  performance?

13  A    No, sir.  My testimony is that $125,000 reduction in the

14  loan that we did not expect to get the reduction in the first

15  30 days did demonstrate performance.

16  Q    Your testimony then, sir, that in 2009 you were still

17  relying on -- supposedly relying on Mr. Harrison's

18  representations in regard to the Innovative Hiring Technology

19  airplane loan?

20  A    We were relying on Mr. Harrison's ability to repay our

21  debt.  He had historically been a good performer.  He ran into

22  some difficult times during the 2007-2008 time period, and we

23  risk rated those loans accordingly.

24  Q    Sir, you've been in banking 35 years?

25  A    At least, yes, sir.

1   Q    So making a 90-day $1.5 million approximate loan and
2   having to write it off almost six years later for $800,000
3   loss, that's performance?
4   A    Mr. Chut, during that period of time, we wrote off a lot
5   of loans, as did a lot of banks throughout South Carolina and
6   other parts of the country.  We all suffered under some very
7   difficult economic times, and certainly we were no different.
8   We were probably a little better than average from most South
9   Carolina banks during that period, but we suffered a lot of
10  losses.
11  Q    So how many other $1.5 million loans did you write off,
12  sir, that you were a loan officer on?
13  A    I didn't write any others off that I was a loan officer
14  on, but we had other loans that we wrote off during that period
15  of time.
16  Q    Let me draw your attention to Exhibit 750, already
17  admitted into evidence.  And looking at Exhibit 750, is this a
18  factoring agreement between US Staffing of South Carolina and
19  GrandSouth Bank?
20  A    It appears so, yes, sir.
21  Q    And on September 2, 2004?
22  A    Yes, sir.
23  Q    Let me draw your attention, sir, to the sixth page of this
24  exhibit.  And do you see a section -- if you can blow it up
25  where it says "officer" on the right-hand side of the bottom of

1  that document, ma'am, Ms. Collins.  Other side.  Right hand.

2          And who is listed as the officer on this loan, sir?

3  A    Doug Corriher.

4  Q    Do you see above that where it says "officer" under --

5  over fax number?

6  A    I see that.

7  Q    And whose name appears there?

8  A    Ron Earnest.  That's an error.

9  Q    But it does appear there?

10 A    It does.

11 Q    And now, at some point Greg Harrison sold all those US

12 Staffing companies you were funding, correct?

13 A    What we were told -- what I was told was in late-2006

14 Mr. Harrison came in and said he lost his workman's

15 compensation policy, or was unable to get it renewed, and that

16 the accounts left us at that point in time.

17 Q    You knew, sir, that Mr. Harrison had sold those companies

18 to Mark Griffin and Ray McDaniel, didn't you, sir?

19 A    Later, I heard that that was the case.  I did not know

20 that at the time.

21 Q    And you've testified that workman's compensation insurance

22 is crucial in the factoring business?

23 A    It is, yes, sir.

24 Q    So --

25 A    That's my opinion.

Earnest - Cross by Chut                                151

```
 1  Q    -- what you've just testified to is that basically you had
 2  been informed that Mr. Harrison couldn't perform a basic
 3  necessity in factoring these accounts that had been lost to the
 4  bank, correct, sir?
 5  A    No, I wouldn't say that, sir.  What I was informed of is
 6  that he was unable to renew his workman's compensation
 7  insurance policy.
 8  Q    A basic necessity in the staffing business?
 9  A    And a very difficult thing to obtain.  Most staffing
10  companies have a lot of difficulty keeping their workman's comp
11  policy in place because it requires a great -- a large capital
12  outlay, particularly if you're a growing company.
13  Q    And then these companies, supposedly separate staffing
14  companies, US Staffing of South Carolina, et cetera, couldn't
15  function without Greg Harrison's insurance, correct?
16  A    They couldn't function without a workman's compensation
17  policy.
18  Q    Let me draw your attention to Exhibit 1299, already
19  admitted.  And so this is a letter you wrote, is that correct,
20  sir?
21  A    Yes, I believe so.
22  Q    And let me draw up -- Ms. Collins, if you'll draw up the
23  portion that begins "In Re" and goes to "Dear Greg" and
24  includes the first two paragraphs.
25            Can you see that, Mr. Earnest?
```

January 30, 2019

Earnest - Cross by Chut                                              152

```
 1  A     I can.
 2  Q     And what's the salutation of this letter, "Dear Greg?"
 3  A     Yes, sir.
 4  Q     And this includes -- this letter is about having
 5  Mr. Harrison assume responsibility for outstanding balances due
 6  on US Staffing of South Carolina, Inc., US Investment of North
 7  Carolina, Inc., and US Staffing of Florida, Inc., is that
 8  correct, sir?
 9  A     This is related to adding him as a guarantor on these
10  three lines.
11  Q     Correct.
12  A     Yes, sir.
13  Q     And he became personally liable for the remaining balances
14  due on those companies, correct?
15  A     We added him as a guarantor, that's correct.
16  Q     And you also added a balance on to the mortgage for 4800
17  Williams Drive, Little River, South Carolina, is that correct,
18  sir?
19  A     That's correct.
20  Q     And your previous testimony was that Mr. Harrison
21  volunteered to have this debt added on to his burden?
22  A     Yes, sir.
23  Q     And you never took any legal action against Joey Medaloni,
24  did you, sir?
25  A     We did not.  Mr. Harrison -- we added Mr. Harrison's
```

1  guaranty at his request, and I was happy to get his guaranty on
2  these.  At that point in time, I believed he was capable and
3  would continue -- would be able to support these lines through
4  their payout.
5  Q    And you already had Mr. Medaloni's guaranty?
6  A    I had Mr. -- I had whoever the guarantors were on all
7  three of these.
8  Q    Well -- and they were supposedly the owners of those
9  companies, correct?
10 A    That's correct.
11 Q    And you didn't sue one of them, did you?
12 A    I didn't have to, sir.  We collected these debts out.
13 Q    In 2007, when these companies stopped doing business with
14 GrandSouth Bank, owing the bank almost a quarter million
15 dollars, you took no legal action against the people that on
16 paper supposedly owned these companies?
17 A    We added a guarantor who had the ability to service the
18 debt and repay it, and that's what happened.
19 Q    Did you take legal action against Joey Medaloni?
20 A    We did not.
21 Q    Did you take legal action against Mark Gleason?
22 A    I didn't have to.  We didn't.  We got them paid out
23 without that.
24 Q    You didn't get them paid out in 2007, sir, is that
25 correct?

1              Did you get them paid out in 2007, sir?

2  A    I don't know when we got them paid out, but they reduced

3  and paid their fees or interests on them, and we were satisfied

4  with the payout.

5  Q    Let me draw your attention to Exhibit 1449, already

6  introduced.  And if you could blow up the top portion.

7              And is this another commercial loan memo you

8  prepared, sir?

9  A    It is -- I believe so, yes, sir.

10  Q    And what borrower is this for?

11  A    US Staffing of SC, Inc., US Staffing of Florida, Inc. and

12  US Investments of North Carolina, Inc., or NC.

13  Q    And you appear as the loan officer on this memo, do you

14  not, sir?

15  A    I do, yes, sir.  That's what the memo says, yes, sir.

16  Q    And what is the purpose of this memo?

17  A    You'll have to --

18  Q    If you look at the very top portion of the originating

19  officer's comments, Ms. Collins.

20              MS. BARBIER:  Your Honor, I'm just asking if he's

21  going to show him a document to let him be able to review the

22  paragraph.

23              MR. CHUT:  And I'll be happy to do that, Your Honor.

24              THE COURT:  All right.

25  BY MR. CHUT:

Earnest - Cross by Chut                                    155

1  Q     Go and take whatever time you need, Mr. Earnest.

2  A     Well, if you can point to purpose of credit.

3  Q     Or if you look at the top portion of originating officer's

4  comments, because the purpose of this memo.

5  A     No, sir.  Look above on the purpose.  Purpose of credit,

6  under total approved.  Purpose is a document renewal of

7  existing lines to -- there's a date out there.

8  Q     Yes, sir, 11/30/08.

9  A     Okay.

10          THE COURT:  Let him read the doc.  He's asked twice

11  to look at that part above.  Show him the part above.

12  BY MR. CHUT:

13  Q     Blow up the purpose of credit, if you would, Ms. Collins.

14  A     Purpose is to document -- excuse me, I'm sorry.

15  Q     Yes, sir.  Read that portion, please, sir.

16  A     Purpose is to document renewal of existing lines to

17  11/30/08.

18  Q     And the reality is these companies were out of business at

19  this point in time, were they not, sir?

20  A     I believe they were, yes.

21  Q     Now, if I could draw your attention to Exhibit 1475, draw

22  you to page 17, and if you take a look at the first page, let

23  me give you a chance to look at the first page, Mr. Earnest.

24  This is the State of North Carolina Board of Financial

25  Institutions examination dated June 4, 2008.  If you'll take a

January 30, 2019

**-4115-**

1  chance to take a look at that and recognize that.

2  A    I don't have it up, sir.

3  Q    1745.

4  A    What am I looking at, sir?

5  Q    I'm going to give you a chance to look at the document

6  before I ask you questions about it.  Just look at the first

7  page.

8  A    You'll have to blow it up better than that, I can't see.

9  Q    Actually, let's look at the second page, Mr. Earnest.

10          THE COURT:  Do you see that?

11          THE WITNESS:  I can see that.  State of South

12  Carolina Board of Financial Institutions Report of Examination.

13          THE COURT:  If you want to look at it, you'll need to

14  blow it up or give him a hard copy.

15  BY MR. CHUT:

16  Q    Can you see that portion, sir?

17  A    I can see this, yeah, I can see what it is.

18  Q    Now, drawing your attention again to -- go to the third

19  page, Ms. Collins, if you can blow that bottom portion up very

20  big.

21          Can you read that, Mr. Earnest?

22  A    I can.

23  Q    And if you want a hard copy, sir, I can provide you with

24  one --

25  A    No, I can see it.

1  Q    -- I'm not trying --

2  A    I understand.  I can see it.

3  Q    -- to be confusing.  And do you see what date this

4  examination is of?

5  A    The start date was March the 31st, 2008.  The examination

6  as of date was December 31, 2007.

7  Q    And let me draw your attention to page 17 of this

8  document, sir.  And if you can blow up, Ms. Collins, the

9  very -- the portion starting with Bruce "Harrison" and going

10 down to Bruce "Harrison relationship."

11 A    Okay.

12 Q    And are these the loans that were assigned to Greg

13 Harrison for the US Staffing companies?

14 A    No, they were not assigned.  Greg Harrison was added as a

15 guarantor.

16 Q    And how -- do you see the days past due on these loans?

17 A    Yes, 79, 79, and 79.

18 Q    And looking at the very top of the page, is there a

19 categorization of this -- of this debt in terms of its

20 category?

21 A    Yes, substandard.

22 Q    Now, stay on that page, Ms. Collins, if you can blow up US

23 Staffing of South Carolina.  And do you see that, sir?

24 A    Yes, sir.

25 Q    Now, Mr. Gleason was also associated with a supposed

```
 1  staffing company NC Global Labor, is that correct, sir?
 2  A    I think so.  I don't know.
 3  Q    How about IHT of SC?
 4  A    Again, I think so.  I don't know.
 5  Q    And but you know he was associated with a variety of
 6  companies during the history of your relationship with
 7  Mr. Harrison?
 8  A    He was one of the licensees.  I just don't recall which
 9  companies.
10  Q    And -- but it was several in sequence, correct?
11  A    Well, he was US Staffing of South Carolina and whatever
12  the -- if you say it's North Carolina Global, then I assume
13  that's it.  I don't know.
14  Q    Did you really think Mr. Gleason ran all these different
15  staffing companies?
16  A    Yes, we believed he did.
17  Q    I didn't say "we," sir.  How about you?
18  A    I believed he did.
19  Q    How about Randy Howell?  Did you believe that Randy Howell
20  really operated US Staffing of Virginia?
21  A    Yes, sir, that's what we were told -- what I was told.
22  That's what was represented to us by these individuals, and I
23  don't know these individuals, didn't know these individuals,
24  but, yes, that's what I believed.
25  Q    And you believed he ran Howell Investments of Virginia?
```

Earnest - Cross by Chut                              159

```
 1  A    I don't know what Howell Investments of Virginia is, but I
 2  don't know.
 3  Q    And Green Ideas N Motion?
 4  A    Green Ideas, I remember that name, yes, sir.
 5  Q    So you believed these were real staffing companies?
 6  A    I believed what they told us.  I believed what they
 7  represented to us.  I was unaware that Mr. Harrison was paying
 8  these individuals to defraud the bank.  So how would I know
 9  that?
10  Q    Let me show you what's marked as Exhibit 581, already
11  introduced.  And blowing up the very top portion of commercial
12  loan memo, Ms. Collins.  And is this one of the commercial loan
13  memos you wrote on the Harrison-related staffing companies?
14  A    I didn't write this one, but this is one of the loan
15  memorandums, the approval memorandums.
16  Q    And what address is listed for NC Global Investments on
17  the top, if you can blow up the left side.
18  A    I can see it.  4800 Williams Drive, Little River, South
19  Carolina.
20  Q    And that's Greg Harrison's house at the beach, isn't that
21  correct, sir?
22  A    I believe that's correct, yes, sir.
23  Q    And looking at the very bottom left-hand page, if you can
24  blow up the left hand, the signature portion, Ms. Collins.
25       And is that Bert Taylor's signature there?
```

January 30, 2019

```
 1  A    I think so, but I'm not certain of that, sir.
 2  Q    Now, drawing your attention to the second page of this
 3  document, and do you see the middle portion -- can you blow up
 4  outstanding loans, Ms. Collins.
 5  A    Yes.
 6  Q    And what's the related debt listed there?
 7  A    37,470 -- I can't tell, five dollars, US Staffing of South
 8  Carolina.
 9  Q    And that's debt also related to Mr. Harrison, isn't it?
10  A    It's related to both of them because both of them
11  guarantee it.  Related debt is -- the reason it's related is
12  because of the guaranties.
13  Q    So it's related to Mr. Harrison and to NC Global
14  Investments, Mr. Gleason's supposed company?
15  A    Was that -- yes.
16           MS. BARBIER:  Your Honor, if he could show him the
17  whole document when he's asking the question so he can see.
18           THE COURT:  Yeah, go back to the first page.  Do you
19  need to see the first page?
20           THE WITNESS:  Yeah, I don't remember what the first
21  page said, I'm sorry, sir.
22  BY MR. CHUT:
23  Q    That's okay.  I can provide with you a hard copy, too,
24  Mr. Earnest.
25  A    No, this will work.  Okay.  North Carolina Global
```

Earnest - Cross by Chut                                    161

```
 1   Investments is guaranteed by Mr. Gleason, and the related debt
 2   of that US Staffing company is also guaranteed by Mr. Gleason,
 3   so therefore it would be related.
 4   Q    So Mr. Gleason -- and it's also related to Mr. Harrison?
 5   A    Because he guarantees it, that's correct.
 6   Q    Now, you persistently describe these companies as
 7   licensees, is that correct, sir?
 8   A    That's correct.
 9   Q    And the bank was provided with license agreements for
10   these companies, is that correct?
11   A    I believe so, yes, sir.
12   Q    By who, Mr. Harrison?
13   A    I presume it came through Mr. Harrison, but I don't know
14   that.  He didn't give it to me.
15   Q    And let me draw your attention to Exhibit 598.  And if
16   you'll blow up the very top portion.  If you'll take a chance
17   to look at that, Mr. Earnest.  Blow up actually the whole first
18   paragraph if you would, Ms. Collins, and take a second to look
19   at that, Mr. Earnest.
20   A    Okay.
21   Q    And who is this licensing agreement between?
22   A    It's between Global Labor, Inc. and NC Global Investments,
23   Inc.
24   Q    And what address is the house -- Greg Harrison's beach
25   house listed again?
```

Earnest - Cross by Chut                                  162

```
 1   A    Having its principal office at 4800 Williams Drive, Little
 2   River, South Carolina.
 3   Q    Now, let me give you a chance to look at page 2 of this
 4   document.  And if you could blow up that first full paragraph,
 5   Ms. Collins.  And if you'll take a chance and look at that,
 6   sir.
 7   A    Okay.
 8   Q    And what license is being provided in this paragraph, sir?
 9   Does it allow the use of the name USA Staffing?
10   A    It's empowered to use the trade name USA Staffing.
11   Q    In what city, sir, Myrtle Beach?
12   A    And "authorize the use of said trade name and staffing's
13   systems and business services to licensee in operating an
14   independent office using the licensed name of USA Staffing in
15   Myrtle Beach, county of Horry, state of South Carolina."
16   Q    And let me draw your attention to another licensing
17   agreement, which is Exhibit 539.  And take a chance -- take a
18   moment to look at this, Mr. Earnest.
19   A    Okay.
20   Q    And is this a licensing agreement between Medaloni of
21   South Carolina and Global Labor?
22   A    It appears so, yes, sir.
23   Q    And going to the second page, looking at that same
24   paragraph for this one, where is Medaloni -- actually Medaloni
25   of South Carolina licensee using the name USA Staffing?
```

January 30, 2019

```
 1  A    Columbia, Richland, South Carolina.

 2  Q    Now, let me show you -- and you testified that Arvato is

 3  outside of Asheboro, North Carolina.  Is outside of Ash --

 4  should be, Asheville, North Carolina?

 5  A    Arvato has multiple locations.  I don't know where all

 6  they are.  It's a pretty large company.

 7  Q    The one you went to was outside of Asheville, North

 8  Carolina?

 9  A    The plant that I visited was in Weaverville, I think's the

10  name of it, Asheville.

11  Q    And you're aware that Mr. Taylor prepared some loan

12  reviews in regards to these purported licensees?

13  A    He prepared loan reviews.  I don't remember specifically

14  those, but, yes, sir.

15  Q    And let me show you what's marked as Exhibit 531.  And if

16  you can blow up the very top half so he can take a look at it.

17  A    Okay.

18  Q    And what company is this loan review for?

19  A    It's a loan review for Medaloni of SC, Inc.

20  Q    And do you see -- if you can blow up the middle portion.

21  Do you see a portion -- let me back up.  Do you see an area --

22  a section called "date of review?"

23  A    July the 28, 2009.

24  Q    And whose name appears there for the bank?

25  A    Robert Taylor.
```

1  Q    Now, if you'll look at the section "evaluation of
2  collateral."

3  A    Okay.

4  Q    And do you see Arvato listed there?

5  A    Arvato Digital Services, yes.

6  Q    And how about a company called Veyance Technologies?

7  A    Veyance Technologies, yes.

8  Q    And how about a Knight & Free law firm?

9  A    I do, I see it.

10  Q    And do you believe any of those to be in Columbia, South
11  Carolina?

12  A    I don't know.  I have no idea.

13  Q    But Medaloni of South Carolina is only licensed by
14  Mr. Harrison to operate in Columbia, South Carolina, isn't that
15  correct, sir?

16  A    There's reference to Columbia.  I don't know where
17  Medaloni of SC operates.

18  Q    Well, yet you set them up a $2 million line of credit.
19  You didn't know where they operate?

20  A    No, no.  We did not set up a $2 million line of credit,
21  that's false.

22  Q    Well, a $2 million factoring line, sir.

23  A    We set up a $2 million factoring line which we buy
24  invoices under --

25  Q    Okay.

Earnest - Cross by Chut                                    165

```
 1  A    -- and that doesn't mean we extended $2 million of credit.
 2  Q    Okay.  Well, let's go back to -- you described these
 3  companies as licensees consistently, correct, sir?
 4  A    I'm sorry?
 5  Q    You described these companies as licensees of
 6  Mr. Harrison, repeatedly, correct, sir?
 7  A    That's correct.
 8  Q    And that was the supposed legal basis of this whole
 9  arrangement, correct, sir?
10  A    The licensee agreement was an agreement between Global
11  Labor, the licensor and each of these licensees which
12  documented what services the licensor provided these licensees.
13  As far as we knew, these companies were individually owned
14  corporations supplying labor to their markets.
15  Q    Okay.  Well, let's look back again at Exhibit 539, and
16  this time let's go to page 33, Ms. Collins.  And if you can
17  blow up that whole signature area.
18            And who has signed here as the licensor?  Is that
19  Mr. Harrison?
20  A    I can't tell.  It looks like it.
21  Q    And who's the licensee, Medaloni of South Carolina?
22  A    It is, yes.
23  Q    And then going back to page 2, and blow up that second
24  paragraph, again.  This licensing agreement provides the right
25  for Medaloni of South Carolina to operate only in the city of
```

1  Columbia, sir, isn't that what it says on the page?

2  A    That's not what I read, no.

3  Q    Where else does it say they can use the trade name US

4  Staffing on that paragraph, sir?

5  A    Mr. Chut, I'd have to read the whole agreement.  You're

6  showing me one little paragraph.

7  Q    You didn't read the whole agreement, sir?

8  A    You're asking me questions that I can't answer.

9  Q    Well, sir.  You've described these companies as licensees

10 of Mr. Harrison, correct?

11 A    That's correct.

12 Q    So you're not -- you're testifying today you're not aware

13 of what the terms of these license agreements were?

14 A    The terms of the licensing agreement is in the licensing

15 agreement.

16         MS. BARBIER:  Objection, Your Honor.

17         THE COURT:  Overruled.  You may answer.

18 BY MR. CHUT:

19 Q    Looking at that second paragraph, where does it say the

20 trade name USA Staffing can be used by Medaloni of South

21 Carolina?

22 A    It says it can be used in the city of Columbia, county of

23 Richland, state of South Carolina, and there's some additional

24 language in there.  I can read it if you want me to.

25 Q    Now, previously Mr. Medaloni was supposedly the owner of

1  Medaloni of Georgia, isn't that correct, sir?

2  A    I don't know.

3  Q    And you met Mr. Medaloni, Mr. Matthew Medaloni,

4  personally, didn't you, sir?

5  A    I did.

6  Q    Did you really believe, sir, he ran a staffing company

7  specializing in construction staffing after meeting with him?

8  A    I absolutely did, yes, sir.  That's what he -- that's what

9  he certified to the bank and that's what I believed.

10 Q    Did he explain how he moved from Georgia to South

11 Carolina, sir?

12 A    No, Mr. Chut.  When I talked to him he told me that the --

13 his business was improving and he specifically mentioned

14 Atlanta, Georgia, construction.

15 Q    Well --

16 A    That's what he told me.

17 Q    Okay.  Well, that's fine, sir.  But look at this -- look

18 at Exhibit 539.

19 A    Does this prohibit him from doing business in Atlanta,

20 Georgia?

21 Q    Well, look at paragraph --

22         THE COURT:  Hold on just a second.  You don't get to

23 ask questions.

24         THE WITNESS:  I'm sorry, Your Honor.  Excuse me.

25         THE COURT:  And, Mr. Chut, no argument.  You can ask

1  your question.

2          MR. CHUT:  Yes, Your Honor.  I apologize, Your Honor.

3  I apologize, Mr. Earnest.

4  BY MR. CHUT:

5  Q    This license agreement does not provide him a right to

6  operate as a licensee of Greg Harrison in Georgia, does it,

7  sir?  And if you want to take time to look at it, feel free.

8  A    It's a little difficult when I've only got one paragraph

9  highlighted.

10          THE COURT:  Have you got a hard copy of it?

11          MR. CHUT:  Yes, sir.

12          THE WITNESS:  And the agreement says what the

13  agreement says.  I'm not going to try to -- I'm sorry, Your

14  Honor.

15  BY MR. CHUT:

16  Q    Well, you're not disagreeing that the licensee agreements

17  were the purported basis of you having a factoring line for

18  this company, is that correct, sir?

19  A    No, sir, that's not correct.  The basis of providing a

20  factoring line to this customer was the certifications they

21  made to us, and based on those certifications, we approved and

22  established a factoring line.  The factoring line anticipates

23  that that customer will sell to the bank invoices.  The

24  factoring department received invoices and purchased those

25  invoices and collected those invoices.

Earnest - Cross by Chut                                    169

```
 1  Q    So you didn't care if Mr. Medaloni pretended to be in
 2  Georgia or South Carolina, did you, sir?
 3  A    That's a false statement.  I cared deeply that he was
 4  telling us the truth.  What I found since then is he was paid
 5  to lie to us.
 6  Q    Well, sir, he told you that he was in a state that was
 7  different from the state that was documented in your file, and
 8  you didn't take any action, did you, sir?
 9  A    There wasn't any action to take.
10  Q    Well, let me approach and give you a chance to look at
11  this, sir.  May I approach, Your Honor?
12          THE COURT:  Um-hum.
13          THE WITNESS:  I'm not sure I see any restriction on
14  where he can operate in this agreement, but perhaps you can
15  point me to it.
16  BY MR. CHUT:
17  Q    Well, maybe to simplify matters, looking at page 2,
18  paragraph 2, is there any reference to anything but Columbia,
19  South Carolina?
20  A    I don't see any restriction on where they can operate, but
21  perhaps you can point me to it.
22  Q    Do you see any reference to a city or a county besides
23  Columbia, Richland County, South Carolina, sir?
24  A    I do not, but I don't see anything in there that restricts
25  them either.
```

Earnest - Cross by Chut                    170

```
1   Q    Thank you, sir.  Now, let me show you what's marked as
2   Exhibit 1282.  Before we go onto that, let me -- so in your
3   meeting with Matthew Medaloni, you since learned, sir, that he
4   was a DJ and a bar owner, is that correct, sir?
5   A    I think you told me that, yes, sir.
6   Q    And how many years did you work in banking?
7   A    Thirty-five.
8   Q    So he managed to put that over on you that he was actually
9   running a series of multimillion dollar staffing companies?
10  A    Was there a question there I need to answer?
11  Q    Yes, sir, that was the question.
12  A    I'm sorry, repeat that, please.
13  Q    You've been a banker for 35 years?
14  A    At least 35, yes, sir.
15  Q    And we agree that Mr. Medaloni was a DJ and ran a bar?
16  A    That's what you told me.  I wasn't aware of that.
17  Q    But you know that now?
18  A    I know what you told me.  I don't know -- I know what you
19  told me.
20  Q    And he managed to convince you that he ran a series of
21  multimillion dollar staffing companies?
22  A    He provided the documentation and the certifications that
23  we required to open up any factoring line with anyone.
24  Q    Now, let me draw your attention to Exhibit 1282.  And if
25  you'll blow up the top portion, and Mr. Earnest, if you'll take
```

January 30, 2019

Earnest - Cross by Chut                                    171

1  a chance to look at this.

2  A    Yes, sir.

3  Q    And let me draw your attention also to the third page, you

4  can see the signature blocks.

5  A    Okay.

6  Q    And do you see your signature there, sir?

7  A    I do.

8  Q    And this is a term letter you prepared at Greg Harrison's

9  request, isn't it, sir?

10 A    I don't know if it was at Harrison -- it was at Doug

11 Corriher's request.

12 Q    But for Greg Harrison?

13 A    Well, it was for Randall Lee Howell.

14 Q    So it's your testimony Mr. Howell asked you to write this

15 letter?

16 A    No, I just testified that Mr. Corriher asked me to write

17 this letter.

18 Q    But you knew this was a company related to Greg Harrison,

19 correct, sir?

20 A    I believed that this was related to the licensee business,

21 yes.

22 Q    Have you ever met Mr. Howell?

23 A    I have not.

24 Q    Do you know whether the company Howell Investments of

25 Virginia actually exists, sir?

Earnest - Cross by Chut                                    172

```
 1  A    I do not.  This is a term sheet.  It's a proposal letter.
 2  We don't have really any information when we provide this other
 3  than the verbal information provided to me by Mr. Corriher.
 4  This is not a commitment to lend.  This is only a discussion
 5  document.  It's designed to allow us to visit with a
 6  prospective customer to determine what their needs are and
 7  determine if we want to pursue it further.
 8  Q    But you can't recall ever visiting with Randall Howell,
 9  the supposed president of Howell Investments of Virginia, can
10  you, sir?
11  A    I did not meet them and, in fact, I haven't met most of
12  the factoring clients that we have at the bank.
13  Q    And, in fact, sir, this gentleman within three weeks had
14  signed a factoring -- or four weeks had signed a factoring
15  agreement for a completely different company, Green Ideas N
16  Motion, isn't that correct, sir?
17  A    That's correct.
18  Q    Do you know what happened to Howell investments?
19  A    I have no idea.
20  Q    Go to the first page, please, Ms. Collins.
21       And what's the amount listed here, $1.5 million, sir?
22  A    Yes, that was the amount, $1,500,000.
23  Q    And so your testimony is, sir, that you would issue a term
24  letter to a company that -- with no information, just based on
25  a request for $1.5 million of factoring?
```

January 30, 2019

**-4132-**

1  A    This letter -- if you go to the second page --

2  Q    Yeah, you can go to the second page.  Sir, any time you

3  want to see something in the document, ask and we'll show it to

4  you.  I'm not trying to be tricky that way.

5  A    There's a representation of facts.  Anything we do is

6  based on the representation that they provide us, and also this

7  is not a commitment.  This is a discussion document.  If we

8  find out that we're not interested in pursuing this customer's

9  relationship, we don't pursue it.

10  Q    And Mr. Howell signed a $2 million factoring agreement

11  within a month for a completely different company, isn't that

12  correct, sir?

13  A    I don't know that.

14  Q    You don't know that, sir?

15  A    I don't have that information if front of me.  How am I

16  supposed to respond to that?

17  Q    Did Mr. Howell sign for Green Ideas N Motion?

18  A    I believe he did, and I also believe he provided

19  information that certified that that company was a company that

20  he owned and he was the guarantor.

21          THE COURT:  All right.  Let's take a mid-afternoon --

22  not really mid-afternoon, but an afternoon recess.  Ladies and

23  gentlemen, the jury's excused for 15 minutes.

24          (At 3:59 p.m., jury leaves.)

25          THE COURT:  Mr. Earnest, since we're breaking in the

Earnest - Cross by Chut                                    174

1  middle of cross, I'm going to instruct you not to discuss your

2  testimony with anyone at this particular juncture.  We'll be in

3  recess for 15 minutes.

4              (At 4:00 p.m., break taken.)

5              (At 4:18 p.m., break concluded.)

6              THE COURT:  We have a little bit of an issue in terms

7  of the use of this back hallway.  It's a secure area for the

8  judges, so it's a good spot for the lawyers to sneak out if

9  they need to run out under cover, but it can't be used

10 generally going back and forth.  I'm sorry about that.

11             There's a couple of other reasons, if you got turned

12 around back there, there's a couple places where you could

13 accidentally set off an alarm in the building, and we'd prefer

14 not to have that happen.  So I'm afraid most everybody's going

15 to have to either head out and go around or do something

16 different during the trial.

17             All right.  Everybody here?  Mr. Earnest is still on

18 the stand.

19             (At 4:19 p.m., jurors arrive.)

20             THE COURT:  All right.  Mr. Chut, you may resume your

21 cross-examination.

22             MR. CHUT:  Thank you, Your Honor.

23 BY MR. CHUT:

24 Q    Now, Mr. Earnest, you don't deny that you've met with

25 Mr. Harrison personally multiple times?

1   A    I met with Mr. Harrison a number of times, from time to

2   time when he came to Greenville and Mr. Corriher brought him

3   down to see me, yes.

4   Q    And you made a personal loan to him in 2006 and remained

5   the loan officer through that loan being charged off, is that

6   correct, sir?

7   A    We the bank made a loan to Mr. Harrison in September, I

8   think, of 2006, that's correct.

9   Q    But you were the loan officer, not the bank, you were the

10  loan officer personally?

11  A    Yes, but I wasn't the only one that approved it, sir.  It

12  was approved through our approval authority and was approved a

13  number of times through our board of directors.

14  Q    Based on your representations?

15  A    Based on -- based on the information provided to us and

16  what we believed was the situation with Mr. Harrison, yes.

17  Q    Based on the representations you made in the loan memos,

18  correct, sir?

19  A    Which was based on the information we received from

20  Mr. Harrison.

21  Q    And isn't it true, sir, that the board, to a very large

22  extent, relied on your representations in making its decisions?

23  A    Based on the information that was provided to us by

24  Mr. Harrison for the loan.

25  Q    Does the board rely on the president of the bank to

1  accurately represent information to it, sir?  Yes or no?

2  A    I would say that's correct, yes, sir.

3  Q    Thank you, sir.  Let me draw your attention to what's

4  marked as Exhibit 1288.  Before we do that, how many other

5  clients were you a loan officer for in 2008, sir?

6  A    I can't answer that.  I had a loan portfolio for a number

7  of years and made loans to a number of different borrowers.

8  Q    Did you make a loan of the magnitude of $1.5 million to

9  anybody else but Greg Harrison in 2006, sir, as a loan officer?

10 A    I can't tell you that, sir.  I've made loans probably at

11 least that high to other borrowers, yes, over the years.

12 Q    As loan officer?

13 A    As loan officer, yes.

14 Q    In 2006, sir; not over the years, in 2006?

15 A    I can't answer that question because I don't have that

16 information in front of me.

17 Q    Okay.

18 A    And that was how many years ago, 13, 14 years ago?

19 Q    Well, that was a big loan, though, sir, wasn't it?

20 A    We had a lot of loans of that size, yes, sir.

21 Q    Let's look at Exhibit 1288, please, Ms. Collins.  And if

22 you'll take a moment and take a look at this document, make

23 sure you recognize it.

24 A    I do.  I recognize it.

25 Q    And is this a partial letter that was located on your home

1 | drive regarding the Greg Harrison and US Staffing companies?

2 | A    Yes.

3 | Q    That you started to write to Jerry Pell?

4 | A    Yes.

5 | Q    And can you read that very first sentence, sir, beginning

6 | "we met?"

7 | A    "We met with Greg Harrison last week."

8 | Q    And can you read the whole sentence, sir.

9 | A    "Regarding a concern we have for the potential for banking

10 | regulators to combine, for lending limit purposes, our advances

11 | to Greg and one or more of his licensees companies.  While we

12 | believe the companies are not combinable under banking

13 | regulations, it would be foolish for us to ignore the issue as

14 | the similarity of names will no doubt cause either the FDIC

15 | and/or South Carolina banking regulators to look closely at the

16 | relationship among the companies."

17 | Q    And you asked Mr. Taylor to review this issue, didn't you,

18 | sir?

19 | A    I asked Mr. Taylor to review the factoring portfolio, yes.

20 | Q    Well --

21 | A    Let me correct that:  David Burgess and I asked him.  I

22 | don't know that I asked him singularly.

23 | Q    And the two paragraphs that are part of this draft are

24 | titled "1. Direct Benefit" on the bottom of the first page,

25 | let's take a look at, sir.

```
 1  A    Yes.
 2  Q    And then on the second page the only paragraph is "Common
 3  Enterprise," is that correct, sir?
 4  A    Yes.
 5  Q    And those match divisions of Mr. Taylor's memo, isn't that
 6  correct, sir?
 7  A    I don't know.  I've never seen Mr. Taylor's memo.
 8  Q    Okay.  Now, let me show you what's been marked as
 9  Exhibit 17 --
10  A    Are you through with that one?
11  Q    Yes, sir.
12  A    Okay.
13  Q    Did you want to say something further?
14  A    Pardon me?
15  Q    We'll move on.  Exhibit 1704.  And do you recognize this
16  document, sir?
17  A    It looks like a memo that I wrote to the credit file on
18  May the 2nd of 2007.
19  Q    And this was something that was on your home drive,
20  correct?
21  A    I'm sorry?
22  Q    This was a document that was found on your home drive, is
23  that correct, sir?
24  A    I assume so.  I don't know.
25  Q    But you typed this on your computer at your desk at
```

```
 1  GrandSouth Bank, correct?

 2  A    I probably did.  I don't remember, but I probably did.

 3  Q    And this memo memorialized a meeting between you,

 4  Mr. Corriher, and Greg Harrison, correct, sir?

 5  A    It looks like we had a meeting with him, and he was

 6  updating us -- the current status of the number of items, and

 7  I'd have to read the rest to see what those were.

 8  Q    And you wrote this memo to memorialize for the file that

 9  meeting?

10  A    Apparently, I did, yes, sir.

11  Q    And what's the date on this, sir?

12  A    May the 2nd, 2007.

13  Q    Now, sir, you were asked questions on direct examination

14  about your Outlook Calendar, is that correct, sir?

15  A    Um --

16  Q    Your Outlook computer calendar?

17  A    I was asked about my calendar, yes, sir.

18  Q    Yes, sir.  And I want to draw your attention -- if you can

19  pull up Exhibit 377, Ms. Collins.  And, sir, you don't deny

20  that this calendar memorializes various meetings you had with

21  Greg Harrison at GrandSouth Bank?

22  A    I think there's some entries in there where the Greg

23  Harrison -- if it's -- I believe there are some notations in

24  there when I met with Mr. Harrison, yes.

25  Q    Let me draw your attention to page 16 of this document.
```

January 30, 2019

```
 1  And if you would blow up April 15, please.  And what does that
 2  say, sir?
 3  A    It says, "Greg in town."  I take from that that he must
 4  have come to down, and Corriher brought him into my office, and
 5  I put that on my calendar on at that date.
 6  Q    So you met with him for a half hour then.
 7  A    Well, no, I don't know about that.  I mean, the software
 8  plugs it in in 30-minute increments.
 9  Q    Or isn't it true, sir, you were just putting in a meeting
10  you were scheduling for Mr. Harrison?
11  A    No, I think it was -- I met with him, and then I put that
12  on my calendar.
13  Q    But your calendar says 11 a.m. through 11:30 a.m.,
14  correct, sir?
15  A    It does.  That must have been about when he came to my
16  office.
17  Q    And I draw your attention to page 15 of the calendar,
18  Ms. Collins.  March 2010.  And look at the entry for the 16th,
19  Ms. Collins.  And is there an entry there that reads 10 a.m.
20  through 10:30 a.m. "Greg Harrison"?
21  A    Yes.
22  Q    So elsewhere when you're referring to "Greg," you're
23  referring to Greg Harrison, correct, sir?
24  A    Probably.  I don't know.  I'd have to look at the entries.
25  Q    Well, let's look at September 2010 for September the 2nd.
```

Earnest - Cross by Chut                                    181

1   The 2nd, September 2010, the second page.  Sorry, Ms. Collins.
2   And that is an entry for 10:30 a.m. through 11 a.m., "Greg in
3   ofc," which I assume means "office," is that correct, sir?
4   A    Yes.
5   Q    And let me draw your attention briefly to page 24 of this
6   exhibit, which is December 2010, and take a look --
7   Ms. Collins, if we can blow up the entry for December 21, 2010.
8   And look actually look at the 28th also, Mr. Earnest.  So
9   there's a "Check with Greg RE payment" at 8:30 to 9 a.m. on the
10  21st.  Do you see that, sir?
11  A    I do.
12  Q    And do you also see on the 28th, 10:30 a.m. through 11
13  a.m., "Greg in town"?
14  A    Yes.
15  Q    Now, you already testified that in December of 2010, you
16  became aware that Mr. Harrison had been indicted, isn't that
17  correct, sir?
18  A    I don't know when it was in 2010.  I think it was in 2010.
19  Whenever he became indicted, some time after that we became
20  aware of that.
21  Q    And you became personally aware that he was indicted for
22  tax charges, sir?
23  A    I believe I was told that.  But we didn't know what kind
24  of tax charges.
25  Q    How about you?  Not "we," how about you, sir?

January 30, 2019

**-4141-**

 1  A    I'm sorry.  I didn't know, no, sir.

 2  Q    And -- but you knew he was charged with tax charges?

 3  A    That's what I understood, yes, sir.

 4  Q    And -- but you continued to meet with him throughout 2011,

 5  isn't that correct, sir?

 6  A    I'm sure I met with him some.  I don't know how many

 7  times.

 8  Q    And --

 9  A    And then when I met with him, he was brought to my office

10  by Mr. Corriher.  So if I met with him, that's how I met with

11  him.

12  Q    Let's look at January 2011, which is page 25.  Looking at

13  page 25, January 19, 2011, Ms. Collins.  And do you see an

14  entry for "Greg" at 10 a.m. to 10:30 a.m?

15  A    Yes.

16  Q    And your normal salutations based on the documents you've

17  looked at today are "Dear Greg" or "Greg," correct, sir?

18  A    That's what I've seen, yes.

19  Q    And isn't it true, sir, that in January of 2011, even

20  setting aside any factoring situations, Mr. Harrison owed about

21  $1.5 million to the bank.  Isn't that correct, sir?

22  A    I don't know how much he owed at that time, but we had --

23  we had two loans -- well, I don't know.  We had a loan with him

24  originally, and then we had two loans to him, including

25  Innovative Hiring Technology and one personally.  I can't tell

January 30, 2019

**-4142-**

Earnest - Cross by Chut                                    183

```
 1  you the balance at this particular time.
 2  Q    The ones you were a loan officer on?
 3  A    That's correct.
 4  Q    And so you had just discovered that he was indicted for
 5  federal tax charges at this time in January of 2011, isn't that
 6  correct, sir?
 7  A    I'm sorry.  I didn't understand.
 8  Q    You found out January of 2011 he was indicted for tax
 9  charges?
10  A    I don't know when I found out, but I found out after he
11  was indicted that he was indicted for some tax-related charges.
12  Q    And --
13  A    But I don't know when that was.  I just don't know.  I
14  don't remember.
15  Q    And those tax charges potentially put the bank at great
16  jeopardy, didn't they, sir?
17  A    Well, they did, but when he went to jail, he certainly
18  couldn't pay us anymore of his payments.
19  Q    And, in fact, both those loans you were the loan officer
20  on were substantially written off?
21  A    That's correct.
22  Q    So this was an issue of big concern for you in
23  January 2011, wasn't it, sir?
24  A    I suppose so.  I don't remember that, sir.  I don't
25  recall.
```

Earnest - Cross by Chut                                    184

1   Q    Have you had any other bank customers that you were a loan

2   officer for that owed you over a million dollars that went to

3   prison for federal tax charges?

4   A    No, this was my first one.

5   Q    Okay.  And so it was a big concern for you is what you're

6   saying?

7   A    Well, we didn't enjoy it.

8   Q    And looking at page 29, May 2011 -- looking at May 4, do

9   you see an entry 8 a.m. through 8:30 a.m., "Greg in town with

10  insurance policy"?

11  A    I do.

12  Q    And was that the insurance policy for his house, or was

13  that related to the factoring companies he was associated with?

14  A    I believe it was probably an insurance policy either for

15  the aircraft or for his house.  I don't know which.

16  Q    And moving to June 2011.  Looking at June 13, do you see

17  "Greg in town," 10 a.m. to 10:30 a.m?

18  A    Yes.

19  Q    And do you see on the 29th, 9:30 a.m. through 10 a.m.,

20  "Greg in town"?

21  A    I do.  And all of these are the events where he shows up,

22  and Mr. Corriher brings him down to my office.  They're not

23  planned meetings.  I don't know that he's going to be in town

24  or at my office until he shows up.

25  Q    But your calendar says 9:30 a.m. -- for example, on the

Earnest - Cross by Chut                                    185

 1  29th, your calendar says 9:30 a.m. through 10 a.m., "Greg in
 2  town"?
 3  A    On that particular calendar, you plug in a time, and it
 4  assigns the 30 minutes.  I don't.
 5  Q    And Greg Harrison was indicted for not paying payroll
 6  taxes on the very companies that you were factoring supposedly
 7  as licensees of him, isn't that correct, sir?
 8  A    We learned that he was indicted for payroll tax violations
 9  during his trial.  That's the first time I heard of it, first
10  time I knew anybody in the bank was aware of it, and we found
11  out about it with my chief financial officer finding an online
12  publication that was covering the trial, and he sent that to
13  me.  Prior to that, Mr. Harrison actually told us he was
14  indicted for federal income tax personally.
15  Q    But you continued to keep on doing business with
16  Mr. Harrison and his companies in 2011, isn't that true, sir?
17  A    We did business with Mr. Harrison because we had loans
18  outstanding that we were collecting the monthly payments that
19  he was paying us.
20  Q    And the fact that he was charged with not paying payroll
21  taxes on those particular lines of credit didn't deter you from
22  continuing to get the money, did it, sir?
23  A    Those lines paid out probably prior to his trial for
24  income -- or for payroll tax violations.  I don't remember when
25  his trial started, but some time during that trial is when we

January 30, 2019

Earnest - Cross by Chut                                    186

1  learned that it was for payroll tax violation.

2  Q    My question was, his -- the knowledge that he was charged

3  with federal tax crimes did not stop you from continuing to

4  seek payment on the balances due on the factoring lines you had

5  extended to these supposedly licensing companies, correct, sir?

6           MS. BARBIER:  Objection, Your Honor, assumes facts

7  not in evidence.

8           THE COURT:  Well --

9           MR. CHUT:  Your Honor, I'll move on, Your Honor.

10          THE COURT:  Yeah, I mean, you can rephrase the

11 question slightly, and I'll overrule it, but sustained as to

12 the form.

13 BY MR. CHUT:

14 Q    Let me show you what's been marked Exhibit 2008,

15 Mr. Earnest -- excuse me 208, sorry.  And if you can blow up

16 the very top portion, Ms. Collins.  Actually, if you can blow

17 up the entire thing so Mr. Earnest can look at it, that would

18 be great.  Can you see that, Mr. Earnest?

19 A    Scoot it over a little bit.  Thank you.  Yes.

20 Q    And if we can blow up the very bottom portion.

21          THE COURT:  Have you had enough time to review it?

22          THE WITNESS:  I'm still reading, sir.

23          MR. CHUT:  Sorry, sir.

24          THE WITNESS:  Okay.

25 BY MR. CHUT:

```
 1  Q    And looking at the very bottom portion, who is this email
 2  from?
 3  A    It's from Doug Corriher to me with copies to David Burgess
 4  and Julia Pace.
 5  Q    And what's the subject?
 6  A    "IHT of SC No. 4-46848."
 7  Q    And that's one of these Greg Harrison-related factoring
 8  lines, correct, sir?
 9  A    IHT of SC, I believe, was a licensee account, yes, sir.
10  Q    And what is -- what is Mr. Corriher saying to you in that
11  very first line of that bottom portion of the email chain?
12  A    "This is the loan that we are paying down through
13  Innovative Hiring Technology and Temporary Personnel (Mark
14  Gleason, guarantor) which has matured."
15  Q    And he wants to put out the maturity date to what date,
16  sir?
17  A    "Please extend maturity date 60 days to February the
18  28th."
19  Q    And going to the very top portion of this email chain.
20  A    Okay.
21  Q    And is this you responding, sir?
22  A    It is?
23  Q    And what did you say back to Mr. Corriher?
24  A    "We are collecting out the balance on the above-referenced
25  account.  I would suggest we move the maturity out to 2/28/11
```

1  at which time the balance should be zero."  I'm responding to

2  that email and sending it to Doug Corriher, Julia Pace, Allison

3  Timmons, and David Burgess.

4  Q    And, again, IHT of SC was one of these purported licensees

5  of Mr. Harrison, correct, sir?

6  A    This was one of the licensees of Global Labor.

7  Q    And so you're paying this down through Mr. Gleason's

8  staffing company, correct, sir?

9  A    This is Mr. Gleason's staffing company, IHT of SC.

10  Q    Oh, and also Hiring and Temporary Personnel, correct?

11  A    Pardon me?

12  Q    Also Innovative Hiring and Temporary Personnel.

13  A    Innovating Hiring --

14  Q    Yeah, look at the bottom portion of the email, sir.

15  A    Yes.

16  Q    So he's IHT of SC; he's Innovative Hiring and Temporary

17  Personnel; and he was also a third company, is that correct,

18  sir, Temporary Personnel Services or --

19  A    IHT looks like it was being phased out, and he had two

20  companies, Innovative Hiring and Temporary Personnel, it

21  appears.

22  Q    And you're paying down the IHT of SC line through this new

23  Mr. Gleason line?

24  A    I'm not paying it down.  He's paying it down.

25  Q    Well, you're authorizing the maturity to be put out so it

1  can be paid, correct, sir?

2  A    From the guarantor, Mark Gleason, who's the owner of the

3  company according to what he told us.

4  Q    He's the owner of a lot of companies, isn't he?

5  A    He's the owner of those three companies according to what

6  he told us, yes, sir.

7  Q    And then US Staffing of South Carolina also, I believe.

8  Was that the one back in the early days?

9  A    I think that's correct, based on what you told me earlier.

10 Q    Prior to 2011, did any of these people have just one

11 company?

12 A    I don't know.

13 Q    But Greg Harrison was linked to every single one of these

14 companies, wasn't he, sir?

15 A    If you read the loan memos, you'll see that that's what we

16 put on the loan memorandums.  But each one of these companies

17 were licensees of Global Labor, which was a Harrison-owned

18 company.

19 Q    But his name appears in not one factoring agreement, does

20 it, sir?

21 A    He wasn't the owner of these companies.  He was the

22 licensor.

23 Q    His name does not appear in one factoring agreement, does

24 it, sir?

25 A    I just said that, sir.  And it was in every loan

1  memorandum that we produced.  It was crystal clear to everyone

2  that he was the licensor.

3  Q    Does his name appear as an owner or guarantor of any of

4  the US Staffing companies, sir?

5  A    No.  Well, I take that back.  He was a guarantor on -- he

6  was added as a guarantor on those three line balances that were

7  remaining outstanding after 2000 --

8  Q    After you determined that he had sold the companies to

9  Mr. Griffin and Mr. McDaniel, and the bank was kind of left in

10  the lurch, isn't that correct, sir?

11  A    No, it's not correct --

12  Q    But as to US Staff --

13  A    My testimony was those balances came due.  We discovered

14  that.  Mr. Harrison -- or Mr. Corriher told us about that.  We

15  told him to go get it collected.  He came back and said

16  Mr. Harrison offered to guarantee those balances.  We agreed to

17  accept his guaranty on those balances so he could pay those out

18  over the next several months.  We took his guaranty because his

19  guaranty, we believed, was worth something.

20  Q    If we look at the US Staffing of Florida factoring

21  agreement, that appears in the records of the bank to be owned

22  100 percent by Joey Medaloni, doesn't it, sir?

23  A    That was the information that was submitted by Mr. Joey

24  Medaloni certifying that he was the owner of the company

25  100 percent and the only officer of the corporation, as I

1  recall.

2  Q    If I -- if you look at the US Staffing of Florida

3  factoring agreement in the records of the bank, only the name

4  Joey Medaloni appears as an owner, is that correct, sir?

5  A    That's what I just said.  He certified that he was the

6  owner, only owner, 100 percent owner, of that corporation.

7  Q    And, yet, Greg -- you had Greg Harrison guarantee that

8  debt when that company went into default, didn't you, sir?

9  A    I'll say again.  Mr. Harrison offered to guarantee that

10 balance outstanding.  Once Mr. Corriher sought to collect that,

11 we agreed to accept his guaranty and the pledge of collateral

12 on that.  We were happy to get it.  We added a guarantor to

13 those lines, and I typically don't turn down guarantees or

14 collateral when somebody offers it.

15 Q    And then you used the new lines, the Medaloni, Inc.,

16 lines, the Medaloni of South Carolina lines, to pay down those

17 defaulted amounts from the original US Staffing companies,

18 didn't you, sir?

19 A    I did not.  I don't know that.

20 Q    And that's one of the reasons you continued to deal with

21 Greg Harrison, to pay down this debt that you had saddled the

22 bank with through your continued dealings with Greg Harrison,

23 correct, sir?

24 A    That's incorrect.

25 Q    Sir, did you write in your memo that if you didn't get the

Earnest - Cross by Chut                                   192

1  factoring business back, there would be a hard time paying down

2  the over $1 million note, the loan that you made to Greg

3  Harrison, sir?

4  A    That's false, and that's not true.  Greg Harrison -- we --

5            THE COURT:  The question was what's in the factoring

6  memo first.  Then you may explain your answer.

7            THE WITNESS:  Pardon me, sir?

8            THE COURT:  So the question was, does this

9  information appear in the factoring agreement?

10           THE WITNESS:  In the factoring memo, we explained

11 what Mr. Harrison's source of income was, and his source of

12 income is from the operation of his staffing business.  If the

13 staffing business was not returned to him from StaffCo, then

14 his ability to service our debt would be impacted.  That was

15 the information that we had in the loan memorandums.

16 BY MR. CHUT:

17 Q    The debt that you were the loan officer on, sir?

18 A    That's correct.

19 Q    Thank you, sir.  Now, let me draw your attention to August

20 of 2011.  If we could pull up August the 3rd.  I'm sorry that's

21 page 32.

22           Before we do that, Mr. Earnest, how many times did

23 you meet Joey Medaloni?

24 A    I only met Joey Medaloni one time, I think.

25 Q    Isn't it true, sir, he took Mr. Harrison to the bank

Earnest - Cross by Chut                                              193

1  normally?

2  A    I don't know that.  I only met him one time.

3  Q    You met him at the bank, though, correct?

4  A    Yes.

5  Q    And did he present himself as the owner of one of these

6  successful staffing companies?

7  A    No, the only -- just an introduction, this is Joey

8  Medaloni, I shook his hand, and then they were on up to Doug's

9  office.  I didn't talk to him.

10 Q    But he was basically Greg's pilot and driver, is that

11 correct, sir?

12 A    That's what I understand.  A pilot.  I don't know about

13 what else he did.

14 Q    And let me draw your attention to -- I'm sorry,

15 Ms. Collins.  Will you pull that up.  August, thank you.

16            And looking at August 3, sir -- actually the 2nd and

17 3rd.  And do you see on August the 2nd, 2011, another notation

18 for "Greg Harrison in office"?

19 A    I see it.

20 Q    And how about August the 3rd, "Look at Greg's request."

21 Do you see that?

22 A    I do.

23 Q    And what was Greg requesting in 2011?

24 A    I have no idea.

25 Q    That was a request made to you, correct, sir?

Earnest - Cross by Chut                                    194

```
 1  A    It was a request that evidently Greg made.  I don't know
 2  what it was.
 3  Q    It ended up on your calendar --
 4  A    I never met with Greg by myself.  It was always with
 5  Mr. Corriher bringing him down to my office, so I don't know
 6  what the request was.
 7  Q    Let's be clear.  You're the president of the bank,
 8  correct, sir?
 9  A    That's correct.
10  Q    Mr. Corriher was the head of the factoring department,
11  correct?
12  A    That's correct.
13  Q    So in those meetings, you were the boss, correct, sir?
14  A    Doug reported to me, yes.
15  Q    So Mr. Corriher did not have broad authority to act
16  outside the factoring department, is that correct, sir?
17  A    Mr. Corriher had defined responsibilities and defined
18  authority.
19  Q    And his main function was to be a salesperson, correct,
20  sir?
21  A    No, that's not correct.  That's absolutely incorrect.  He
22  managed the factoring division, and he was responsible for all
23  the operation within the factoring department.
24  Q    But you did the credit underwriting for every client he
25  brought into the bank, isn't that correct, sir?
```

January 30, 2019

Earnest - Cross by Chut                                    195

1   A    No, that's incorrect.  The -- all the accounts that were
2   brought into the bank were underwritten on the basis of the
3   account debtor credit limits that could be established.
4   Mr. Corriher did that, and David Burgess and I would look at
5   the financial information; and the approval authority that's
6   established by our bank, by our board of directors, determined
7   who had to sign off on those.
8   Q    But that's not -- Mr. Corriher didn't approve the credit,
9   isn't that correct, sir?
10  A    No, that's not correct.  Mr. Corriher approved the trade
11  credit.  That's where the advances are made is on the purchase
12  of the invoices on the trade credit.  The lines are set up
13  based on the loan authorities or the authorities in the bank.
14  Q    Who presented to the board of directors for approval the
15  factoring clients that Mr. Corriher brought to the bank?
16  A    It depends.  It depended on the size of the line.  If it
17  was circulated outside the board meeting, Mr. Burgess would
18  circulate those.  If it was in the board meeting, we would put
19  in the board package to approve it through the board.
20  Q    But Mr. Corriher didn't present it to the board, is that
21  correct, sir?
22  A    Mr. Corriher signed off on them.  No, he didn't come into
23  the board meeting and present them.
24  Q    Did he sign off on anything to present to the board
25  without you reviewing it?

1  A    No.

2  Q    And Mr. Burgess worked for you, isn't that correct, sir?

3  A    That's correct.

4  Q    And what's your understanding of his situation today, sir?

5  A    Tragically, Mr. Burgess is sitting in a health facility.

6  He's had a stroke, had pancreatic cancer.  He beat that.

7  Unfortunately, he suffered a stroke during that period of time,

8  and that's where he is.

9  Q    So he's not, to your understanding, available to

10  contradict anything you say about his role?

11  A    I would say he's not, that's correct.

12  Q    One last thing on these calendars, sorry, sir.  Let's look

13  at one last entry in November 2011.  And look at November 2,

14  please.  And, again, do you see an entry for 9 a.m. through

15  9:30, "Greg in town"?

16  A    I do.

17  Q    Now, let me draw your attention to Exhibit 1364.  And do

18  you recognize this document, sir?  I'll give you a chance to

19  take a look at it.

20  A    It's a wire transfer for 3.2 million that was going to US

21  Funding.

22  Q    And that's your signature in the middle of the page, isn't

23  it, sir?

24  A    It is.

25  Q    So you approved this wire of $3.2 million, didn't you,

1  sir?

2  A    That's correct.

3  Q    And this was part of this purported license -- Greg

4  Harrison licensee program, correct, sir?

5  A    This was an advance made -- the total was advance made to

6  our licensee customers for the purchase of invoices owned by US

7  Funding that were purchased from CMI -- Compensation

8  Management, Inc., which was their -- they factored those

9  invoices.

10 Q    So this was for -- supposedly for Medaloni, Inc., Medaloni

11 of South Carolina, Green Ideas N Motion, et cetera?

12 A    I believe that's correct.

13 Q    And you approved this wire leaving the bank?

14 A    Pardon me?

15 Q    You approved this $3.2 million leaving the bank?

16 A    Yes, I signed it.

17 Q    By your signature alone?

18 A    Yes.

19 Q    And if you could blow up that portion under Mr. Earnest's

20 signature.  What does that portion say, wires over 30,000?  If

21 you would read that portion in parentheses, I would appreciate

22 it, sir.

23 A    "Wires over 30,000 must also be signed by a bank officer.

24 Wires over 100,000 must be signed by Ron, Mason, David Burgess,

25 Phil, Bert, or JB."

```
 1  Q    So "Ron" was you?

 2  A    That's me.

 3  Q    "Mason" was Mr. Garrett?

 4  A    That's correct.

 5  Q    "David Burgess" is David Burgess.  Who's "Phil"?

 6  A    Phil King.

 7  Q    And how about "Bert"?

 8  A    "Bert Taylor."

 9  Q    And who's "JB"?

10  A    JB Garrett; he's our chief financial officer.

11  Q    This is a small enough bank where you can identify

12  officers by name and expect the employees to recognize it?

13  A    I'm sorry?

14  Q    This is small enough bank where you can identify officers

15  by first name and/or initials and expect the employees to

16  understand what that means?

17  A    Probably, yes.

18  Q    And, sir, you actually had no idea what the actual payout

19  this was going for, did you, sir?

20  A    Well, no, we had a list of the accounts that were being

21  purchased.

22  Q    You testified, sir, that Doug Corriher told you in

23  September of 2009, almost eight months later, that you guys

24  didn't have a payoff?

25  A    He didn't have a payoff quote from US Funding.  He had the
```

1  account listing of the accounts being purchased, and that's

2  what he presented.

3  Q    That had been split up among these various supposed

4  staffing companies?

5  A    Yes.  Each of these clients were purchasing the segment of

6  the business that they were going to operate.

7  Q    Now let me draw your attention to what's marked as

8  Exhibit 1363.  Take a moment and look at this.  I can hand you

9  the hard copy if you would like a chance to look at the hard

10 copy, sir.

11 A    Okay.

12 Q    And what is this document, sir?

13 A    It says "Asset Purchase Agreement."

14 Q    And who is it purportedly between?

15 A    It's between Compensation Management, Inc., Global Labor,

16 Inc., and US Funding, Inc.?

17 Q    And what's the date?

18 A    January the 16th of 2009.

19 Q    And is this a purported asset agreement where CMI is

20 buying -- or Global Labor is buying CMI's assets?

21 A    I believe that's what it is, yes.

22 Q    And is this a document you claimed to have relied on in

23 extending the $3.2 million out the door of the bank?

24 A    Well, no.  We actually relied on the invoices that were

25 being purchased from CMI.  That's how the number -- or, excuse

1   me, from US Funding.  That's how the amount was generated.

2   Q    Well, if you didn't have this document, how would you know

3   that CMI was supposedly selling these invoices?

4   A    US Funding was selling the invoices, not CMI.

5   Q    Well, what is that --

6            MR. CHUT:  Blow up that top portion, Ms. Collins.

7            THE WITNESS:  The 3.2 transaction -- 3.2 million

8   transaction was the purchase of invoices owned by US Funding

9   that had been purchased from Compensation Management, Inc.  US

10  Funding owned those invoices and those were the invoices being

11  purchased.

12  BY MR. CHUT:

13  Q    Okay.  Let's read the top of this document and see if that

14  agrees with what you just said, sir.  If you'll read that into

15  the record.

16  A    We're not a party to this agreement.  GrandSouth Bank's

17  not a party to this agreement.

18  Q    Sir, isn't it true that you wrote emails stating that you

19  reviewed the asset purchase agreements to make sure the assets

20  were flowing from CMI to Global Labor, et cetera?

21  A    Yes.

22  Q    Okay.  So --

23  A    But the invoices we were purchasing were owned by US

24  Funding.  This agreement is talking about the assets being

25  purchased by Global Labor from Compensation Management, as I

 1  understand it.

 2  Q    Okay.  If you'll please read that top paragraph then,

 3  please, sir.

 4  A    "This purchase agreement is made the 16th day of January,

 5  2009, to be effective the 16th day of January, 2009, by and

 6  among Compensation Management, Inc., a Delaware corporation

 7  (hereinafter referred to as the 'Seller'), Global Labor, a

 8  Delaware corporation (hereinafter referred to as the 'Buyer'),

 9  and US Funding, Inc., a North Carolina corporation (hereinafter

10  referred to as 'Lender')."

11  Q    And let me have you look at the second paragraph on the

12  first page entitled "Purchase of Assets."  And do you see a

13  purchase price listed there?

14  A    Yes.

15  Q    And what is that purchase price?

16  A    $7,500,000.

17  Q    And this document was kept in the records of the bank,

18  wasn't it, sir?

19  A    I guess.  I don't know.

20  Q    Well, let's look at paragraph 3.  And what does that say?

21  A    "US Funding shall immediately release the UCC filing for

22  the Seller at the time of Closing, File" number and gives the

23  file number.

24  Q    Did you ever do anything to verify that that UCC file was

25  being released?

Earnest - Cross by Chut                                    202

1  A    No, I have not verified that.  The UCC on Compensation

2  Management that US Funding had, they did assign that to Global

3  Labor.  It was assigned after the settlement of the Acquient

4  litigation.

5  Q    The Acquient litigation was settled over a year later.

6  How about when you sent $3.2 million to US Funding?  Did you

7  verify they were releasing their UCC, sir?

8  A    There was information -- there was email traffic between

9  Doug Corriher and Larry Gibney at US Funding asking if they had

10 been terminated or assigned, but it wasn't.

11 Q    That wasn't my question.  Did you verify it before you

12 sent the $3.2 million out to --

13 A    It wouldn't have been done until after we sent the money

14 to them to pay it off.

15 Q    So you would send the money and then -- did you verify

16 after you sent the money in January of 2009 they released their

17 UCC, sir?

18 A    I did not, no.

19 Q    Let me draw your attention, sir, to Exhibit 651, sir.

20 Take a moment and look at that.  You can have a hard copy if

21 you want to look at that, sir.

22 A    It looks like an asset purchase agreement between Global

23 Labor and Brooks Labor.

24 Q    And what's the date on that?

25 A    January the 12th of 2009.

1  Q    So this is four days before the -- supposedly Global Labor

2  is buying CMI's assets?

3  A    Yes.

4  Q    And what is the -- looking at paragraph 2, what's the

5  purchase of assets?

6  A    You want to know the purchase price?

7  Q    Yes, sir.

8  A    It says $505,000.

9  Q    Now, let me draw -- did you do anything to verify that

10 that was accurate?

11 A    No, I don't believe I did.

12 Q    So the level of due diligence you took before you wired

13 $3.2 million out was fairly low, sir.  Is that a fair

14 statement?

15 A    Mr. Chut, the accounts that were owned by US Funding were

16 the accounts we purchased.  That was for the $3.2 million.  We

17 sent $3.2 million to US Funding and purchased approximately

18 $3.9 million in accounts receivable.  Those were the accounts

19 that we purchased.

20 Q    In fact, US Funding didn't believe you were purchasing

21 those accounts at all, did they, sir?

22 A    That's what Mr. Gibney said nine months later.

23 Q    Well, he kept on funding those accounts, didn't he, sir?

24 A    I wasn't aware of that.

25 Q    And this is -- go ahead, sir.  I didn't mean to cut you

1  off.

2  A    That's all right.  Go ahead.

3  Q    And this is January of 2009 this wire went out?

4  A    Yes, January 16, if I recall correctly.

5  Q    And, again, this is approximately 2 1/2 years after Greg

6  Harrison gave you a $375,000 NSF check, isn't that correct,

7  sir?

8  A    If that time frame is correct, that would be correct, yes,

9  sir.

10 Q    And this is about -- almost two years after he sold the US

11 Staffing companies without warning and saddled the bank with

12 almost a quarter million dollars of unpaid invoices, correct,

13 sir?

14 A    You'll have to repeat that, sir.  I didn't --

15 Q    This is approximately 2 1/2 years after -- also after Greg

16 Harrison sold the US Staffing companies without warning to the

17 bank?

18 A    And you said saddled us with?

19 Q    Almost a quarter million dollars of debt.

20 A    That was paid.

21 Q    It wasn't paid in 2007, was it, sir?

22 A    It was paid.

23 Q    Was it paid in 2007?

24 A    I don't know when it was paid.  I know it was not charged

25 off.  It was paid.

Earnest - Cross by Chut                                205

```
 1              THE COURT:  Do you know whether it was paid off in
 2  2007 or not?
 3              THE WITNESS:  I do not.  I don't know when it was
 4  paid off, sir.
 5  BY MR. CHUT:
 6  Q    But that's the money you had to have Mr. Harrison
 7  personally guarantee, correct?
 8  A    That's the money that Mr. Harrison offered to guarantee
 9  and we accepted.
10  Q    And -- so this will be the third time potentially that
11  Mr. Harrison had tricked you, correct, sir?
12  A    He -- I don't know how he tricked us when the loan -- when
13  the funds were paid off.
14  Q    Now, Mr. Earnest, let me draw your attention to what's
15  been marked as Government's Exhibit 546.
16              Let me ask you one more question in response to your
17  last answer.  On the personal loans, those are never paid off,
18  sir, is that correct?
19  A    We charged off the balance that we charged off, yes.
20  Q    Okay.  Thank you, sir.
21              Let me draw your attention to Exhibit 546 and have
22  you look at page 2, and take a moment to take a look at that.
23  A    Is this page 2?
24  Q    Yes, sir.
25  A    Okay.
```

Earnest - Cross by Chut                                    206

```
 1  Q    And take a moment to take a look at it, sir.  Again, I
 2  have a hard copy if you want to see it.
 3              THE COURT:  Can you read it?
 4              THE WITNESS:  Kind of.
 5              MR. CHUT:  Can we blow it up more?
 6              THE WITNESS:  It looks like a UCC filing dated
 7  December the 19th, 2008, on Brooks Labor, Inc.
 8  BY MR. CHUT:
 9  Q    And that gives the bank a security interest in assets of
10  the company Brooks Labor, Inc., correct, sir?
11  A    It's a notice of a security interest taken by the bank in
12  whatever the assets are that are described.
13  Q    And the security interest is actually created by the
14  factoring agreement between the bank and Brooks Labor, correct?
15  A    That's correct.
16  Q    And what would be the value of this UCC-1 if Brooks Labor
17  in fact had no assets?
18  A    Well, the notice is only to the security interest that we
19  have in the assets that are described in the factoring
20  agreement.
21  Q    What if those assets didn't existence, sir?  What would be
22  the value of the UCC 1?
23  A    If there are no assets, then there would be no security
24  interest that would be of any value.
25  Q    And you never had a factoring agreement creating a
```

January 30, 2019

**-4166-**

 1  security interest in the assets of Compensation Management, did
 2  you, sir?
 3  A    Compensation Management was never a customer of the bank,
 4  no.
 5  Q    And you never had a factoring agreement creating a
 6  security interest in the assets of Compensation Management, is
 7  that correct, sir?
 8  A    That's correct.  We did not.
 9  Q    And so if a creditor seized for some reason the assets of
10  Compensation Management, GrandSouth Bank would have no ability
11  to be involved in that or count in that, would they, sir?
12  A    You'll have to repeat that.
13  Q    You don't have a security interest in CMI, correct, sir?
14  A    That's correct.
15  Q    So any creditors of CMI that did would be able to move on
16  their assets without interference from GrandSouth Bank?
17  A    That's correct.
18  Q    And so if Compensation Management wasn't paying their
19  taxes and the IRS seized CMI's assets, the bank wouldn't have
20  any 45-day grace period, would it, sir?
21  A    No.  If the Internal Revenue Service had filed a notice of
22  federal tax lien representing the lien they filed on CMI, then
23  they would be in the senior position on accounts after 45 days.
24  Q    Let me draw your attention to what's marked as
25  Exhibit 483.

1             And that 45 days is a grace period for people with
2    actually a lien on those assets, correct, sir?
3    A    It's a notice to all creditors.  The notice of federal tax
4    lien is a notice to all creditors that a federal tax lien
5    exists; and for accounts after 45 days, if you have -- see a
6    lien senior or any lien senior to the IRS, then the IRS jumps
7    that lien.
8    Q    On the records of GrandSouth Bank, Compensation Management
9    was not a debtor of the bank.  Is that correct, sir?
10   A    That's correct.
11   Q    Let me draw your attention to Exhibit 483.  Take a moment
12   to look at that, sir, so you can familiarize yourself with it.
13   A    I'm familiar with it.
14   Q    And is that an email from you?
15   A    It is.
16   Q    And what date is that, sir?
17   A    June the 15th, 2009.
18   Q    And who did you send it to?
19   A    David Burgess, Bert Taylor, and JB Garrett.
20   Q    And what's the subject?
21   A    The subject is Compensation Management.
22   Q    And read that very first short sentence, sir, that reads,
23   "I looked into this account..."
24   A    "Looked into this account and gathered some information."
25   Q    And read the last sentence begins, "I am told..."

1  A    "I am told by our people in factoring that all of the
2  account debtors are now sending the payments to us so this
3  should not be a problem in the future."
4  Q    Let me draw your attention to --
5  A    No.  This -- Compensation Management is referencing the
6  CMI invoices we purchased from US Funding.
7  Q    Well, "I am told by our people in factoring that all of
8  the account debtors are now sending the payments to us."
9          Is that what it says, sir?
10 A    Yes, but this is related to the -- the invoices we
11 purchased were Compensation Management invoices.  They were
12 owned by US Funding.  We purchased those in January of 2009.
13 That's what this refers to.
14 Q    Sir, you knew all along you were really just factoring
15 Compensation Management, didn't you, sir?
16 A    No, I did not, sir.  I did not know that.
17 Q    You really believed you were factoring Matthew Medaloni's
18 factoring?
19 A    I absolutely believed that.  I was provided with
20 information every single month showing the balances outstanding
21 on every single factoring line we had in the bank, including
22 these accounts.  And I tracked -- that report that was provided
23 showed the performance on those accounts that -- at the time we
24 had them in the bank.
25 Q    So you believed that Matthew Medaloni factoring in

January 30, 2019

**-4169-**

1  Columbia, South Carolina, could support $2 million worth of

2  factoring line?

3  A    No, sir, he did not have $2 million of factoring.  As a

4  matter of fact, what you showed me earlier was 446,000, or 400

5  and some thousand dollars.  So I don't think it was ever

6  $2 million.

7          But, yes, I believed that Matthew Medaloni, as he

8  represented to my bank, as he was paid to represent to my bank

9  by Mr. Harrison, to defraud my bank, so, yes, I believed that.

10 Q    Just like you supposedly believed that Joey Medaloni

11 actually was running a staffing empire that drove Greg down to

12 the bank, what, on his off days?

13 A    And Mr. Medaloni -- Matthew Medaloni came to my bank --

14         THE COURT:  All right.  Hold on just a second.  Ask

15 your question, Mr. Chut.

16         MR. CHUT:  Yes, Your Honor.

17 BY MR. CHUT:

18 Q    Let's look at Exhibit 439, Mr. Earnest.

19 A    Sorry, Your Honor.

20 Q    And what is the date of this email, sir?

21 A    This is June the 16th of 2009.

22 Q    And who sent this email?

23 A    I sent this to Bert Taylor with carbon copies to David

24 Burgess and JB Garrett.

25 Q    And what's the subject again?

1  A    The subject is "Compensation Management," and this is a

2  day after the previous -- I think it was the day after the

3  previous exhibit you just showed me.

4  Q    And here, you say, "...the former factor of the

5  predecessor company related to Greg Harrison and Compensation

6  Management," is that correct, sir?

7  A    That's correct.

8  Q    Now, I'm going to draw your attention to Exhibit 329.  And

9  look at the very top portion of this email, sir.  And

10 Mr. Corriher says to you, "The info Matt was obtaining was on

11 CMI and not the licensees."  Is that correct, sir?

12 A    That's what it says, yes, sir.

13 Q    And this email is dated December 2, 2009, isn't that

14 correct, sir?

15 A    This is an email that -- he is responding to my email

16 where I was asking him whatever happened to the audit that

17 Mr. Carpenter was supposed to do on the Global licensees.

18 Q    And he said to you, "Matt wasn't looking at the licensees,

19 he was looking at CMI."  Is that correct, sir?

20 A    He says, "The information Matt was obtaining was on CMI,

21 not the licensees.  Greg's attorney advised him not to give

22 Matt anything else or forward us any more documents related to

23 CMI and GSB due to the lawsuits/subpoenas."

24      He did not tell me that he gave me or anybody else

25 the reports that Mr. -- that he evidently had in his possession

Earnest - Cross by Chut                                      212

```
 1  from Mr. Carpenter.
 2  Q    Let me draw your attention to what's marked as
 3  Exhibit 486.  And if you'll blow up the left-hand portion of
 4  this.  And who is this a bill to?
 5  A    Arvato Digital Services, Inc.
 6  Q    And where is Arvato located?
 7  A    This is Weaverville, North Carolina.
 8  Q    And who is the company doing the billing, sir?
 9  A    Compensation Management, American Staffing Resources.
10  Q    And I don't -- do you see any Green Ideas N Motion or
11  Medaloni of South Carolina as the biller?
12  A    I do not see it, sir, but, then, I wouldn't see these
13  invoices.
14  Q    So you knew to a certainty that you were factoring
15  Medaloni of South Carolina, but you never saw the invoices, is
16  that your testimony, sir?
17  A    My testimony is I didn't see any of the invoices from any
18  of the customers, sir.  That was done in the factoring
19  division.  I got reports, sent people in to look.
20           As far as I know, we were factoring the invoices that
21  were submitted by our customers, and were collecting those
22  invoices.
23  Q    Let me draw your attention to what's been marked as
24  Exhibit 363, already admitted.  And if you'll blow this up,
25  Ms. Collins, so he can read it.  Will you blow up the top part.
```

```
 1          And do you recognize this document, sir?
 2  A    It's a request for a wire transfer, yes.
 3  Q    And what's the date?
 4  A    April -- looks like 1st, 2010.
 5  Q    And what's the amount?
 6  A    $200,000.
 7  Q    And what's the receiving account name?
 8  A    Global Labor.
 9  Q    And that's Greg's house's address, isn't it, sir?
10  A    It is.  I think it is.  I don't know.  I've never been to
11  his house, so I don't know.
12  Q    Well, sir, let's go back to these personal loans if it
13  will refresh your memory.  Let's go back to Exhibit 1454.
14  A    It says 4309 Hoke Lane?
15  Q    Yes, sir.
16  A    And what was the other one?  It looks similar, Hoke Lane.
17  Q    Now, whose signature appears in the middle of the page,
18  sir?  Back to 363.
19  A    Shannon Drake, Doug Corriher, and me.
20  Q    And who is the signature in the middle of the page?
21  A    Greg Harrison.
22  Q    And --
23  A    There's signatures down below, too, it looks like.
24  Q    Drawing your attention now -- well, let's go down to that
25  bottom portion.  And Doug Corriher showed this document to you
```

1 and told you that he had basically copied these signatures onto

2 this page, didn't he, sir --

3 A    No, he did not.

4 Q    -- or this form?

5 A    I signed it, but he did not show it to me.  I think his --

6 can I say his testimony?  His testimony was that he took it to

7 the -- our Operations Officer and our Chief Financial Officer.

8 Q    Did he show you this form -- not this particular

9 transaction, sir, but this form with the signatures

10 mimeographed on the bottom, or copied onto the bottom?

11 A    No.  The only time I saw this was when I signed it.

12 Q    Okay.  Let's look at Exhibit 364.  And if you can blow

13 that up, Ms. Collins.  And what is this document entitled?

14 A    It's entitled, "Outgoing Wire Detail."

15 Q    And do you see a recurring wire description?  Blow that

16 up, please, Ms. Collins.

17 A    I see it.  "GrandSouth Bank for Greg Harrison."

18 Q    So for all these -- all the advances for these purported

19 licensees, GrandSouth Bank sent the money to Greg Harrison?

20 A    No, the money went to Global Labor, which was Harrison's

21 company, but it was also the processer for the payroll for

22 these companies.

23 Q    Well, what does it say on the wire?  It says, "Greg

24 Harrison," doesn't it?

25 A    It's a repetitive wire.  It's a template.

Earnest - Cross by Chut                                    215

```
1   Q    But it did not go to any of those supposed licensing
2   companies, did it, sir?  The advances went to the company
3   controlled by Greg Harrison?
4   A    It went to Global Labor, who was the licensor who provided
5   the payrolling and invoicing for these companies.
6   Q    And so, the account debtor sent their checks to the
7   lockbox at GrandSouth Bank, isn't that correct, sir?
8   A    They sent checks to GrandSouth Bank, that's correct.
9   Q    And then, GrandSouth Bank made advances with that money to
10  Global Labor under the signature of Greg Harrison, is that
11  correct, sir?
12  A    The money that we received on the -- I don't have
13  firsthand knowledge of this, so I -- but the payments come into
14  the factoring department, they apply them against the invoices
15  on the factoring system, and then they apply them against the
16  lines, the line balances.
17  Q    But you do know you were wiring the money to Global Labor
18  for Greg Harrison?
19  A    I know we were wiring the money to Global Labor at the
20  request of these customers to pay for their payroll.
21  Q    And it was not going to the customers directly?
22  A    It was going into their checking account, and it was
23  debited from their checking account, DDA, to Global Labor.
24  Q    And then combined into one wire and sent to Global Labor
25  under the signature of Greg Harrison?
```

January 30, 2019

Earnest - Cross by Chut                                216

```
 1   A     Well, under their signatures, too.

 2   Q     But it was not sent to accounts they control; it was sent

 3   to Greg Harrison?

 4   A     It was sent to Global Labor.  I don't know about that.

 5   Q     And you don't know what happened to the money after that,

 6   do you, sir?

 7   A     I don't, no, sir.

 8   Q     Now, you hired Doug Corriher in what year, sir?

 9            THE COURT:  Let me see counsel up here before we

10   switch gears.

11            (Bench conference as follows:)

12            THE COURT:  Are we, like, five minutes away, or what?

13            MR. CHUT:  More like half an hour to an hour, Your

14   Honor.

15            THE COURT:  I'm going to send them home.  All right.

16            (Bench conference concluded.)

17            THE COURT:  All right.  Ladies and gentlemen, I'm

18   going to excuse you now for your overnight recess.  Do not

19   discuss the case with anyone or permit anyone to discuss it

20   with you.

21            It's a guess, but I think we'll finish the evidence

22   sometime tomorrow.  That's not final, but I think that's the

23   way it will be, and I'll update you on the schedule further

24   thereafter.  The jury's excused until 9:30.

25            (At 5:16 p.m., jurors excused.)
```

January 30, 2019

 1          THE COURT:  Mr. Earnest, you may step down.  We're

 2   breaking during your cross-examination.  So I'm going to

 3   instruct you not to discuss your testimony.

 4          (Witness excused.)

 5          THE COURT:  Hopefully, tomorrow, we'll be close -- do

 6   you know how many -- have any idea how long any additional

 7   evidence will take, Ms. Barbier?

 8          MS. BARBIER:  Beg the Court's indulgence.

 9          THE COURT:  Um-hum.

10          MS. BARBIER:  Your Honor, I think we'll wrap up

11   tomorrow.

12          THE COURT:  All right.  Yes, sir, Mr. McLellan?

13          MR. McLELLAN:  Your Honor, we're trying to determine

14   whether we should bring Ms. Hunnicut in from South Carolina to

15   testify.  And she's indicated earlier today that she could make

16   it here tomorrow morning, which we would do, depending upon the

17   Court's ruling on our request to permit her to testify to

18   questions about how withheld information would have affected

19   her audits pursuant -- and I cited that *Cuti* case to the Court.

20   If we could get a ruling on that, Your Honor, we could

21   determine whether or not we're going to call this witness.

22          THE COURT:  All right.  Do you have the same

23   objection?

24          MR. CAMDEN:  I have the same objection.  Beyond that,

25   Your Honor, I mean, what does that mean?  I mean, you know, if

1  I ask someone a question, hey, you know, if I didn't cite a

2  bunch of applicable authority to you, Judge, would that have

3  changed your rulings, if I didn't put any of the available

4  facts on the record?  I don't know what it's probative of in

5  any meaningful way.  Certainly, if it's presented as a

6  hypothetical, I just -- I don't think we're getting anywhere

7  with Ms. Hunnicut.

8        THE COURT:  All right.  Let me explain it this way,

9  Mr. McLellan.  And I'd love to, especially during this quirky

10 budget time, be able to give you a final answer.  But, at this

11 particular juncture, I've looked briefly at the reports.  It's

12 not clear to me what evidence she should have received -- I'm

13 not even clear on what she's reported on.

14       I understand your need to answer the question.  We're

15 not through cross-examination of Earnest yet.  Taylor has not

16 had an opportunity to cross-examine Earnest, so I don't know

17 what's coming.  Without some kind of forecast, it's awfully

18 hard for me to say yes or no at this point because I'm in the

19 dark as to what it may actually be, if that makes any sense to

20 you.

21       MR. McLELLAN:  Yes, Your Honor.

22       THE COURT:  So I'd like to accommodate you.  If you

23 want to push her out and say tomorrow afternoon -- I don't know

24 what time she has to leave to get here, but if you want to push

25 it out until two, give us time to get through more evidence so

1  I can get a little better feel.  If there's some things you
2  want to point me to, I'll take a look and see.  But I just --
3  at this point, I haven't heard an audit defense yet coming out,
4  so I don't know that that's there.
5          There may be things -- if we end up in a position
6  where I permitted her called to identify the audit, if there
7  were -- and somebody didn't convince me, contrary to what you
8  cited from the Second Circuit in terms of her field of
9  expertise and whether or not her comment on, well, if this
10  information was different, how would that affect your -- the
11  outcome, unless she's an expert, if I did allow her to testify
12  because it was relevant, I lean toward saying at this point,
13  absent some change in light of the case you've cited, I would
14  give you some leeway in terms of what -- how different
15  information might have affected the report that she gave,
16  assuming it's otherwise relevant.
17          But, at this point, I'm just not clear on the
18  ultimate relevance.  That's the best I can tell you.
19          MR. McLELLAN:  Thank you, Your Honor.
20          THE COURT:  Mr. Bannister -- yes, ma'am, Ms. Barbier?
21          MS. BARBIER:  I just had one question, Your Honor, if
22  we could get clarification from the Government because I'm
23  really in the dark on this.  What is the allegation that
24  anybody withheld any information from Ms. Hunnicut, and what
25  would that information be, and who would that person be?

Earnest - Cross by Chut                    220

```
 1            THE COURT:  Well, I don't know the answer to that.
 2  She was debriefed and a memorandum was provided.  I don't know.
 3  And, generally speaking, if it became necessary, if I thought
 4  you were truly going to be sandbagged, I probably, at this
 5  point, would do that by way of a voir dire rather than a
 6  proffer, because like last -- the first time we went through
 7  this, I'll tell you candidly, I misunderstood what was being
 8  proffered, and I don't want to go down that road again.
 9            So, if we're going to -- if I'm going to allow her to
10  testify, then I would likely look favorably upon a brief voir
11  dire and let everybody have some idea of what was coming.
12            MS. BARBIER:  Okay.
13            THE COURT:  All right.
14            MS. BARBIER:  Thank you.
15            THE COURT:  All right.  Mr. Bannister, I say this to
16  you with all due respect.  I have a hard time believing anybody
17  on your defense team was caught flat-footed during the course
18  of this trial, except I'm going to give you the benefit of the
19  doubt, and say that it was preferable for you to hear the cross
20  before you finalized what you might want to do in terms of your
21  cross-examination.  I'll broadly construe that to mean you were
22  caught flat-footed.  I'm not trying to be funny, I'm trying to
23  make a point.
24            But it does put -- two things.  One, if the defense
25  calls a witness, the cross goes around the table and then to
```

```
 1  the opposing side and then back.  So it's real easy.
 2            We're a little bit out of order, and so I will
 3  forewarn you that we come back -- and when we do come back, if
 4  you're crossing Earnest, you'll be next.  Then I'll give
 5  Barbier and Mr. Earnest an opportunity to do some redirect.  I
 6  probably would allow a little bit of recross, but I'm going to
 7  have a hard time being convinced to come back to you twice.
 8            MR. BANNISTER:  I understand.
 9            THE COURT:  If that makes any sense to you.
10            MR. BANNISTER:  That's fair.
11            THE COURT:  So we'll leave it at that.  All right.
12  Anything else?
13            MR. CHUT:  No, Your Honor.  Thank you, Your Honor.
14            THE COURT:  Do we need to meet at 9:00 tomorrow or
15  are we good where we left off?
16            MR. CHUT:  I think we're good, Your Honor.
17            THE COURT:  All right.  You all agree?  All right.
18  Let's make every effort to see if we can bring the jurors in at
19  9:30 and on time tomorrow.  We'll be in recess until 9:30.
20            (At 5:24 p.m., proceedings adjourned.)
21
22
23
24
25
```

* * * * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the proceedings in the above-entitled matter.

Date: 01/30/2019    Joseph B. Armstrong, FCRR
                    United States Court Reporter
                    324 W. Market Street
                    Greensboro, NC  27401

January 30, 2019

**-4182-**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF NORTH CAROLINA
 2
    UNITED STATES OF AMERICA    ) Greensboro, North Carolina
 3                              ) January 31, 2019
         vs.                    ) 9:30 a.m.
 4                              )
    RONALD KEITH EARNEST        )
 5                              ) Case No. 1:16CR205-3
         Defendant.            )
 6  _____)
    UNITED STATES OF AMERICA    )
 7                              )
         vs.                    )
 8                              )
    ROBERT THOMAS TAYLOR        )
 9                              ) Case No. 1:16CR205-4
         Defendant.            )
10  _____)

11


12                        EXCERPT
    (PROCEEDINGS NOT INCLUDED IN PREVIOUSLY FILED WITNESS EXCERPTS)
13           BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
                  UNITED STATES DISTRICT JUDGE
14
    APPEARANCES:
15
    For the Government:  FRANK JOSEPH CHUT, AUSA
16                       Office of the U.S. Attorney
                         101 S. Edgeworth Street, 4th Floor
17                       Greensboro, North Carolina 27401

18                       JEFFREY A. MCLELLAN
                         U.S. Department of Justice, Tax Division
19                       POB 972
                         Washington, DC 20044
20
    For the Government   WILLIAM M. MONTAGUE
21                       U.S. Department of Justice, Tax Division
                         601 D. STREET, NW
22                       Washington, DC 20004

23


24


25
```

2

```
 1   Appearances, Continued:

 2   For the Defendant:     DEBORAH B. BARBIER
     Earnest                Deborah B. Barbier, LLC
 3                          1811 Pickens Street
                            Columbia, SC 29201
 4
                            JOSHUA BRIAN HOWARD
 5                          Gammon, Howard & Zeszotarski, PLLC
                            115 1/2 W. Morgan St.
 6                          Raleigh, NC 27601

 7   For the Defendant:     WES J. CAMDEN
     Taylor                 CAITLIN M. POE
 8                          Ward and Smith, P.A.
                            PO Box 33009
 9                          Raleigh, NC 27636-3009

10                          JAMES W. BANNISTER
                            Bannister Wyatt & Stalvey, LLC
11                          PO Box 10007
                            Greenville, SC 29603
12
     Also Present:          Nexsen Pruet
13                          1230 Main Street, 700
                            Columbia, SC  29201
14

15

16

17

18

19

20

21

22   The Reporter:          Joseph B. Armstrong, FCRR
                            324 W. Market, Room 101
23                          Greensboro, NC  27401

24            Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25
```

3

1                          I N D E X

2    WITNESSES FOR THE GOVERNMENT:                          PAGE

3    BETH HUNNICUT
        Direct Examination By Mr. McLellan               60
4        Cross-Examination By Mr. Howard                 68

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    P R O C E E D I N G S

 2            (At 9:30 a.m. proceedings held, filed separately:)

 3            (TRIAL TESTIMONY, RONALD K. EARNEST, CONTINUED.)

 4            (At 10:13 a.m., proceedings continue:)

 5            THE COURT:  All right.  I'll let you renew whatever

 6   motions you want to renew for the record.  Anybody?

 7            MR. HOWARD:  Your Honor, we would renew our previous

 8   Rule 29 motions, noting especially that Rule 29(b) provides

 9   that the Court can withhold its decision on particularly the

10   obstruction count as you have, but the decision on that has to

11   be made as to the evidence that was in evidence at the time the

12   motion was made.

13            THE COURT:  I understand.

14            MR. HOWARD:  We'd ask the Court to reconsider that.

15   I really think if you would apply the standards we submitted in

16   our brief and in argument, that it would help narrow the issues

17   for the jury's consideration as well.

18            THE COURT:  Okay.  Yes, sir?

19            MR. CAMDEN:  Your Honor, I think we did this at the

20   close of our evidence, but I just want to make sure we're clear

21   for the record.  We renewed our motion for Rule 29 generally --

22            THE COURT:  You did.

23            MR. CAMDEN:  -- but specifically with respect to

24   Count Twenty-Nine.

25            THE COURT:  We're going to revisit Count Twenty-Nine
```

1  in a minute.

2          MR. CAMDEN:  Thank you.

3          THE COURT:  All right.  The Government anticipate

4  rebuttal evidence?

5          MR. McLELLAN:  I just -- I've not left the courtroom,

6  Your Honor.  I -- we put the word out for Ms. Hunnicut, and I

7  don't have an answer to her availability at this time.

8          THE COURT:  So we would -- with respect to -- we've

9  got to have a voir dire, and so we'll -- do you want to go

10  check and see if she's available.

11          MR. McLELLAN:  Yes, Your Honor.

12          THE COURT:  All right.

13          MS. POE:  Your Honor, while the Government is doing

14  that, I know that Mr. Earnest has submitted his proposed jury

15  instructions already.  I'm actually filing Mr. Taylor's right

16  now as we speak.  I know the Court had envisioned having our

17  charge conference tomorrow morning.

18          In the interest of moving things along, I think

19  that -- I can't speak for anyone else, we would be ready to do

20  that as soon as this afternoon once the Government has had its

21  opportunity to review everything and respond.

22          THE COURT:  Did you read my instructions last night?

23          MS. POE:  I read them this morning, Your Honor.

24          THE COURT:  Okay.

25          MR. CHUT:  Your Honor, we would just ask to keep on

6

1  the regular schedule.  This is a 4-week jury trial.  It's

2  complicated legal issues.  I think the parties have to have

3  time to look at this, and there's no need to rush at all, and I

4  think --

5           THE COURT:  Well, over night's pretty good time to

6  prepare, but let's see -- let me get through the trial, and

7  then if we need to revisit, we'll revisit.

8           Yes, sir?

9           MR. McLELLAN:  Your Honor, Ms. Hunnicut is about

10  2 1/2 or three hours out.

11           THE COURT:  Well, we all got caught unexpectedly.

12           If Ms. Hunnicut testifies, how long do you think it

13  will take?

14           MR. McLELLAN:  Less than an hour, Your Honor.

15           THE COURT:  All right.  Yes, sir?

16           MR. HOWARD:  Your Honor, we would protest the

17  prejudice of calling Ms. Hunnicut hours from now.  I mean,

18  she -- her letterhead says Fort Mill.  That means -- if she's

19  2 1/2, 3 hours out, that means she's still in Fort Mill.

20           THE COURT:  Assuming that's where she came from.

21           MR. HOWARD:  Correct.  And so we also feel that there

22  is ample reason to exclude her to begin with.  Your ruling in

23  the first place was correct.

24           THE COURT:  I think it was correct at the time.

25           MR. HOWARD:  And nothing has meaningfully changed.

7

1  We see all the cases that the Court has cited, that the
2  Government has cited, and then I found another one that's on
3  point.  Admitting CPAs who come in and examine the books and
4  records of -- and most of these cases are famous frauds, things
5  that are in the front page of the paper during economic
6  recessions, you know, Adelphia and Rigas.
7           They would bring in CPAs who actually examined the
8  fraud and testify about the fraud.  This is different, and I
9  don't mean to denigrate her profession, but it is not a CPA.
10 CIA is --
11          THE COURT:  I don't know what it is.  I've never seen
12 it before.
13          MR. HOWARD:  There you go.
14          And a critical component of all of these analyses is
15 these folks were applying standard accounting rules, whether
16 it's GAP or whatever applied in that particular case, and can
17 be examined on that, and those applications were clear-cut.
18 Who knows what the rules of a CIA are, and we can't
19 cross-examine her on that.
20          The other part is that these folks actually got in
21 the books and records as to the issue for that case and
22 testified about that.  She can only provide value to them about
23 a hypothetical.
24          THE COURT:  I think there's reason to be concerned.
25 That's the reason I'm going to permit the voir dire.  So --

8

1  yes, sir.

2          MR. CHUT:  I just want to make a comment, with no

3  disrespect to my friend, Mr. Howard.  We had asked yesterday if

4  there was going to be any more witnesses after Mr. Earnest.  We

5  got no response from defense.  For whatever reason, everybody's

6  busy in the middle of a trial, so we're not -- it's not like we

7  were sure to have her here, Your Honor.  So --

8          THE COURT:  Yeah.  I'm a little bit sympathetic to

9  that.  We're in Week 4, and scheduling is difficult.  Here's

10 what I think we're going to do.  I'll certainly hear from you.

11 I hate to make the jury sit here for 2 1/2 to 3 hours, but if I

12 send them home -- so one option is to send the jury home, go

13 ahead with the charge conference.

14         I don't think Hunnicut's going to make a big

15 difference in terms of the charge conference itself, and then

16 bring the jury back in the morning at 9:30, finish the

17 evidence, and then we'd move straight into closing arguments at

18 that point.  So that's one option, and that's the only option,

19 frankly.

20         And in relation to the charge conference, we're going

21 to talk a little bit more about -- I'll talk a little bit more

22 about Count Thirty, but we're going to talk a little bit more,

23 and I'll hear from you if you want to be heard from on Count

24 Twenty-Nine as to Taylor.  I have a couple of reservations

25 about that, but I didn't bring my notes down here.

```
 1          So unless somebody can convince me there's a better
 2   plan, I'm going to bring the jury in, excuse them for the day,
 3   tell them we'll come back tomorrow.  Tomorrow will be a long
 4   day.  We've got four -- two hours plus, so we'll say perhaps
 5   close to six hours of argument, plus one hour of testimony.
 6          If we do go this route, we're going to get -- and
 7   Ms. Hunnicut does testify, we're going to get Ms. Hunnicut's
 8   testimony in, and we're going to finish up closing arguments
 9   tomorrow, even if that means we stay until 6:00 and have short
10   breaks in between, then I'll instruct them on Monday.
11          Anybody got a better idea?
12          MR. CHUT:  No, Your Honor.
13          THE COURT:  All right.
14          MR. CAMDEN:  That works for us, Your Honor.
15          MR. HOWARD:  Does that mean Agent Myles is off the
16   table for rebuttal?
17          MR. McLELLAN:  Ms. Hunnicut is --
18          THE COURT:  That would be the only -- I do want to
19   make sure we're at the only rebuttal witness likely to testify.
20          MR. McLELLAN:  Yes, Your Honor.
21          THE COURT:  Okay.  So it's just a question of
22   Hunnicut.
23          All right.  With that assurance then, I'm going to
24   bring the jury in.  I'm going to send them home, tell them to
25   get a good night's rest, and we'll see them tomorrow morning at
```

1  9:30 for perhaps as much as an hour of testimony or perhaps

2  straight into closing arguments.  At that point, if we move

3  into closing arguments, that will likely take all day and could

4  run a little past 5:00, and then final instructions on Monday.

5          MR. MONTAGUE:  Your Honor, might we ask to start at

6  nine instead, rather than worry about running long.

7  Mr. McLellan and I are from out of town, and we'd like to be

8  able to get home.

9          THE COURT:  I've driven to D.C. at 5:00 in the

10  evening.  8:30 is my latest departure time.  I'll ask them to

11  consider starting at nine, but it's their decision.

12          By the way, I'm a little offended you're in such a

13  hurry to get out of our fair city.

14          MR. MONTAGUE:  I have three small children, Your

15  Honor.

16          (At 10:23 a.m., jurors arrive.)

17          THE COURT:  All right.  Ladies and gentlemen,

18  unfortunately, we've hit a matter that I'm going to have to --

19  that's going to take me a while outside your presence.  So I'm

20  going to go ahead and send you home, but let me tell you what's

21  going to happen from here.

22          Tomorrow I'm going to have you return.  It may be

23  that you listen to a little bit more evidence, maybe a half

24  hour to an hour's worth, and then we'll move straight into

25  closing arguments.  I anticipate closing arguments will take

1   somewhere in the grand total of like five hours or so.  So
2   tomorrow the most that we will do is those closing arguments --
3   is that final bit of evidence, should it be presented, and then
4   closing arguments, then you'll go home for the weekend.

5           On Monday morning, you'll return, and I'll give my
6   final instructions to you, and the case will be submitted to
7   you for deliberation at that time.  I think my instructions
8   will likely take a little while.

9           So tomorrow if you want to start at 9:30, because I
10  know pretty much what's going to happen tomorrow, it will be a
11  long day.  I'm -- of that I'm sure.  If you prefer to start at
12  nine, all of you agree you want to start at nine, leave a
13  message for the CSO as you walk out, and we'll start at 9:00
14  tomorrow.  If your preference is to leave it at 9:30, that's
15  fine.  You don't need to do anything, just take off and go
16  home.  So I'm going to excuse you at this time to return
17  tomorrow morning at 9:30, unless you tell us otherwise and all
18  of you agree that's possible.  The jury's excused at this time.
19          (At 10:25 a.m., jurors excused.)
20          THE COURT:  Do you think Ms. Hunnicut will be here
21  before lunch?  What time is it?  It's 10:30 now.  So probably
22  1:00 is what you're expecting?
23          MR. McLELLAN:  Your Honor --
24          THE COURT:  Best guess?
25          MR. McLELLAN:  I beg the Court's indulgence, I passed

1  the word that she's on tomorrow to testify.  I don't know if --

2  what, if any, effect that would have -- she was driving.  She

3  had left the house and was --

4          THE COURT:  I want you to run out there and turn her

5  around as quickly as possible.

6          MR. McLELLAN:  Do I want her to --

7          THE COURT:  We need to have that -- I want to go

8  ahead and do the voir dire today, even if that makes two trips,

9  so we can go straight into evidence tomorrow.

10          MR. McLELLAN:  Yes, Your Honor, so I'll ascertain

11  that.

12          THE COURT:  Okay.  Sorry about that.  I may not have

13  made myself clear.

14          MR. McLELLAN:  Thank you, Your Honor.

15          THE COURT:  All right.  So we're going to break for

16  about a half hour, let everybody collect their thoughts.  When

17  we come back, I want -- be prepared to offer additional

18  argument on Count Twenty-Nine as to Taylor, and then that

19  shouldn't take very long, and then we'll move straight into a

20  charge conference.  We'll talk about instructions, and then

21  depending on when we finish, hopefully sometime this afternoon,

22  we'll be able to do whatever voir dire needs to be done as to

23  Ms. Hunnicut.  We'll be in recess for 30 minutes.

24          (At 10:27 a.m., break taken.)

25          (At 11:08 a.m., break concluded.)

1          THE COURT:  All right.  Were you able to stop

2    Ms. Hunnicut and turn her around?

3          MR. McLELLAN:  The word I have is that she's now

4    gotten a bag packed and is on her way here.

5          THE COURT:  Okay.  And we think sometime this

6    afternoon, she'll arrive?

7          MR. McLELLAN:  Yes, Your Honor.

8          THE COURT:  Okay.  All right.  Well, let's take up

9    Counts 29 and 30.  We've had extensive arguments on them

10   already, so I'm going to give a few of my thoughts and concerns

11   as to each, and then I think with respect to Count Twenty-Nine,

12   it's probably -- since I have some reservations about letting

13   it go to jury, it's probably most appropriate for the

14   Government to have an opportunity to respond, and then the

15   defendant will have a chance to argue in rebuttal.

16          Count Thirty is the opposite.  I think after I share

17   a few thoughts, I'll give the defendant a chance to respond and

18   let the Government respond to that, so let's start with Count

19   Thirty first.

20          I'm going to give you both, and I'll hear from you --

21   well, let's just do Count Thirty first, and then we'll turn to

22   Count Twenty-Nine.  So 18 USC Section 1503 requires that the

23   Government prove beyond a reasonable doubt the following facts:

24          One, that there was a proceeding pending in any Court

25   of the United States.

1          Two, the defendant had knowledge or notice of the
2    pending proceeding.

3          Three, the defendant influenced, obstructed, or
4    impeded or endeavored to influence, instruct or impede the due
5    administration of justice.

6          And, four, that the defendant acted or did so
7    corruptly, that is, with the intent to influence, obstruct, or
8    impede that proceeding in its due administration of justice.  I
9    don't think there's any question there's no threats of force or
10   violence or threatening letter.  It all relates to the question
11   of perjury.

12         There are a number of statements the Government
13   contends were false.  Denying that he had any direct in-person
14   contact with Harrison at the bank, concealing meetings with
15   Harrison and the fact that he was the loan officer on
16   Harrison's accounts, stating that the factoring loans to the
17   1.0 staffing companies were paid in full with no issues, when
18   in reality Harrison had assumed and paid off the bank debt
19   personally after selling the licensee companies, concealing
20   knowledge that Harrison actually controlled the 1.0 companies,
21   stating that he believed the 2.0 companies were real, stating
22   that he and other bank officers were not aware the bank was
23   actually factoring CMI invoices.

24         And then the two that I have focused on specifically
25   for purposes of this motion are stating that he did not know

1  Harrison was not paying payroll taxes or had payroll tax issues

2  until sometime after Harrison was indicted and stating that he

3  had no knowledge of the Carpenter audit.

4          Both of those things may ultimately turn out to be

5  true, but both of those things are directly contradicted by the

6  Corriher testimony in the case as well as, to some degree,

7  what -- well, we'll just leave it at the Corriher testimony at

8  this point.  And regardless of how weak or strong that

9  testimony is, it's the jury's responsibility to resolve facts.

10         At least in my analysis, false statements need to be

11  material and have the natural and probable effect of

12  interfering with the due administration of justice.  That's

13  *Aguilar*, 515 US at 600 and 601.  Statements that are wholly

14  irrelevant, verbal detours with no bearing on the proceedings,

15  are not material and cannot support an obstruction charge.

16  That's *Bond*, 784 F.3d at 586.  There must be a nexus between

17  the allegedly false statement and subsequent obstruction that

18  is more than speculative.  That's *Blair*, 661 F.3d at 767.

19         Corriher was ultimately indicted, in part, for

20  conspiracy to defraud the United States and to impede the IRS

21  in its collection of payroll taxes.  Earnest said that the

22  grand -- Earnest said before the grand jury that he was not

23  familiar with the issues identified in the Carpenter audit and

24  that Corriher never reported those issues to him.  However,

25  Corriher testified that he forwarded Carpenter's audit issues

1  report to Earnest, at least delivered it and laid it on the
2  desk, and then Earnest subsequently called Corriher to discuss
3  this specific issue.

4        At least in my mind, at this point, I think that is
5  sufficient to create a factual question as to whether this
6  statement materially influenced the administration of justice.
7  I think it is relevant to the grand jury's investigation of an
8  alleged payroll tax conspiracy because Earnest's knowledge and
9  approval could affect -- Earnest's knowledge, anyway, in
10 continuing a business relationship with Harrison could have all
11 manner of relationship to Harrison's participation in the
12 nonpayment of payroll taxes.  So that's about as clear as I can
13 give it at this point.  I'm sure, Mr. Howard, the defendant
14 disagrees, but you may have some things you want to add that
15 I'll consider.

16        MR. HOWARD:  Your Honor, two things:  It was unclear
17 to me from the Court's analysis that one fact is clear.  The
18 Carpenter failed audit or work papers, whatever you want to
19 call it, was not put on Mr. -- Corriher didn't say put it on
20 Earnest's desk.

21        THE COURT:  It wasn't put on Earnest -- I can't
22 remember if it was Taylor or Burgess.

23        MR. HOWARD:  I think the testimony tended to reflect
24 he tried to circulate it through the bank and started with
25 Mr. Taylor.

1          THE COURT:  And Taylor wasn't sitting at his desk
2    when he dropped it off.

3          MR. HOWARD:  That's right.

4          THE COURT:  The only way to make the connection is if
5    the jury should believe Corriher that Earnest later called him
6    in to talk about that.

7          MR. HOWARD:  I do believe, Your Honor, for the
8    purposes of this analysis, we would have to assume that all of
9    the seven statements the Government has alleged are false in
10   Count Thirty are false.

11         THE COURT:  Fair enough.

12         MR. HOWARD:  Obviously, we contest that, but the
13   issue here is that someone needed to take that stand and
14   explain what that did to the grand jury investigation of Doug
15   Corriher.  And the only person that came close to that was
16   Special Agent Myles, and on page 7 of his transcript, right
17   about as Mr. McLellan was going to get him to say that,
18   objections flew, and they never went any further.

19         And I have the transcript here and would be glad to
20   show that up, but it's clear from the sidebar that they were
21   trying to cross that Rubicon, and they never got there.

22         THE COURT:  Let me see what happened there.

23         MR. CHUT:  And, Your Honor, looking at the elements,
24   I'm not sure I agree with that analysis.

25         THE COURT:  I'll give you a chance, Mr. Chut.

 1          MR. CHUT:  Okay, yes, sir.

 2          MR. HOWARD:  Your Honor, I've tabbed what I think are

 3    the relevant provisions.

 4          THE COURT:  All right.  So it looks like they got to

 5    the point of saying to the grand jury -- let's see.  Where does

 6    this start -- that the truth and accuracy of witness testimony

 7    is vital to the functioning of the grand jury.  Then we had all

 8    this argument up here about it.  I don't see that I struck that

 9    testimony.  I got kind of sidetracked on how to balance the way

10    the testimony was going with not letting that impinge on the

11    fact that the grand jury was -- that the indictment is only an

12    accusation, nothing more.

13          I came -- finished the bench -- I threatened to give

14    a limiting instruction.  We finished the bench conference, and

15    I said, "Ladies and gentlemen, the evidence that's being

16    presented here is evidence that you may consider only as to

17    Mr. Earnest.  You may not consider this evidence as to either

18    Ms. Drake or Mr. Taylor during the course of this trial, unless

19    I should instruct you otherwise later.  All right.  You may

20    continue."

21          So we got up to the part -- "So what's in is the

22    grand jury's responsible for listening to evidence or documents

23    presented to them, and they will make a decision on whether to

24    indict or not."

25          "What is the importance of the testimony of a witness

1  in a grand jury's decision making?  Testimony before the grand

2  jury is very important and how important is the truth and

3  accuracy of the testimony -- witness testimony to the

4  functioning of the grand jury?  Absolutely vital."

5            And then I said, "Hold on a second."

6            And those answers stood, except they were limited as

7  to Earnest.  Is that the way you recall it?

8            MR. HOWARD:  That's exactly correct, Your Honor, and

9  that's where -- you know, to use the *Bond* analogy again from

10  earlier in the trial, he stepped into the batter's box, and

11  Mr. McLellan was about to throw him the pitch, and they never

12  put the ball in play.

13            And while I've -- you know, Mr. Chut has disagreed on

14  the analysis of the law, we've cited in our brief -- and we've

15  also cited it in the last portion of our proposed jury

16  instructions -- because materiality, it seems like the Court

17  recognizes, is a part of this count, but, for instance, the

18  *Caron* case, "The Government's burden on obstruction is not

19  satisfied merely upon proof that a defendant rendered false

20  testimony," which is as far as we get here with that Myles

21  testimony.  "Rather, the Government must further demonstrate the

22  rendering of such testimony thwarted or impeded the grand

23  jury's investigation."

24            The *Grubb* case, also from the Fourth Circuit, 11 F.3d

25  426, Fourth Circuit '93, "An obstruction of justice prosecution

1  cannot rest solely on the allegation of proof of perjury,

2  rather what also must be additionally proven is that the false

3  statements given in some way either obstructed or were intended

4  to obstruct."  And Agent Myles never quantified what happened

5  as a result of the allegedly false testimony.  They didn't put

6  the ball in play.

7            THE COURT:  All right.

8            MR. CHUT:  Well, Your Honor, a couple things.  First

9  of all, this is a Rule 29 motion, so all the evidence is in the

10 light most favorable to the Government with the inferences, et

11 cetera, and that's important to remember in this argument.

12           Second, Your Honor, in that light, Agent Myles

13 clearly testified that the truth was absolutely vital and this

14 with was important testimony.  The grand jury is involved in an

15 indictment, the process of considering indictments.

16           We provided substantial evidence in the light most

17 favorable to the Government to all the elements, Your Honor, as

18 you set -- as we set forth in our trial brief, and as you set

19 forth in your proposed instructions, Your Honor.  There's no

20 reason for this not to go to the jury on a Rule 29 standard,

21 and I think, Your Honor, we're adding elements on to -- adding

22 elements really to this jury argument on to the actual bones of

23 the charge, and we've met all our burden, Your Honor, under

24 Rule 29 to go to the jury.

25           THE COURT:  So -- but what's the ultimate obstruction

21

1   as proved?

2           MR. CHUT:  The ultimate obstruction as proved is

3   that -- well, first of all, Your Honor, we have to prove that

4   he acted corruptly with the intent to influence, obstruct, or

5   impede the proceeding, and, of course, we know (indiscernible)

6   to do so had the natural and probable effect of interfering

7   with the due administration of justice.

8           Mr. Earnest getting in there and saying I barely had

9   any direct contact with Mr. Harrison was clearly not true.  I

10  thought the first 2005 factoring agreements were all fine, they

11  all paid out, and his continued statements about the taxes and

12  the nature of believing these other companies were true would

13  have the natural tendency of impeding and misshaping the

14  evidence presented to the grand jury.

15          It was substantially misleading and false testimony,

16  and it had the natural tendency to impede the grand jury's

17  decision on the facts, and I think there's really -- especially

18  in the light most favorable to the United States, Your Honor,

19  there's really no question about it.

20          THE COURT:  All right.  I really think -- I think

21  it's a very close issue in terms of that element of obstructing

22  and impeding, but, ultimately, if you look at the transcripts

23  of the grand jury testimony, the obvious focus of the grand

24  jury testimony, and ultimately what the jury may, but is

25  certainly not required to find, was the target of the

**-4203-**

1 investigation -- or the subject of the investigation, as well
2 as the relationship to that investigation of the tax issues, I
3 think it's enough to go to the grand jury.

4     So I'm going to deny the motion as to Count Thirty,
5 although I recognize that it is close, and this is a very good
6 argument that's being made.  All right.  Let me give you this
7 back before I forget it.  So motion denied as to Count Thirty.

8     Count Twenty-Nine, Taylor, I'll go through the same
9 drill.  Obviously, the allegations contained in Count
10 Twenty-Nine are very broad with respect to conspiracy and
11 include the allegations set out in paragraphs 1 through 75, 77
12 of Count One.  The allegations at least initially focus on the
13 $3.2 million transaction and a statement that despite knowing
14 that a significant portion of the purchased accounts receivable
15 were uncollectible, Corriher, Drake, and Taylor allowed those
16 accounts receivable to remain on SC's book -- bank's books as
17 aging receivables, and then goes on to describe a number of
18 actions beginning in March of 2009.

19     Two issues that I think seems to me are here -- well,
20 I'll pose this as a question for now.  But what knowledge did
21 Taylor have specifically regarding the application of new
22 factoring proceeds to pay off uncollectible US Funding
23 receivables as he prepared loan renewal forms for the 2.0
24 licensee companies?  I'm not sure that knowledge of the sham
25 companies and their relatedness is enough here.

1          The object of the conspiracy is to misapply funds and

2     create false entries, so Taylor must have knowledge of the

3     purpose, that is, that aging receivables were uncollectible and

4     that new proceeds would be improperly diverted to pay down this

5     debt.

6          So the object of the conspiracy here is to make false

7     entries in the books, records, or statements of the bank with

8     the intent to deceive or defraud the bank, and, ultimately, the

9     Government's required to prove that at sometime during the

10     existence or life of the conspiracy, the defendant knew the

11     purpose of the agreement and then deliberately joined the

12     conspiracy.

13          A few of the relevant facts, Exhibit 1364, GrandSouth

14     Bank wired 3.2 million to US Funding on January 16, 2009.

15     Presumably US Funding would turn over any subsequent payments

16     on these accounts receivables to GrandSouth Bank as the new

17     factor.  No written agreement between the parties.  It looks

18     like the $3.2 million transfer was approved by Earnest only.

19          After the transfer, there was clearly confusion about

20     who the account debtors should pay and certain account debtors

21     continued to pay US Funding.  There's no agreement between

22     GrandSouth Bank and US Funding, and we get into a whole host of

23     issues.  Corriher emails Gibney at US Funding to ask for the

24     $3.2 million payoff documentation, which apparently did not

25     exist, and to request that US Funding release security, which

1   it refused to do.

2          The Acquient lawsuit gets filed some time around this
3   time involving an account debtor caught between the two
4   factors.  GrandSouth Bank realized some of these accounts that
5   had either been double factored or were uncollectible because
6   US Funding had already been paid, and GrandSouth Bank had no
7   legal claim to those proceeds because there was no purchase
8   agreement.

9          The bank then went on to make advances to the
10  licensees and applied the money received from those new
11  receivables against the uncollectible aging receivables from US
12  Funding.  Corriher says they excluded the uncollectible
13  accounts receivable from the new borrowing base.  CMI and
14  Harrison account debtors were -- constituted both pools, so
15  they were actually buying different and new receivables and
16  applying the proceeds to pay down the uncollectible ones.

17         It doesn't look quite like circular lending to me
18  because of the exclusion of the uncollected accounts from the
19  borrowing base, ultimately leaving -- at least in summary
20  fashion -- a result that the resulting bank entries were
21  fraudulent because they showed these uncollectible amounts as
22  being paid off in the ordinary course by the real account
23  debtor who had, in fact, paid US Funding when in reality the
24  accounts were paid off with the proceeds from other or new
25  CMI/Harrison account debtors.

1    A few of the things that give me concern about this

2   account, to the extent this count alleges improper recording of

3   the source of the money used to pay off the uncollectible US

4   Funding receivables, I'm not sure at this point what evidence

5   shows that Taylor knew about this particular conspiracy or its

6   purpose.

7    As I found previously -- and I'll put it this way:

8   It's almost the opposite of what I perceive as the problem with

9   Shannon Drake.  On this front, I think there's enough evidence

10  to support Taylor's knowledge with respect to the broader

11  conspiracy, but with respect to the specifics as to these

12  internal transactions and application of proceeds, I'm not sure

13  how much Taylor knew about the operation sufficient to support

14  a finding by the jury, even in the light most favorable to the

15  Government, that Taylor knew about this particular conspiracy

16  and its ultimate purpose.

17    Corriher testified he didn't raise the issue with

18  Taylor, which in and of itself is certainly evidence that the

19  jury could disregard if they chose not to believe Corriher, but

20  assuming that -- even assuming that that is disregarded, we've

21  still got issues as to Taylor's primary duties, which seem to

22  me to include drafting and signing loan renewals based on

23  information received from Corriher, and performing loan reviews

24  of the factoring portfolio, as I see it, in a manner as

25  instructed by Earnest.

1        Taylor signs the loan renewals for the 2.0 factoring
2   lines, but I'm not sure there's any evidence to support a
3   finding that he was told about or was aware of the conflicting
4   claims as to CMI receivables or the viability of those claims,
5   the $3.2 million wire transfer to US Funding or the fact that
6   the proceeds of the new factoring would be used to pay off
7   uncollectible accounts from the US Funding transition, or that
8   any of this information would have been obvious to him and
9   information that he used to prepare the loan renewals or
10  reviews.

11       It seems to me the forms Taylor prepared focused on
12  the credit worthiness of the account debtors and the risk to
13  the bank, and Taylor reviewed the financial statements of the
14  clients, including quarterly tax returns, personal financial
15  statements, and personal tax returns on any guarantor or
16  guarantors.

17       This is another thing I'm going to bring up here,
18  because I find to be an interesting fact, and I think it cuts
19  in favor of Taylor, and that is even if somehow -- and I don't
20  think there's any evidence that he was -- that $375,000 -- was
21  it 375 provided by Harrison that bounced?

22       If one of those documents I saw had in the upper
23  right-hand corner a notation of something like Harrison's net
24  worth was 19.6 million, as I read it, how -- the conflicting
25  evidence, I think, would make it very difficult to piece

1    together some of the finer components of this scheme, that is

2    to say, if a report came in from Earnest and Mr. Taylor

3    appeared to be of -- I mean, Mr. Harrison appeared to be sound

4    financially, balancing that against other evidence might prove

5    to be pretty difficult after review of the documents, but

6    that's a side issue.

7            I think there is evidence that Taylor had some

8    knowledge or suspicion about whether the Harrison licensees

9    were independent companies and concerns about whether the bank

10   was accurately reflecting the licensee debt as it related to

11   Harrison.  But I'm not convinced that the evidence would show

12   that Harrison knew any of the facts about the $3.2 million wire

13   to US Funding, or that Taylor knew about the uncollectible

14   accounts or much, if any, about the Acquient litigation.  I

15   think there's an assumption with respect to the Acquient

16   litigation that has to -- would have to apply, and that is that

17   everybody in the bank knew about it, but I'm not sure that to

18   be the case ultimately.

19           And so I'm concerned about whether or not there's

20   sufficient evidence that would allow the jury to reasonably

21   infer and/or find that Taylor knew about or was willfully blind

22   to a conspiracy to misallocate funds to pay off uncollectible

23   receivables.

24           All right.  Who wants to be heard on that?

25           MR. MONTAGUE:  First of all, Your Honor, I would

1  begin with the loan reviews that Mr. Taylor did in July of

2  2008, and while these are focused on credit worthiness, one of

3  the primary aspects that is considered in these loan review

4  cover sheets is the aging of these particular entities.

5          THE COURT:  All right.  Hold on just a second.

6          So what's the date of these?

7          MR. MONTAGUE:  July 29, 2008.

8          MS. POE:  2009.

9          MR. MONTAGUE:  I'm sorry, 2009.  You're correct.

10         THE COURT:  So July of 2009.  At this point, the

11 3.2 million has been paid.  That occurred in January, and

12 there's been some adjustment in the receivables in this January

13 to March time frame, more or less spearheaded by Corriher, but

14 as reflected in one email to some degree directed by Earnest,

15 as I understand.

16         MR. MONTAGUE:  And continuing past that --

17         THE COURT:  I understand it continued to pass, but

18 there was some -- we'll say some stuff going on with respect to

19 those receivables in that time frame, but most of the evidence

20 seems to suggest either Corriher or Earnest was handling that.

21         MR. MONTAGUE:  There is -- I believe it's a June

22 email, subject Compensation Management, Mr. Taylor is copied on

23 talking about, you know, I understand, and I think the figure

24 $443,000 was the one Mr. Earnest used and has gone -- had gone

25 to the former factor of our client, Compensation Management.

1          THE COURT:  Interesting choice that you mentioned 443

2    and not 3.2.

3          MR. MONTAGUE:  You know, what percentage of that is

4    difficult to parse in part, Your Honor, because the way the

5    books were kept.

6          THE COURT:  Right.  So back to your original point,

7    the July 2009 loan memo.

8          MR. MONTAGUE:  So, Your Honor, those -- you know,

9    front and center on those loan memos is this -- is the

10   percentage of aging that is over the 90 days, and, you know,

11   the Government's allegation, Your Honor, in part, is that

12   these -- the reason these checks came in from CMI was to get

13   these invoices that were over 90 days off the books and records

14   of the bank so they would not, you know, in order to make these

15   entities appear more creditworthy, so there was a motivation to

16   do this, Your Honor.

17         Further I would point --

18         THE COURT:  All right.  So hold on.  Let's talk about

19   to do this.  So there's an entry in the loan review that you're

20   looking at now that has a percentage of invoices over 90 days.

21         MR. MONTAGUE:  Yes, Your Honor.

22         THE COURT:  So any evidence to show that that's false

23   at that point?

24         MR. MONTAGUE:  The fact that these invoices are being

25   marked as paid by the debtors when, in fact, this money is

```
 1  coming from Compensation Management.
 2          THE COURT:  Okay.  But in terms of the sentence you
 3  just mentioned, just read it specifically on invoicing over 90
 4  days.
 5          MR. MONTAGUE:  Review of the client -- this is for
 6  Green Ideas N Motion, I believe, but there were five separate
 7  ones all within one or two days of each other.  Factor with one
 8  concentration, Belding Hausman for 28.8 percent of the dollars
 9  factored, 155,000 or 15.7 percent was over 90 days.  Some
10  percentage of that, Your Honor, for these entities that were
11  getting these checks from CMI, those -- that's not true, so
12  that percentage would have been higher had these not been
13  marked as paid.
14          THE COURT:  Okay.  What's to show that Mr. Taylor
15  knew that that reduction occurred as a result of CMI payments?
16          MR. MONTAGUE:  It would be an inference, Your Honor.
17  There is not direct testimony that he was told about this.
18  However --
19          THE COURT:  Okay.  Give me your direct -- your best
20  circumstantial case.
21          MR. MONTAGUE:  Um --
22          THE COURT:  Let me say this before you get started:
23  I seem to remember those collection sheets --
24          MR. MONTAGUE:  Yes, Your Honor.
25          THE COURT:  -- that list out all the account debtors.
```

1          MR. MONTAGUE:  Yes.

2          THE COURT:  And I don't recall any of the actual

3    invoices themselves being provided to Mr. Taylor or anybody

4    else.

5          MR. MONTAGUE:  Well, those collection reports would

6    be where you could see it, Your Honor.  You wouldn't see it on

7    the invoices.  You will see it --

8          THE COURT:  Tell me what you see on the collection

9    reports.

10          MR. MONTAGUE:  On the collection reports, you would

11    see a single check number being used to pay down.  In one case,

12    on April 17 it's alleged in the indictment going for

13    essentially ten pages, Your Honor, of different account

14    debtors, it's not the same account debtor.

15          THE COURT:  What's shown on there with respect to the

16    source of the check?

17          MR. MONTAGUE:  It's not indicated on there, but the

18    fact that there is one single check number used to pay off

19    multiple account debtors, hundreds of entries, hundreds of

20    invoices, is in and of itself suspicious, Your Honor, and

21    seeing that you could have gone beyond it and pulled the check

22    stub.  I mean, those are obviously in the books and records of

23    the bank, and that would have shown it coming from CMI.

24          THE COURT:  All right.

25          MR. MONTAGUE:  But it's not typical that one -- you

1  know, that different account debtors would be paying with a
2  single check.  These are separate companies, and they're not
3  going to be paying with one check.
4          THE COURT:  We'll say -- just as a hypothetical --
5  ten different account debtors, that is the actual individuals
6  or companies hiring the factoring -- hiring the employees of
7  these for whatever, you would anticipate, if you look at that
8  sheet, that there would be a check coming in for each separate
9  company?
10          MR. MONTAGUE:  At the very least, and sometimes
11  multiple ones from that individual company.
12          THE COURT:  Okay.  Fair enough.
13          Then why would it be Mr. Taylor's responsibility to
14  see that and say, oh, here's a problem, let me go investigate,
15  as opposed to relying upon the absence or the presence of
16  comments from Corriher as head of the factoring department that
17  there was a problem?
18          MR. MONTAGUE:  I would point in this case to a few
19  emails, Your Honor, and one is Government Exhibit 334, and I
20  believe it was one of Mr. Taylor's exhibits as well.
21          The subject of this email -- and it's dated May the
22  4th -- and then there's also an early one I'll read of 2009,
23  and the subject is, "Factoring Portfolio Review," and
24  Mr. Earnest directs Mr. Burgess, Mr. Taylor, Mr. Corriher,
25  Mr. Garrett that the review should start with the largest

1  accounts, and then he talks about process review.

2      He wants to see the documents used to make advances,

3  verification process, collection activities, he specifically

4  mentions that, Your Honor, account debtor concentrations and

5  trends in collections, and, again, the collections, "I want to

6  see examples of the documents used for advances, verification,

7  collection, et cetera, so I can draw my own conclusions.  I

8  also want to have discussions with each of the account

9  executives and ultimately develop well-defined procedures

10  specific to each account."

11      And then at the end of the email, he directs D-E-B

12  and you, Bert -- "D-E-B, you, Bert, and I should try to get

13  together later this afternoon to discuss how we should approach

14  this.  Bert will need to obtain the most recent spreadsheets

15  from Doug."

16      So it's clear that Mr. Taylor is intimately involved

17  in this review process that Mr. Earnest is directing him to

18  undertake.

19      THE COURT:  He's involved.  How intimately it is is

20  the question.

21      MR. MONTAGUE:  It seems that he's the one that's

22  primarily going and pulling these documents, and seems like

23  that is a fair inference from this email, Your Honor.

24      THE COURT:  Why is that?

25      MR. MONTAGUE:  Because at the end of this email, it

34

1    says, "Bert, you'll need to obtain the most recent spreadsheets

2    from Doug and sort them largest balance to lowest so we can

3    identify which counts to begin the review."

4              THE COURT:  So number one, Mr. Corriher puts together

5    the info, right?

6              MR. MONTAGUE:  That's true.

7              THE COURT:  And, number two, what was that info?

8              MR. MONTAGUE:  Well, including among it, it seems to

9    be --

10             THE COURT:  No.  Do you have the actual spreadsheet?

11             MR. MONTAGUE:  No, we don't.

12             THE COURT:  Okay.  No?

13             MR. MONTAGUE:  No, I don't believe we do.

14             THE COURT:  All right.

15             MR. MONTAGUE:  And then, secondly, there is an email

16   from March 6 of 2009 from Mr. Earnest specifically to

17   Mr. Taylor copied to Mr. Burgess but directed to Mr. Taylor

18   saying, "Bert, as we discussed, I want you to monitor the

19   factoring process to insure that we're performing the

20   appropriate due diligence in accepting advancing on invoices.

21   Your perspective should be from the credit administration point

22   of view."

23             Skipping down a couple lines, "Your involvement

24   should be similar to an auditor in determining if we're

25   managing the risk appropriately to reduce our exposure to loss

1   from fraud or credit."

2        "You will need to become very familiar" -- skipping

3   down a couple more lines -- "You will need to become very

4   familiar with the process so that you will have the ability to

5   determine if the staff is performing the appropriate

6   verifications and processes that will manage the risk within

7   tolerable levels."

8        Again, I think it would be a fair inference from

9   that, collections --

10       THE COURT:  So let's go to step 2, so he receives an

11  email from Earnest saying you need to do all those things,

12  right?

13       MR. MONTAGUE:  Correct.

14       THE COURT:  And a fair inference from that might be

15  that he did it, but then the bigger question is what did he do

16  and what did he see?  Is there any evidence of that?

17       MR. MONTAGUE:  No, Your Honor.

18       THE COURT:  Okay.  Fair enough.

19       Do you all want to be heard?

20       MS. POE:  Just briefly, Your Honor.  In Count

21  Twenty-Nine, this is a conspiracy that's charged involving

22  Mr. Taylor, Mr. Corriher, Ms. Drake and Mr. Harrison.  It's

23  uncontested that Mr. Taylor never spoke with Mr. Harrison.

24  They couldn't have agreed to do anything.

25       THE COURT:  Well, that's not really the test.

1          MS. POE:  Well, Your Honor, I think for a conspiracy,
2     there has to be an agreement, and my point is simply --
3          THE COURT:  You can agree through others; you can be
4     willfully blind.  There doesn't have to be any evidence that
5     Mr. Taylor ever talked to Mr. Corriher.
6          MS. POE:  Not to Mr. Harrison specifically --
7          THE COURT:  I mean, Mr. Harrison, excuse me.
8          MS. POE:  -- but also the Court has found Ms. Drake,
9     that there wasn't significant enough evidence to go to the
10    jury --
11         THE COURT:  The jury can disagree with me on that.
12    The fact that I dismissed Ms. Drake doesn't necessarily mean
13    the jury's bound by that; as a matter of fact, they're not.
14         MS. POE:  In terms of determining, Your Honor, at
15    this point what the question is before the Court, which is can
16    a jury find Mr. Taylor guilty beyond a reasonable doubt of this
17    particular conspiracy.  We would submit there's simply not
18    enough evidence at this point.
19         The Government's evidence that it's pointing to is
20    highly speculative.  Essentially, it boils down to there were
21    documents in the bank from which someone could have pieced this
22    together, which I'm not sure if that's even true, frankly,
23    without knowing what was going on, where the source of the --
24         THE COURT:  All right.  I'm going to turn this around
25    on you a little bit.  Mr. Taylor is a law-abiding citizen.

1  He's a good employee, and it seem -- the Government's point
2  that if he were told as an -- as one of the members of the
3  credit review team to review these invoices from top to bottom
4  as that email just expressed, and report back with an Excel
5  spreadsheet or whatever, that it is a reasonable inference that
6  Mr. Taylor did it.
7          The facts are clear, I think, perhaps I'm wrong, that
8  there wasn't an invoice to be found in GrandSouth Bank from
9  Medaloni, Medaloni of South Carolina, any of these licensee
10 companies.  All GrandSouth Bank held, as I understand the
11 evidence, are invoices from CMI.  So if one of our more trusted
12 employees is directed to go review all these things, then
13 there's no way he would have seen anything other than CMI
14 invoices in GrandSouth Bank.
15         MS. POE:  Your Honor, I would respond to that in a
16 couple parts, and to get to the Court's point, first, I'm not
17 sure that Mr. Taylor was ever specifically directed to look at
18 invoices.  The actual invoices coming in --
19         THE COURT:  Well, fair enough, but if you look --
20 read that line from that email again, please.
21         MR. MONTAGUE:  "Process review:  Documents used to
22 make advances, verification process, collection activity,
23 account debtor concentrations and trends in collections.  I
24 want to see examples of documents used for advances,
25 verifications, collections" -- I think there was -- is that the

 1  one you --

 2          THE COURT:  Yeah, thank you.

 3          MR. MONTAGUE:  And the other one refers specifically

 4  to invoices, that would be 434.

 5          THE COURT:  All right.  It's a pretty broad category

 6  of stuff.

 7          MS. POE:  It is pretty broad, and like the Court

 8  said, we don't know what he did in response to that.  I think

 9  it probably is a fair assumption that he did what he was told

10  to do, but the fact that we don't have the results of that, I

11  think at this point we can't assume that that should be held

12  against Mr. Taylor.

13          But to answer your question more pointedly, Your

14  Honor, I think even if Mr. Taylor has seen these invoices with

15  it -- and I think it would have been either the invoices or the

16  checks, if he had seen those invoices with the name CMI, I

17  don't know that that itself would have been enough to alert him

18  to the fact that the bank's money was being used to pay itself.

19  That -- which is the essence of this charge.

20          That alone doesn't tell him anything about what the

21  source of the funds are in terms of the bank being -- the

22  bank's own money being used to pay down aging receivables.  The

23  name CMI wouldn't alert him to anything about that at all.

24          And, finally, the name CMI, I don't know that that

25  would have raised alarm bells at all because of the

39

documentation that did exist in the bank showing that Global

Labor had purchased CMI and all of its assets, including its

name, and then Global sold that, all those CMI assets,

including the CMI name, to the franchisee who were then allowed

to do that.

I think that the fact that they might have been doing

business in the name of CMI, based on what Mr. Taylor knew,

based on the documentation without having evidence from

Mr. Harrison or Ms. Akers or anyone else to tell him

differently, I don't know that that in and of itself would have

raised any alarm bells, let alone the circular lending that

it --

THE COURT:  I think that's a fair inference and I

made one similar in granting Ms. Drake's motion, but it's a

little -- I think it's a little more complicated with respect

to Mr. Taylor who has a little -- at least if the '05 memo is

to be believed, has a little better basis upon which to be

concerned about ignoring corporate formalities.

MS. POE:  I understood, Your Honor, and to the extent

that the '05 memo provided any kind of additional concern with

respect to the subsequent '08 entities, I think that those

documents that I just talked about showing the purchase of the

CMI assets from Global Labor, and then the subsequent sale to

the licensees, were designed to alleviate that exact concern,

and Mr. Taylor wasn't involved in the construction of those

documents.

To the extent they were trying to fool Mr. Taylor, that's exactly what you'd want to put together, so I don't know that the existence of that has any bearing on his mentality. It certainly doesn't show that the bank's money was being used to pay itself. I simply don't know how anyone at the bank could have known that without having access to the CMI bank accounts or talking to someone at CMI to know about that.

And without that, Your Honor, I don't think any reasonable juror could find beyond a reasonable doubt that Mr. Taylor knowingly participated in that object of this conspiracy.

MR. MONTAGUE: May I address that, Your Honor?

THE COURT: You may.

MR. MONTAGUE: I would just point out that -- you know, that sounds like a defense, and Mr. Taylor is free to raise that, but the reality is we -- as we saw yesterday from documents that were already in evidence in the Government's case in chief, those purchase and sale -- asset purchase and sale agreements don't line up.

You know, Global Labor is supposedly purchasing the assets four days after it sells them to these five entities so, you know, it does not -- it's not the case that this is as it's being characterized. And if Mr. Taylor were fooled, then that is a defense and not something that would dip into the Rule 29,

1  Your Honor.

2          MS. POE:  Your Honor, the dates of those contracts

3  don't have anything with circular lending.

4          THE COURT:  And let me just say, I understand clearly

5  that if it's a question of whether Mr. Taylor was duped or not,

6  that's an issue for the jury; no question about that.  The

7  question is is the evidence sufficient to support a finding as

8  to Mr. Taylor's knowledge, either directly or through a willful

9  blindness theory.

10          Here's a question for you, Mr. Montague, it's kind of

11  something that keeps popping up in my mind.  From the

12  perspective of a loan or a credit review officer, like

13  Mr. Taylor, what's your assessment of the evidence in the case

14  with respect to the actual factoring agreement that is

15  constructed in the manner of a purchase and sale?

16          Now, let me disabuse you of concern about whether or

17  not I think the evidence is sufficient to show that these

18  factoring arrangements were extensions of credit or loans.  I

19  think the evidence is clear that -- or establishes, at least

20  sufficient to carry the case to the jury, on the question of

21  whether or not they were loans, but setting that side for just

22  a moment, if the structure of the documentation is on the one

23  hand we have a loan memo, which establishes a factoring

24  arrangement, extension of credit under a factoring agreement,

25  and then we have what amounts to as a sale agreement, how does

1  the credit officer rationalize those two things based on the

2  evidence presented in the case?

3         MR. MONTAGUE:  I mean, first of all, let me point

4  out, Your Honor, based on the earlier emails, this was part of

5  his job description.  I mean, I don't know -- and part -- and

6  that seems to be the best answer I could give you.

7         THE COURT:  Yeah.  In fairness, let me go one step

8  further for you.  In looking at the evidence in the case, it's

9  almost like, in analyzing this, there is this loan agreement or

10 extension of credit that extends to what's being advanced.  The

11 factoring agreement itself structured as a purchase as a sale

12 with a purchaser and a seller almost suggests that once the

13 invoices are sent to GrandSouth Bank, GrandSouth Bank almost

14 stands in the shoes of an owner in the sense that they're free

15 to do with the money received from the account debtors as they

16 choose, unless it's circumscribed in the agreement itself,

17 which is why I'm raising this question about a credit review

18 officer.

19        So if, for example, on a standard loan the bank has a

20 mortgage interest, which -- in which the borrower retains

21 ownership, but the bank has this legally recognized interest to

22 secure its loan, here it's almost as though we have this loan

23 agreement, but securing that loan agreement is the sale of

24 these receivables, and since it's a sale, there is this

25 recourse provision in the documents that gives me a little bit

1    of pause, but since it's a sale, then once the money comes in

2    to pay the receivables, it's basically the bank's money to

3    disburse as the bank chooses in accordance with the other

4    agreements.  What do you say to that?

5            MR. MONTAGUE:  I mean, that would be assuming that

6    the money were coming from perhaps some other source than, you

7    know, CMI, but, I mean, I don't think that gives them license

8    to take it and essentially say, well, it's coming from this

9    source, but we're going to pretend on the bank's books as if

10   it's actually coming from here.

11           THE COURT:  In fairness --

12           MR. MONTAGUE:  I don't think that -- I don't think

13   those two things equate just because maybe it is a sale, and I

14   don't know whether that's a -- I'm not conceding that that's a

15   correct characterization, but assuming that it is --

16           THE COURT:  I'm not asking you to say -- and I'm

17   not -- frankly, not inquiring as to whether or not it makes

18   everything okay.  I don't think it does.  I'm trying to look at

19   this from the standpoint of what knowledge Mr. Taylor had when

20   he was conducting these loan reviews and doing these other

21   things with respect to these receivables, because it is --

22   certainly there's basis to be concerned about it.

23           Anything further?

24           MR. MONTAGUE:  No, Your Honor, not at this point.

25           THE COURT:  All right.  Andrew, do you mind stepping

1    up here.

2              (Short pause.)

3              THE COURT:  I think the Government is more than

4    justified in having concern about Taylor's role in the case.

5    Ultimately, I think with respect to Count Twenty-Nine that to

6    get to a jury finding that Taylor is guilty of that count

7    requires the stacking of one too many inferences with respect

8    to his knowledge about some of the specific transactions

9    required for the Government to prove knowingly with respect to

10   Count Twenty-Nine.  So I'm going to grant the Rule 29 motion as

11   to Count Twenty-Nine and dismiss that.

12             All other motions to dismiss are denied.

13             It's noon.  Do you think there's any chance your

14   witness will be here by 2:00?

15             MR. McLELLAN:  I'd have to check with the special

16   agent, Your Honor.

17             THE COURT:  Step out.  I'm trying to figure out

18   whether to take a short lunch break and come back -- here's the

19   thing, Mr. McLellan.  I think it would be helpful if we could

20   do the voir dire as early as possible to give me some time to

21   have some idea about some of these instructions.

22             If she's not going to be here for a while, then we

23   might go ahead with the charge conference now, and if it's --

24   as soon as one or 1:30 that she'll arrive, then we can go ahead

25   with the voir dire, then I'll push the charge conference off

```
 1            IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF NORTH CAROLINA
 2
   UNITED STATES OF AMERICA       ) Greensboro, North Carolina
 3                                ) January 31, 2019
        vs.                       ) 9:30 a.m.
 4                                )
   RONALD KEITH EARNEST           )
 5                                ) Case No. 1:16CR205-3
        Defendant.                )
 6  _____)
   UNITED STATES OF AMERICA       )
 7                                )
        vs.                       )
 8                                )
   ROBERT THOMAS TAYLOR           )
 9                                ) Case No. 1:16CR205-4
        Defendant.                )
10  _____)

11
                      TRIAL TESTIMONY
12             RONALD K. EARNEST, CONTINUED
        BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
13               UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  For the Government:  FRANK JOSEPH CHUT, AUSA
                         Office of the U.S. Attorney
16                       101 S. Edgeworth Street, 4th Floor
                         Greensboro, North Carolina 27401
17
                         JEFFREY A. MCLELLAN
18                       U.S. Department of Justice, Tax Division
                         POB 972
19                       Washington, DC 20044

20  For the Government   WILLIAM M. MONTAGUE
                         U.S. Department of Justice, Tax Division
21                       601 D. STREET, NW
                         Washington, DC 20004
22

23

24

25
```

```
 1  Appearances, Continued:

 2  For the Defendant:    DEBORAH B. BARBIER
    Earnest               Deborah B. Barbier, LLC
 3                        1811 Pickens Street
                          Columbia, SC 29201
 4
                          JOSHUA BRIAN HOWARD
 5                        Gammon, Howard & Zeszotarski, PLLC
                          115 1/2 W. Morgan St.
 6                        Raleigh, NC 27601

 7  For the Defendant:    WES J. CAMDEN
    Taylor                CAITLIN M. POE
 8                        Ward and Smith, P.A.
                          PO Box 33009
 9                        Raleigh, NC 27636-3009

10                        JAMES W. BANNISTER
                          Bannister Wyatt & Stalvey, LLC
11                        PO Box 10007
                          Greenville, SC 29603

12  Also Present:         Nexsen Pruet
13                        1230 Main Street, 700
                          Columbia, SC  29201

14

15

16

17

18

19

20

21

22  The Reporter:         Joseph B. Armstrong, FCRR
                          324 W. Market, Room 101
23                        Greensboro, NC  27401

24          Proceedings reported by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25
```

January 31, 2019

**-4228-**

3

1                              I N D E X

2    WITNESSES FOR THE DEFENDANT:
                                                         PAGE
3    RONALD K. EARNEST
          Cross-Examination, Continued By Mr. Chut         8
4

5     Defense (Earnest) rests                               32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

January 31, 2019

**-4229-**

4

```
 1                    P R O C E E D I N G S

 2            (At 9:30 a.m., excerpt as follows:)

 3            (Defendants present.)

 4            THE COURT:  A couple housekeeping matters, and then

 5   I'll bring the jury in.  Probably everybody knows, but I filed

 6   a rough draft of preliminary instructions last night.

 7   Nothing's final.

 8            I'll make this comment.  So I've left in "not

 9   persuaded" that I'll give at this point, but just for purposes

10   of discussion.  In terms of the 371 counts, I wasn't -- I mean,

11   I was satisfied, but I felt like there was some potential to

12   modify the 371 instruction.  Just briefly this morning, I

13   looked at the 371 instruction submitted by Earnest, and I have

14   some interest in that one.

15            So bottom line is that all is open for discussion,

16   but I would like to make that discussion roll off of the

17   preliminary instructions that I have filed.

18            Number two, I guess it's proof that you're never too

19   old to learn something.  I took a look at the case -- the

20   Second Circuit case that the Government cited yesterday, 720

21   F.3d 453.  I also looked at *United States versus Rigas,* 490

22   F.3d at 208, and, finally, *United States versus McMillan,* 600

23   F.3d at 434.

24            I think in terms of an accountant or others who have

25   some degree of training, there is some latitude between --
```

```
 1   to -- for them to offer certain -- we'll call it an opinion,
 2   but for them to offer certain testimony without necessarily
 3   being qualified as an expert.  That still does not suggest that
 4   I made a final decision on allowing this audit witness to
 5   testify.  I think I'm going to have to hear some evidence,
 6   because it is a very close line in terms of what can and can't
 7   be done.  But when we get to that point, those are three cases
 8   that I have been looking at.
 9           All right.  Anything we need to take up before we
10   resume?
11           MR. CHUT:  May I ask a question, Your Honor, about
12   what the Court's intention for scheduling is?  Assuming we
13   finish evidence today --
14           THE COURT:  Fair question.  I meant to get to that.
15   Thanks for the reminder.
16           Assuming we finish the evidence today, or even
17   tomorrow morning, but let's assume we finish the evidence
18   today, my intention is to send the jury home for the weekend
19   and tomorrow, probably around 10:00, to have a charge
20   conference.  I think that will take a little while.  And then
21   bring the jury back and start closing arguments Monday morning
22   at 9:30.
23           But one thing I would like to know, to the extent --
24   it's not binding at this point, but I would like to know what
25   the parties are thinking in terms of what's a reasonable length
```

```
 1  of time for closing arguments.  I indicated earlier in the
 2  trial that I wasn't going to permit three-hour closing
 3  arguments.  I can be convinced of anything, but that would be a
 4  tough one to sell me on.  But I would like to know what
 5  everybody thinks is reasonable.
 6           I'll start with the Government in terms of -- you can
 7  give me a total time, argument and rebuttal, or you can break
 8  it down.  I don't care.
 9           MR. CHUT:  Your Honor, we would estimate an hour for
10  closing and an hour for rebuttal, so two hours total.
11           THE COURT:  All right.  Anybody want to give me some
12  idea?
13           MR. BANNISTER:  And, Judge, I think maximum 40, 45
14  minutes.
15           MS. BARBIER:  Your Honor, I would say an estimate --
16  a good estimate is 45 minutes to an hour.
17           THE COURT:  All right.  Now, the rule is, Mr. Chut,
18  you've got to lay your case out in your opening, and rebuttal
19  is rebuttal.  So you might have a hard time selling me on an
20  hour for rebuttal, but we'll see.
21           MR. CHUT:  Okay, Your Honor.  Maybe we could allocate
22  differently, an hour 15 minutes for opening and 45 minutes for
23  rebuttal, Your Honor.
24           THE COURT:  All right.  Give it some thought and
25  we'll see.  But we ought to be able to get all the arguments in
```

January 31, 2019

7

```
1   in a day, and then it will just be a question -- I mean, I
2   think the instructions are going to be -- unless we cut them
3   down, and they probably will be cut down some, it's going to
4   take a while.  And I am planning -- I don't know that I will
5   end up doing it, but because of the length of the instructions,
6   I probably will try to get them set up so I can do it by way of
7   PowerPoint to allow the jurors to read along while I read.
8   We'll talk about that at the charge conference.
9           All right.  If nothing else, then where is
10  Mr. Earnest?  Mr. Earnest is there.  I'll have you come up
11  after the jury comes in.
12          Bring the jury in.
13          (At 9:36 a.m., jurors arrive.)
14          THE COURT:  All right.  Good morning, ladies and
15  gentlemen.
16          Mr. Earnest, you may return to the witness stand and
17  I will remind you that you are still under oath in this
18  proceeding.
19          THE WITNESS:  Yes, sir.
20          THE COURT:  All right.  Mr. Chut, you may resume.
21          MR. CHUT:  Thank you, Your Honor.
22                  RONALD K. EARNEST,
23          DEFENDANT'S WITNESS, PREVIOUSLY SWORN
24              CROSS-EXAMINATION, CONTINUED
25
```

```
 1  BY MR. CHUT:
 2  Q    What year did you hire Mr. Corriher at GrandSouth Bank,
 3  sir?
 4  A    I don't remember.  I think it was around 2003-2004, but I
 5  don't remember.
 6  Q    And you had worked with him at Anderson bank prior to
 7  that?
 8  A    With Anderson National Bank.  That's correct.
 9  Q    And what years were those, sir?
10  A    I was at Anderson National Bank from 1992 to 1998.  I
11  don't recall what years Mr. Corriher was there beginning.  I
12  just don't remember.
13  Q    And, approximately, how many years did you work at
14  Anderson National Bank?
15  A    From 1992 through -- to 1998.
16  Q    Mr. Corriher or you, sir?
17  A    I'm sorry.  Me.
18  Q    How about Mr. Corriher?  How many years --
19  A    He was there in 1998.  I don't recall if he -- I think
20  he -- I just don't recall when he came.  I'm sorry.
21  Q    And Mr. Corriher worked at GrandSouth Bank until 2014 when
22  the factoring department was closed?
23  A    That sounds correct.  I don't know the exact time frame of
24  that, but that sounds right.
25  Q    Okay.  And you were aware that Mr. Corriher was subpoenaed
```

Earnest - Cross by Mr. Chut                                    9

```
 1  by Greg Harrison to testify at Mr. Harrison's criminal trial --
 2  A    Yes.
 3  Q    -- in 2011?
 4  A    I was aware of that, yes.
 5  Q    And you later had the opportunity to review the
 6  transcripts of his trial testimony, isn't that correct, sir?
 7  A    I received his trial transcript from our attorney, Mr. Jim
 8  Medford.  I don't remember when I saw it, but he did provide
 9  that to us after we engaged him probably -- I don't remember
10  when that was.
11  Q    And you became aware that Mr. Corriher had testified that
12  he had been provided 941 tax returns for CMI, Compensation
13  Management of Iowa, and IHT, is that correct, sir?
14  A    I eventually found that out.  That's correct.
15  Q    And that he had testified at that trial that he had become
16  aware that those companies of Mr. Harrison owed millions of
17  dollars in payroll tax?
18  A    I don't know that I can say that.  I just don't -- I don't
19  recall that.  I do remember the 941 issue.
20  Q    And you discussed this with Mr. Corriher?
21  A    No, sir, I did not.
22  Q    You never discussed his trial testimony with him?
23  A    No.
24  Q    And then Mr. Corriher continued to work at the bank until
25  2014 approximately?
```

```
 1  A    If that's the date he left, yes, sir.
 2  Q    So over two years after his testimony at the Harrison
 3  trial?
 4  A    I don't recall when his testimony was, but he -- and I
 5  don't have those dates in front of me, but if it's 2014, that's
 6  when -- if that's when he left, then that's when he left.
 7  Q    Now, you didn't fire him when you discovered that he was
 8  receiving 941 tax returns showing no payroll taxes paid, did
 9  you, sir?
10  A    No.  I didn't -- well, first of all, I didn't know that
11  that was in the 941s, I don't believe.
12  Q    Now, you sent Mr. Corriher with a renewal note on the
13  personal loan of Greg Harrison to have Greg sign at the trial,
14  isn't that correct, sir?
15  A    Sign at the trial?
16  Q    You sent Mr. Corriher to Mr. Harrison's trial with a
17  renewal note for Mr. Harrison to sign, isn't that true, sir?
18  A    I don't know about that.  I don't recall that, but I
19  remember I sent him -- there was some letter or email
20  regarding -- he was going to the beach or something and he said
21  he was going to see Mr. Harrison, but I don't remember about
22  the trial.
23  Q    You don't recall sending him with a renewal note on the
24  personal loan you were officer for to be signed by Mr. Harrison
25  at his criminal trial?
```

```
 1  A    I don't remember that, no, sir.

 2  Q    Let me draw your attention, sir, to Exhibit 1496.  And

 3  what is this document called, Mr. Earnest?

 4  A    This is a document called a classified action plan.  This

 5  is a document that we provided the board monthly during a

 6  certain period of time, and then when things improved a little

 7  bit, we started providing it to them quarterly.

 8  Q    And --

 9  A    And it listed all the loans that were in the criticized or

10  classified category.  That would be our risk grades of special

11  mention or watch and substandard.  The purpose of the form was

12  to inform the board of what actions were -- what the status was

13  of those loan assets.

14  Q    And drawing your attention to the portion in the middle,

15  what does that read?  Which loans are these for, sir?

16  A    There's two loans to -- there's two loans.  One is to

17  Bruce Gregory Harrison, and then there's one for Innovative

18  Hiring Technology.

19  Q    And is the risk rating indicated on these loans?

20  A    It is.  Grade 7 would be a substandard risk rating.

21  Q    And is there an officer initials?

22  A    The officer would be me, RKE.

23  Q    And can you read the Action Plan paragraph that's written

24  out there?

25  A    "Borrower is owner-operator of staffing related entities;
```

1  loans are secured by aircraft; value of collateral does not

2  fully cover debt; Harrison has been indicted by IRS/Federal

3  Government on numerous tax-related issues, which are likely to

4  impact ability to continue making monthly payments; loans are

5  amortizing and have been current; plan is to continue to

6  monitor borrower performance.  GSB," GrandSouth Bank,

7  "continues to be concerned with ability of borrower to continue

8  to pay given legal difficulties."

9  Q    Now, let me draw your attention to Exhibit 1498.  And is

10 this another Classified Asset Action Plan?

11 A    Yes, it is.

12 Q    And is it for these same loans?

13 A    Yes, it is.

14 Q    And do these loans remain at a seven?

15 A    Yes.

16 Q    And what does the Action Plan read on this Classified

17 Asset Action Plan?

18 A    "Harrison has been convicted of multiple crimes and is

19 awaiting sentencing in April; conviction occurred during late

20 December '11 and Harrison was remanded to custody pending a

21 bail hearing, expected to be released during first week of

22 January '12.  GSB will discuss ability to continue to service

23 debt with borrower during January and make determination on

24 accrual status and loss potential; results of discussion may

25 include 'subsequent event' requiring change in loan status as

1  of 12/31/11."

2         And subsequent event means we would correct the books

3  as of 12/31/11 based on any charge-offs we make.

4  Q    Now, sir, let me draw your attention to Exhibit 348.  And

5  is this an email from Doug Corriher to yourself?

6  A    It is.

7  Q    And what date is it?

8  A    I think it is.  Yes, it is, yes.

9  Q    And, well, take your time to look at it.

10  A    Um-hum, August 20, 2010.

11  Q    And what's the subject?

12  A    Greg's checks.

13  Q    And what's the attachment called?

14  A    It says, "Do not delete important," and this was in

15  reference to Bruce -- our attorney at Smith Moore Leatherwood

16  requesting information.

17  Q    And let me draw your attention to page 2 of this exhibit,

18  and take a second and take a look at that.

19  A    Okay.

20  Q    And if you could blow up the very bottom of the page,

21  Ms. Collins.  And is that a check stub, sir?

22  A    Yes.

23  Q    And --

24  A    This information was provided to Bruce Ashley with Smith

25  Moore Leatherwood at his request during the Acquient

1  litigation, which we were a third-party defendant.  This was a

2  request from him for that information.

3  Q    Okay.  Let's go back to this first page of this exhibit,

4  sir.

5  A    Okay.

6  Q    Now, setting aside why this was sent to you, who sent this

7  to you?

8  A    Doug Corriher.

9  Q    Okay.  Now, let's go back to the second page -- and if

10 you'll blow up the bottom, Ms. Collins.  What company is this

11 check, this check stub from?

12 A    Compensation Management, Inc.

13 Q    And blowing up the top portion, is this a collection

14 report for GrandSouth Bank?

15 A    It appears -- yes, that's correct.

16 Q    And what company is it for?

17 A    Medaloni of SC, Inc.

18 Q    Okay.  Now, let me draw your attention to page 22,

19 Ms. Collins, of the document.

20 A    What's the date?  Could you do the upper left-hand

21 corner --

22 Q    Yes, sir.

23 A    -- so I can see what date that was, please.  Okay.  Thank

24 you.

25 Q    And what date is it, sir?

Earnest - Cross by Mr. Chut                          15

1   A    It's November 11, '09, is that -- is that -- when this
2   collection report was, I guess, created.
3   Q    Now, going to page -- beg the Court's indulgence.  Go to
4   page 26, Ms. Collins.  And blowing up the top portion again is
5   this a -- another GrandSouth Bank collection report?
6   A    Yes, it appears so.
7   Q    For NC Global Investments?
8   A    Yes.
9   Q    And, again, the date in the corner is 11/11/09, is that
10  correct, sir?
11  A    It looks like -- yes, it looks like they're posted on
12  June 19, 2009.
13  Q    Now, let's go to the bottom, Ms. Collins, if you would.
14  And is this another check stub?
15  A    It is.
16  Q    For Compensation Management?
17  A    Appears so, yes.
18  Q    And what's the amount, sir, $200,000?
19  A    $200,000, yes.
20  Q    Now, Ms. Collins, if you'll blow the top portion up again.
21  Actually, go down to the bottom one more time, sorry.
22        And what's the check number on this check stub?
23  A    053244.
24  Q    And going back to the top, do you see invoice number and
25  date on the left side of the top portion?

Earnest - Cross by Mr. Chut                                    16

```
 1  A    Yes.
 2  Q    And, for example, do you see an account for Arvato
 3  Digital?
 4  A    Yes.
 5  Q    And do you see the -- under the check number, the check
 6  number that matches the check stub at the bottom of the page?
 7  A    Five --
 8  Q    Can you blow up that side.
 9  A    53244.
10  Q    Blow up the top right side, please, Ms. Collins.
11           And what name is also listed there?
12  A    Slash Greg.
13  Q    And these are -- these check stubs are checks that were
14  the check stubs that match checks that Greg brought personally
15  down to the bank, aren't they, sir?
16  A    I don't know.  I don't know how they got to the bank.  I
17  wouldn't know that.
18  Q    But these are check stubs that are in the record of the
19  bank?
20  A    Yes, but I would have never seen these checks.  But I'm
21  aware since we sent them to our attorneys.
22  Q    You're aware because you got them right here, too, aren't
23  you, sir?
24  A    Well, you're showing them to me, yes, sir.
25  Q    So you were aware, at least of this date, that Greg
```

Earnest - Cross by Mr. Chut                                    17

1  Harrison was bringing Compensation Management checks to pay

2  invoices down for these various -- whatever you want to call

3  them companies, Medaloni, Inc., Green Ideas N Motion, et

4  cetera?

5  A    We purchased in January 16 of 2009 invoices that were

6  owned by US Funding that they purchased through their factoring

7  arrangement with Compensation Management, Inc.  During the

8  first few months of collecting on those checks, payments went

9  back to US Funding and there's lots of email traffic that's in

10 discovery from Mr. Corriher to US Funding about those items.

11 My understanding is these checks represent the proceeds that

12 were paid by US Funding to Compensation Management on the

13 checks that they collected that should have come to us.

14 Q    So your testimony, sir -- first of all, in terms of

15 answering my question, were you aware, at least as of the date

16 of this email, that Mr. Harrison deliver -- brought these

17 checks, whether you knew about it, how he brought them or not,

18 to apply to these invoices?

19 A    I was not aware that Mr. Harrison brought these checks.  I

20 was aware of these checks -- I was aware of these reports

21 because Doug sent them to me at the request of our attorney.

22 Q    And you're testifying today that you believed that US

23 Funding was paying money owed to GrandSouth Bank to

24 Compensation Management, correct, sir?  Is that your testimony?

25 A    Say that again, I'm sorry.

Earnest - Cross by Mr. Chut                                    18

1  Q    You just testified that your explanation for these checks
2  is that US Funding paid Compensation Management to then pay to
3  GrandSouth Bank?
4  A    That was my understanding.  That's what I was told by
5  Mr. Corriher, yes.
6  Q    And then in February of 2010, the bank sued US Funding for
7  $3.2 million, correct, sir?
8  A    I don't believe so.
9  Q    Okay.
10 A    The only litigation that I remember is Acquient, LLC,
11 which was the lender to US Funding filed suit against US
12 Funding, Compensation Management, and others, and we were
13 eventually added as a third-party defendant.  I think that was
14 in the fall of 2009.  I don't recall when we were added as a
15 third-party defendant, but that -- that lawsuit was ultimately
16 settled some time in 2010.
17 Q    So your testimony is you believed that US Funding gave
18 Greg Harrison all this money, and he voluntarily gave it to
19 GrandSouth Bank?
20 A    My testimony is that's what I was told by Mr. Corriher,
21 and from reviewing the Bank of America records, it appears that
22 there were transactions between US Funding and Compensation
23 Management during that time period, yes.
24 Q    So you relied on Mr. Corriher at that time period?
25 A    I did.

1   Q    Now, let me look -- look -- have you look at page 27 of
2   this exhibit.  And if you'll go to the bottom, Ms. Collins.
3   And, again, is this a check stub -- you can blow it up, cut a
4   little bit more down.  What company is this from?
5   A    It looks like it's from Compensation Management, Inc.
6   Q    And going to the top portion on the right side, is there a
7   reference to that check number again?
8   A    I'm sorry, I didn't -- hang on -- 53243 -- yes, sir.
9   Q    And is there a reference to Greg again?
10  A    There are -- there is, yes.
11  Q    And, finally, if we can go to page 21 of this exhibit and,
12  again, is this a Compensation Management check stub?
13  A    It appears, yes.
14  Q    And what's the check number on this?
15  A    052786.
16  Q    And if we can go to page 20 of this exhibit.  And if you
17  can blow up the very -- is this another collections report from
18  GrandSouth Bank, Mr. Earnest?
19  A    Yes, I believe it is.
20  Q    And if you can blow up the top portion of the body,
21  Ms. Collins.
22  A    It's for Medaloni, Inc.
23  Q    And do you see, looking at the right side, references to a
24  check number on the check stub attached to this collection
25  report?

```
 1  A    Yes, this is -- this check was applied to the invoices
 2  that are listed on the left that have been purchased from
 3  Medaloni, Inc.
 4  Q    And do you see an invoice for the second from the top for
 5  ESCO Company solid waste, invoice date 11/5/2008?
 6  A    Yes, I do.  Yes, I do.
 7  Q    And what was the date that this check was applied in the
 8  far right side?
 9  A    April the 8th, 2009.
10  Q    And now let me show you what's been marked and introduced
11  as Exhibit 333, and take a moment to look at this.  If you can
12  blow up the top portion, Ms. Collins.  I believe you testified
13  about -- to this on direct.  And do you recognize this email,
14  sir?
15  A    Yes, yes, I do.
16  Q    And this is an email you wrote, isn't that correct, sir?
17  A    It is.
18  Q    Giving instruction to your subordinates about various
19  aspects of the factoring operation at GrandSouth Bank?
20  A    Yes.
21  Q    And read that first sentence into the record, please, sir.
22  A    "We need to quantify the exposure on DE of Spartanburg and
23  suspend all advances on this account until and unless we
24  establish an agreed upon plan to use future invoices to pay on
25  fraudulent invoices."
```

1  Q    Now, sir, let me draw your attention to Exhibit 353 --

2  A    Do I need to -- would I -- may I be able to explain that,

3  sir.

4  Q    Yes, sir.

5  A    In factoring, if we have invoices that become ineligible,

6  we deduct those from the advance base.  So it's a flow of

7  invoices.  If customers send us an invoice that moves out

8  beyond 90 days, or we make it ineligible because we find out

9  that it was not a good invoice, we deduct that from future

10 advances.  That's how we protect ourselves in the event

11 invoices don't collect, and that's what we're talking about in

12 this particular memo.

13 Q    Let me draw your attention to this memo again, sir.  "Pay

14 on fraudulent invoices," isn't that what you wrote, sir?

15 A    That's what I wrote, yes.

16 Q    That's where a client has actually provided a false

17 invoice to GrandSouth Bank, and you have paid on it, correct,

18 sir?

19 A    We had paid on it?  Yes, invoices are submitted to us by

20 our customers.  Like all information, we require them to

21 certify that the information is correct, accurate, and

22 authentic.  When we find out it's not, the action we take,

23 particularly in this case, is we deduct those invoices -- if we

24 accept future invoices from them, we verify those invoices, and

25 then we deduct from the advances the invoices that have turned

Earnest - Cross by Mr. Chut                                    22

1 out to be non-collectible, fraudulent in this case, or that go

2 beyond 90 days, and we don't think they're going to be

3 collected.

4 Q    And by paying down fraudulent invoices --

5 A    No, no, no --

6 Q    -- it doesn't appear -- sir, I'm going to ask my question.

7 A    I'm sorry, excuse me, sir.

8         THE COURT:  Have you finished your answer?

9         THE WITNESS:  I believe so, Your Honor.  I'm sorry, I

10 didn't mean to jump in on him.  I'm sorry, sir.  Go ahead.

11 BY MR. CHUT:

12 Q    You're using money from future invoices in this memo to

13 pay down fraudulent, false invoices, correct?

14 A    That is incorrect, sir.  Invoice -- advances are made on

15 invoices.  That invoice does not get marked paid.  That invoice

16 is excluded as being an invoice that we're going to rely upon

17 to pay the advances that we've made to the customer.  We deduct

18 that from the total of invoices provided so that the next

19 advance we make will be something less than the 85 percent, and

20 that's how we recover our advances.

21         We're not paying off an old invoice or an invoice

22 that we don't think's collectible.  We're adjusting the total

23 of invoices that we make the calculation on what the available

24 advance can be for that customer.  So it's not correct to say

25 we paid off an invoice.  We didn't pay off the invoice.  The

January 31, 2019

**-4248-**

1  invoices either get collected or they get deleted because

2  they're no longer considered to be collectible.

3  Q    Now, you wrote this email, correct?

4  A    I did, yes, sir.

5  Q    And it says, "Unless we establish an agreed upon plan to

6  use future invoices to pay on fraudulent invoices," correct,

7  sir?  That's what it says, correct?

8  A    That's what it says, correct.

9  Q    Okay.  Let's take a look --

10 A    Excuse me, I'm sorry, go ahead.

11 Q    Let's take a look at Government's Exhibit 353.  And is

12 this another wire transfer request?

13 A    Yes, sir.

14 Q    And does your signature appear on this document?

15 A    Yes, sir.

16 Q    And how about looking at 355, and is this another wire

17 request?

18 A    Yes, sir.

19 Q    And what's the date, sir?

20 A    June the 4th of 2009.

21 Q    And does your signature appear on this wire?

22 A    Yes, sir, it appears that that's my signature.

23 Q    And how about 357, Ms. Collins.  And what date is on this

24 wire request?

25 A    June 29, 2009.

January 31, 2019

Earnest - Cross by Mr. Chut                                    24

1  Q    And is that your signature, sir?

2  A    Yes, sir, it is.

3  Q    And 359, Ms. Collins.  And what date is this, sir?

4  A    This is July the 9th of 2009.

5  Q    And is that your signature on this one?

6  A    It is, yes, sir.

7  Q    And how about Exhibit 361?  And what date is this wire?

8  A    This is February the 4th of 2010.

9  Q    And is this your -- does your signature appear on this

10 wire?

11 A    Yes, sir.

12 Q    And how about Exhibit 363?  And what is the date on this

13 wire, sir?

14 A    April the 1st of 2010.

15 Q    And does your signature appear on this wire?

16 A    Yes, sir.

17 Q    And, finally, how about Exhibit 363?

18 A    Is that the same one, sir?

19 Q    No, this is Exhibit 363, April.

20 A    This is April the 1st of 2010, for 200,000.  Wasn't the

21 previous one the same thing?

22 Q    I don't think so, but if it was, I apologize.  And that's

23 your signature on it?

24 A    That is my signature, yes, sir.

25 Q    Let me show you Exhibit 381.  And is this the memo that

1  Mr. Taylor wrote concerning his review of the first factoring

2  arrangement with Mr. Harrison?

3  A    That's my understanding.  I didn't see that until it was

4  presented into evidence.

5  Q    So you claim that he never provided you that in 2005?

6  A    He did not provide that to me in 2005, no, sir.

7  Q    Let me show you what's marked as Exhibit 711.  And if we

8  can blow up the top portion.

9         And do you recognize this as a record for a check --

10  demand about a deposit account at GrandSouth Bank?

11  A    That's what it appears, yes.

12  Q    And for what company, sir, Medaloni, Inc?

13  A    Medaloni, Inc.

14  Q    And is there a notation "Close"?

15  A    I see that up there, yes.

16  Q    And do you see an arrow with a number pointing toward it

17  in the middle?

18  A    I do.

19  Q    And what's that number written there --

20  A    173500, it appears.

21  Q    And looking at 649, and what account is this for?

22  A    Looks like Brooks Labor, Inc.

23  Q    And is that same notation of "Close" with the arrow

24  towards 173500 there?

25  A    Yes, sir.

Earnest - Cross by Mr. Chut                                    26

```
 1  Q    And how about 595?
 2  A    This is NC Global Investments.  It appears Doug Corriher
 3  printed all of these, and it has the same notation on it.
 4  Q    And how about 537?
 5  A    It's Medaloni of SC, Inc.
 6  Q    And it says, "Do Not Close," but does it also have the
 7  same notation for the account?
 8  A    It does, yes, sir.
 9  Q    And, finally, how about 214?
10  A    It's to IHT of SC, Inc.
11  Q    And is there the same notation "Close" with the arrow
12  pointing to the account?
13  A    It has "Close," and it has, "OK," somebody's signature,
14  173500.
15  Q    And looking at Exhibit 1487, if you can blow up the very
16  top portion.  1487, I'm sorry.
17        And what account is this in the name of?
18  A    Bruce Gregory Harrison.
19  Q    And do you see the account number?
20  A    173500.
21  Q    And that matches the number on the other documents?
22  A    It does, yes, sir.
23  Q    And, sir, you appeared before the grand jury in this
24  courthouse on two occasions, is that correct, sir?
25  A    That's correct.
```

January 31, 2019

Earnest - Cross by Mr. Chut                                      27

```
 1  Q    In the year 2013?
 2  A    March and August, if I recall correctly.
 3  Q    And you were still president of GrandSouth Bank at that
 4  time?
 5  A    That's correct, yes, sir.
 6  Q    And the grand jury was investigating unpaid payroll taxes
 7  for companies associated with Greg Harrison, is that correct,
 8  sir?
 9  A    Yes, sir, I guess.  I don't know what they were
10  investigating, but I was called before the grand jury.
11  Q    And you were asked questions, though, about GrandSouth --
12  about any role GrandSouth Bank employees had in these unpaid
13  taxes, is that correct, sir?
14  A    I don't remember, but, yes.
15  Q    And some of the questions you were asked were actually
16  asked by the grand jurors themselves, is that correct, sir?
17  A    That's correct.
18  Q    And now, let me draw your attention to Exhibit 423 on
19  page 97.  And if you could look at this record, and do you see
20  where it says "Grand Juror"?  If you can read that question:
21  "Is there a reason why he's not capable of being a loan
22  officer?"  If you can read your response.
23  A    "He -- he doesn't have the background or the training.
24  Most lending officers have spent years lending money, analyzing
25  balance sheets, financial statements, cash flow.
```

```
 1              Also," keep reading?
 2  Q    Yes, sir.
 3  A    "Also, they spend a lot -- a lot of years gaining
 4  experience on issues like lender liability, regulatory issues
 5  related to lending, compliance.  If it's a consumer loans --
 6  consumer loans, compliance is a big issue, and Doug doesn't
 7  have that experience."
 8  Q    And then the grand juror asked you on the same page:  "I
 9  guess, for me, I would like to know what kind of relationship
10  you had with the Harrison and the Medaloni people and the other
11  persons that's involved."
12              And you said, "Sure."
13              And then he asked you a further question about your
14  relationship.  And if you would look at page 97 at the top,
15  "The Witness" that begins:  "Only Harrison -- "your answer was,
16  "Only Harrison.  I knew -- I knew Harrison."
17              Is that correct, sir?
18  A    Well, go back to the question, I'm sorry.
19  Q    I'm sorry.  If you look at the bottom of page 97.  The
20  grand juror asked:  "I'm a bit confused with you saying that
21  you -- you don't personally know them, and it was kind of a,
22  hey, how are you doing in the office.  But yet, in your emails,
23  you call him by first name."  And you answered --
24  A    Yeah.  They're saying you don't personally don't know
25  them.  I think the context of that was the licensee customers,
```

Earnest - Cross by Mr. Chut                          29

1  and my response was, "Only Harrison.  I knew Harrison."

2  Q    And let me draw your attention briefly to page 102.  And,

3  here, the grand juror asked you:  "You and Mr. Corriher seem to

4  have a really close working relationship and very thorough.

5  Why would you not know about the 941 taxes?"

6          And what did you say to answer that, sir, where you

7  see "The Witness?"

8  A    I said, "Well, because I never saw it, number one.  Number

9  two, it's not a procedure we have in -- as in the bank.  The

10 941s are -- are not something that we -- that any of us in the

11 bank, myself included, would have ever seen."

12         Do you want me to continue?

13 Q    And now, let me -- let me draw your attention to page 103.

14 And based on -- you were given a 941 to review.  And if you

15 look at question on the top of page 103, the grand juror asked

16 you:  "That particular one shows they weren't paying their

17 taxes."

18         And you answered, beginning, "Yeah," on page 103,

19 Ms. Collins.

20 A    Which one?

21 Q    I'm sorry.  We may be on the wrong exhibit.  I apologize,

22 Mr. Earnest and Ms. Collins.  423 -- 104, I'm sorry.  I'm

23 looking at the wrong page number.

24         And see where it says, "That particular one shows

25 that they weren't paying their taxes"?

1   A    Yes.  Could you scroll back up a little bit so I can

2   understand.

3   Q    Yes, sir, you sure can.  We sure can.  Yeah.

4   A    Okay.  Which one -- where do you want me to look, sir?

5   Q    Look at the top on page 104, at the very top, where he

6   says:  "That particular one shows they weren't paying their

7   taxes."

8   A    Okay.

9   Q    And you answered -- how did you answer that question?

10  A    "Yeah, I'm -- I'm -- that's correct, and I wish I had seen

11  that."

12  Q    And there's a further question, then you make a comment:

13  "I would have ran -- " what did you say there, sir?

14  A    Let's see.  The question was:  "Yeah, and I understand.

15  I'm not --"

16  Q    And how did you answer, sir?

17  A    "I would have ran to the IRS and waved that in front of

18  them."

19  Q    And did you also testify to the grand jury that it

20  would've been the duty of a bank officer to report knowledge

21  that taxes weren't being paid by a bank customer?

22  A    I remember you asking that question.

23          MS. BARBIER:  Objection, Your Honor.  If he's going

24  to ask him, could he show him the transcript?

25          THE COURT:  I didn't -- is there -- are you quoting

1 out of a transcript?

2          MR. CHUT:  I was, Your Honor, but I can move on.  I'm

3 almost done, Your Honor.

4          THE COURT:  Okay.

5 BY MR. CHUT:

6 Q    And isn't it true, sir, that in these -- in regard to

7 these factoring lines, you only negotiated with Mr. Harrison,

8 is that correct, sir?

9 A    I'm sorry?

10 Q    You only negotiated with Mr. Harrison.  You weren't

11 negotiating with Mr. Medaloni, or Mr. Howell, or Ms. Byrd?

12 A    I didn't negotiate with any of them.  Mr. Corriher was the

13 one who had that responsibility.

14 Q    But you, personally, only spoke to Mr. Harrison about

15 these factoring lines?

16 A    The only -- only other person involved in any of these

17 factoring lines that I met was -- well, let me back up.  I met

18 Joey Medaloni one time, shook his hand, he was introduced to

19 me.  And that was the only -- there was no conversation.

20          I met Mr. Matthew Medaloni, who testified in this

21 case, and he was brought to my office by Mr. Corriher, and I

22 believe that was in March of 2010, which would've been roughly

23 15 months after the original advance.  And, as I testified

24 earlier, I said I'm glad to meet you, we appreciate your

25 business, how's your business?

1          And his response was something to the effect, you
2    know, business is improving, which, during that period of time,
3    you know, with -- I was glad to hear because we were hearing
4    lots of gloom and doom.  And he specifically mentioned the
5    Atlanta market and the construction industry.
6          And that meeting probably lasted less than five
7    minutes, just a, hi, how are you, appreciate your business,
8    anything else we can do for you, the typical conversation I
9    have with any customer.
10          MR. CHUT:  Thank you, sir.  One moment, Your Honor.
11    Thank you, sir.  Thank you, Your Honor.
12          THE COURT:  Cross-examination?
13          MR. BANNISTER:  I don't have any questions, Your
14    Honor.
15          THE COURT:  All right.  Redirect.
16          MS. BARBIER:  Beg the Court's indulgence.  We don't
17    have any questions, Your Honor.
18          THE COURT:  All right.  You may step down,
19    Mr. Earnest.
20          (At 10:13 a.m., witness excused.)
21          THE COURT:  All right.  You may call your next
22    witness.
23          MS. BARBIER:  Your Honor, at this time, we rest.
24          THE COURT:  All right.  Ladies and gentlemen of the
25    jury, I'm going to ask you to step back to the jury room for

January 31, 2019

Earnest - Cross by Mr. Chut                              33

1   just a moment, please.

2           (At 10:13 a.m., jurors excused.)

3           (Excerpt concluded.)

4                   * * * * *

5               C E R T I F I C A T E

6       I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.

7

8                           _Joseph B. Armstrong_
                            _____
9   Date: 01/31/2019    Joseph B. Armstrong, FCRR
                         United States Court Reporter
10                       324 W. Market Street
                         Greensboro, NC  27401
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

January 31, 2019

**-4259-**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA            )
                                    )
        v.                          )        1:16CR205-2
                                    )
SHANNON MICHELLE DRAKE              )

## JUDGMENT

For the reasons announced in open court on January 29, 2019,

**IT IS HEREBY ORDERED AND ADJUDGED** that Defendant Shannon

Michelle Drake's motion for judgment of acquittal is hereby

**GRANTED** and that the Indictment returned by the grand jury on

June 28, 2016, the superseding indictment returned by the grand

jury on November 29, 2016, the superseding indictment returned

by the grand jury on June 27, 2017, and the superseding

indictment returned by the grand jury on August 29, 2917,

against Defendant Drake are **DISMISSED.**

**IT IS FURTHER ORDERED** that the Defendant is acquitted,

discharged, and any bond exonerated.

This the ___4th___ day of ~~January~~ February, 2019.


_William L. Osteen, Jr._
United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO: 1:16-CR-205-02-WO

| | |
|---|---|
| UNITED STATES OF AMERICA, | APPLICATION FOR ATTORNEYS' FEES AND EXPENSES PURSUANT TO THE HYDE AMENDMENT, TITLE VI, SECTION 617, PUB L. 105-119, 111 STAT. 2519; TITLE 18 U.S. CODE, SECTION 3006(A) |
| Plaintiff, | |
| v. | |
| SHANNON MICHELLE DRAKE | |
| Defendant. | |

COMES NOW Claire J. Rauscher and Allen T. O'Rourke, attorneys for Shannon Michelle Drake, and hereby request this Honorable Court to order payment of Ms. Drake's reasonable attorneys' fees and other litigation expenses in the above-captioned case by the United States pursuant to the Hyde Amendment, Title VI, Section 617, Pub L. 105-119, 111 Stat. 2519; Title 18, U.S. Code, Section 3006(A).[1] In support thereof,[2] the following facts and circumstances are alleged:

---

[1] The Hyde Amendment states in pertinent part: "[T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) … may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation." 18 U.S.C.A. § 3006A. As this law does not specifically provide guidance on how the application for attorney's fees and expenses should be filed, counsel can convert this application into a separate civil complaint, if necessary.

[2] Due to mandatory requirements for filing the motion, defense counsel will be filing a memorandum of law in support of this application shortly.

---

1.    In or around September 2012, the Government commenced a criminal investigation into suspected participation and conspiracy by GrandSouth Bank personnel with the fraudulent activity of Bruce Gregory Harrison, who had been sentenced in August 2012 for related tax fraud.

2.    The Government issued two grand jury subpoenas requiring Ms. Drake to testify before the grand jury in September 2012 and May 2013.

3.    During the course of its criminal investigation, including during and before her grand jury testimony, the Government:

    a.  falsely represented to Ms. Drake, her attorney Smith Moore Leatherwood LLP (SML), and the grand jury that Ms. Drake was not a "target" or even "subject" of the investigation; and

    b.  knowingly accepted, accommodated, and benefited from SML's representation of Ms. Drake while having a significant un-waived conflict of interest.

4.    Based on that investigation, the Government later obtained indictments against Ms. Drake in June 2016, November 2016, June 2017, and August 2017.

5.    In obtaining indictments against Ms. Drake, the Government relied upon and instructed the grand jury concerning a theory of criminal liability for "nominee lending" that the Government knew or reasonably should have known to be legally erroneous.

6.    The Government attempted to proceed to trial against Ms. Drake in May 2018 until the trial was continued, and the Government eventually did proceed to trial against Ms. Drake in January 2019.

7.     During the course of this case, including on or before both trial dates, the Government elected to continue prosecuting Ms. Drake and proceed to trial against her:

   a.  while knowing that her indictment was based upon a legally erroneous theory of criminal liability and failing to advise the Court and Ms. Drake thereof;

   b.  while electing not to disclose exculpatory and impeachment information subject to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); and

   c.  while lacking a good faith basis to believe there was admissible evidence sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact.

8.     Furthermore, in support of prosecuting Ms. Drake, the Government made or failed to correct representations about her to this Court that the Government knew to be false or for which the Government lacked a good faith basis, including in its trial brief.

9.     At the end of the Government's case in chief, this Court granted a Motion for Judgment of Acquittal pursuant to Fed. R. Crim. P. 29 on all remaining counts in the indictment, finding the Government had failed to provide sufficient evidence that Ms. Drake had the criminal state of mind alleged in the indictment.[3]

10.    Ms. Drake does not have significant wealth or income and, therefore, qualifies for consideration under the Hyde Amendment (see her affidavit, attached as Exhibit A).

---

[3] Defense counsel has ordered the transcript but has not received it to date.  This statement is based on defense counsel's recollection and may be amended once the transcript is received.

3

11.    To date, the unreimbursed[4] attorneys' fees and expenses total in excess of $400,000.

**WHEREFORE**, counsel requests that this Court award reasonable attorneys' fees and litigation expenses in an amount to be determined, but in excess of $400,000, and set a discovery schedule for counsel to obtain records and other information from the Government relevant to this application.

Respectfully submitted this the 6th day of March, 2019.

WOMBLE BOND DICKINSON (US) LLP

 /s/  Claire J. Rauscher
Claire J. Rauscher, N.C. Bar No. 21500
Allen T. O'Rourke, N.C. Bar No. 38404
301 S. College Street, Ste. 3500
Charlotte, NC 28202
(704) 331-4900
Fax: (704) 338-7811
claire.rauscher@wbd-us.com
allen.orourke@wbd-us.com

*Counsel for Shannon M. Drake*

---

[4] Excludes funds received from insurance and other sources.

4

## CERTIFICATE OF SERVICE

I hereby certify that on this the 6th day of March, 2019, a copy of the foregoing **APPLICATION FOR ATTORNEYS' FEES AND EXPENSES PURSUANT TO THE HYDE AMENDMENT** was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following:

Wes J. Camden
Caitlin M. Poe
Ward and Smith, P.A.
POB 33009
Raleigh, NC  27636-3009
Wjcamden@wardandsmith.com
Cmpoe@wardandsmith.com
*Counsel for Defendant Robert Taylor*

James W. Bannister
Bannister, Wyatt & Stalvey, LLC
Post Office Box 10007
Greenville, SC  29603
Jbannister@bannisterwyatt.com
*Counsel for Defendant Robert Taylor*

Joshua Brian Howard
Gammon, Howard & Zeszotarski, PLLC
115 ½ W. Morgan Street
Raleigh, NC  27601
Jhoward@ghz-law.com
*Counsel for Defendant Ronald Earnest*

Deborah B. Barbier
Deborah B. Barbier, LLC
1811 Pickens Street
Columbia, SC  29201
dbb@deborahbarbier.com
*Counsel for Defendant Ronald Earnest*

Matthew Martin
United States Attorney
Frank Joseph Chut, Jr.
Assistant United States Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC  27401
Matt.Martin@usdoj.gov
Frank.Chut@usdoj.gov
*Counsel for Plaintiff USA*

William M. Montague
US Department of Justice
601 D St., NW, 7th Floor
Washington, DC  20004
William.Montague@usdoj.gov
*Counsel for Plaintiff USA*

Jeffrey A. McLellan
US Department of Justice
Trial Attorney, Tax Division
POB 972
Washington, DC  20044
Jeffrey.A.Mclellan@usdoj.gov
*Counsel for Plaintiff USA*

 */s/  Claire J. Rauscher*
Claire J. Rauscher
Counsel for Shannon M. Drake

5

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO: 1:16-CR-205-02

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHANNON MICHELLE DRAKE,<br><br>Defendant. | MEMORANDUM IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES AND EXPENSES PURSUANT TO THE HYDE AMENDMENT, TITLE VI, SECTION 617, PUB L. 105-119, 111 STAT. 2519; TITLE 18, U.S. CODE, SECTION 3006(A) |

COMES NOW Claire J. Rauscher and Allen T. O'Rourke, attorneys for Shannon Michelle Drake, and respectfully submit this Memorandum in Support of the Application for Attorneys' Fees and Expenses Pursuant to the Hyde Amendment, Title VI, Section 617, Pub L. 105-119, 111 Stat. 2519; Title 18, U.S. Code, Section 3006(A) ("Application") that was filed on March 6, 2019 (Doc. No. 485).

### A. Erroneous Legal Theory to Prosecute Shannon Drake

As alleged by the Application, the Government's case against Ms. Drake was built on an erroneous legal theory to treat nominee lending as inherently fraudulent – along with a set of false assumptions about what Ms. Drake would know as the "Account Executive" for the Harrison 2.0 loans and a presumed "bank officer."

In essence, the Government's indictment charged Ms. Drake with participating in what they called a "nominee lending scheme." This scheme consisted of GrandSouth Bank factoring the receivables of Bruce Gregory Harrison's staffing business (in general, Compensation Management, Inc.) and directing the factoring advances to Mr. Harrison's control (via Global Labor, Inc.), but doing so under a set of factoring agreements the

1

bank had executed with "nominee" companies (namely, the "Harrison 2.0" companies) instead of under an agreement with Mr. Harrison.[1]

In setting forth this nominee lending scheme, the indictment made no specific factual allegations whereby Ms. Drake actually did or said anything so as to deceive GrandSouth Bank or otherwise commit fraud. As alleged, Ms. Drake just seemed to be doing her regular job of administering the factoring loans as directed by her supervisor Doug Corriher. This made it difficult to figure out what could be the Government's theory to charge her alongside the other co-defendants. That is what led Ms. Drake to file pretrial motions seeking to dismiss the indictment for insufficiency and requesting a bill of particulars (*see* Doc. Nos. 52-53, 64, 161-162, 190, and 242-243).

Eventually, on April 17, 2018, with a trial date coming up, Ms. Drake filed a motion *in limine* to preclude the Government from using the phrase "nominee lending scheme" in front of the jury (as they had done in argument and pleadings up until then) because that phrase wrongly implied that "nominee lending" was fraudulent by nature and illegal (Doc. Nos. 256-257). Her motion cited multiple cases which made clear that nominee lending is not inherently illegal; although it may become illegal if the nominee loan is being used to deceive the bank and conceal the true borrower.[2] Ms. Drake's motion *in limine* went on to explain:

---

[1] The Government summed up the nominee lending scheme in a similar manner in their sentencing memorandum for Mr. Corriher: "In essence, Corriher and his co-conspirators ran a nominee lending scheme in which credit was, on paper, extended to various nominee companies. In reality, however, all funds went to benefit Harrison and his staffing companies." (Doc. No. 195 at 2.)

2

[I]t would be improper for the jury to find a defendant guilty of scheming to defraud [GrandSouth] Bank on the grounds that he or she was aware of the nominee arrangement in the factoring loans at issue. Since nominee lending is not inherently criminal or fraudulent, the defendants cannot fairly be argued to be aware of a criminal scheme to defraud simply because they are aware of nominee lending. Yet, that is what the Government would imply by using the phrase "nominee lending scheme."

(Doc. No. 257 at 3.)

On April 26, 2018, the Government responded by conceding that nominee lending was not "per se illegal," but then arguing that "the government's use of the phrase 'nominee lending scheme' does not argue or imply nominee lending is inherently criminal" (Doc. No. 291 at 2).

That same day, this Court entered a text order on the docket indicating, *inter alia*, that "it seems to this court that the scheme alleged is more complex than simple nominee lending." Soon after, during a hearing on April 30, 2018, this Court summarized how the Government's case seemed to require not only nominee lending but also the intent to circumvent lending limits: "[O]kay, so we have nominee lending, which may be a bad banking practice, but it's not in and of itself unlawful. Here, as I understand the evidence, at least part of the bank – of the Government's theory is that these things were done to allow Harrison to exceed the legal lending limit, and, therefore, all these steps that were

---

[2] *See United States v. Waldroop*, 431 F.3d 736, 741 (10th Cir. 2005) ("Nominee loans are not inherently illegal, but are illegal if they are used to deceive a financial institution about the true identity of a borrower."); *United States v. Doke*, 171 F.3d 240, 245 (5th Cir. 1999) (accepting "that a nominee loan is not illegal where there is no evidence that the transaction is concealed from the bank, and where the loan documents make the relationship between the various transactions very clear"); *United States v. Willis*, 997 F.2d 407, 410 n.2 (8th Cir. 1993) ("Nominee loans are not illegal per se. They are illegal, however, when the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of false pretenses.").

3

taken in furtherance of that are – constitute fraud or misapplication, whatever you want to characterize it as" (Apr. 30, 2018, Hr'g Tr. at 76:12-19, attached as Ex. A).

The Government later explained their legal theory the same way in the Trial Brief (Doc. No. 425). Once again, they conceded that "[n]ominee or straw loans are not necessarily illegal," but that "[n]ominee loans are illegal where '… the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of false pretenses'" (Doc. No. 425 at 7 (quoting *Willis*, 997 F.2d at 410 n.2)). The Government then asserted that, in this case, the nominee lending arrangement was employed "for the purpose of extending credit to BGH's staffing business in contravention of the lending limits" (Doc. No. 425 at 8-9).

The Government knew this statement of their theory was inaccurate regarding Ms. Drake. They never had evidence that she knew anything about a bank's legal lending limits – much less that she conspired to help Mr. Harrison exceed them. For, in truth, that legal theory was never how the Government had prosecuted Ms. Drake. Actually, the Government had charged her based on an erroneous legal theory that she would be guilty if she handled the Harrison 2.0 factoring accounts while being aware they involved a nominee arrangement.

That this was the Government's actual legal theory became apparent when an email sent by the prosecutor to his team on May 5, 2013, was disclosed during the course of another hearing in this case. That email reads as follows:

Here are some of my thoughts on what needs to be done on Corriher:
*     *     *

4

3.  We need to decide if we want to treat Shannon Drake as a target. She is a bank officer. While I do not believe there is evidence that she knew about the taxes, *she was an essential cog in the Five Guys system and was well aware that these loans were a nominee arrangement*. It would help us to get her an attorney of her own. Give her a break in response for full testimony or *make her eat a false entry on bank books charge* (venue issues aside)?

(Ex. B at 1, emphasis added.)  Being "an essential cog in the Five Guys system" was Ms. Drake doing her job to administer the Harrison 2.0 accounts as directed.[3]  Thus it was her "aware[ness] that these loans were a nominee arrangement" that would make her subject to prosecution for "a false entry on bank books charge" and for membership in the conspiracy eventually charged. (*Id.*)

To be able to indict Ms. Drake under this legal theory, the Government would need to make the Grand Jury believe that nominee lending is illegal in itself.  It turns out that is precisely what happened.  On January 21, 2019, during the middle of trial, the Government disclosed a *Jencks* packet with the transcript of Special Agent Kyle Myles's testimony to the Grand Jury that took place on May 31, 2016.  During his testimony, Special Agent Myles affirmed the prosecutor's description of "nominee lending" as something that is fraudulent by nature and falsifies bank records:

Q.  And is nominee lending a – is that something the FDIC encourages?

A.  No, not at all.

Q.  And what are the problems with nominee lending?

---

[3] During her testimony about this email, Special Agent Mary Blackerby confirmed that "the Five Guys system" referred to the five "nominee" companies that were used for the Harrison 2.0 factoring loans. (Ex. B-1 at 25).

5

A.   Well, it's just what you said. The FDIC and the examiners cannot get an accurate picture of the amount of risk the bank is taking by these lending transactions if they don't know who ultimately the money is going to and who's supposed to be paying it.

Q.   *And is nominee lending sort of just in its very nature a altering or faking of the bank's books just in general?*

A.   *Yes, it is.*

Q.   Because, basically, you have parties that look like on the books the money's being loaned to, when, in fact, it's going to benefit somebody else?

A.   That's right.

(Tr. of Kyle Miles Grand Jury Test'y, May 31, 2016, at 18:17-19:8, attached as Ex. C, emphasis added.)  This testimony, taken only a few weeks before the indictment was issued on June 28, 2016 (Doc. No. 1), confirms how the Government used an erroneous legal theory to charge Ms. Drake for what really amounted to doing her regular job.  The Government misled the Grand Jury to believe the opposite of what they later conceded to this Court after Ms. Drake's motion *in limine* – namely, that the practice of nominee lending is not inherently illegal but rather can become illegal if used to deceive the bank and conceal the true borrower.[4]

The Government should have known better from the outset, of course, but they certainly knew better by the time this case went to trial.  There were a little over two and a half years between Ms. Drake's indictment on June 28, 2016, and the start of her trial

---

[4] Glossing over this distinction in the language of the indictment, the Government simply inserted the idea of concealing the true borrower into their definition of what is "nominee lending."  Specifically, the indictment reads: "The practice of nominee lending is one in which a bank makes loans to a nominal borrower for the benefit of a *concealed* third party not included in the loan agreements" (Doc. No. 85 ¶ 30, emphasis added).

6

on January 8, 2019. After all of that litigation, the Government was well awre that their case against Ms. Drake had been predicated on legal error and that they had no evidence to prove, *inter alia*, that she intended to circumvent the bank's lending limits. Nonetheless, the Government preferred to roll the dice with the jury rather than admit that they lacked the evidence needed to be able to prove her guilt. A prosecution that began in error finally ended in bad faith.

### B. Misrepresentations and Non-Disclosure of *Brady* Material

While they relied on an erroneous legal theory to charge Ms. Drake and in fact lacked the evidence to be able to prove her guilt, the Government made multiple inaccurate statements to this Court about the nature of their prosecution and evidence against Ms. Drake. The Government also withheld exculpatory evidence subject to *Brady v. Maryland*, 373 U.S. 83 (1963), that would have exposed the lack of evidence.

Mr. Corriher was the lynchpin connecting Ms. Drake to this case. She was being prosecuted for supposedly joining a conspiracy with him and Mr. Harrison based on her work administering the Harrison 2.0 factoring accounts in the manner that Mr. Corriher directed her. Mr. Corriher pled guilty in the summer of 2017 (*see* Doc. Nos. 60-61) and then met with the Government on numerous occasions as part of his cooperation agreement. As her direct and only supervisor in the factoring department at the bank, Mr. Corriher was in the best position by far to tell the Government what Ms. Drake did within the factoring department, how she had been directed concerning the Harrison 2.0 accounts, and how much she would have known about or been involved in the fraudulent scheme for which they were indicted together as co-conspirators.

7

As was later revealed by his testimony during the trial in this case, however, Mr. Corriher did not in fact provide the Government with incriminating evidence against Ms. Drake or otherwise implicate her in the criminal activity.  The important fact that Mr. Corriher, despite being the Government's main cooperator and Ms. Drake's main link to the indictment, declined to implicate Ms. Drake in any wrongful conduct or involvement in the charged conspiracies certainly amounts to *Brady* information that should have been disclosed.  Yet the agents' notes from his debriefings fail to reflect this *Brady* information, and the Government did not otherwise disclose it to Ms. Drake. Indeed, the Government refused to make this disclosure even after, on March 6, 2018, counsel for Ms. Drake made a specific written request for the following:

- The substance of any communications (including but not limited to notes, memos, emails, texts, etc.) with witnesses, including but not limited to Douglas Corriher and their counsel that contain exculpatory … information regarding Shannon Drake and the charges in the indictment;

- Information or conversations provided by any witness, including but not limited to Douglas Corriher involving the conspiracies and charges alleged in the indictment who failed or omitted mention of Shannon Drake and her involvement in the charged criminal activity (i.e. omission of information)

(Ex. D)  The Government's decision to proceed to trial against Ms. Drake while knowing that Mr. Corriher would not implicate her in the charged criminal activity as well as their decision to withhold that critical *Brady* information demonstrates the frivolousness of their case against her and the Government's bad faith.

Furthermore, after the long struggle to surmise the specific factual theory being used to prosecute Ms. Drake, as mentioned above, the Government set out some specific

8

factual allegations for her in the Trial Brief submitted to this Court on December 27, 2018 (Doc. No. 425). Specifically, throughout the Trial Brief's factual summary, Ms. Drake's name appears only one time – alongside Mr. Corriher's – in the following paragraph:

> Corriher *and Drake* established an elaborate system at the bank by which thousands of payments made out to CMI were applied to the loan accounts in the names of the five nominees. *They* also set up a system whereby the proceeds of the loans made to the nominees were combined to fund wire transfers to an account controlled by BGH. Tellingly, some of these wire transfers were recorded at the bank as "for [BGH]."

(Doc. No. 425 at 10, emphasis added.) However, as the Government well knew when they filed the Trial Brief, this part of the factual summary was false with regard to Ms. Drake. The Government knew there was no evidence that Ms. Drake had partnered or worked with Mr. Corriher or anyone else to create any "elaborate system" in the factoring department.[5]

The evidence at trial was clear that Mr. Corriher set up the accounts in the factoring software, entered the various companies into the system, and controlled the

---

[5] Indeed, in a sentencing pleading filed about a month earlier, the Government had attributed that conduct to Mr. Corriher alone: "Again, as the PSR correctly notes, again without objection, Corriher established an 'elaborate system' within GrandSouth Bank to apply payments intended for the Staffing Companies to dummy accounts in the bank in the names of the Nominee Companies. (PSR ¶ 27). Corriher directed Julie Akers by email to divide the actual staffing customers among the fraudulent Nominee Companies. (Attach. A, Email dated January 2, 2009 Corriher to Julie Akers.). Further, he created a system that fraudulently made it appear that the transfers of CMI funds to Harrison were approved by the owners of the Nominee Companies before being combined into one bank wire transfer for the benefit of Harrison. (PSR ¶ 27). In so doing, Corriher forged and created a wire transfer form that appeared to show that each of the owners of the Nominee Companies had approved a portion of the wire transfer. (Attach. B, Wire Transfer Form)." (Doc. No. 408 at 7-8.)

9

information flow to others. No one within the factoring department other than Mr. Corriher had any input on the setup or arrangement of the Harrison 2.0 accounts, and every account executive who handled those factoring accounts was required to do so according to Mr. Corriher's directions the same way that Ms. Drake did.

Indeed, during his testimony at trial, Mr. Corriher made no mention of Ms. Drake's alleged role in the scheme. The trial was devoid of any evidence that Ms. Drake had any knowledge of any fraud or any other kind of wrongdoing in the factoring department. The government did not put on a single witness at trial who testified that she was involved in any scheme to defraud or willfully misapplied bank funds with the intent to injure or defraud the bank. Furthermore, the Government did not put into evidence any document that proved that Ms. Drake willfully misapplied bank funds with the intent to injure or defraud the bank.

In addition, despite the Government's assertions to the contrary, it was clear to the employees of the bank that the licensors were controlled by Mr. Harrison in contradiction to the Government's theory that this information was being concealed from the bank. The wire transfer forms reflected his involvement with the licensee companies and the testimony at trial by numerous witnesses, including the wire transfer employees, proved that this information was not hidden from the bank.

The Government's Trial Brief demonstrates once again that the government acted in bad faith as they knew at the time of its filing that Drake did not 'establish', 'set up' or create any system that would defraud the bank. The government persisted with going forward with the trial against Drake, knowing they had no facts that Drake was involved

10

in any conspiracy. This was born out at the end of the trial by the dismissal of the case against her on all 27 counts by the trial court at the close of the Government's case pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (See Ex. E).

In addition to the misrepresentations in the Trial Brief, the Government made misrepresentations to this Court about the nature and weight of evidence from two Grand Jury witnesses – Witnesses A and B – who supposedly substantiated the charges against Ms. Drake. In the context of argument over the timing of when Ms. Drake became a "target" in the Grand Jury investigation leading to her indictment, the Government claimed that evidence from these and the further review of unspecified documents are what moved the needle to make Ms. Drake become a target and ultimately be charged. (*See* Doc. No. 233 at 5-7 and Ex's 1 and 2.) This account of their prosecution of Ms. Drake was inaccurate, however, as the Government well knew.

The Government once again mischaracterized the nature of their case against Ms. Drake – their case more accurately summed up by the prosecutor's May 2013 email that proposed charging her (*see* Ex. B) – and the role of evidence from these Grand Jury witnesses in making that case. Witness B's testimony before the Grand Jury merely involved reciting procedures in the factoring department and mentioned no specific conduct or any evidence inculpating Ms. Drake. Thus only Witness A had anything negative to say about Ms. Drake, such as her suggestion that Ms. Drake shredded documents at Mr. Corriher's direction at a time when Mr. Corriher would want to conceal evidence relevant to Mr. Harrison's tax fraud. However, Witness A's account lacked credibility and was fraught with bias and speculation – as the impeachment evidence

11

disclosed by defense counsel made undeniable. That is probably why the Government elected not to call her to testify during trial. Regardless of the reason, the Government ultimately revealed that they considered Witness A to be non-essential to the charges against Ms. Drake when they decided to try the case without her.

In reality, the Government did not place priority on Witness A's testimony as demonstrated by their failure to investigate the veracity of her claims after being put on notice of significant credibility issues. In April 2018, defense counsel provided to the Government the personnel file of Witness A detailing the reasons for her dismissal from GrandSouth Bank, which clearly contradicted her Grand Jury testimony on the topic. (See Ex. F). Shortly before trial, on December 26, 2019, the Government filed a motion to preclude Ms. Drake from cross-examining Witness A about the reasons for her dismissal (Doc. Nos. 420-421), saying that Witness A denied what was stated in the dismissal paperwork and provided another false story about the reasons for her dismissal. At the hearing on this motion two days later, on December 28, 2018, it became clear that the Government had not investigated to confirm the veracity of Witness A. For example, the Government failed to interview the Human Resources professional or any other individual with knowledge of the reasons or justifications for Witness A's dismissal. Indeed, the Government appeared to learn for the very first time at the hearing that the supervisor who had approved Witness A's termination was in fact the Government's main cooperating witness Douglas Corriher.

The Government listed numerous employees of the factoring department as their witnesses at trial. If the Government had asked these witnesses (some of whom testified

12

at trial) about the veracity of Witness A or about the truth of her allegations about Drake's shredding of documents, the Government would have learned that Witness A had a bad reputation for truthfulness. In addition, they would have learned that Ms. Drake did not shred documents as described by Witness A. There was no shredding apparatus in the department – only a bin where documents were submitted – and no one in the department, including those seated nearest the document boxes at issue, ever saw ever saw any documents being shredded by Drake. If the Government had made any attempt to corroborate Witness A's testimony or look into the reasons for her dismissal from the bank, they would have found not only had she lied to the Grand Jury, she also lied to them and made up evidence. The witness whom the Government argued to the Court was key to prosecuting Ms. Drake was herself unworthy of belief. This is yet another example of how the Government's lengthy prosecution of Ms. Drake was frivolous, vexatious, and in bad faith.

### C. Misleading of Shannon Drake and her Attorney for the Grand Jury

As alleged by the Application, the Government falsely represented to Ms. Drake, her attorney Smith Moore Leatherwood LLP ("Smith Moore"), and the grand jury that she was neither a "target" nor even a "subject" of their grand jury investigation beginning in September 2012; and also the Government knowingly accepted, accommodated, and benefited from Smith Moore's representation of her while having a significant un-waived conflict of interest. In support thereof, Ms. Drake incorporates by reference her earlier motions and memoranda concerning the Government's misconduct during the grand jury investigation (Doc. Nos. 122, 163, 166, 191, 214, 218, 219, and 224), the hearing thereon

13

held on April 13, 2018, and this Court's memorandum opinion and order of April 18, 2018 (Doc. No. 266).

Added to the points and arguments set forth therein, it is worth emphasizing that the Government's grand jury investigation leading to Ms. Drake's indictment started just a few days after the sentencing of Mr. Harrison, who had been found guilty of tax fraud after a three-week trial in 2011. That sentencing hearing was September 5, 2012, and involved much argument about his factoring arrangement with GrandSouth Bank using the Harrison 2.0 companies. (*See United States v. Harrison*, No. 10-cr-411, M.D.N.C., Sen'g Transcript, Sep. 5, 2012, Doc. No. 135 ["Harrison Sen'g Transcript"], at 45 to 70, attached as Ex. G.)

Within a week, the same prosecutor obtained a grand jury subpoena dated September 11, 2012, and addressed to "Shannon Drake, Account Executive" – making her their first grand jury witness (Ex. Hat 1). The Government simultaneously served GrandSouth Bank with a subpoena seeking "[a]ll emails between Douglas Corriher[,] Vickie Montgomery, Shannon Drake, and Bruce Gregory Harrison, GHarrison@live.com, Julie Akers, Peter Koch, and Juraj Slovak regarding the above named entities" – namely, the Harrison 2.0 and 3.0 companies (Ex. H at 5). Under the circumstances, their investigation plainly was focused on the Harrison 2.0 factoring loans that had been handled by Ms. Drake at the direction of Mr. Corriher.

With the clarity afforded by what turned out to be the Government's case presented at trial, it is now even clearer how she was likely a "target" and undeniably a "subject" back when the Government subpoenaed her in September 2012. Her direct

14

involvement as the account executive for the Harrison 2.0 loans – which the Government

would later present as proof of her guilt at trial – was already well known to the

Government from the investigation and prosecution of Mr. Harrison.  For instance,

Virginia Linke specifically mentioned Ms. Drake in her direct testimony for the

Government during Mr. Harrison's trial:

> A.   When GrandSouth became involved, instead of sending over one set
>        of invoices to US Funding we were now separating it into five
>        different companies.
>
> Q.   And who were you sending the reports to?
>
> A.   We were sending it to *Shannon* and Doug at GrandSouth Bank.
>
> Q.   And what would be the procedure for accessing funds from
>        GrandSouth Bank?
>
> A.   They would send the funds to Global Labor and we would have to ask
>        for funds to obtain – to pay payroll.

(*United States v. Harrison*, No. 10-cr-411, M.D.N.C., Trial Transcript, Sep. 5, 2012, Doc.

No. 93, at 34-34, attached as Ex. I, emphasis added.)

Furthermore, the sentencing hearing on September 5, 2012, featured lengthy

arguments about Mr. Harrison obtaining funds through GrandSouth Bank's elaborate

factoring arrangement with the Harrison 2.0 nominee companies – that is, the "nominee

lending scheme" for which Ms. Drake was prosecuted.  In applying the U.S. Sentencing

Guidelines (USSG), the Government maintained (*i*) that the fraudulent nature of

Mr. Harrison's factoring arrangement amounted to "criminal activity" triggering a two-

level enhancement under Section 2T1.1(b)(1) for failure to report income derived from

"criminal activity"; and also (*ii*) that the elaborate scheme of nominee company loans

15

funneling money through Global Labor to Mr. Harrison amounted to "sophisticated means" triggering another two-level enhancement under Section 2T1.1(b)(2).

Denying there was any attempt to conceal, Mr. Harrison's attorney insisted: "[T]here was nothing hidden about that relationship. Everybody knew about it. The banks knew about it." The Court responded by mentioning Mr. Corriher who had testified at trial on behalf of Mr. Harrison. The following exchange took place:

> THE COURT: Well, the gentleman from GrandSouth certainly became unnerved to the extent that he was aware that money was not going where it was supposed to be and he was also aware that there were more companies out there being factored than he probably – or the Defendant probably could have taken care of and gotten money from GrandSouth.
>
> MR. WISENBERG: Are you talking about Mr. Corriher?
>
> THE COURT: Yes.
>
> MR. WISENBERG: Mr. Corriher, the business about –
>
> THE COURT: He knew what was going on.
>
> MR. WISENBERG: Mr. Corriher did?
>
> THE COURT: Yes. That had been arranged by the Defendant.
>
> MR. WISENBERG: Right. But, again, I believe I heard the Court said he knew it was going on. This is something that has to be –
>
> THE COURT: Well, he should have been charged. He was not an indicted codefendant, but there's not any suggestion he shouldn't have been charged, and that's why I said he was perhaps unnerved by the situation.

(Harrison Sen'g Transcript, Ex. G at 61.). The Government later referred back to this remark about Mr. Corriher in support of an enhancement under USSG Section 3B1.1 for Mr. Harrison being the organizer or leader of criminal activity which involved five or more participants or was otherwise extensive.

16

Ultimately, the Court determined that the Government had established the requested enhancements under USSG Sections 2T1.1(b)(1) and 2T1.1(b)(2) relating to the Harrison 2.0 factoring loans.  In doing so, the Court made a specific finding about the unlawfulness of the Harrison 2.0 factoring arrangement to help conceal the tax fraud:

> THE COURT: The Court will find by a – the Government has established by a preponderance of the evidence the appropriate application of sophisticated means based upon especially complex or especially intricate offense conduct arising out of the creation of companies that serve to provide factoring funds that went to the Defendant and not to the companies that were the purpose of the factoring arrangements.

(Harrison Sen'g Transcript, Ex. G at 65.)

The Government's subpoena to Ms. Drake served a few days later should be viewed in this context.  At that time – and certainly before her testimony – the Government knew that she was directly involved in the Harrison 2.0 factoring arrangement which had been treated as unlawful by the Court sentencing Mr. Harrison for purposes of USSG Sections 2T1.1(b)(1) and 2T1.1(b)(2).  What is more, that Court's remarks and the Government's arguments suggest that Mr. Corriher was considered to be a potential guilty participant for having "provide[d] factoring funds that went to the Defendant and not to the companies that were the purpose of the factoring arrangements." (Harrison Sen'g Transcript, Ex. G at 65.)

Given the nature of the Government's case as discussed above and as laid bare during her trial, these circumstances further reveal how improper and deceptive it was for the Government to claim that Ms. Drake was neither a "target" nor even a "subject" when she was subpoenaed in September 2012.  As the account executive responsible for

17

administering the Harrison 2.0 factoring loans and providing those funds that went to

Mr. Harrison, the job she performed at Mr. Corriher's behest was very much at the heart

of the Government's investigation.  The reality is that, when they initially subpoenaed her

to the Grand Jury, the Government already believed that her guilt or innocence would

turn on the knife edge of what she knew or should have known while doing her job.

If the Government had represented her actual status, Ms. Drake likely would have gotten

separate legal counsel – free from Smith Moore's conflict of interest – who could assert

her rights and negotiate independently with the Government so as to avoid indictment.

Indeed, that would have been a real possibility.  In the prosecutor's May 2013 email

mentioned above, he specifically mentioned the idea of giving her a break in exchange

for full testimony: "It would help us to get [Ms. Drake] an attorney of her own. Give her

a break in response for full testimony or make her eat a false entry on bank books charge

(venue issues aside)?" (Ex. B at 1.)  Instead, having no conflict-free attorney of her own

to defend her, and also being misled by the Government to believe that they considered

her job on the Harrison 2.0 accounts to be non-incriminating, Ms. Drake ended up

sharing her full testimony without any deal when in fact she should have asserted her

right to remain silent.  Of course, that testimony and her other assistance to the

Government would eventually be used to indict Ms. Drake.  Then this completely

innocent woman's life and family would be turned upside-down for the foreseeable future

by the wrongful prosecution of this case.

18

### D.  Conclusion

The Hyde Amendment affords  financial redress to an accused when they have been subjected to vexatious, frivolous or bad faith federal criminal prosecutions.  In this case, for over two and a half years, Shannon Drake suffered under the pressure of a wrongful federal criminal indictment that was in no way warranted by the evidence or applicable law.  The Government continued to pursue this baseless prosecution by ignoring the underlying lack of evidence and erroneous legal theory, making misleading representations to the Court, declining to provide exculpatory evidence, and misleading Ms. Drake and her attorney during the Grand Jury investigation.  The Government should never have prosecuted Ms. Drake from the outset, of course.  However, regardless how this case began, the Government should not have continued prosecuting her through trial when they knew their theory of indictment was based on legal error and they lacked sufficient evidence of her guilt.

Respectfully submitted this the 8th day of April, 2019.

 /s/  Claire J. Rauscher
Claire J. Rauscher, N.C. Bar No. 21500
Allen T. O'Rourke, N.C. Bar No. 38404
Womble Bond Dickinson (US) LLP
301 S. College Street, Ste. 3500
Charlotte, NC  28202
Telephone:  (704) 331-4900
Fax:  (704) 338-7811
claire.rauscher@wbd-us.com
allen.orourke@wbd-us.com
*Counsel for Defendant Shannon Drake*

19

# EXHIBIT A

**April 30 Hearing Transcript Excerpt**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF NORTH CAROLINA
 2
   UNITED STATES OF AMERICA        ) Greensboro, North Carolina
 3                                 ) April 30, 2018
        vs.                        ) 9:39 a.m.
 4                                 )
   SHANNON MICHELLE DRAKE,         )
 5                                 ) Case No. 1:16CR205-2
        Defendant.                 )
 6   _____)
   UNITED STATES OF AMERICA        )
 7                                 )
        vs.                        )
 8                                 )
   RONALD KEITH EARNEST,           )
 9                                 ) Case No. 1:16CR205-3
        Defendant.                 )
10   _____)
   UNITED STATES OF AMERICA        )
11                                 )
        vs.                        )
12                                 )
   ROBERT THOMAS TAYLOR,           )
13                                 ) Case No. 1:16CR205-4
        Defendant.                 )
14   _____)

15                           MOTIONS HEARING
             BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
16                    UNITED STATES DISTRICT JUDGE
   APPEARANCES:
17
   For the Government:   NATHAN P. BROOKS
18                       U.S. Department of Justice
                         601 D St., NW, 7th Floor
19                       Washington, DC 20004

20                       JEFFREY A. MCLELLAN
                         U.S. Department of Justice, Tax Division
21                       POB 972
                         Washington, DC 20044
22
   Court Reporter:       Joseph B. Armstrong, FCRR
23                       324 W. Market, Room 101
                         Greensboro, NC  27401
24
                 Proceedings reported by stenotype reporter.
25         Transcript produced by Computer-Aided Transcription.
```

Motions Hearing - April 30, 2018

```
 1  APPEARANCES, Continued:

 2  For the Defendant:    CLAIRE J. RAUSCHER
    Drake                 ALLEN T. O'ROURKE
 3                        Womble Bond Dickinson (US), LLP
                          One Wells Fargo Ctr., Ste. 3500
 4                        301 S. College St.
                          Charlotte, NC 28202-6037
 5

 6  For the Defendant:    DEBORAH B. BARBIER
    Earnest               Deborah B. Barbier, LLC
 7                        1811 Pickens Street
                          Columbia, SC 29201
 8
                          JOSHUA BRIAN HOWARD
 9                        Gammon, Howard & Zeszotarski, PLLC
                          115 1/2 W. Morgan St.
10                        Raleigh, NC 27601

11  For the Defendant:    WES J. CAMDEN
    Taylor                CAITLIN M. POE
12                        Ward and Smith, P.A.
                          PO Box 33009
13                        Raleigh, NC 27636-3009

14                        JAMES W. BANNISTER
                          Bannister Wyatt & Stalvey, LLC
15                        PO Box 10007
                          Greenville, SC 29603
16
    Via Telephone:        MARK C. MOORE
17                        Nexsen Pruet
                          1230 Main Street, 700
18                        Columbia, SC  29201

19                        ANDREW A. MATHIAS
                          Nexsen Pruet
20                        1230 Main Street, 700
                          Columbia, SC  29201
21

22

23

24

25
```

Motions Hearing - April 30, 2018

It's been a long time for me.

MR. BROOKS:  I mean, adding up numbers, of course, is an opinion, but it's not an expert one.  I mean, I think the rule -- obviously, we do have 701, but that does not contemplate summary witnesses.  I mean, you need to be able to summarize voluminous records.

THE COURT:  Yeah, let me ask this.  So how does Ms. Hench -- assuming that my inartful summary is correct and she's going to include these other loans and add them up and say this exceeded the legal lending limit for Harrison or whatever, does she opine as to whether or not these should be included, or is there other evidence on this -- okay, so we have nominee lending, which may be a bad banking practice, but it's not in and of itself unlawful.  Here, as I understand the evidence, at least part of the bank -- of the Government's theory is that these things were done to allow Harrison to exceed the legal lending limit, and, therefore, all these steps that were taken in furtherance of that are -- constitute fraud or misapplication, whatever you want to characterize it as.

Mr. O'Rourke does raise an interesting point.  Is Ms. Hench going to come in and say I've looked at the facts, and based on the facts that have been presented, I think these nominee companies' loans should be included as -- in calculating Mr. Harrison's legal lending limit, or does that come in some other way?

Motions Hearing - April 30, 2018

# EXHIBIT B

**Prosecutor Email**

## Blackerby Mary C

| | |
|---|---|
| **From:** | Chut, Frank (USANCM).[Frank.Chut@usdoj.gov] |
| **Sent:** | Sunday, May 05, 2013 4:11 PM |
| **To:** | Blackerby Mary C; Knapp, Michael N. (FBI); McLellan, Jeffrey A. (TAX) |
| **Subject:** | Things to do on Corriher |

Here are some of my thoughts on what needs to be done on Corriher:

1. 

2. We need to review Corriher's personal account records closely. I gave them a quick look and thought that they looked a little strange. There might be something there that we are missing.

3. We need to decide if we want to treat Shannon Drake as a target. She is a bank officer. While I do not believe there is evidence that she knew about the taxes, she was an essential cog in the Five Guys system and was well aware that these loans were a nominee arrangement. It would help us to get her an attorney of her own. Give her a break in response for full testimony or make her eat a false entry on bank books charge (venue issues aside)?

4. We need to use Burgess to set the base line for lending/regulatory procedures at GSB.

5. We will discuss our charging structure on Tuesday.

6.



DEFENDANT'S EXHIBIT

SD-4

1

# EXHIBIT B-1

**March 7, 2018 Motion Hearing Excerpt**

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF NORTH CAROLINA
 2
     UNITED STATES OF AMERICA        ) Greensboro, North Carolina
 3                                   ) March 7, 2018
          vs.                        ) 11:11 a.m.
 4                                   )
     SHANNON MICHELLE DRAKE,         )
 5                                   ) Case No. 1:16CR205-2
          Defendant.                 )
 6   _____)
     UNITED STATES OF AMERICA        )
 7                                   )
          vs.                        )
 8                                   )
     RONALD KEITH EARNEST,           )
 9                                   ) Case No. 1:16CR205-3
          Defendant.                 )
10   _____)
     UNITED STATES OF AMERICA        )
11                                   )
          vs.                        )
12                                   )
     ROBERT THOMAS TAYLOR,           )
13                                   ) Case No. 1:16CR205-4
          Defendant.                 )
14   _____)

15                         MOTIONS HEARING EXCERPT
              (TESTIMONY OF MARY BLACKERBY AND KYLE MYLES)
16            BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
                       UNITED STATES DISTRICT JUDGE
17
     APPEARANCES:
18
     For the Government:   FRANK JOSEPH CHUT, AUSA
19                         Office of the U.S. Attorney
                           101 S. Edgeworth Street, 4th Floor
20                         Greensboro, North Carolina 27401

21                         NATHAN P. BROOKS
                           U.S. Department of Justice
22                         601 D St., NW, 7th Floor
                           Washington, DC 20004
23
                           JEFFREY A. MCLELLAN
24                         U.S. Department of Justice, Tax Division
                           POB 972
25                         Washington, DC 20044
```

Case 1:16-cr-00205-WO   Document 233-7   Filed 03/29/18   Page 2 of 49
Case 1:16-cr-00205-WO   Document 493-3   Filed 04/08/19   Page 2 of 6
**-4292-**

Blackerby - Direct by Ms. Barbier                    23

```
 1  BY MS. BARBIER:
 2  Q    Agent Blackerby, in this email, AUSA Chut says in May of
 3  2013:  "We need to decide if we want to treat Shannon Drake as
 4  a target."  Did you recall that?
 5  A    No.
 6  Q    Mr. Chut also says:  "It would help us to get her an
 7  attorney of her own."  Did you recall that?
 8  A    No.
 9  Q    Did you recall any -- after reading this, did you recall
10  any more about the conversations related to this?
11  A    No, I did not.  I did not recall anything about this
12  email.
13  Q    Okay.  And your testimony is you don't recall anything --
14  any similar conversations related to Mr. Earnest?
15  A    No.
16  Q    Who redacted this email?
17            MR. BROOKS:  Objection, Your Honor.
18            THE COURT:  Sustained.
19  BY MS. BARBIER:
20  Q    Do you know who redacted this email?
21            THE COURT:  Sustained.
22            MS. BARBIER:  I don't have any other questions, Your
23  Honor.
24            THE COURT:  Examination?
25            MR. O'ROURKE:  Thank you, Your Honor.
```

Case 1:16-cr-00205-WO   Document 233-7   Filed 03/29/18   Page 24 of 49
Case 1:16-cr-00205-WO   Document 493-3   Filed 04/08/19   Page 3 of 6
**-4293-**

Blackerby - Cross                                    24

```
 1                    CROSS-EXAMINATION
 2   BY MR. O'ROURKE:
 3   Q     Ms. Blackerby, I would like to refer your attention to the
 4   email that is Defendant Earnest Exhibit No. 1.  Did you print
 5   this out?
 6   A     I did, yes.
 7   Q     And where did you find it to print out?
 8   A     It was already printed out.  I had it with some notes in
 9   the file.
10   Q     Can you describe for me who it's addressed to and who it's
11   from?
12   A     The email is addressed to me, Special Agent Mike Knapp,
13   and Mr. McClellan, and it is from Mr. Chut.
14   Q     And what's the topic of the email?
15   A     The topic -- the subject is "Things to do on Corriher."
16   Q     And, generally speaking, what is this email about?
17   A     It's some bullet points that Mr. Chut made in preparation
18   for -- it looks like in preparation for a meeting, but it's
19   just some bullet points that Mr. Chut made of things to think
20   about or maybe discuss.
21   Q     And did -- if I could draw your attention to the email,
22   Bullet Point 3 relates to Ms. Drake, is that correct?
23   A     Yes.
24   Q     And do you understand what Mr. Chut is -- wrote in this
25   email?
```

Case 1:16-cr-00205-WO   Document 233-7   Filed 03/29/18   Page 25 of 49
Case 1:16-cr-00205-WO   Document 493-3   Filed 04/08/19   Page 4 of 6
**-4294-**

```
 1  A    I can read it, and I do -- I don't recall any of this,
 2  but, yes, I can read the email, and I know what it's referring
 3  to.
 4  Q    The phrase "Five Guys System" is used.  What does that
 5  refer to?
 6  A    "Five Guys" is the terminology that we used for the five
 7  nominee lending -- the five nominee lines of credit.
 8  Q    And are those the five lines of credit relating to nominee
 9  companies that are identified in the indictment in this case?
10  A    Yes.
11  Q    Later, in Bullet Point 3, it talks about making her "eat a
12  false entry on bank books charge."  Do you see that?
13  A    Yes.
14  Q    What do you understand to have been the basis for having
15  her "eat a false entry on bank books charge"?
16           MR. BROOKS:  Objection, Your Honor.
17           THE COURT:  I'll allow it.  Overruled.
18           THE WITNESS:  I take this as just some thoughts that
19  Mr. Chut had that he wanted to get out.  I mean, the comment
20  says "give her a break in response for full testimony or make
21  her eat a bank entry charge."
22  BY MR. O'ROURKE:
23  Q    So I can be more specific.  Which bank books are we
24  talking about in that Bullet Point 3?
25           THE COURT:  That I'm going to sustain.  In terms of
```

Case 1:16-cr-00205-WO   Document 233-7   Filed 03/29/18   Page 26 of 49
Case 1:16-cr-00205-WO   Document 493-3   Filed 04/08/19   Page 5 of 6
-4295-

1  the answer to the question, "eat a false entry" simply means

2  charge her and get her to plead guilty to a false entry charge,

3  correct?  Was that your understanding?

4          THE WITNESS:  That is how I would interpret that,

5  yes.

6          THE COURT:  All right.  You may continue.

7  BY MR. O'ROURKE:

8  Q    Is there anything else that you recall about this email as

9  you sit here today?

10 A    No.

11         MR. BROOKS:  Objection.

12         THE COURT:  Well, since the answer is no, I'll

13 overrule the objection.

14         MR. O'ROURKE:  Thank you, Your Honor.  No further

15 questions.

16         THE COURT:  Anything, Mr. Brooks?

17         MR. BROOKS:  Just briefly, Your Honor.

18                  CROSS-EXAMINATION

19 BY MR. BROOKS:

20 Q    Good morning, Agent Blackerby.

21         THE COURT:  I'm sorry.  I didn't mean to skip you

22 all, but I assume you all have no --

23         MR. CAMDEN:  We don't have a dog in the fight, Judge.

24         THE COURT:  All right.  Mr. Brooks?

25         MR. BROOKS:  Thank you, Your Honor.

Case 1:16-cr-00205-WO   Document 233-7   Filed 03/29/18   Page 27 of 49
Case 1:16-cr-00205-WO   Document 493-3   Filed 04/08/19   Page 6 of 6
**-4296-**

# **EXHIBIT D**

**Rauscher, Claire**

| | |
|---|---|
| **From:** | Rauscher, Claire <Claire.Rauscher@wbd-us.com> |
| **Sent:** | Tuesday, March 06, 2018 3:22 PM |
| **To:** | McLellan, Jeffrey A. (TAX) (Jeffrey.A.McLellan@usdoj.gov); frank.chut@usdoj.gov |
| **Cc:** | O'Rourke, Allen |
| **Subject:** | U.S. v. Shannon Drake-Follow up letter |
| **Attachments:** | 2018.03.06 LT to Jeffrey McLellan and Frank Chut re Shannon Drake.pdf |

Frank and Jeff-
Please see the attached letter.  If you have any questions, please feel free
to contact me.
Regards,
Claire


**Claire Rauscher**
Partner
Womble Bond Dickinson (US) LLP

**d:** 704-331-4961
**m:** 704-617-6548
**e:** Claire.Rauscher@wbd-us.com

One Wells Fargo Center
Suite 3500
301 South College Street
Charlotte, NC 28202-6037




**womblebonddickinson.com**

  


This email is sent for and on behalf of Womble Bond Dickinson (US) LLP. Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.

1

womblebonddickinson.com

**WOMBLE
BOND
DICKINSON**

**March 6, 2018**

Jeffrey A. McLellan
Jeffrey.a.mclellan@usdoj.gov
Frank Chut
Frank.chut@usdoj.gov
Assistant U.S. Attorneys
United States Attorney's Office
Suite 1600
227 W. Trade Street
Charlotte, NC  28202

**Via E-Mail**

**Re:**    *United States v. Shannon Drake* - Docket No. 1:16CR205

Womble Bond Dickinson (US) LLP

One Wells Fargo Center
Suite 3500, 301 South College Street
Charlotte, NC 28202-6037

t:   704.331.4900
f:   704.331.4955

Claire J. Rauscher
Partner
Direct Dial: 704-331-4961
Direct Fax: 704-338-7811
E-mail:Claire.Rauscher@wbd-us.com

Dear Mr. McLellan and Mr. Chut:

I am in receipt of your letter dated February 25, 2018 that was sent in response to my February 18, 2018 letter.  I want to be specific about certain communications that are being requested in the letter that would be covered under *Brady v. Maryland*, 373 U.S. 83 (1963):

- The substance of any communications (including but not limited to notes, memos, emails, texts, etc.) with witnesses, including but not limited to Douglas Corriher and their counsel that contain exculpatory or other information regarding Shannon Drake and the charges in the indictment;

- Information or conversations provided by any witness, including but not limited to Douglas Corriher involving the conspiracies and charges alleged in the indictment who failed or omitted mention of Shannon Drake and her involvement in the charged criminal activity (i.e. omission of information)

If you have any questions about this clarification of my previous letter, kindly contact me.

Sincerely,

**Womble Bond Dickinson (US) LLP**

Claire J. Rauscher
Partner

cc:    Allen T. O'Rourke

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/legal notices for further details.

# **<u>EXHIBIT E</u>**

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES OF AMERICA        ) Greensboro, North Carolina
                                     ) January 29, 2019
     vs.                             ) 12:30 p.m.
 4                                   )
                                     )
 5   SHANNON MICHELLE DRAKE,         )
                                     ) Case No. 1:16CR205-2
 6       Defendant.                  )
                                     )
 7   UNITED STATES OF AMERICA        )
                                     )
 8       vs.                         )
                                     )
 9   RONALD KEITH EARNEST,           )
                                     ) Case No. 1:16CR205-3
10       Defendant.                  )
                                     )
11   UNITED STATES OF AMERICA        )
                                     )
12       vs.                         )
                                     )
13   ROBERT THOMAS TAYLOR,           )
                                     ) Case No. 1:16CR205-4
14       Defendant.                  )
     _____)

15
                        RULING ON RULE 29 MOTIONS
16          BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
                    UNITED STATES DISTRICT JUDGE
17
     APPEARANCES:
18
     For the Government:   FRANK JOSEPH CHUT, AUSA
19                         Office of the U.S. Attorney
                           101 S. Edgeworth Street, 4th Floor
20                         Greensboro, North Carolina 27401

21                         JEFFREY A. MCLELLAN
                           U.S. Department of Justice, Tax Division
22                         POB 972
                           Washington, DC 20044

23

24

25
```

7

1        Similarly, with respect to Mr. Taylor, I think

2   there's a lot of evidence here from which a jury could find

3   that Mr. Taylor did not knowingly participate in these matters,

4   but I also think there is sufficient evidence under the

5   applicable standard as to Rule 29, which all the parties have

6   addressed to varying degrees, correctly for the most part, I

7   think.  No question that I have to view the evidence in the

8   light most favorable to the Government and apply those

9   standards, *Glasser*, *Jackson versus Virginia*, et cetera.

10        I think there is evidence from which a jury could

11   find flowing -- beginning with the 2005 memo that suggests

12   Mr. Taylor had knowledge with respect to the structuring of

13   these companies, the relationship of Mr. Harrison to these

14   companies, as well as his control and -- from which a jury

15   could find that Mr. Taylor knowingly participated in these

16   schemes, whether that knowing -- knowledge element is proved by

17   direct knowledge, whether it's direct or circumstantial

18   evidence, or whether that knowledge is proved under a willful

19   blindness theory, which, to be clear, I think does apply here.

20   So the motion will be denied as to Mr. Taylor.

21        With respect to Ms. Drake, I feel differently.  I'm

22   going to grant the motion to dismiss as to Ms. Drake.  I think

23   the evidence can be very properly summarized, as the Government

24   argues, that certainly Ms. Drake's participation in

25   transactions related to these fraudulent schemes is

8

1 substantial.  Ms. Drake was the account representative on the
2 Harrison -- at least to some degree, the 1.0 companies, clearly
3 the 2.0 companies, and, to some degree, the 3.0 companies; and
4 many witnesses have testified with respect to who worked on
5 Harrison's accounts, Drake's visit to CMI on at least one
6 occasion, Drake's signature appears on many of the documents.
7 The Government has pointed out in its responsive brief a couple
8 of transactions which might arguably be deemed irregular.  In
9 just looking at the evidence presented, drake signed wire
10 request forms listing Global Labor's Bank of America account as
11 the recipient.  She dealt with those multiple signature blocks.
12       And so there's substantial evidence of Drake's
13 participation in the transactions -- many of the transactions
14 that are at issue in this particular case.
15       However, as my questioning made clear, I think, as
16 well as my review of the evidence, ultimately, with respect to
17 Defendant Drake, her knowledge and intent are significant
18 issues.  Ordinarily, I would find knowledge and intent to be
19 matters best determined by the jury under the theory that if
20 the jury could reasonably find that Defendant Drake had the
21 requisite knowledge and intent, her actions, that is, signing
22 off on wire requests, inputting false data, the bucketing --
23 tangential involvement in the initial bucketing of the invoices
24 according to the licensee companies, might otherwise satisfy
25 the elements of bank fraud, misapplication of funds, and making

9

1  false entries.

2        I also recognize under the Government's theory that
3  the Government could prove Drake's knowledge under a theory of
4  willful blindness, just as I have previously found with respect
5  to Mr. Taylor and Mr. Earnest.

6        All those factors notwithstanding, I do find that
7  Counts -- actually One through Fourteen and Sixteen through
8  Twenty-eight or Twenty-nine, I guess, should be dismissed,
9  slightly different reasons as to Counts Two through Fourteen
10  and Count Sixteen through Twenty-seven.

11        With respect to Two through Fourteen and Sixteen
12  through Twenty-seven, I don't believe the evidence is
13  sufficient to show enough knowledge in Ms. Drake with respect
14  to the scheme itself as to the matters I've outlined, the legal
15  lending limit, the related companies, related transactions,
16  avoiding UCC filings of other companies, and those types of
17  matters to suggest that Defendant Drake was either willfully
18  blind or knowingly participated in bank fraud or the
19  misapplication of bank funds.

20        As I recall the evidence, there was no evidence
21  presented that anyone within the factoring department had or
22  gave Defendant Drake any reasonable basis upon which to suspect
23  the companies were fake or that Drake ignored any obvious red
24  flags.  I understand the Government may disagree with that to
25  some degree, but the existence or absence of a red flag in this

1  case, as I see the evidence, is, in part, significantly

2  dependent upon some idea of what the relationship of these

3  companies are, what the bank understood those relationships to

4  be by virtue of the original loan documents, and what

5  Harrison's relationship was to these various companies.

6          In that regard, I find that Defendant Drake's

7  knowledge as to those matters -- frankly, I don't find the

8  evidence to support any knowledge that she had with respect to

9  the specific structuring of the deals, who may have been in

10 charge of directing distributions, or those types of matters.

11         With respect to Counts One and Twenty-nine, I think

12 it may be arguable that it's a closer call as to those two

13 counts, each of which deal, at least in part, with false bank

14 entries, and I think it's clear from the evidence that

15 Defendant Drake was the person at GrandSouth Bank who approved

16 wire requests, completed TMS sheets, and made entries into the

17 SQL or whatever that system was within the bank.  Perhaps

18 that's best characterized as potentially forming a basis for a

19 finding by a jury of a willful blindness by Defendant Drake.

20         But I ultimately conclude with respect to the

21 evidence in this case that the evidence is insufficient to

22 demonstrate Defendant Drake's willful blindness as to the

23 commission of the scheme.  First of all, I don't find that

24 Defendant Drake even had -- based on the evidence presented

25 that there is a sufficient basis upon which a jury could find

11

1　that Drake even had subjective knowledge or suspicion that

2　information that she was being provided in logging into the

3　systems was false.  There's no evidence that she ever

4　mischaracterized a transaction that she participated in in the

5　sense that she made an entry from one corporation and booked it

6　against another corporation or that type of thing.  There's no

7　evidence she profited from this.

8　　　　　　I certainly understand a position on the part of the

9　Government that there were so many transactions involved that

10　it would be easy to bury these transactions and conceal them

11　from the Government, but at least within the bank records

12　there's no evidence that any of the transactions that she

13　booked or logged weren't readily apparent to bank supervisors

14　or officers.  They were maintained as they occurred on the

15　books and records of the bank.

16　　　　　　Second, I don't think there's any evidence to suggest

17　that Drake's position within the factoring department imposed

18　any review or supervisory obligations regarding record

19　accuracy, for example, as opposed to Taylor who was responsible

20　for reviewing loans.

21　　　　　　So I think ultimately the absence of evidence in this

22　case as to -- as to Defendant Drake and her knowledge and

23　intent as to the scope of the activity or the lack of evidence

24　as to those factors causes me ultimately to conclude that the

25　case should be dismissed -- all counts should be dismissed as

12

1  to Defendant Drake.

2          There are a couple of things I want to make clear.

3  In making this ruling, I am basing this ruling upon my view of

4  the evidence that has been presented in this case.  It is

5  certainly possible, as the Government argued, that I have made

6  mistakes in evidentiary rulings or that type of thing.  If I

7  have, I have.

8          But ultimately, I'm getting to this point, and that

9  is I think it's clear from the orders that I have previously

10 entered that I am not very impressed with some of the matters

11 that took place before the grand jury.  Having said that, I

12 found, and still believe to this day, that I don't have

13 authority to address those matters that occurred before the

14 grand jury; and this ruling, to the extent there's any question

15 in anyone's mind, is based solely upon my review of the

16 evidence in the case and not as a result of my concern over any

17 defalcations that may have occurred with respect to the grand

18 jury investigation.  I think that would be highly improper on

19 my part.

20         Having said that, Ms. Drake, I do want to make a

21 point here, and that is that I don't know what your feeling is

22 about our justice system, about investigators and prosecutors,

23 but it seems to me clear, based upon arguments that have been

24 made, that had the Government chosen to do so, the Government

25 could have put on testimony such as that which Ms. Gustavson

1  clearly offered before the grand jury about the destruction of
2  records.  Whether the Government elected to do that because of
3  credibility concerns or other issues, we will never know.
4          I don't say this to criticize the Government.  I say
5  that to make this point, Ms. Drake.  Had the Government
6  presented that evidence, even if that evidence was almost
7  inherently unbelievable, I would have been compelled to let
8  this case go forward, and I am very impressed -- in spite of my
9  concerns about some of the conduct that occurred before the
10  grand jury, I am very impressed with the Government's candor to
11  the Court during the course of this trial as well as their
12  review of the evidence and their presentation of the evidence,
13  at least as I see it.  That's not to say that it's good or bad.
14  But had the Government been a little bit less professional in
15  their presentation, they might have elected to present evidence
16  that they weren't comfortable with for whatever reason simply
17  to survive a Rule 29 motion, and that would've been a tough
18  call on my part.
19          So I commend your counsel for the job they've done on
20  your behalf, and I commend counsel for the Government for the
21  manner in which they prosecuted this case as to you.  I'm not
22  saying that as to anyone else.
23          I hope that you understand that these things don't
24  happen very often and that you will make the most of the
25  opportunities that you will have going forward as a result of

14

```
 1  my dismissal of this case.  At the conclusion of this hearing,
 2  you are free to go.  All remaining counts are dismissed.
 3         We've got a jury coming in at two.  Anything we need
 4  to take up before the jury comes?
 5         MR. CHUT:  Your Honor, we would just ask the Court
 6  respectfully to note our objection to the ruling, Your Honor.
 7         THE COURT:  I would assume you do so.
 8         MR. CHUT:  Yes, Your Honor.  Thank you, Your Honor.
 9         THE COURT:  Anything else?
10         MR. HOWARD:  Just so the record is clear, when the
11  Court was discussing multiplicity arguments, I think once or
12  twice you may have used the term "duplicity."  I would
13  suggest -- do we want to make clear --
14         THE COURT:  It's a multiplicity argument.  I've used
15  "duplicity," but the argument is "multiplicity."  Anything
16  else?
17         All right.  You all ready to proceed with your
18  evidence in the case?
19         MS. POE:  I believe we'll be ready at two, Your
20  Honor.
21         THE COURT:  All right.  Do you have any idea how long
22  it will take?
23         MS. POE:  I don't.  I apologize, Your Honor.
24         THE COURT:  Can you give me a good faith forecast,
25  Mr. Bannister?
```

# **<u>EXHIBIT G</u>**

Case 1:16-cr-00205-WO    Document 493-6    Filed 04/08/19    Page 1 of 28

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA     *
                             *  Case No. 1:10CR411-1
vs.                          *
                             *  Winston-Salem, North Carolina
BRUCE GREGORY HARRISON, III  *  September 5, 2012
                             *  10:35 a.m.
                 Defendant.  *
*****************************

            TRANSCRIPT OF SENTENCING HEARING
        BEFORE THE HONORABLE JAMES A. BEATY, JR.
           UNITED STATES CHIEF DISTRICT JUDGE


APPEARANCES:

For the Government:     FRANK J. CHUT, JR., ESQUIRE
                        Assistant United States Attorney
                        Post Office Box 1858
                        Greensboro, North Carolina 27402

                        JEFFREY A. MCLELLAN, ESQUIRE
                        United States Department of Justice
                        Trial Attorney, Tax Division
                        Post Office Box 972
                        Washington, DC 20044

For the Defendant:     SOLOMON L. WISENBERG, ESQUIRE
                        Barnes & Thornburg, LLP
                        1717 Pennsylvania Avenue, NW
                        Suite 500
                        Washington, DC 20006

                        DAVID B. FREEDMAN, ESQUIRE
                        Crumpler Freedman Parker & Witt
                        301 North Main Street, Suite 700
                        Winston-Salem, North Carolina 27101

Court Reporter:        Lori Russell, RMR, CRR
                        P.O. Box 20593
                        Winston-Salem, North Carolina 27120

         Proceedings recorded by stenotype reporter.
      Transcript produced by Computer-Aided Transcription.
```

Case 1:16-cr-00205-WO   Document 49-6   Filed 04/09/19   Page 2 of 28
Case 1:10-cr-00411-TDS   Document 1355   Filed 01/07/13   Page 1 of 111
-4311-

1    appropriately determined.

2        I'll let you now move to the next objection,
3    Mr. McLellan, that was raised by the Defendant.

4            MR. MCLELLAN:  Your Honor, the Defendant objects
5    to the enhancement that was found by probation, two points
6    for failure to report criminally-derived income over
7    $10,000.  Now, the situation here is that the Defendant did
8    not report the proceeds of illegal activities that he was
9    engaged in that are separate illegal activities from the tax
10   offenses.

11       Now, in his papers, his original written objection to
12   the presentence investigation report, the Defendant refers
13   as an example of such a thing as a failure to report the
14   proceeds of illegal gambling as an example, where you've got
15   some kind of criminal activity going on and it's the
16   proceeds of that that's not getting reported.

17       Now, here, as we show extensively in our papers filed
18   on June the 18th, the Defendant failed to report the
19   proceeds of a variety of crimes of various types of fraud
20   that were being committed by him and also with the
21   assistance of some other people.  We suggest in our papers
22   examples of mail fraud, bank fraud, and state law false
23   pretenses.  Now, these -- these generally have to do with
24   things that the Defendant did to cause the -- these
25   contracts that -- that his companies made with -- with the

Case 1:16-cr-00205-TDS   Document 493-6   Filed 04/08/19   Page 45 of 111
Case 1:16-cr-00205-TDS   Document 493-6   Filed 04/08/19   Page 45 of 111
-4312-

1   clients to -- you know, to come to fruition on the one hand

2   and also things that the Defendant did to cause the flow of

3   factored funds to keep coming in on the other hand.  Those

4   are basically the two areas that -- that it was necessary

5   to -- for him to use fraud in order to keep the money

6   flowing.

7        So as the Court heard at trial from a couple of

8   different clients, the Defendant -- Defendant's companies

9   promised to take care of the payroll taxes for these

10  employees and -- and handle these matters properly with the

11  Internal Revenue Service.  That's manifestly not the case

12  here, Your Honor.  And so far as the clients are concerned,

13  that's fraud on them.

14       So far as these funders are concerned, they're --

15  there's various funders that provided the factored funds

16  that flowed into the Defendant's companies.  You know, the

17  Court heard extensive evidence from -- from representatives

18  of these funders that in order for -- for the Defendant's

19  companies to be able to make payroll they needed to make,

20  basically, loan arrangements with these -- with these

21  factors.  One of them was Greenfield Commercial Credit and

22  the latter-day one was GrandSouth Bank.  The Court heard

23  from witnesses from both those institutions that it was, you

24  know, required from the Defendant's companies -- from the

25  Defendant to make representations to them about how, you

Case 1:16-cr-00205-TDS   Document 498-6   Filed 04/08/19   Page 46 of 131
Case 1:16-cr-00205-TDS   Document 433-6   Filed 01/07/19   Page 46 of 131
**-4313-**

know, those -- you know, how he was handling the affairs of

the company in order to qualify for the loans; and in one

instance, you know, there's -- I beg the Court's indulgence.

I'll find the specific reference.

(Pause in the proceedings.)

THE COURT:  Let's take a 15-minute recess.  We'll

come back to this.

(A morning recess was taken from 11:40 a.m. until 12

p.m.; all parties present.)

THE COURT:  Mr. McLellan.

MR. MCLELLAN:  Thank you, Your Honor.  I was --

prior to the break, Your Honor, I was addressing the

enhancement for failure to report criminally-derived income

over $10,000.  Section 2T1.1(b)(1) actually defines the

phrase "criminal activity" for purposes of this guideline

and that definition is "any conduct constituting a criminal

offense under federal, state, local, or foreign law."  And

that's comment Note 3 to the -- to the guideline.

And, Your Honor, the Court saw evidence of fraud being

committed by the Defendant at trial with reference to these

clients, as I was discussing earlier, and also with

reference to these funders.

The specific example that's probably the clearest, Your

Honor, was the testimony of John Trendell.  He was the

person who was conducting audits of the Defendant's

Case 1:16-cr-00205-TDS   Document 498-6   Filed 04/08/19   Page 47 of 39
Case 1:16-cr-00205-TDS   Document 498-6   Filed 04/08/19   Page 47 of 131
-4314-

1  companies for an earlier funder, Greenfield Commercial
2  Credit; and he asked the Defendant for proof that the
3  payroll taxes were being paid over to the IRS.  Now, the
4  proof that was provided by the Defendant to Mr. Trendell was
5  that forged bank statement that was literally assembled by
6  another one of the Government's witnesses, Michael Brooks.
7      This is an example of giving a forged document to a
8  financial institution in order to induce that financial
9  institution to make a loan or, in this case, factor the
10 receivables.  That's a clear case, Your Honor, of something
11 that would be criminal activity under federal and state law,
12 you know, to --
13          THE COURT:  So is the focus more appropriate there
14 on the criminal activity as to whether or not it's income?
15 I think I had some difficulty in determining whether or not
16 it's income.  But in terms of criminal activity, if he
17 provided the information through Mr. Brooks that was
18 determined to have been a cut-and-paste document, then
19 that's the criminal activity.  To the extent that the money
20 was received based on that criminal activity, that should
21 have been reported.  Is that what your argument -- is that
22 your argument?
23          MR. MCLELLAN:  Yes, Your Honor.
24          THE COURT:  All right, sir.
25          MR. MCLELLAN:  That is -- ultimately, Your Honor,

Case 1:16-cr-00205-TDS   Document 198-6   Filed 04/08/19   Page 6 of 29
Case 1:16-cr-00415-TDS   Document 133-6   Filed 01/07/18   Page 48 of 111
-4315-

1    as the Court saw, there was -- there was millions of

2    dollars' worth of monies taken out of these staffing

3    companies by the Defendant for his own benefit and -- and

4    taxes ought to have been paid on those diversions.  That's

5    the basis for most of the tax due that the Court already has

6    before it in the individual income tax summary.

7            THE COURT:  All right, sir.

8            MR. MCLELLAN:  And as far as -- as far as an

9    example of that is concerned, besides the example that the

10    Defendant gives of, you know, gambling proceeds, we cited a

11    case in our papers from the Seventh (sic) Circuit, this

12    *Ladum* case.  It's a situation where the enhancement applied

13    when the -- the defendants were making false representations

14    on their gun license applications so that they could get

15    their gun business going, and that was a crime that then

16    enabled the income to flow and for them to evade the taxes

17    on that income.

18      Here it's a similar situation.  False representations

19    are made to the funders so that the money will flow so that

20    the money can be taken out of the company as income --

21    unreported income, over $10,000, to the Defendant.

22            THE COURT:  Would it have been applicable, though,

23    Mr. McLellan, if the money had, in fact, been used to pay

24    the payroll taxes?  Of course, it wouldn't be a charge, in

25    essence.  But would this application be appropriate assuming

Case 1:16-cr-00205-TDS   Document 498-6   Filed 04/08/19   Page 7 of 29
Case 1:16-cr-00205-TDS   Document 435   Filed 01/07/18   Page 49 of 111
-4316-

```
 1    that the taxes had been paid?  As I said, that sort of
 2    defeats itself to the extent if he paid the taxes or
 3    reported them then it wouldn't be part of the indictment.
 4              MR. MCLELLAN:  Well, Your Honor, the -- the
 5    Defendant is charged -- just -- as far as his individual
 6    income taxes are concerned, the Defendant is charged with
 7    three counts of willful failure to file for -- income tax
 8    returns for three years in a row and the computations -- the
 9    income computations that -- that the Court has before it
10    cover -- the individual income tax computations cover those
11    three years.  Those are years when monies are flowing into
12    the company by means of fraudulently procured loans.  The
13    Defendant is -- is diverting a chunk of that money that
14    ought to have been paid as payroll taxes to his own benefit
15    for yachts and movies and other things that the Court saw in
16    our proofs at trial and that's unreported income over
17    $10,000, Your Honor.
18              THE COURT:  All right, sir.
19         Mr. Wisenberg, anything further?
20              MR. WISENBERG:  Oh, yes, Your Honor.  This is
21    truly a disturbing interpretation of the guidelines.  First
22    of all, there's not a lot of case law on this particular
23    guideline provision; but all the case law that I've found,
24    including the case law cited by the Government, are classic
25    cases of people engaged in illegal activity, deriving
```

Case 1:16-cr-00205-TDS   Document 498-6 Filed 04/08/19 Page 8 of 29
Case 1:16-cr-00415-TDS   Document 498-6 Filed 01/07/19 Page 50 of 141
-4317-

1    income -- they're all income tax cases -- deriving income

2    from that illegal activity and not reporting because to

3    report it would reveal the illegal activity.

4         *Ladum* is no example because it was people who procured

5    their firearms license by falsehoods; and if that had been

6    discovered, their whole operation would have been shut down.

7         *United States versus Ellis* cited by the Government is

8    an embezzlement -- is a pastor embezzling from the church

9    till, close to half a million dollars; and, obviously, if he

10   reported that, his activity would be discovered, if he

11   reported it accurately.

12        *United States versus Parrott*, a classic case of an

13   accountant misappropriating client funds.  He's not -- if he

14   reports that as income and reports it accurately, he is

15   going to reveal his criminal activity.

16        In this case, what's happened -- this is particularly

17   relevant with respect to the last item that Mr. McLellan was

18   talking about, you know:  The Defendant is using this money.

19   It should have been paid over and he's using it to finance

20   his own lifestyle and that's a separate crime.

21        The fact is that most of what or all of what the

22   Government is talking about is stuff that really merges with

23   the offense, that's either a part of the offense or 404(b)

24   type evidence; and the Government is saying after a trial --

25   after a three-week trial, they're going back and cherry

Case 1:16-cr-00205-TDS   Document 498-6   Filed 04/08/19   Page 9 of 29
Case 1:16-cr-00205-TDS   Document 498-6   Filed 04/08/19   Page 51 of 141
-4318-

52

1    picking through the record, without really offering much in
2    the way of proof, and saying, "Oh, that was a crime.  That's
3    state law embezzlement because you're taking stuff from the
4    employee.  Well, that's a crime because you're" -- "That's a
5    separate crime because you're" --
6              THE COURT:  It's a question of whether or not
7    the -- it's the appropriate application of 2T1.1(b)(1)
8    that's at issue here.
9        You cite a lot of cases, but there is a case out of the
10   Southern District of Illinois that would seem to be similar,
11   the *McKinney* case, where the -- there's a spouse who falsely
12   represented she worked for defendant's company to obtain a
13   mortgage loan and the loan proceeds were then taken by the
14   husband.  The husband claimed he shouldn't be charged.  But
15   it seemed to be similar to what's going on here; that the
16   criminal activity was the fraud in getting the loan and then
17   using those proceeds for some purpose other than the
18   mortgage loan.
19             MR. WISENBERG:  But if he had accurately reported
20   it in that case, again, his fraud would have been uncovered.
21   What you have here is -- they're basically saying -- it's
22   part of the crime to be saying, "You took that money.  You
23   didn't pay it over and you used it to fund your own
24   lifestyle."  That merges --
25             THE COURT:  But particularly in terms of the

Case 1:16-cr-00205-WO  Document 483-6  Filed 04/08/19  Page 20 of 28
Case 1:16-cr-00411-YDS  Document 4356  Filed 02/07/23  Page 52 of 111
-4319-

1    Mr. Brooks incident, they created a document in order to

2    induce Greenfield to give money and that money did not go to

3    pay the payroll taxes.

4            MR. WISENBERG:  That -- you're talking about the

5    auditor from the credit company?

6            THE COURT:  Yes,

7            MR. WISENBERG:  Well, what I would say to that,

8    Your Honor, is this is an instance where Your Honor's role

9    to look at preponderance of the evidence becomes very

10   crucial here because, in fact, they didn't -- they can't

11   come in after the fact -- I don't believe they should be

12   able to come in after the fact and say, "Well, look here in

13   the record.  Mr. Brooks testified that he -- he did this at

14   the request of the Defendant and he told that to the

15   factoring company."  That doesn't necessarily establish a

16   bank fraud or a wire fraud.

17       That person -- we know that little one incident, which

18   the Defendant not only contested but presented a photograph

19   that showed he wasn't even there, he was out of town at the

20   time -- but beyond that, beyond that, Your Honor, that's --

21   that would be one element of what might be some kind of a

22   fraud.  That was a person -- there was no interstate

23   transaction.  That was a person on the premises.  It's

24   basically a bad act.

25       They're taking a 404(b) type of bad act and coming in

Case 1:16-cr-00205-WDS  Document 485-6  Filed 04/08/19  Page 53 of 128
Case 1:16-cr-00411-YDS  Document 485-6  Filed 02/07/13  Page 53 of 111
-4320-

1  after the fact and applying the guidelines in a way that's

2  never been applied that I know of and just inherently isn't

3  what this guideline is about.  Otherwise, virtually any

4  fraud, virtually any fraud, tax fraud or any fraud,

5  prosecuted in the U.S. courts you could go in and say,

6  "Well, that -- there's a fraud there.  There's a fraud

7  there."

8       Let me make it clear.  I understand that it doesn't

9  have to be something that was formally charged, but they

10 don't have enough here to come in and apply this guideline,

11 which is a classic guideline meant to prohibit people

12 from -- from hiding assets -- hiding a criminal activity by

13 lying about it on their tax return.  Here, even assuming the

14 testimony is accurate about what happened at the credit

15 agency, it's basically -- even if you accept it, he's

16 already engaged in tax fraud and is trying to keep it

17 happening, so I just don't think it applies here.

18      THE COURT:  Well, Mr. McLellan would tie it more

19 closely to the charges of failing to file individual income

20 tax, which would suggest and did suggest to the Court that

21 any amounts included as a part of what he should have

22 reported were related to this incident as well.

23      MR. WISENBERG:  I would say they haven't -- I

24 would say that's speculative, Your Honor.  What they

25 prosecuted was a tax fraud and this is a little bit of

Case 1:16-cr-00205-WDS  Document 483-6  Filed 04/08/19  Page 12 of 28
Case 1:16-cr-00411-YDS  Document 456  Filed 01/07/13  Page 54 of 111
-4321-

1    404(b) evidence that they threw in; that they're now coming

2    back and saying, without any kind of support -- statistical

3    support, not even as much as they put in on their amount of

4    loss, "Oh, he derived this income from this -- from lying to

5    the factors." When, in fact, if this is something that

6    happened, even if you accept it, well after the alleged tax

7    fraud -- payroll tax fraud was going on, it's just simply --

8    it's continuous. More importantly, it's not how -- it's not

9    right. It's not how this guideline is supposed to work.

10            THE COURT: All right, sir.

11        Anything further, Mr. McLellan, on that point?

12            MR. MCLELLAN: No, Your Honor.

13            THE COURT: The Court will find by a preponderance

14    of the evidence the guideline 2T1.1(b)(1) was appropriately

15    applied in this case based upon the facts that the Court

16    recalls from the trial and particularly the incident

17    relating to the use of a fraudulent document to obtain

18    factoring sums from the Greenfield factoring company. The

19    Court will find it was appropriately applied in this case

20    and will find so based upon a preponderance of the evidence.

21        Mr. McLellan.

22            MR. MCLELLAN: Your Honor, the Defendant has

23    objected to the application of the sophisticated means

24    enhancement at 2T1.1(b)(2).

25        Now, the guidelines give the definition or at least

Case 1:16-cr-00205-WGS   Document 435-6   Filed 04/08/19   Page 13 of 28
Case 1:16-cr-00411-YDS   Document 435-6   Filed 01/07/19   Page 55 of 111
-4322-

give examples of acts by the defendant that constitute
sophisticated means in this context; and examples given are
use of fictitious entities, corporate shells, or offshore
financial accounts.

Now, applying this guideline to the facts of this case,
the Court has before it a wide variety of misconduct on the
part of the Defendant that easily arise to the level of
sophisticated means. As -- as we -- in the *Kontny* case, the
Seventh Circuit case that we cite in our papers, the essence
of sophisticated means is deliberate steps taken to make the
offense difficult to detect.

We have a situation here where, for example, the
Defendant lied to Revenue Officer Peoples -- the Court heard
her testimony -- and gave her a tax ID number, an EIN, to
convince her that he did not own the company anymore and,
essentially, gave her the tax ID of another company that
actually belonged to his mother. And we heard the testimony
of the Defendant's mother who testified that she never
purchased or otherwise acquired any companies in
North Carolina from her son.

And, you know, this is a -- an elaborate ruse on the
part of the Defendant to put the revenue officer off the
track as to whether or not the taxes and the tax obligations
of this company had been -- had been met and, in fact,
succeeded in deceiving the revenue officer. She actually

Case 1:16-cr-00205-WO  Document 486  Filed 04/09/19  Page 56 of 128
Case 1:16-cr-00411-YDS  Document 486  Filed 01/07/19  Page 56 of 111
-4323-

1   closed the case.

2       The -- there's a great deal of elaborate concealment on
3   the part of the Defendant with regard to the companies that
4   we referred to as the Harrison 2.0 companies.  These are the
5   latter counts of conviction, Fifty through Sixty, I believe,
6   where the Defendant actually didn't for most of the term
7   of -- of their operation have his name on these companies as
8   the owner anymore, but he controlled the flow of funds, and
9   he -- he was able to siphon off the payroll taxes and only
10  provide the office staff folks who were trying to meet the
11  payroll with enough to -- to cover only the net payroll.
12  And this is the testimony of -- of Julie Akers and Virginia
13  Linke, and the Court heard that testimony, and the jury
14  convicted on those counts.  Here's the Defendant operating
15  by means of, you know, some other company altogether but
16  controlling the companies with the -- with the -- with the
17  actual employees.

18      And you have the situation where, you know, it gets
19  really complex with regard to the Harrison 2.0 companies,
20  Your Honor.  Mr. Corriher from GrandSouth Bank's testimony
21  is that he's factoring the receivables of certain companies;
22  and these are CMI, CMI of Iowa, and I.H.T. of SC.  These are
23  the companies that actually have the employees out in the
24  field doing the work on the one hand.  They're the companies
25  with the receivables.  That's what's supposed to be being

Case 1:16-cr-00205-WO   Document 486   Filed 04/08/19   Page 57 of 128
Case 1:16-cr-00411-YDS   Document 235   Filed 02/07/13   Page 57 of 111
-4324-

1    factored with GrandSouth Bank.

2         However, the Defendant arranged that factoring so that

3    it's not these three companies being factored but four sham

4    companies whose receivables supposedly are being factoring,

5    but they actually don't have any receivables.  The real

6    companies with the receivables are -- you know, with the

7    employees are out doing the work.  There are four other

8    companies that have no employees and they're the ones that

9    are supposedly having their receivables factored.  I believe

10   the testimony was to the effect that the reason is that the

11   more companies whose receivables you could factor it

12   basically serves to -- to allow more monies to flow into the

13   factoring because there's restrictions on how much an

14   individual company's receivables can be factored.

15        So at this point you have got two levels of complexity.

16   There's the real workers out there doing the work which

17   receivables are being factored.  They're being factored not

18   under the names of the real companies but under these sham

19   companies owned nominally by Defendant's nominees.  And

20   then -- not only do you have that, but you have when the

21   money flows from the factor it doesn't go either to the real

22   companies or to the sham companies.  It goes to yet another

23   company, Global Labor, which is a company that the Defendant

24   controls the bank accounts of.

25        So you've got all manner of layers of concealment here,

Case 1:16-cr-00205-WO   Document 455-6   Filed 04/09/19   Page 36 of 128
Case 1:16-cr-00411-TDS   Document 485-6   Filed 01/07/13   Page 58 of 111
-4325-

59

1  Your Honor, which would certainly rise at that stage to --
2  or amount to sophisticated concealment; and the Court has
3  ample evidence along these lines to -- to find the
4  enhancement.
5          MR. WISENBERG:  May I respond, Your Honor?
6          THE COURT:  Yes, sir, please.
7          MR. WISENBERG:  You can say -- one can say clearly
8  or easily arises to the level all one wants, but there's
9  still the question of the language of the guideline which is
10  crystal clear:  especially complex or especially intricate
11  offense conduct pertaining to execution or concealment of
12  the offense.  It's got to be especially complex, especially
13  intricate and pertain -- and it's got to be offense conduct.
14  It's got to pertain to concealment or execution of the
15  offense.  It has to be unusually sophisticated.  What you
16  have here, as I said earlier, Your Honor, is virtually any
17  fraud crime that you have, including tax fraud, involves at
18  least one or two examples of a cover-up or a lie and that
19  doesn't make it sophisticated means.  No, you don't --
20          THE COURT:  Mr. Wisenberg, you have what exists
21  here from the evidence is an obligation to pay payroll
22  taxes; that the Defendant made arrangements to obtain funds
23  to do that but did not fund the companies so they could pay
24  their payroll taxes.  He did that by means of -- as
25  suggested, of getting the factoring under one name.  The

Case 1:16-cr-00205-WDS   Document 485-6   Filed 04/09/19   Page 57 of 128
Case 1:16-cr-00411-YDS   Document 485-6   Filed 02/07/19   Page 59 of 111
-4326-

```
 1    money didn't go to those companies who it was then factored
 2    for; but the employees, Ms. Akers or Ms. Byrd or whoever was
 3    in charge at the time, had to go to the Defendant to get the
 4    payroll money.  The money was then controlled by him in some
 5    other company.  That's complex at the least in terms of how
 6    you're dealing with the factoring companies of getting money
 7    for people who actually owe the -- or companies that
 8    actually should be paying payroll taxes, but they're not
 9    getting the money in the end.
10              MR. WISENBERG:  Well, may I respond to that, Your
11    Honor?
12              THE COURT:  Yes, sir.
13              MR. WISENBERG:  There was one example of something
14    like that, of testimony about that that Your Honor is
15    talking about at trial with Ms. Byrd.  There was absolutely
16    nothing --
17              THE COURT:  Well, Ms. Akers as well with
18    Compensation Management.
19              MR. WISENBERG:  Same company.  They were both in
20    the conversation.  But there was nothing --
21              THE COURT:  Ms. Byrd got out of it because she
22    didn't want the responsibility to fall on her since she was
23    the named president at the time.
24              MR. WISENBERG:  True, Your Honor, but there was
25    nothing hidden about that relationship.  Everybody knew
```

1  about it.  The banks knew about it.  There was no -- there

2  was no showing that -- and particularly with respect to the

3  various factoring --

4          THE COURT:  Well, the gentleman from GrandSouth

5  certainly became unnerved to the extent that he was aware

6  that money was not going where it was supposed to be and he

7  was also aware that there were more companies out there

8  being factored than he probably -- or the Defendant probably

9  could have taken care of and gotten money from GrandSouth.

10         MR. WISENBERG:  Are you talking about

11 Mr. Corriher?

12         THE COURT:  Yes.

13         MR. WISENBERG:  Mr. Corriher, the business

14 about --

15         THE COURT:  He knew what was going on.

16         MR. WISENBERG:  Mr. Corriher did?

17         THE COURT:  Yes.  That had been arranged by the

18 Defendant.

19         MR. WISENBERG:  Right.  But, again, I believe I

20 heard the Court said he knew it was going on.  This is

21 something that has to be --

22         THE COURT:  Well, he should have been charged.  He

23 was not an indicted codefendant, but there's not any

24 suggestion he shouldn't have been charged, and that's why I

25 said he was perhaps unnerved by the situation.

Case 1:16-cr-00205-WO  Document 483-6  Filed 04/09/19  Page 19 of 28
Case 1:16-cr-00411-TDS  Document 485  Filed 01/07/13  Page 61 of 111
-4328-

1      MR. WISENBERG:  Well, his testimony was that he

2   didn't know about it from what I recall and that's what the

3   questioning was from Mr. Chut about.  But the point is it

4   talks about -- there's no hidden companies.  There's no

5   offshore companies and it's not particularly intricate.

6   Remember, Your Honor, if it's intricate -- it's one thing

7   for it to be intricate.  It's another thing for it to be

8   because you want to get more money, because you want to

9   factor more -- because you want to factor more things.  It

10  has to be intricate with respect to --

11      THE COURT:  Well, there were more presidents of

12  companies that had no business being presidents than I could

13  imagine.  Mr. Brooks was president of a company.  Ms. Byrd,

14  who probably would not have qualified in any sense to be

15  president of a company, was asked to be a president of a

16  company and she realized that she was not suited for that

17  role.

18      MR. WISENBERG:  But, Your Honor, Trevor Jefferson,

19  president of Strategic Insource Solutions, he was a

20  licensee.  Lou Ann Shaw was the president of Integrated

21  Staffing Solutions.  She was a licensee.  Pete Pappas, who

22  testified, president of Higher Alternatives.  They were all

23  licensees and they --

24      THE COURT:  But Mr. Jefferson testified he still

25  had to go to Mr. Harrison for information or assistance and

Case 1:16-cr-00205-WO  Document 483-6  Filed 04/08/19  Page 20 of 28
Case 1:16-cr-00411-YDS  Document 856  Filed 01/07/19  Page 62 of 111
-4329-

1    perhaps other things.  I -- he may have been operating his

2    own company, but he did not separate himself from any

3    obligation he may have owed to Mr. Harrison.

4        MR. WISENBERG:  Well, he had to pay a licensing

5    fee to Mr. Harrison.

6        THE COURT:  It seemed to have been more than that

7    at trial and we're not trying to retry the case now.

8        MR. WISENBERG:  I understand.  But his affidavit

9    makes clear -- and I don't think his trial testimony is

10   inconsistent with this -- that he pays his taxes.  In fact,

11   he said, "You've got to pay.  You've got to withhold and

12   you've got to pay your taxes."  As his affidavit says, he

13   has the arrangement with GrandSouth or with whatever the

14   factoring company is now.  He does all that.  It's his

15   company.  He's not a nominee.  The same thing was said of --

16   the same thing was said by Lou Ann Shaw in testimony.  The

17   same thing is said by Pete Pappas in his affidavit to the

18   Court.

19       The licensee -- there's been no proof by the Government

20   that in general the licensee relationship set up by

21   Mr. Harrison with respect to the 2.0 companies is a sham.

22       THE COURT:  They all had to go back to Global

23   Labor.

24       MR. WISENBERG:  Well, they had to pay a licensing

25   fee to Global Labor, but they're real companies.  They're

Case 1:16-cr-00205-WO  Document 483-6  Filed 04/08/19  Page 21 of 128
Case 1:16-cr-00411-TDS  Document 485  Filed 02/07/19  Page 63 of 111
-4330-

1  real companies that are functioning right now.  Your Honor,
2  they function right now while Mr. Harrison is in prison.
3  Their -- their -- in jail.  Their people are here.  They're
4  functioning real companies.  The Government can say these
5  are nominee persons.  There's absolutely no evidence that
6  Trevor Jefferson, Pete Pappas or Lou Ann Shaw are nominees.
7  They have vibrant businesses right now.
8       That's the problem.  You can't just stand up and say,
9  as the Government does, they're nominees or this is complex.
10  It has got to be a complexity, something really intricate
11  that is related to concealment of the offense or execution
12  of the offense.
13            THE COURT:  All right, sir.
14            MR. WISENBERG:  May I have a moment, Your Honor?
15            THE COURT:  Yes.
16       (Discussion at counsel table.)
17            MR. WISENBERG:  That's all I have, Your Honor.
18            THE COURT:  Yes, sir.
19            MR. MCLELLAN:  Just a brief factual clarification,
20  Your Honor.  The -- Mr. Wisenberg is talking about more
21  recent companies than the Government is talking about in its
22  papers as far as use of nominal owners.  The nominal owners
23  we're talking about are those who controlled -- we're
24  talking about basically Mark Gleason, Joey Medalone, Matthew
25  Medalone, and, as the Court pointed out, Michael Brooks

Case 1:16-cr-00205-WO   Document 485-6   Filed 04/09/19   Page 22 of 128
Case 1:16-cr-00411-TDS   Document 436   Filed 01/07/13   Page 64 of 111
-4331-

1    owning these sham companies during the quarters covered by

2    the indictment, not these more recent entities.

3            THE COURT:  The Court will find by a -- the

4    Government has established by a preponderance of the

5    evidence the appropriate application of sophisticated means

6    based upon especially complex or especially intricate

7    offense conduct arising out of the creation of companies

8    that serve to provide factoring funds that went to the

9    Defendant and not to the companies that were the purpose of

10   the factoring arrangements.

11       Yes, sir.

12           MR. MCLELLAN:  Your Honor, we can now address the

13   role in the offense enhancement.  This is under United

14   States Sentencing Guideline 3B1.1 and this is the -- this is

15   the enhancement that the -- that the Government recommends

16   the Court find at Subsection (a):  "If the defendant was an

17   organizer or leader of a criminal activity that involved

18   five or more participants or was otherwise extensive,

19   increase by 4 levels."

20       And as we explain in our papers -- and I'll briefly

21   recap, Your Honor -- this -- this misconduct by the

22   Defendant was both.  It did involve five or more

23   participants and it certainly qualifies as otherwise

24   extensive.

25       The -- the first example of a participant, as has

Case 1:16-cr-00205-WDS  Document 485-6  Filed 04/08/19  Page 83 of 128
Case 1:16-cr-00411-YDS  Document 286  Filed 02/07/19  Page 65 of 111
-4332-

1  already been discussed in these proceedings here today, is

2  Michael Brooks who's forging documents for the Defendant to

3  procure the funding.

4      The Court has also observed just recently that

5  Mr. Corriher knowingly arranging funding for these companies

6  knowing, as he admitted in his own testimony, that the --

7  that the payroll tax obligations were not being met.  It's

8  another example of a participant.

9      The -- these individuals that I just -- that I just

10 mentioned, they're reflected in the evidence at the trial.

11     Mark Gleason, the Medalone brothers, these are straw

12 owners of companies that have no employees but nevertheless

13 filled in the paperwork and getting the funding as though

14 they had businesses with some kind of an income to factor.

15 Again, these are examples of participants.

16     So adding these -- adding these individuals together,

17 the Court could find that this -- and should find that

18 this -- the Defendant was an organizer or leader of a

19 criminal activity that involved five or more participants.

20     Now, the Court can also find that this misconduct was

21 "otherwise extensive."  Now, given the long duration and the

22 vast scope of the misconduct, you know, spanning years

23 and -- and a large number of companies, huge amounts of

24 money, Your Honor, if there is anything that was an

25 "otherwise extensive" criminal conduct, you know, this is an

Case 1:16-cr-00205-WO   Document 485-6   Filed 04/08/19   Page 34 of 128
Case 1:16-cr-00411-TDS   Document 35-6   Filed 01/07/13   Page 66 of 111
-4333-

1    example of it.

2        The Defendant has mentioned that in order for this

3    guideline to apply or for this enhancement to apply that the

4    Court has to find there's at least one participant.  If

5    nothing else, Your Honor, we've got the examples of Michael

6    Brooks and Mr. Corriher, which are quite clear, and easily

7    qualify the Defendant for the application of the enhancement

8    at Subpart (a), which results in a four-level increase.

9            THE COURT:  Mr. Wisenberg.

10           MR. WISENBERG:  Your Honor, what the Government

11   has to prove here is that Mr. Harrison was an organizer or

12   leader and that at least one other person is culpable for

13   the offense of conviction, the offense of conviction.

14       Now, they didn't try this case -- all the people

15   they're talking about now, they didn't try this case as a

16   conspiracy.  They didn't try this case and say to the jury

17   these people aided and abetted Mr. Harrison.  There are some

18   instances, one -- there's an instance -- Mr. Brooks is the

19   incident that the Government has referred to repeatedly

20   where Mr. Brooks testified that "We made a false statement

21   to an auditor," not from the IRS but an auditor from a

22   factoring company, "at the behest of Mr. Harrison."  We

23   disputed that.  We understand Your Honor is free to believe

24   the Government's witness on that.

25       But the Government's theory at trial, clearly theory at

Case 1:16-cr-00205-WO   Document 485-6   Filed 04/08/19   Page 25 of 128
Case 1:16-cr-00411-YDS   Document 485-6   Filed 02/07/13   Page 67 of 111
-4334-

1    trial, was that Mr. Harrison acted alone.  In fact, they

2    made a big point of that.  They made a big point about the

3    fact that some of the employees for Mr. Harrison, such as

4    Ms. Byrd and Ms. Akers, tried to get him to pay taxes and he

5    didn't do it.  The fact that a bank officer -- well, in

6    fact, Mr. Corriher testified that he didn't know there was a

7    violation of the loan-to-one-borrower rule.

8        But the fact that somebody does something that is

9    essentially 404(b) evidence is not the same -- or even a bad

10   act is not the same thing as saying that somebody knew about

11   the offense of conviction and -- and aided it, essentially

12   is an aider and abettor.  That's what's required.  You have

13   to do that before you can get and -- say there's

14   extensive -- there's extensive participation.  That's our

15   position.

16           THE COURT:  All right, sir.

17       Anything further?

18           MR. MCLELLAN:  Just briefly, Your Honor.  The

19   definition of a participant under the guidelines is a person

20   who is criminally responsible for the commission of the

21   offense but need not have been convicted.  There's no

22   necessity for these people to even have been charged under

23   Fourth Circuit precedent and we cite the case of *United*

24   *States versus Turner*, the 1996 Fourth Circuit case.  So

25   there's no requirement of any conspiracy being charged or

Case 1:16-cr-00205-WO  Document 485-6  Filed 04/08/19  Page 86 of 128
Case 1:16-cr-00411-YDS  Document 456  Filed 01/07/13  Page 68 of 111
-4335-

1  any other charges being -- being brought against the people

2  who are considered by the Court to have been a participant

3  for purposes of the imposition of this enhancement, Your

4  Honor.

5          MR. WISENBERG:  May I briefly respond, Your Honor?

6          THE COURT:  Briefly, yes, sir.

7          MR. WISENBERG:  Yes, you don't have to be -- you

8  don't have to be charged; but, again, you have to be --

9  there has to be evidence that you're guilty of the offense

10 of conviction, not a particular 404(b) bad act.

11         THE COURT:  With respect to the objection, the

12 Court will sustain the objection as to any enhancement

13 beyond the two-point level -- offense level for the specific

14 offense characteristics under 2T1 point -- excuse me.  This

15 is under 3B1.1(c).  The Court will not apply a four-level

16 enhancement.

17     The only evidence the Court finds to be credible by a

18 preponderance of the evidence of another participant was

19 that of Mr. Michael Brooks to the extent that he prepared a

20 fraudulent document to be used in obtaining funds that were

21 for payroll purposes.  To that extent, the Court finds that

22 it is appropriately applied under 3B1.1(c) that Defendant

23 was an organizer, leader, manager, supervisor in any

24 criminal activity.  Mr. Brooks testified that he made the

25 fraudulent document at the direction of the Defendant.

Case 1:16-cr-00205-WO   Document 483-6   Filed 04/08/19   Page 87 of 128
Case 1:16-cr-00411-TDS   Document 235   Filed 02/07/19   Page 69 of 111
-4336-

1    Only two points will be applied.  The Court will deny

2    the Government's request for a four-level enhancement.

3        Anything further?

4        MR. MCLELLAN:  Your Honor, as to the obstruction

5    enhancement, the Defendant has interposed an objection in

6    that connection and I'd just like to briefly address that.

7    This is under United States Sentencing Guideline Section

8    3C1.1.

9        As the Court already noted in its -- its memorandum

10   having to do with denying bail for the Defendant on January

11   the 31st, 2012, the Defendant presented false testimony at

12   the trial.  Now, we've pointed out in our papers that the

13   Defendant also lied when he claimed on his direct exam and

14   also on cross-examination that he mailed the 2004 and the

15   2005 and the 2006 individual income tax returns.  The IRS

16   records show that those returns were never received by the

17   Internal Revenue Service and the jury convicted the

18   Defendant on each of those counts.  Therefore, they

19   necessarily did not credit and found false his

20   representations that he had actually mailed those returns.

21   If he had mailed them, if the jury had credited it,

22   certainly they would not have convicted him of willfully

23   failing to file.  It's simply not credible.

24       Now, the Defendant necessarily proffered falsehoods in

25   this case in order to convince the Court to appoint counsel

Case 1:16-cr-00205-WO  Document 48-6  Filed 04/08/19  Page 28 of 28
Case 1:16-cr-00411-YDS  Document 435  Filed 02/07/19  Page 70 of 111
-4337-

# **<u>EXHIBIT H</u>**

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

**SUBPOENA TO TESTIFY BEFORE A GRAND JURY**

To:  Shannon Drake, Account Executive
GrandSouth Bank
381 Halton Road
Greenville, SC 29607

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: | U.S. Courthouse L. Richardson Preyer Bldg. 324 West Market Street Greensboro, North Carolina | Date and Time: | Grand Jury Room Second Floor 9:30 a.m. September 24, 2012 |
|---|---|---|---|

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

> If you have any questions regarding this subpoena please contact Frank J. Chut, Jr., Assistant United States Attorney, collect at (336)333-5351, upon receipt of this subpoena. The date of your appearance WILL change. To avoid any inconvenience to you, please call Frank J. Chut, Jr., Assistant United States Attorney, collect at (336)333-5351 upon receipt of this subpoena to advise the telephone numbers and addresses, home and work, where you can be reached. Also, call the day before your scheduled appearance to confirm that you are still required to appear. Please Dress Appropriately For Your Court Appearance. No Cell Phones Permitted in the Court House Building.

Date:  September 11, 2012  _____

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena are:

FRANK J. CHUT, JR., Asst. U.S. Attorney
Middle District of North Carolina
P. O. Box 1858
Greensboro, NC   27402 336/333-5351

c/d 2012R00124-16
(SA Blackerby)

Case 1:16-cr-00205-WO   Document 298-1   Filed 04/09/19   Page 2 of 6
Case 1:16-cr-00205-WO   Document 298-1   Filed 04/12/18   Page 2 of 60
**-4339-**

AO 110 (Rev. 06/09) Subpoena to Testify Before Grand Jury (Page 2)

## PROOF OF SERVICE

This subpoena for *(name of individual or organization)* Shannon Drake
was received by me on *(date)* September 11, 2012

☑ I served the subpoena by delivering a copy to the named person as follows: hand delivered
2 GrandSouth Bank, 381 Helton Road
Greenville, SC                              on *(date)* September 12, 2012

☐ I returned the subpoena unexecuted because:

I declare under penalty of perjury that this information is true.

Date: September 12, 2012

                    Mary C. Blackerby
                              *Server's signature*

                    Mary C. Blackerby, Special Agent, IRS-CI
                              *Printed name and title*
                    4905 Koger Blvd, Mail Stop 3
                    Greensboro, NC 27407
                              *Server's address*

Additional information regarding attempted service, etc:

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
## for the
### Middle District of North Carolina

GrandSouth Bank **SUBPOENA TO TESTIFY BEFORE A GRAND JURY**
Attn: Legal Order Processing
381 Halton Road
Greenville, SC 29607
To:

     **YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place:U.S. Courthouse | Date and Time: | Grand Jury Room |
|---|---|---|
|    L. Richardson Preyer Bldg. | | Second Floor |
|    324 West Market Street | | September 24, 2012 |

     You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

     Please see attached.

     If you have any questions regarding this subpoena please contact Frank J. Chut, Jr., Assistant United States Attorney, collect at (336) 333-5381, upon receipt of this subpoena.

Date: _____
     September 11, 2012

                       *CLERK OF COURT*

                             *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the United States attorney, or assistant United States attorney, who requests this subpoena, are:

FRANK J. CHUT, JR., Asst. U.S. Attorney
Middle District of North Carolina
P. O. Box 1858
Greensboro, NC 27402 336/333-5351

c/d 2012R00124-18
(SA Blackerby)

AO 110 (Rev. 06/09) Subpoena to Testify Before Grand Jury (Page 2)

**PROOF OF SERVICE**

This subpoena for *(name of individual or organization)* Grand South Bank
was received by me on *(date)* September 11, 2012

☑ I served the subpoena by delivering a copy to the named person as follows: hand delivered to
David Burgess, Sr. Vice President @ Grand South Bank, 381 Halton Road
Greenville, SC _____ on *(date)* September 12, 2012

☐ I returned the subpoena unexecuted because: _____

I declare under penalty of perjury that this information is true.

Date: September 12, 2012

Mary C. Blackerly
*Server's signature*

Mary C. Blackerby, Special Agent, IRS-CI
*Printed name and title*
4905 Koger Blvd, Mail Stop 3
Greensboro, NC 27407
*Server's address*

Additional information regarding attempted service, etc:

Case 1:16-cr-00205-WO   Document 203-7   Filed 02/12/18   Page 5 of 60
Case 1:16-cr-00205-WO   Document 202-1   Filed 02/12/18   Page 5 of 60
-4342-

## ATTACHMENT TO GRAND JURY SUBPOENA
### (GrandSouth Bank)

**Global Labor, Inc.**
**307 S. Swing Road**
**Greensboro, NC**

**Integrated Staffing Solutions, Inc.**
**Temporary Personnel Solutions, LLC**
**Innovative Hiring, LLC**
**Hire Alternatives, LLC**
**Administrative Alternatives, LLC**
**Strategic Insource Solutions, Inc.**
**Brooks Labor**
**Medaloni Inc.**
**Medaloni of South Carolina**
**North Carolina Global Investments**
**Green Ideas N Motion**

Please provide the following:

1. Correspondence related to the above named entities including but not limited to all documentation to establish factoring agreements; copies of factoring agreements; factoring applications; license agreements between Global Labor and the licensees; invoices; loan memorandums; all tax related documents, including tax returns; financial information submitted by the licensees and owner(s)/manager(s) of each entity; and statements and payments to the above named entities;

2. Personnel file for Douglas A. Corriher, Vice President, including application for employment (and any attachments to the application such as resume, records of all interviews, and reference checks, etc); job title; job duties; records used to determine qualifications for promotion, commendation, compensation, or disciplinary action (documentation of any verbal and written reprimands/warnings or termination); wage or salary history; authorization for a deduction or withholding of pay; performance and general employment history (job descriptions, performance evaluations/appraisals and the employee's responses to the same; correspondence between the employee and supervisor(s); fringe benefits; leave and attendance records; retirement records; and information relating to any investigations or any potential legal or regulatory violations by the employee;

3. All emails between Douglas Corriher Vickie Montgomery, Shannon Drake, and Bruce Gregory Harrison, GHarrison@live.com, Julie Akers, Pete Koch, and Juraj Slovak regarding the above named entities;

4. Email correspondence with the owner(s)/manager(s) for each of the above named entities including Trevor Jefferson, Mark Gleason, Pete Pappas, Lou Ann Shaw, Joey Medaloni, Matthew Medaloni, Mike Brooks, and Randy Howell;

5. All documentation provided to state banking regulators and the FDIC regarding the above named entities and factoring agreements;

6.  All records produced for BHC Interim Funding II, LP Case No. 11CVS6696 filed in the North Carolina Business Court.

RECORD FORMAT: In addition to hard copies, records are requested in the form of magnetic media. Data may be provided in 3 ½ inch diskette, 8mm tape, or 9 track tape, in ASCII delimited format. A record layout for the data is also requested.

2

Case 1:16-cr-00205-WO   Document 202-1   Filed 04/09/19   Page 7 of 60
Case 1:16-cr-00205-WO   Document 202-1   Filed 04/09/18   Page 7 of 60
-4344-

# <u>EXHIBIT I</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA      *
                              *  Case No. 1:10CR411-1
vs.                           *
                              *  Winston-Salem, North Carolina
BRUCE GREGORY HARRISON, III,*   November 30, 2011
                              *  9:30 a.m.
            Defendant.    *
******************************

## VOLUME 3 OF 12
### TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JAMES A. BEATY, JR.,
UNITED STATES CHIEF DISTRICT JUDGE, and a jury.


APPEARANCES:

For the Government:       FRANK J. CHUT, JR., ESQUIRE
                          TERRI-LEI O'MALLEY, ESQUIRE
                          Assistant United States Attorney
                          Post Office Box 1858
                          Greensboro, North Carolina 27402


                          JEFFREY A. MCLELLAN, ESQUIRE
                          U.S. Department of Justice
                          Post Office Box 972
                          Washington, DC 20044


For the Defendant:        THOMAS N. COCHRAN, ESQUIRE
                          Assistant Federal Public Defender
                          301 North Elm Street, Suite 410
                          Greensboro, North Carolina 27401


Court Reporter:           Lori Russell, RMR, CRR
                          P.O. Box 20593
                          Winston-Salem, North Carolina 27120


Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

Case 1:16-cr-00205-WO   Document 498-9   Filed 04/08/19   Page 2 of 4
Case 1:10-cr-00411-TDS   Document 93   Filed 04/25/12   Page 2 of 183
-4346-

```
 1    Q.    Now, initially who was the funding company at CMI?
 2    A.    It was US Funding.
 3    Q.    And at some point did that change to a different
 4    company?
 5    A.    Yes, it did.
 6    Q.    And what company was that?
 7    A.    GrandSouth Bank.
 8    Q.    Now, when it was US Funding, who was this report sent
 9    to?  Was it sent to the funding company?
10    A.    It was sent to the funding company, yes.  I think
11    her -- I -- I'm forgetting her name.  I'm sorry.
12    Q.    You are thinking about someone at the funding company?
13    A.    I'm sorry.  Yes, I was thinking of her name and I,
14    unfortunately, can't remember.
15    Q.    Now, did that system change when GrandSouth became
16    involved?
17    A.    Yes, it did.
18    Q.    And how did that system change?
19    A.    When GrandSouth became involved, instead of sending
20    over one set of invoices to US Funding we were now
21    separating it into five different companies.
22    Q.    And who were you sending the reports to?
23    A.    We were sending it to Shannon and Doug at GrandSouth
24    Bank.
25    Q.    And what would be the procedure for accessing funds
```

Case 1:16-cr-00205-WG    Document 493-9    Filed 04/08/19    Page 3 of 4
Case 1:16-cr-00411-TDS    Document 93-3    Filed 04/23/12    Page 34 of 158
**-4347-**

LINKE – DIRECT

35

1   from GrandSouth Bank?

2   A.   They would send the funds to Global Labor and we would

3   have to ask for funds to obtain -- to pay payroll.

4   Q.   And who would be asked?

5           MR. COCHRAN:  Objection.

6           THE COURT:  Overruled.

7   A.   Greg Harrison.

8           MR. COCHRAN:  Your Honor, if I could approach.

9           THE COURT:  Yes, sir.

10      (The following bench conference was recorded.)

11          MR. COCHRAN:  Your Honor, the line of questioning

12  for Ms. Linke regarding who was doing the funding calls

13  for --

14          THE COURT:  She's -- she's doing the work.  If

15  you're asking, "Do you -- were you asking Mr. Harrison or

16  was somebody else asking?" that may be different.  We've

17  heard enough about what's going on to know that that's what

18  took place.

19          MR. COCHRAN:  I understand, Your Honor, but it's

20  calling for hearsay on her part.  She is finding this

21  information out from somebody else.

22          THE COURT:  If she's not the person to ask it --

23  you should ask if she was the person.  If not, then I'll

24  sustain the objection.

25          MR. COCHRAN:  Yes, sir.

Case 1:16-cr-00205-WO   Document 493-8   Filed 04/08/19   Page 4 of 8
Case 1:16-cr-00411-TDS   Document 93-3   Filed 04/23/22   Page 35 of 163
-4348-

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | |
| **vs.** | **CASE NO. 1:16-CR-205-2-WO** |
| **SHANNON MICHELLE DRAKE** | |
| **Defendant.** | |

### REQUEST FOR DISCOVERY REGARDING APPLICATION FOR ATTORNEYS' FEES AND EXPENSES PURSUANT TO THE HYDE AMENDMENT, TITLE VI, SECTION 617, PUB L. 105-119, 111 STAT. 2519; TITLE 18, U.S. CODE, SECTION 3006(A)

Defendant Shannon Drake ("Ms. Drake"), hereby requests that the Government answer fully and separately, in writing and under oath, the following Interrogatories and Requests for Production of Documents (collectively, "Requests") within thirty (30) days from the date of service or such other date as agreed to between the parties or established by court order.

### INSTRUCTIONS

The Government's responses to Defendants' Requests should include all information, knowledge, or belief available to the Government (Assistant U.S. Attorneys or other staff) or any, investigators (including all federal agents), consultants, agents, or other representatives acting on its behalf.  Please respond in accordance with the following instructions:

1.    **Claims of Privilege and Exception to Discovery**.  If any claim of privilege is asserted, in whole or in part, with respect to any Request, or if you refuse to disclose any information or documents requested herein, in whole or in part, based on any claim of privilege or immunity, please provide with your production a written log containing the following information as to each document: the date, author, and type of document; the names and job titles of the persons to whom the document was sent,

distributed or shown; a summary of the content of the document and the number of pages of the document; and a detailed description of the grounds for the claim of privilege.

2.     **Destroyed Documents**. In the event that a document called for by these Requests has been destroyed or misplaced, the response hereto shall identify for each document: (i) its author; (ii) its addressor; (iii) its addressee(s); (iv) each recipient thereof; (v) each person to whom it was distributed or shown; (vi) the date prepared; (vii) the date transmitted; (viii) the date received; (ix) the manner of its destruction; (x) the date of its destruction; (xi) the name, title and address of the person authorizing its destruction; (xii) the name, title and address of the person destroying the document; and (xiii) a description of the efforts to locate the document and copies of it.

3.     **Continuing Nature**. These Requests are intended to be and shall be answered or responded to fully as of the date of response and shall be deemed to be continuing thereafter until the conclusion of this matter. If Plaintiff should subsequently acquire any further responsive information or documents called for by these Requests, Plaintiff should promptly furnish such information or documents to the undersigned counsel.

4.     **Answer to the Fullest Extent Possible**. If any of the following Requests cannot be answered in full, please answer it to the fullest extent possible, explaining why you cannot answer the remainder of the Request, and stating any information or knowledge which you have concerning the unanswered portion. Where an individual Request calls for an answer that involves more than one part, answers to each part of the Request should be clearly set so as to be understandable.

5.     **Objections**. If the Government has a good-faith objection to any of these Requests, or any part thereof, the specific nature of the objection and whether it applies to the entire Request or to a certain portion thereof shall be clearly stated. If there is an objection to any part of a Request, then the part(s) objected to should be indicated and information responsive to the remaining unobjectionable parts should be provided.

6.     **Language**. The use of the singular form of any word includes the plural and vice versa. Reference to one gender includes the other gender. The word "all" means any and all. The word "including" means "including without limitation."

### Definitions

1.     "**Communication**."  The word "communication" is used herein to refer to any transmission or exchange of information, whether orally, electronically, or in writing, including without limitation, any conversations, memoranda, telephone calls, facsimiles, e-mails, text messages, or any other mediums of transmission.

2

2. **"Describe," "description," "summarize," or "summary."** The words "describe," "description," "summarize," and "summary," when used with respect to any act, negotiation, practice, process, occurrence, occasion, transaction, incident, or course of conduct means to provide the following information: (i) the time and place thereof; (ii) a chronological account setting forth each element thereof, what such element consisted of, and what transpired as a result thereof; and (iii) the identity of each person involved.

3. **"Document" or "Documents."** The words "document" and "documents" are used herein in the most comprehensive and inclusive sense permitted (as an example, defined by Rule 34 of the North Carolina Rules of Civil Procedure) and therefore include, but are not limited to, all forms of recorded information in your actual and constructive possession, custody, and control, whether handwritten, typed, printed, recorded, or stored on computer or personal storage devices, diskettes, videotapes, audio tapes, or photographic film, as well as electronically stored in formation and data compilations. The terms "document" and "documents" also include any drafts or versions thereof, and all copies on which any mark, alteration, writing, attachment, or any other change from the original appears. By way of example and not limitation, the terms "document" and "documents" include: letters, correspondence, memoranda, email and other "ESI" and electronic communications such as text messages and posts, comments, and direct messages on social media, voicemail recordings, facsimile or telefax transmissions, film or photographic prints, video and audio recordings, drawings, charts, telephone logs, diary, journal, calendar, invoices, financial reports, word processing files, PowerPoint files, spreadsheets, images, metadata, programs, databases, and data compilations.

4. **"Identify."** The word "identify," when used with respect to a document, shall mean to state with respect thereto, to the extent known: (i) the name or title; (ii) the nature and substance of the document with sufficient particularity to enable it to be identified; (iii) the date of preparation; (iv) the author(s), addressee(s), and recipient(s). When used with respect to a person, the word "identify" shall mean to state with respect thereto, to the extent known: (i) his or her name; (ii) if a natural person, his or her last-known residential, telephone number, and email address; and (iii) if a business organization, its last-known complete address and telephone number. With respect to a communication, the word "identify" shall mean to state with respect thereto, to the extent known: (i) the date and place thereof; (ii) the type of communication (e.g., in-person conversation, email, letter, telephone conversation, text messages); (iii) the name, business address, job title, and responsibilities of each person who participated therein, or witnessed or heard any part thereof; (iv) the substance of what was said by each person who participated therein; and (v) the identity of all documents relating thereto.

5. **"Indictment."** The word "indictment" is used herein to refer to the criminal action in which these Requests have been served, United States v. Shannon Drake *et al.*, United States District Court in the Middle District of North Carolina, Docket

3

No. 1:16CR205 as well as the grand jury proceedings related to the indictments. The term **"Indictment,"** as used herein, refers to all of the indictments (including superseding indictments) filed by the Government in the above-captioned action on June 28, 2016, November 29, 2016, June 27, 2017, and August 29, 2017.

6.      **"People" and "person."** The words "people" and "person" shall include natural persons, proprietorships, corporations, public corporations, municipal corporations, state governments, local governments, governmental agencies, political subdivisions, partnerships, groups, associations, and other business and public organizations.

7.      **"Produce."** In answering each Request, produce all responsive documents in your possession, custody, or control or in the possession, custody, or control of your investigators, consultants, agents, and representatives, including without limitation all former and current counsel.

8.      **"Relate," "relating," "relating to," and related to."** The terms "relate," "relating," "relating to," and "related to" mean referring to, commenting upon, describing, analyzing, studying, reflecting, or otherwise discussing in any way a subject matter identified in the Request, and is defined so as to reach all matters within the scope of discovery (using as a model the North Carolina Rules of Civil Procedure), including all information which, though inadmissible at trial, is reasonably calculated to lead to the discovery of admissible evidence.

9.      **"You" and "your."** The words "you" and "your" collectively refer to the Government and any other person or persons acting for or purportedly acting on the Government's behalf, including but not limited to members of the U.S. Attorney's office in the Middle District of North Carolina or members in the office of the Department of Justice, IRS Division.

10.     **"With particularity" and "with specificity."** These terms, include providing (i) time, place, and content, (ii) identity of the relevant person(s), (iii) what was obtained by you as a result or what otherwise resulted from the act involved in the Request (consistent with the North Carolina Rules of Civil Procedure.)

11.     **"Social Media"** means any Internet-based program or application used for the purposes of content sharing, public networking, or otherwise communicating with others. This includes but is not limited to Facebook, Instagram, Twitter, SnapChat, Vero, Vimeo, Vine, WhatsApp, YouTube, blog post and any other internet-based program or application.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendants request that the Government produce for inspection and copying the following designated documents in its possession, custody, and control at the offices of Womble Bond Dickinson (US) LLP, One Wells Fargo Center, Suite 3500, 301 South College Street, Charlotte, North Carolina 28202, Attention: Claire J. Rauscher and Allen T. O'Rourke.

1.      Produce any documents referenced in, relied upon or related to the drafting of the indictments regarding Ms. Drake.

2.      Produce the transcript of the prosecutor's legal charge and other statements made to the Grand Jury related to each indictment against Shannon Drake [an appropriate protective order can be drafted and filed, if necessary.]

3.      Produce the Presentence Investigation Report of Douglas Corriher (as referenced by the Government in Doc. No. 408 at 7-8), any written objections thereto and related responses submitted by Mr. Corriher or by the Government, and any sentencing memorandum and related pleadings submitted by Mr. Corriher prior to his sentencing.

4.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the representation of Ms. Drake by Smith Moore Leatherwood LLP and any related conflict of interest.

5.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to whether to, when to, and why to treat Ms. Drake as a "target" or "subject" during the grand jury investigation.

6.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to whether, how, and why to charge Ms. Drake in each of the four indictments.

7.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to whether, how, and why to continue prosecuting Ms. Drake from indictment through trial, including the Rule 29 hearing.

8.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of

5

any kind, whether in hard copy or electronic storage, related to any theory of guilt regarding the prosecution of Ms. Drake, including but not limited to the significance of "nominee lending," the idea of a "nominee lending scheme," consideration of Ms. Drake as a "bank officer" or mere employee, and willful blindness as applied to Ms. Drake.

9.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to Douglas Corriher's disclosure of information to the Government (directly or through counsel) relevant to Ms. Drake's guilt or innocence.   All statements made by Douglas Corriher should be identified with specificity.

10.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the refusal, failure, or reluctance of Mr. Corriher to disclose inculpatory information about Ms. Drake in response to any inquiry or request by the Government (directly or through counsel).  All statements made by Douglas Corriher should be identified with specificity. All statements made by Douglas Corriher should be identified with specificity.

11.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to any inculpatory evidence provided by Mr. Corriher about Ms. Drake in response to any inquiry or request by the Government (directly or through counsel).

12.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the trial testimony, trial preparation and anticipated testimony  of Douglas Corriher relating to Ms. Drake.

13.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the credibility of Cheryl Gustavson as a witness against Ms. Drake.

14.      Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the decision of whether or not to call Cheryl Gustavson to testify at trial.

6

15.     Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the decision to continue the prosecution of Ms. Drake while no longer relying on the testimony of Cheryl Gustavson.

16.     Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the credibility of Yolanda Martese Simpson as a witness against Ms. Drake.

17.     Produce all documents, notes, communications, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to the decision of whether or not to call Yolanda Martese Simpson to testify at trial.

18.     Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to and the decision to continue the prosecution of Ms. Drake while no longer relying on the testimony of Yolanda Martese Simpson.

19.     Produce all documents, communications, notes, emails (including sent, received, and draft messages), text messages, voice messages, and any other records of any kind, whether in hard copy or electronic storage, related to any discussions regarding dismissing the prosecution of Ms. Drake before or during trial.

20.     Identify all persons and personnel in the U.S. Attorney's office for the Middle District of North Carolina, all personnel in the U.S. Department of Justice, including personnel of the Tax Division, and all federal law enforcement agents who were involved in the prosecution of Ms. Drake.

21.     Identify and produce all social media, including press releases that were issued by the Department of Justice or any federal agency regarding the indictments of Ms. Drake.

## <u>INTERROGATORIES</u>

1.     Identify with specificity--by name, address, and telephone number, all persons, who were involved in the decision to indict and maintain the prosecution Ms. Drake.

**<u>RESPONSE:</u>**

2.     Describe the nature and content of any communications with those involved in the decision to indict and maintain the prosecution of Ms. Drake beginning from the summer of 2012 until the second superseding indictment filed on June 27, 2017.  Please identify each person involved in such communication with specificity.

**<u>RESPONSE:</u>**

3.     Identify with specificity--by name all persons who were involved in a discussion of whether or not to call Cheryl Gustavson at trial.

**<u>RESPONSE:</u>**

4.     Describe the nature and content of any communication with the government and federal agents regarding the affirmative decision not to call Cheryl Gustavson.

**<u>RESPONSE:</u>**

5.     Identify by name those who made the decision that Cheryl Gustavson not be called at trial.

**<u>RESPONSE:</u>**

8

6.     Describe the nature and content of any communications with among the government attorneys and agents regarding whether or not to call Yolanda Martese Simpson at trial.

**RESPONSE:**


7.     Identify by name those who were involved in the decision made not to call Yolanda Martese Simpson at trial.

**RESPONSE:**


8.     Identify by name anyone who raised questions or concerns about indicting or prosecuting Ms. Drake.

**RESPONSE:**


9.     Identify by name any one who raised questions or concerns about continuing to prosecute Ms. Drake before or during trial.

**RESPONSE:**

Respectfully submitted:

s/*Claire J. Rauscher*
Claire J. Rauscher
Allen T. O'Rourke
Womble Bond Dickinson LLP (US)
One Wells Fargo Center, Ste. 3500
301 S. College St.
Charlotte, NC 28202
(704) 331-4900
Fax: (704) 338-7811
Counsel for Defendant Drake

9

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing through the electronic service function of the Court's electronic filing system, as follows:

Frank Joseph Chut, Jr.
Assistant United States Attorney
Matthew Martins
U.S. Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401

Will Montague
US Department of Justice
601 D St., NW, 7th Floor
Washington, DC 20004

Jeffrey A. McLellan
US Department of Justice
Trial Attorney, Tax Division
POB 972
Washington, DC 20044

Claire J. Rauscher
Counsel for Shannon Drake

Date: May 14, 2019

10

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO: 1:16-CR-205

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>SHANNON MICHELLE DRAKE,<br><br>     Defendant. | REPLY TO THE GOVERNMENT'S OPPOSITION TO SHANNON DRAKE'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES UNDER THE HYDE AMENDMENT |

COMES NOW Claire J. Rauscher and Allen T. O'Rourke, attorneys for Shannon Michelle Drake, and respectfully submit this Reply to the Government's Opposition (Doc. No. 515) to her Application for Attorneys' Fees and Expenses Under the Hyde Amendment (Doc. Nos. 485 and 493).

### A. Legal Standard and Discovery

Under the Hyde Amendment, the court in a criminal case may award a prevailing defendant "a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust." 18 U.S.C.A. § 3006A. The Fourth Circuit has explained the standard this way:

> By its plain language, vexatious means "'without reasonable or probable cause or excuse.'" *[United States v.] Gilbert*, 198 F.3d [1293,] 1298–99 [(11th Cir. 1999)] (quoting Black's Law Dictionary 1559 (7th ed.1999)). A frivolous action is "'groundless ... with little prospect of success; often brought to embarrass or annoy the defendant.'" *Id.* (quoting Black's Law Dictionary 668 (6th Ed.1990)). And, bad faith "'is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will.'" *Id.*

(quoting Black's Law Dictionary 139 (6th ed.1990)).  To prevail under the Hyde Amendment, "a lot more is required ... than a showing that the defendant prevailed at the pre-trial, trial, or appellate stages of the prosecution." *Id.*  "Unsupported assertions in a brief cannot substitute for evidence in the record." *Id.* at 1305 (internal quotation marks omitted) …. Consequently, the Hyde Amendment "places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges." *Gilbert*, 198 F.3d at 1302–03.

*In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000).

Here, the "daunting obstacle" language referenced by the Government refers not to the degree of impropriety but rather to the need for evidence in the record rather than mere unsupported assertions about the prosecution.  We do point out specific evidence in support of our application, such as the exhibits attached, and also specific evidentiary gaps in the trial and investigatory record.  These are more than sufficient to carry the burden under the unique circumstances of this prosecution.

Notably, the Government continues to be the gatekeeper for additional evidence concerning the manner of their prosecution.  Pre-trial requests that would have uncovered such evidence were largely rebuffed, but details emerged over the course of litigation. Now we have made further discovery requests material to our Hyde Amendment application.  We respectfully request to be allowed to supplement the record in the future after discovery is completed.

### B.  Unanswered Frivolousness

In their opposition, as in the trial, the Government focuses almost entirely on their evidence that Ms. Drake knew or should have known that the Harrison 2.0 accounts were in fact controlled by Mr. Harrison.  The evidence highlighted on pages 11 to 19 of their

2

response all goes to that inference – namely, her awareness of the Harrison 1.0 accounts belonging to Mr. Harrison, her email correspondence with Kathy Miller mentioning Mr. Harrison, the wire request form which Mr. Corriher created, and the depositing of funds among Harrison 2.0 accounts. (*See* Doc. No. 515 at 11-19.)

Since they consider Mr. Harrison's role to be contrary to how the Harrison 2.0 loans were recorded on the bank's books, the Government also wishes to draw the further inference that "Drake knew that the Harrison arrangement was a sham and that Drake intended to conceal that sham arrangement ..." (Doc. No. 515 at 10-11).  But that is a *non sequitur* from the evidence cited.  To make that inference, you also need evidence that Ms. Drake knew how the loans were recorded on the bank's books.  The Government has not cited such evidence, they did not present such evidence during trial, and by all accounts they never had that evidence.  Instead, the Government has just made that assumption about Ms. Drake throughout this case.  In doing so, the Government prosecuted Ms. Drake frivolously and vexatiously.  The case against her was based not on reasonable grounds or excuse but on false assumptions.

To put this another way, and as explained in our Rule 29 motion (*see* Doc. No. 470 at 2-3 and oral argument thereon, incorporated by reference), the Government needed to prove four key points to establish the *mens rea* they alleged in prosecuting Ms. Drake. However, the Government only ever had sufficient evidence to prove one of those points. These four points and our related argument are listed below:

3

| | Elements of *Mens Rea* Alleged | Lack of Grounds for Prosecution |
|---|---|---|
| #1 | That Shannon Drake knew Mr. Harrison's staffing business to be the true borrower or beneficiary for the Harrison 2.0 factoring loans; | Ms. Drake conceded the evidence for this point in her Rule 29 argument. After all, the evidence at trial showed it was common knowledge throughout GrandSouth Bank that Mr. Harrison was the true beneficiary of the Harrison 2.0 factoring loans. |
| #2 | That she knew the loan documentation did not include Mr. Harrison (thus "nominee lending"); | The Government never offered evidence to prove this point and never had such evidence. |
| #3 | That she intended to deceive GrandSouth Bank by concealing Mr. Harrison as the true borrower or beneficiary; and | The Government never offered evidence to prove this point and never had such evidence.  To the contrary, the evidence at trial showed it was common knowledge throughout GrandSouth Bank that Mr. Harrison was the true beneficiary of the Harrison 2.0 factoring loans. |
| #4 | That she knew the purpose of circumventing the bank's lending limits. | The Government never offered evidence to prove this point and never had such evidence.  Indeed, they never even had evidence that Ms. Drake had ever heard of legal lending limits. |

Accordingly, the evidence to prove Point #1 cited by the Government's opposition (*see* Doc. No. 515 at 11-19) does not resolve the frivolousness of prosecuting Ms. Drake. For they prosecuted her without having evidence for the remaining key points – making the case "'groundless ... with little prospect of success'" (*i.e.*, frivolous) and also "'without reasonable or probable cause or excuse'" (*i.e.*, vexatious).  *In re 1997 Grand Jury*, 215 F.3d at 436 (quoting *Gilbert*, 198 F.3d at 1298-99).  Moreover, whereas the prosecutor in *In re 1997 Grand Jury* dropped his case when confronted by the lack of basis for the charges, here the Government persisted all the way through trial and a contested Rule 29 hearing.  Doing so, under the unique circumstances of this case,

4

demonstrated a reckless disregard for the appropriateness of charging Ms. Drake and should amount to bad faith for Hyde Amendment purposes.

### C. No Excuse in Witness B's Story

In addition to the foregoing, the Government now relies on the grand jury testimony of Witness B to justify prosecuting Shannon Drake. This is what the Government describes as "evidence that Drake acted to prevent the fraud from being discovered." (Doc. No. 515 at 19.) Specifically, the Government claims that Witness B "testified ... that after federal agents had served papers on Corriher, Drake, at Corriher's direction, shredded Harrison-related documents"[1] and "further testified that Drake and Corriher would meet outside of the bank to have conversations regarding the Harrison-related accounts in secret." (*Id.* at 19-20.)

As discussed in our memorandum, plenty of evidence confirms that no such shredding occurred. This evidence was easy to find out from Witness B's personnel file and from talking to the same coworkers whom the Government called as trial witnesses, including Lesley Cannon and Blake Timanus. None of these people corroborated seeing the 8-15 banker boxes that Witness B claimed were piled around Ms. Cannon's desk and shredded by Shannon Drake and Ms. Cannon over the course of several days – nor even any shredding equipment in the factoring department. (*See* Doc. No. 515, Ex. AJ at 42,

---

[1] The "papers" served on Mr. Corriher were for the tax fraud case against Mr. Harrison, whereas Ms. Drake was never even charged in that conspiracy. The indictment reflects what the prosecutor's May 2013 email stated: "I do not believe there is evidence that she knew about the taxes ..." (Doc. No. 493, Ex. B at 1.) Thus, even as summarized, Witness B's words did not provide evidence "that Drake acted to prevent the [bank] fraud from being discovered." (Doc. No. 515 at 19.)

5

50-51, 59-61.)  The Government surely knew that Witness B's story was not credible – especially after we provided them with our copy of Witness B's personnel file – and that would explain why the Government declined to make her a trial witness.

Not only did they decline to call Witness B during trial, the Government also did not seek to elicit her story of document shredding from any other trial witnesses. According to Witness B's account, Lesley Cannon (trial witness for the Government) and others in the factoring department would have clearly seen the boxes shredded:

> Q.    And what kind of opportunity to observe these boxes and the shredding would you have had as far as where you were located in the office?
>
> A.    Well, I had to walk by it – by them to get to the copy machine.  I had to walk by them to get to Lesley's desk.  They were surrounding Lesley's desk, so she saw them, too.  Pretty much everyone in the department saw them.

(Doc. No. 515, Ex. AJ at 42:14-20.)  Witness B also indicated that Doug Corriher (trial witness for the Government) directed the shredding and that Ms. Cannon helped out:

> Q.    And from talking to Ms. Drake, what was your understanding of – of how she got the idea that she should shred all these files?
>
> A.    She said Doug told her to do it.  Doug Corriher told her to pull the files.  And then she complained that she had too much work to do and can she get someone else ….
>
> *        *        *
>
> Q.    Did – who did – did the actual shredding, to your knowledge?
>
> A.    Shannon definitely did most of it, and I think she got Lesley – she always got Lesley to help her.

(Doc. No. 515, Ex. AJ at 41:12-17, 51:5-8.)  If the Government had truly believed Witness B's story about document shredding, then they would have tried to elicit that

6

evidence during trial from Mr. Corriher, Ms. Cannon, or another factoring department employees. However, the Government skipped over the story entirely. The reality is that nobody would corroborate Witness B's grand jury testimony, for it was simply untrue. That is why the Government could not use her story at trial, and why it cannot now be used to justify prosecuting Ms. Drake.

Furthermore, the Government's summary of Witness B's grand jury testimony is mostly wishful thinking. In reality, her testimony portrayed Ms. Drake as a line employee frustrated by her boss assigning her too much work – not a willing conspirator trying to conceal fraud. Indeed, as Witness B told the story, Ms. Drake went around asking for help from Witness B and other employees – again, not like a willing conspirator trying to conceal fraud – and indeed got help from Ms. Cannon whom the Government has portrayed as innocent.

Witness B was also unsure about the timing and other key details. For instance, she did not know what was in the boxes and – contrary to the Government's summary – she refused to say that shredding them was wrong or an attempt to conceal:

> Q. So this was not – the material she was shredding was not the material you normally shredded by – per bank policy?
>
> A. I don't know what was in the boxes, honestly. I'm assuming it was advances and agings and invoice verifications and probably maybe even some check stubs.
>
> Q. Was that material that was normally maintained by the bank?
>
> A. Yeah. You have to maintain them for a certain number of years, and I don't know if it's eight or ten years.

*     *     *

7

> Q. Well, did you think maybe something was wrong with shredding the documents?
>
> A. I – I had no idea. I mean, they could have been the old U.S. Staffing ones that we didn't – no longer had and why keep them. I don't – you know, I don't know his reasoning, and he didn't explain.

(Doc. No. 515, Ex. AJ at 51:9-19, 61:2-7.)

In truth, the prosecution of Ms. Drake was never really based on Witness B's testimony. We know that from the prosecutor's May 2013 email about "mak[ing] her eat a false entry on bank books charge," from the omission of indictment allegations about Ms. Drake shredding files, and from the Government's decision to proceed to trial without Witness B or her story of document shredding. Even if this case were based on Witness B's words, however, the prosecution still would have been frivolous and vexatious. Nothing Witness B said provided that missing evidence to show that Ms. Drake knew how the Harrison 2.0 factoring loans were recorded on the bank's books or knew anything about legal lending limits. Furthermore, had this case truly been based on Witness B's grand jury testimony, then the Government's decision to proceed at trial without her would be bad faith indeed.

### D. Conclusion

The Government still has no reasonable basis or excuse for the way they treated Shannon Drake throughout this case. Their evidence to justify prosecuting her merely supports a conclusion that she worked on the Harrison 2.0 accounts while knowing that Mr. Harrison was the true beneficiary. Lesley Cannon, Blake Timanus, and Witness B also would be implicated on that basis, but the Government treated them as totally

innocent.  The alleged co-conspirator Doug Corriher could have explained whether and how Ms. Drake joined the conspiracy, but the Government did not ask him when they called him to testify.  Instead, they try to rely on Witness B's story which no one would corroborate or believe enough to present during trial.

In reality, from the outset, the Government's prosecution against Ms. Drake was predicated on the erroneous view that they could "make her eat a false entry on bank books charge" because "she was an essential cog in the Five Guys system and was well aware that these loans were a nominee arrangement." (Doc. No. 493, Ex. B at 1).  This rationale was wrong as a matter of law (since nominee lending is not unlawful) and also wrong as a matter of fact (since, being unfamiliar with the loan documents recorded, Ms. Drake was unaware of a nominee arrangement).  Rather than confront these issues and drop their prosecution like the Government did in the *In re 1997 Grand Jury* decision, here the Government spent years prosecuting Ms. Drake all the way through trial.  They knew or should have known that they never had a viable case against Ms. Drake, but the Government decided to keep on prosecuting her anyway. Accordingly, "the position of the United States was vexatious, frivolous, or in bad faith," and this Court should award attorney's fees and expenses under the Hyde Amendment. 18 U.S.C.A. § 3006A.

Respectfully submitted this the 27th day of May, 2019.

WOMBLE BOND DICKINSON (US) LLP

 */s/  Claire J. Rauscher*
Claire J. Rauscher, N.C. Bar No. 21500
Allen T. O'Rourke, N.C. Bar No. 38404

9

301 S. College Street, Ste. 3500
Charlotte, NC 28202
(704) 331-4900
Fax: (704) 338-7811
claire.rauscher@wbd-us.com
allen.orourke@wbd-us.com

*Counsel for Shannon M. Drake*

10

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2019, the **REPLY TO THE GOVERNMENT'S OPPOSITION TO SHANNON DRAKE'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES UNDER THE HYDE AMENDMENT** has been served through the electronic service function of the Court's electronic filing system, as follows:

Frank Joseph Chut, Jr.
Assistant United States Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC  27401
Frank.Chut@usdoj.gov
*Counsel for Plaintiff USA*

Will Montague
U.S. Department of Justice
601 D St., NW, 7th Floor
Washington, DC  20004
Will.Montague@usdoj.gov
*Counsel for Plaintiff USA*

Jeffrey A. McLellan
U.S. Department of Justice
Trial Attorney, Tax Division
Post Office Box 972
Washington, DC  20044
Jeffrey.A.Mclellan@usdoj.gov
*Counsel for Plaintiff USA*

Sandra J. Hairston
Matthew G.T. Martin
U.S. Attorney's Office
101 S. Edgeworth Street, 4th Floor
Greensboro, NC  27401
Sandra.Hairston@usdoj.gov
Matt.Martin@usdoj.gov
*Counsel for Plaintiff USA*

　*/s/  Claire J. Rauscher*　　　　
Claire J. Rauscher
*Counsel for Defendant Shannon Drake*

I, Claire J. Rauscher, hereby certify that the word count for the **REPLY TO THE GOVERNMENT'S OPPOSITION TO SHANNON DRAKE'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES UNDER THE HYDE AMENDMENT** is 2812 words according to the word count feature in Microsoft Word processing software.

_s/ Claire J. Rauscher_
Claire J. Rauscher

12

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA : 
: 
v. :      1:16CR205-2
: 
SHANNON MICHELLE DRAKE : 


<u>OBJECTION BY THE UNITED STATES TO MOTION FOR DISCOVERY</u>

NOW COMES the United States of America, by and through Matthew G.T. Martin, the United States Attorney for the Middle District of North Carolina, and objects to the Motion for Discovery filed by Shannon Michelle Drake, through counsel, on May 14, 2019. (DE # 514). In support of this objection the United States shows as follows:

Drake has been provided fulsome and timely discovery in this case. Nonetheless, she has filed a motion demanding broad-ranging discovery to substantiate her Hyde Amendment claim. Specifically, Drake demands the production of grand jury materials which are protected from disclosure by Fed. R. Crim. P. 6(e), as well as documents regarding the government's internal prosecutorial deliberations, including "whether, how, and why to charge [her]" and whom to call as government witnesses at trial. (*Id*. at 5). However, her discovery demand does not cite to any legal authority. Drake's discovery

demands should be denied because the Hyde Amendment does not authorize discovery, and in any event, Drake fails to show any good cause for it.

The Hyde Amendment does not provide for discovery.  The amendment provides that a court may "receive" evidence, but contains no provision for a court to order, or a defendant to compel, the production of documents. *See* 18 U.S.C. § 3006A (Note).  This omission is noteworthy as "[v]arious provisions of the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, which do give the court authority to order production, say so explicitly." *United States v. Schneider*, 395 F.3d 78, 91 (2d Cir. 2005) (citing Fed. R. Crim. P. 16(a)(1)(A), (B), (E) (laying out the government's criminal disclosure obligations) and Fed. R. Civ. P. 26(b)(1), (3), (4) (laying out the scope of civil discovery)).  Stated simply, "nothing in the words of the [Hyde Amendment] suggests that the court has the power to order the government to produce materials, either to the defendant or to the court." *United States v. Schneider*, 395 F.3d 78, 91 (2nd Cir. 2005); *see also United States v. Truesdale*, 211 F.3d 898, 907 (5th Cir. 2000) ("It is clear that the [Hyde] Amendment, especially when read in conjunction with the [Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412], does not provide for discovery or a hearing as a matter of right.").

2

Even if that provision of the Hyde Amendment could be read as authorizing discovery, and it should not, Drake's discovery demand fails because she makes no attempt to demonstrate "good cause" for seeking it. Circuit courts that have addressed a request for discovery under the Hyde Amendment have been clear that, *if* discovery is permitted, defense must first show "good cause." For example, the Second Circuit in *Schneider* held that even if the Hyde Amendment permitted discovery, it was not appropriate where a defendant failed to meet a threshold showing and instead "hoped to make his case by requiring the government to disclose its confidential materials to the court." 395 F.3d at 91. Likewise in *United States v. Capener*, the court declined to determine the scope of discovery permitted under the Hyde Amendment. 608 F.3d 392, 405–06 (9th Cir. 2010). The *Capener* court reasoned that defendant's "fail[ure] to present any evidence to the district court supporting his allegations of bad faith on the part of the prosecutors" necessarily demonstrated the absence of good cause to require the production of evidence. *Id.* (observing that "[t]he Hyde Amendment's tools for developing evidence are extremely limited," and that "[t]he Hyde Amendment itself provides little additional scope for investigating the government's conduct").

Here, Drake demands the production of among other materials, grand jury transcripts which are protected from disclosure by Fed. R. Crim. P. 6(e), and deliberative documents concerning charging decisions, which are shielded

3

from disclosure by privilege. Separate and apart from showing "good cause," these specific materials would require her to satisfy an additional burden. *See, e.g., In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017) ("[O]pinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances.") (quotations omitted); *United States v. Aisenberg*, 358 F.3d 1327, 1350 (11th Cir. 2004) ("Nothing in the Hyde Amendment itself modifies the . . . well-established legal standards for discovery of sealed grand jury materials."). Drake has not even attempted to show good cause or any cause for the production of these materials and her request should therefore be denied.

4

In sum, the Hyde Amendment does not permit discovery, and even if it did, Drake fails to demonstrate good cause for this Court to order the production of privileged materials and secret grand jury information. Therefore, her motion should be denied.

This, the 30th day of May, 2019.

MATTHEW G.T. MARTIN
United States Attorney


/S/ WILLIAM M. MONTAGUE
Trial Attorney
U.S. Department of Justice
Tax Division
VA Bar # 89425
P.O. Box 972
Washington, DC 20044
Phone:  202/616-2386


/S/ FRANK J. CHUT, JR.
Assistant United States Attorney
United States Attorney's Office
NCSB # 17696
101 S. Edgeworth St., 4th Floor
Greensboro, NC 27401
Phone: 336/333-5351

5

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on May 30, 2019, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the defense.

Respectfully submitted,

/S/ WILLIAM M. MONTAGUE
Trial Attorney
United States Department of Justice
Tax Division
VA Bar # 89425
P.O. Box 972
Washington, DC 20044
Phone:  202/616-2386


/S/ FRANK J. CHUT, JR.
Assistant United States Attorney
NC Bar # 17696
United States Attorney's Office
101 S. Edgeworth St., 4th Floor
Greensboro, NC 27401
Phone: 336/333-5351

6

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO: 1:16-CR-205

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **RESPONSE TO THE** |
| **Plaintiff,** | **GOVERNMENT'S OBJECTION TO SHANNON DRAKE'S REQUEST FOR** |
| **v.** | **DISCOVERY CONCERNING HER APPLICATION FOR ATTORNEYS'** |
| **SHANNON MICHELLE DRAKE,** | **FEES AND EXPENSES UNDER THE** |
| **Defendant.** | **HYDE AMENDMENT** |

COMES NOW Claire J. Rauscher and Allen T. O'Rourke, attorneys for Shannon Michelle Drake, and respectfully submit this Response to the Government's Objection (Doc. No. 520) to her Request for Discovery (Doc. No. 514) relating to her Application for Attorneys' Fees and Expenses Under the Hyde Amendment (Doc. Nos. 485 and 493).

First, in regard to the Court's authority to order discovery and hear evidence, the Fourth Circuit has determined that the Federal Rules of Civil Procedure apply to the application for attorney's fees and expenses and to the proceedings under the Hyde Amendment. *United States v. Holland*, 214 F.3d 523, 527 (4th Cir. 2000) ("Not only are we confident that Hyde Amendment proceedings are of a civil nature, but our conclusion that the Rules of Civil Procedure should apply is supported by the fact that the Hyde Amendment provides that 'awards shall be granted pursuant to the procedures and limitations … provided for an award under section 2412 [of the Equal Access to Justice Act].'  The procedures in the Equal Access to Justice Act are, in turn, governed by the Federal Rules of Civil Procedure.  It is, therefore, likely that Congress intended that the Hyde Amendment also be governed by the Federal Rules of Civil Procedure.").  Rules 26

through 37 of the Federal Rules of Civil Procedure provide detailed procedures to facilitate discovery concerning a party's legal claim, including the routine types of discovery that we have requested.[1]

In regard to the Grand Jury information that we have requested, "[t]he Supreme Court has explained that a party seeking disclosure of grand jury materials must make a showing of a 'particularized need' by demonstrating that (1) the materials are needed to avoid an injustice in another proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request is structured to cover only needed materials." *United States v. Moussaoui*, 483 F.3d 220, 235 (4th Cir. 2007) (citing *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979)). We have made that showing of particularized need for our Hyde Amendment application. The way the Government charged Ms. Drake and especially how they characterized the law and evidence – both initially and for each superseding indictment – are directly relevant to many of the key disputed issues. As the prosecution of all co-defendants has now concluded, and as most (if not all) transcripts of Grand Jury testimony are already disclosed, there is no longer any strong need for secrecy about what the Government stated to the Grand Jury in order to prosecute Ms. Drake. Finally, we reiterate our

---

[1] The text of the Hyde Amendment also appears to contemplate discovery and the taking of evidence, including about matters before the Grand Jury, by authorizing this Court, "for good cause shown," to implement special measures for confidentiality. Title VI, Section 617, Pub L. 105-119, 111 Stat. 2519; 18 U.S.C. § 3006(A). To be clear, we do not believe that the Government has been able to show such "good cause" to justify ex parte treatment regarding any information that we have requested.

2

willingness to enter into a protective order or follow other appropriate protections to address any remaining concerns about Grand Jury secrecy.

Finally, the Government's objection claims that our discovery request includes "deliberative documents concerning charging decisions, which are shielded from disclosure by privilege." (Doc. No. 520 at 3-4)  That is to be expected since the Hyde Amendment's legal standard – that is, whether "the position of the United States was vexatious, frivolous, or in bad faith" – directly relates to the Government's motives or justifications, or lack thereof, in their decision-making to prosecute Ms. Drake from indictment through trial in this case.[2] Title VI, Section 617, Pub L. 105-119, 111 Stat. 2519; 18 U.S.C. § 3006(A).  Regardless, the Government has not asserted privilege in a manner which allows for meaningful response or adjudication.  According to the Federal Rules of Civil Procedure, "a party [who] withholds information otherwise discoverable by claiming that the information is privileged" must "describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. Pro. 26(b)(5)(A)(ii).

In particular, for specific records or information about which the Government wishes to assert privilege, we must be able to assess whether that privilege has been waived by the Government's proffers about their decision-making (*see, e.g.*, Doc. Nos. 233 and 515) and by other disclosures of their internal work product.  As previously

---

[2] In general, here the phrase "'position of the United States' means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based …." 28 U.S.C.A. § 2412(d)(2)(D).

3

discussed (*see* Doc. No. 320 at 3), for example, the Government disclosed a binder for the Grand Jury entitled "Documents Related to Indictment" which contains selected documents and highlighted excerpts of grand jury testimony, along with a detailed table of contents specifying the particular grounds for the allegations in the indictment (*see* Exhibit A attached). However, this binder omits the grand jury testimony of Witness A about shredding documents and other evidence which the Government now claims drove the decision to indict Ms. Drake (*see* Doc. No. 515 at 8-21). Such circumstances enhance the good faith basis of our discovery requests; the Government should not be allowed to evade them simply by making a blanket claim of privilege.

WHEREFORE, counsel on behalf of Shannon Drake request the court deny the Government's objection to Shannon Drake's Request for Discovery and order the production of the requested documents.

Respectfully submitted this the 7th day of June, 2019.

WOMBLE BOND DICKINSON (US) LLP

 */s/  Claire J. Rauscher*

Claire J. Rauscher, N.C. Bar No. 21500
Allen T. O'Rourke, N.C. Bar No. 38404
301 S. College Street, Ste. 3500
Charlotte, NC 28202
(704) 331-4900
Fax: (704) 338-7811
claire.rauscher@wbd-us.com
allen.orourke@wbd-us.com

*Counsel for Shannon M. Drake*

4

## CERTIFICATE OF SERVICE

I hereby certify that on this the 7th day of June, 2019, a copy of the foregoing **RESPONSE TO THE GOVERNMENT'S OBJECTION TO SHANNON DRAKE'S REQUEST FOR DISCOVERY CONCERNING HER APPLICATION FOR ATTORNEYS' FEES AND EXPENSES UNDER THE HYDE AMENDMENT** was filed with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following:

Wes J. Camden
Caitlin M. Poe
Ward and Smith, P.A.
POB 33009
Raleigh, NC  27636-3009
Wjcamden@wardandsmith.com
Cmpoe@wardandsmith.com
*Counsel for Defendant Robert Taylor*

James W. Bannister
Bannister, Wyatt & Stalvey, LLC
Post Office Box 10007
Greenville, SC  29603
Jbannister@bannisterwyatt.com
*Counsel for Defendant Robert Taylor*

Joshua Brian Howard
Gammon, Howard & Zeszotarski, PLLC
115 ½ W. Morgan Street
Raleigh, NC  27601
Jhoward@ghz-law.com
*Counsel for Defendant Ronald Earnest*

Deborah B. Barbier
Deborah B. Barbier, LLC
1811 Pickens Street
Columbia, SC  29201
dbb@deborahbarbier.com
*Counsel for Defendant Ronald Earnest*

Matthew Martin
United States Attorney
Frank Joseph Chut, Jr.
Assistant United States Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC  27401
Matt.Martin@usdoj.gov
Frank.Chut@usdoj.gov
*Counsel for Plaintiff USA*

William M. Montague
US Department of Justice
601 D St., NW, 7th Floor
Washington, DC  20004
William.Montague@usdoj.gov
*Counsel for Plaintiff USA*

Jeffrey A. McLellan
US Department of Justice
Trial Attorney, Tax Division
POB 972
Washington, DC  20044
Jeffrey.A.Mclellan@usdoj.gov
*Counsel for Plaintiff USA*

 */s/  Claire J. Rauscher*
Claire J. Rauscher
Counsel for Shannon M. Drake

# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA

        Plaintiff,

    vs.                              **CASE NO. 1:16-CR-205-WO-02**

SHANNON MICHELLE DRAKE

        Defendant.

## NOTICE OF APPEAL

Notice is hereby given that Counsel for Shannon Michelle Drake, the Defendant in the above-captioned matter, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the District Court's Amended Memorandum and Order filed May 4, 2021 (Docket Entry 538).

Respectfully submitted,

*/s/ Claire J. Rauscher*
**Claire J. Rauscher**
**Womble Bond Dickinson (US) LLP**
**One Wells Fargo Center, Suite 3500**
**301 S. College Street**
**Charlotte, NC 28202**
**NC Bar: 21500**
**Claire.rauscher@wbd-us.com**

Attorney for Shannon Michelle Drake

Dated: May 17, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2021, that a true and correct copy of the

**Notice of Appeal** has been electronically filed with the Clerk of Court utilizing the

CM/ECF system to the following:

Frank Joseph Chut, Jr.
Assistant United States Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Frank.Chut@usdoj.gov
*Counsel for Plaintiff USA*

Sandra J. Hairston
Acting United States Attorney
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Sandra.Hairston@usdoj.gov
*Counsel for Plaintiff USA*

　　　　　　　　　　　　　　　 */s/ Claire J. Rauscher*
　　　　　　　　　　　　　　　Claire J. Rauscher
　　　　　　　　　　　　　　　*Counsel for Defendant Shannon Drake*