No. 21-4242

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

SHANNON MICHELLE DRAKE,

Defendant-Appellant

ON APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
(No. 16-CR-205, Hon. William L. Osteen Jr.)

BRIEF FOR THE APPELLEE

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

S. ROBERT LYONS
  *Chief, Criminal Appeals &*
  *Tax Enforcement Policy Section*
KATIE S. BAGLEY
JOSEPH B. SYVERSON
GREGORY S. KNAPP
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 972*
  *Washington, D.C. 20044*
  *(202) 307-3350*

*Of Counsel:*
SANDRA J. HAIRSTON
  *United States Attorney*

- i -

## TABLE OF CONTENTS

Table of Authorities ........................................................................ ii

Statement of Jurisdiction ...............................................................1

Statement of the Issues ..................................................................2

Statement of the Case ....................................................................2

    I.      Prior, Related Prosecution for Tax Fraud ....................3

    II.     The Bank-Fraud Investigation in this Case ................4

    III.    Drake's Connection to the Fraud ..................................6

    IV.    The Charges ......................................................................10

    V.     Pretrial Motions ...............................................................11

    VI.    Trial .....................................................................................16

    VII.   Rule 29 Motions ..............................................................17

    VIII.  Hyde Amendment Claim ...............................................19

Summary of the Argument .........................................................22

Argument .......................................................................................24

    I.      The District Court Did Not Abuse Its Discretion in
         Denying Drake's Application for Attorney's Fees .....................24

         A.    Standard of Review ............................................24

         B.    Drake Has Not Met the Hyde Amendment's High
               Standards for Recovery ...................................25

         C.    The District Court Applied the Proper Legal
               Standard ................................................................41

    II.     The District Court Properly Denied Drake's Request for
         Discovery ...........................................................................45

         A.    Standard of Review ............................................45

         B.    The Hyde Amendment Does Not Provide for
               Discovery ..............................................................45

         C.    In Any Event, Drake Has Not Shown Good Cause
               for Discovery ........................................................51

Conclusion ....................................................................................55

Certificate of Compliance ..........................................................56

Certificate of Service ...................................................................57

- ii -

TABLE OF AUTHORITIES

<u>Cases</u>

*Brady v. Maryland*, 373 U.S. 83 (1963).......................................................... 19, 22

*Catano v. United States*, 248 F. Supp. 2d 1158 (S.D. Fla. 2003) ........................37

*In re 1997 Grand Jury*, 215 F.3d 430 (4th Cir. 2000)......... 2, 22, 24, 25, 26, 35, 36

*In re Grand Jury Subpoena*, 646 F.3d 159 (4th Cir. 2011) ....................................37

*James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993)..........................................................42

*Johnson v. United States*, 734 F.3d 352 (4th Cir. 2013) ........................................35

*Moran v. Burbine*, 475 U.S. 412 (1986)..................................................................38

*Salinas v. United States*, 522 U.S. 52 (1997)............................................................39

*United States v. Anderson*, 74 Fed. App'x 768 (9th Cir. 2003)...........................49

*United States v. Ayala*, 601 F.3d 256 (4th Cir. 2010) ...........................................38

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012)...........................................40

*United States v. Capener*, 608 F.3d 392 (9th Cir. 2010) ................................. 49, 51

*United States v. Cauble*, 706 F.2d 1322 (5th Cir. 1983) .......................................31

*United States v. Celesia*, 945 F.2d 756 (4th Cir. 1991) .........................................29

*United States v. Gardner*, 23 F. Supp. 2d 1283 (N.D. Okla. 1998).. 50, 51, 52, 53

*United States v. Gilbert*, 198 F.3d 1293 (11th Cir. 1999) ................. 25, 40, 46, 47

*United States v. Harrison*, 541 Fed. App'x 290 (4th Cir. 2013)......... 3, 10, 11, 14

*United States v. Heavrin*, 330 F.3d 723 (6th Cir. 2003) ......................................26

*United States v. Isaiah*, 434 F.3d 513 (6th Cir. 2006) ............ 24, 26, 29, 30, 31, 44

*United States v. Johnson*, 659 Fed. App'x 311 (6th Cir. 2016).................... 49, 51

*United States v. Knott*, 256 F.3d 20 (1st Cir. 2001) ...................................... 31, 34

*United States v. Krepps*, 605 F.3d 101 (3d Cir. 1979)..................................... 29, 30

*United States v. Lindberg*, 220 F.3d 1120 (9th Cir. 2000) ....................... 27, 49, 51

*United States v. Manchester Farming P'ship*,
  315 F.3d 1176 (9th Cir. 2003)................................................................ 28, 32, 44

*United States v. Manzo*, 712 F.3d 805 (3d Cir. 2013)........................ 23, 26, 35, 36

*United States v. Markert*, 732 F.3d 920 (8th Cir. 2013) ......................................27

*United States v. Monson*, 636 F.3d 435 (8th Cir. 2011) ......................................37

*United States v. Pritt*, 77 F. Supp. 2d 743 (S.D. W. Va. 1999).................... 30, 32

*United States v. Ramsey*, 785 F.2d 184 (7th Cir. 1986) ......................................38

*United States v. Schneider*, 395 F.3d 78 (2d Cir. 2005) ............... 41, 48, 49, 52, 53

*United States v. Shaygan*, 652 F.3d 1297 (11th Cir. 2011) ..................................36

*United States v. Sherburne*, 249 F.3d 1121 (9th Cir. 2001) .......................... 30, 33

*United States v. Truesdale*, 211 F.3d 898 (5th Cir. 2000) ....................... 45, 47, 48

*United States v. Turner*, 389 F.3d 111 (4th Cir. 2004) ....................................45

*United States v. Vinson*, 852 F.3d 333 (4th Cir. 2017) ..................................27

*United States v. Waldroop*, 431 F.3d 736 (10th Cir. 2005) ..................................27

*United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981) ........................................39

## Statutes

18 U.S.C. § 3006A ...................................................... 1, 24, 25, 46, 51

18 U.S.C. § 371................................................................... 10, 11

18 U.S.C. § 656 ................................................................... 11, 29

18 U.S.C. § 1005 ...................................................................29

18 U.S.C. § 1344(2) ...................................................................11

18 U.S.C. § 3231 ...................................................................1

28 U.S.C. § 1291 ...................................................................2

28 U.S.C. § 2412 ............................................................ 1, 41, 46, 47

Pub. L. No. 105-119 ............................................................ 1, 19, 25

## Rules

Fed. R. App. P. 4(a)(1)(B)...................................................................2

Fed. R. App. P. 28(a)(8)(A)...................................................................35

Fed. R. App. P. 32 ...................................................................56

Fed. R. Crim. P. 16(a)(1)(A)...................................................................46

Fed. R. Crim. P. 29 ............................................................ 17, 32, 53

No. 21-4242

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

SHANNON MICHELLE DRAKE,

Defendant-Appellant

ON APPEAL FROM AN ORDER
OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
(No. 16-CR-205, Hon. William L. Osteen Jr.)

BRIEF FOR THE APPELLEE

STATEMENT OF JURISDICTION

Shannon Drake appeals the denial of her application for attorney's fees under the Hyde Amendment, Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997), *reprinted in* 18 U.S.C. § 3006A, statutory notes. The district court had jurisdiction over the underlying criminal prosecution under 18 U.S.C. § 3231. On February 4, 2019, the district court entered a judgment of acquittal in Drake's favor. J.A. 75 (Doc. 478). Drake timely filed her application for attorney's fees on March 6, 2019. J.A. 76 (Doc. 485); *see* 28 U.S.C. § 2412(d)(1)(B); 18 U.S.C. § 3006A, statutory notes (incorporating Section 2412's procedures and limitations into the Hyde Amendment).

- 2 -

On May 3, 2021, the district court denied Drake's application.  J.A. 81
(Doc. 537).  The court amended its opinion and order on May 4, 2021.  J.A.
82 (Doc. 538).  On May 17, 2021, Drake timely appealed the district court's
denial of her application.  J.A. 82, 4382 (Doc. 543).  *See* Fed. R. App. P.
4(a)(1)(B) (60-day time limit for appeal in a civil case); *In re 1997 Grand Jury*,
215 F.3d 430, 436 (4th Cir. 2000) (Hyde Amendment action is civil).  This
Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.    Whether the district court abused its discretion in denying
Drake's application for attorney's fees under the Hyde Amendment,
concluding that the prosecution was not "vexatious, frivolous, or in bad
faith."

II.    Whether the Hyde Amendment authorizes discovery, and if so,
whether the district court abused its discretion in concluding that Drake
had not shown good cause for discovery.

## STATEMENT OF THE CASE

A grand jury charged Drake and others with multiple counts of
conspiracy, bank fraud, misapplication of bank funds, and falsifying bank
records.  J.A. 99-145.  After a three-week trial, the district court granted
Drake's motion for a judgment of acquittal but denied her co-defendants'
motions for the same.  *E.g.*, J.A. 74.  The district court later denied Drake's
application for attorney's fees under the Hyde Amendment, finding that

- 3 -

the prosecution was not vexatious, frivolous, or in bad faith. *E.g.*, J.A. 6621.
Drake appeals.

## I.     *Prior, Related Prosecution for Tax Fraud*

Greg Harrison owned a temporary staffing business in North
Carolina. *United States v. Harrison*, 541 Fed. App'x 290, 291-92 (4th Cir.
2013). In 2010, a grand jury charged Harrison with tax crimes related to his
failure to collect and pay over payroll taxes. *See id.* at 291-92; Superseding
Indictment at 5-49, *United States v. Harrison*, No. 10-CR-411 (M.D.N.C. Dec.
14, 2010). A jury convicted Harrison on all counts, and he was sentenced to
144 months of imprisonment. *Harrison*, 541 Fed. App'x at 292.

The evidence at Harrison's trial showed that his staffing business
received funding from GrandSouth Bank, a state-chartered, FDIC-insured
bank headquartered in Greenville, South Carolina. J.A. 4346-47 (excerpt of
Harrison trial transcript); *see also* J.A. 1636-38. The evidence also showed
that Harrison dealt with Douglas Corriher and Shannon Drake at
GrandSouth. *See* J.A. 4347 (testimony of Harrison's employee about
contacting "Shannon and Doug at GrandSouth Bank").

Harrison had been a client of GrandSouth's factoring department
since around 2003. J.A. 1672-73, 1678, 2989. Factoring is the utilization of a
company's accounts receivable as collateral to obtain advances from a bank
(or other factoring company). J.A. 1046-47, 1633, 1656-57. Corriher was the
head of GrandSouth's factoring department, and Drake was an account

- 4 -

executive[1] responsible for handling Harrison's factoring lines of credit.  J.A. 1065, 2189, 2192, 2987, 2991.

At Harrison's sentencing, the government cited evidence that Harrison used a complex series of nominee companies to conceal his interest in the factoring funds advanced by GrandSouth.  J.A. 4235. Defense counsel argued that there was no concealment because Corriher knew about Harrison's use of the nominees.  J.A. 4326-28.  The district court, rejecting this argument, suggested that the fact that Corriher knew about the concealment meant only that "he should have been charged," too.  J.A. 4328.

II.    *The Bank-Fraud Investigation in this Case*

A grand jury then began investigating GrandSouth's banking practices in connection with Harrison's factoring lines of credit.  *See, e.g.*, J.A. 4339, 4341 (Sept. 2012 subpoenas issued to Drake and GrandSouth); J.A. 5096, 5107-10 (grand jury testimony of investigating agent).  The investigation developed evidence that Harrison, in cooperation with officers and employees of GrandSouth, used nominee entities to evade legal lending limits.  *E.g.*, J.A. 5107-12.

---

[1] Drake asserts (Br. 7), without citation, that it was inaccurate for the government at trial to refer to her as an "account executive."  But Drake used that title on her professional correspondence.  J.A. 5562 (Dec. 28, 2009, email from "Shannon Drake, Account Executive, GrandSouth Bank"). Several officers, employees, and clients of GrandSouth also testified that Drake was an "account executive."  J.A. 1065 (Julie Akers); J.A. 1642 (Douglas Corriher); J.A. 2189 (Lesley Cannon); J.A. 2991 (Cyndy Ayers).

- 5 -

A legal lending limit capped the amount that GrandSouth could loan to any single borrower. J.A. 3067-68, 3071. When Harrison began factoring with GrandSouth, he wanted a credit line of approximately $10 million, which greatly exceeded this lending limit. J.A. 1674, 1677. So Harrison and the Bank agreed to enter several, smaller factoring agreements, each in the name of a company nominally controlled by one of Harrison's "loyal" associates but actually controlled by Harrison. J.A. 1680; *see also* J.A. 1678-83, 1686.

Harrison continued factoring with GrandSouth until he sold his staffing business in 2006. J.A. 2362-64. Harrison reacquired the business in 2008 and operated it under the name Compensation Management, Inc. J.A. 2375-77. Compensation Management continued factoring with GrandSouth, and as before, Harrison used nominees to enter multiple factoring agreements. J.A. 1070-71, 3610-11. In July 2008, Corriher attended a meeting at Harrison's home where several of Harrison's associates signed factoring agreements on behalf of a nominee company.[2] J.A. 1500-01, 1756-57. These individuals did not participate in Harrison's staffing business or the factoring agreements set up in their names. *See, e.g.*, J.A. 1512, 2422, 2444, 2673-76, 2680. GrandSouth did not disclose

---

[2] Joey Medaloni signed for Medaloni, Inc.; Matthew Medaloni signed for Medaloni of S.C., Inc.; Michael Brooks signed for Brooks Labor, Inc.; Randy Howell signed for Green Ideas N Motion Corp.; and Mark Gleason signed for NC Global Investments, Inc. J.A. 1504, 1794-95, 2413-14, 2445-47, 2676-77.

- 6 -

Harrison's interest in the nominee factoring agreements to bank examiners, thereby concealing a violation of its legal lending limit. *See* J.A. 1343, 1367-70, 1408 (testimony of South Carolina bank examiner); J.A. 2895-99 (testimony of FDIC examiner); J.A. 3662, 3665-66 (forensic accountant's analysis of violation of legal lending limit).

III.    *Drake's Connection to the Fraud*

As the district court found, even "a cursory review" of the evidence demonstrated "that Drake, in her position at GrandSouth Bank, was involved in or in fact administratively executed many of the criminal transactions" associated with the nominee lending scheme. J.A. 6609-10. As stated, Drake was the account executive who handled Harrison's factoring lines of credit. Corriher testified that GrandSouth account executives like Drake were responsible for reviewing invoices payable to account debtors and reviewing "credit limits on account debtors." J.A. 1638. In performing these functions for Harrison's factoring lines, Drake communicated directly with Compensation Management, not any of the nominees. For example, Compensation Management employee Angela Holland testified that she contacted Drake to submit invoices and request factoring advances from GrandSouth. J.A. 2849. Drake, along with Corriher, also visited Compensation Management's office in early 2009 to discuss the factoring arrangement. J.A. 1066, 1817.

Drake's correspondence frequently recognized that the nominee factoring lines were controlled by Harrison operating out of Compensation

- 7 -

Management. For example, in a January 2009 email to Compensation Management employee Katherine Miller, Drake provided instructions for Compensation Management's clients to pay GrandSouth directly by wiring funds to accounts held in the names of the nominee companies. J.A. 2926-28. In a February 2009 email to Miller, Drake addressed how "Greg" (Harrison) wanted to post certain client payments to the nominee accounts. J.A. 2934-35, 5564; *see also* J.A. 5567-58 (email between Drake and Miller about posting a payment to a nominee account); J.A. 5561 (email in which Drake jokes about all "these freakin' accounts" controlled by Harrison).

Despite Drake's familiarity with "Greg's" factoring lines of credit, Drake routinely made entries in GrandSouth's books and records that falsely indicated that receivables controlled by Harrison's company were controlled by the nominee companies, and that factoring advances made for Harrison's benefit were made for the benefit of the nominee companies. J.A. 6618; *see also* J.A. 5175 (GrandSouth loan account statement for "NC Global Investments"); J.A. 5196 (loan account statement for "Brooks Labor Inc."); J.A. 5220 (loan account statement for "Medaloni Inc."). The district court found that the bank entries Drake made were "material and, for the most part . . . false," in that they concealed Harrison's interest in the factoring arrangement. J.A. 6618.

Drake, along with Corriher, also authorized wire transfers against the factoring lines of credit controlled by Harrison. *E.g.*, J.A. 1891, 2226, 2992-93. However, the nominal beneficiaries of these advances were not even

- 8 -

asked to authorize the transfers.  For example, Drake authorized a $400,000 wire transfer on April 8, 2009, against the factoring lines of Medaloni of S.C. and NC Global Investments, nominally owned by Matthew Medaloni and Mark Gleason, respectively.  J.A. 5475 (wire transfer form).  But although the wire transfer form that Drake used contained copies of Medaloni's and Gleason's signatures, those individuals were not involved in the transfer.  *See* J.A. 1512 (Medaloni testified that he had "nothing" to do with GrandSouth after signing the factoring agreement); J.A. 2455 (Gleason testified that he never spoke with Drake after signing the factoring agreement).  GrandSouth employee Lesley Cannon testified that the wire transfer form that Drake used to authorize these advances was non-standard because it listed not one, but multiple factoring clients, corresponding to the nominal beneficiaries of Harrison's various credit lines.  J.A.2212, 2226-27, 2230; *see also* J.A. 2504 (GrandSouth employee Catherine Smith testified that it "wasn't typical to have multiple signatures" on the wire transfer form).

Other evidence showed that Drake helped Harrison create the false appearance that invoices Compensation Management submitted to obtain factoring advances had been paid off by Compensation Management's clients.  Harrison and Drake did so by recycling newly-loaned funds to pay these invoices.  For instance, the $400,000 that Drake advanced on April 8, 2009, was redirected to a Compensation Management operating account. J.A. 3657, 5485-86.  On or about that same day, Harrison delivered to

- 9 -

GrandSouth approximately $515,000 in checks drawn on that same account and payable to four of the nominee companies.  J.A. 1134, 1139-49, 3654-55, 5478-81.  Drake applied those funds to satisfy several unpaid invoices listed in the Bank's records for the nominee factoring lines.  J.A. 3657-60.

The grand jury developed more evidence that Drake helped Corriher conceal the fraudulent nature of Harrison's factoring arrangement.  *See, e.g.*, J.A. 4544.  In December 2015, C.G., a colleague of Drake's at GrandSouth, testified before the grand jury.  J.A. 4504, 4516.  C.G. testified that

[3]

During her grand jury testimony, C.G.

---

[3] The highlighted portions of this brief describe grand jury material that is under seal.  These portions are redacted from the publicly filed version of the brief.  *See* 4th Cir. Local Rule 25(c)(3)(B).

- 10 -

████████████████████████████

█████████████████████████████████

████████████████████████████████████

████████████████████████████████

██████████████████

In January 2016, Y.S., another of Drake's colleagues, testified before the grand jury.  J.A. 4581, 4588-89.  Y.S. testified that ████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

█████████████████

IV.    *The Charges*

In a June 2017 superseding indictment, a grand jury charged Corriher, Drake, and Ronald Earnest (GrandSouth's President) with conspiracy, bank fraud, and misapplication of bank funds related to the administration of Harrison's factoring lines of credit.  J.A. 17 (Doc. No. 57).  Corriher pleaded guilty to conspiracy, 18 U.S.C. § 371, and agreed to

- 11 -

cooperate with the government.  J.A. 17 (Doc. No. 60, Plea Agreement); J.A.
1631-33.  He was sentenced to 15 months' imprisonment.  J.A. 64 (Doc. No.
417).

In an August 2017 superseding indictment, the grand jury charged
Drake, Earnest, and Robert Taylor (another GrandSouth officer) with
conspiring with Corriher to misapply GrandSouth's funds and to make
materially false entries in GrandSouth's books and records, in violation of
18 U.S.C. §§ 371, 656, and 1005.  J.A. 114-15 (Count One).  Count One
alleged that, as part of the conspiracy, the defendants factored receivables
of Harrison's staffing business in amounts over the legal lending limits.
J.A. 115-16.

The grand jury also charged the defendants with multiple counts of
bank fraud, 18 U.S.C. § 1344(2), and misapplication of bank funds, 18
U.S.C. § 656.  J.A. 125-32 (Counts 2-27).  The grand jury charged Drake and
Taylor with another count of conspiring with Corriher to make materially
false entries in GrandSouth's books and records, in violation of 18 U.S.C.
§§ 371 and 1005.  J.A. 138-39 (Count 29).  Count 29 alleged that the
defendants falsified the Bank's records to conceal the fact that certain of
Compensation Management's accounts receivable were uncollectible.  *Ibid.*

V.    *Pretrial Motions*

Drake moved to dismiss the indictment and suppress testimony she
had given before the grand jury in September 2012 and May 2013.  J.A.
4384, 4387.  During both of Drake's appearances before the grand jury, the

- 12 -

government advised her that she was a fact witness and was not a target or subject of the investigation.  J.A. 4389.  In her motion, Drake argued that the government's statements were inaccurate because, given Drake's connection to Harrison's credit lines, "a reasonably prudent prosecutor would have concluded that Drake was a target of the investigation."  J.A. 4389.

In response, the government argued that its statements to Drake during her grand jury testimonies were accurate because, at the time, Drake was neither a subject nor a target of the investigation.  J.A. 4403.  The government also noted that, after Drake last testified before the grand jury in 2013, the government developed other evidence inculpating her.  J.A. 4403-04.  In particular, C.G. and Y.S. did not testify before the grand jury until December 2015 and January 2016, respectively.  J.A. at 4404, 4413, 4419.  The government further argued that Drake had not shown prejudice from any misrepresentation about her status before the grand jury.  J.A. 4407-10.

In February 2018, while Drake's motion to dismiss was pending, the government voluntarily produced a May 5, 2013, email from one of the prosecutors to members of the investigation team.  J.A. 4482.  The email, titled "Things to do on Corriher," stated:

- 13 -

Here are my thoughts on what needs to be done on Corriher:

. . . .

3. We need to decide if we want to treat Shannon Drake as a target. She is a bank officer. While I do not believe there is evidence she knew about the taxes, she was an essential cog in the Five Guys system[4] and was well aware that these loans were a nominee arrangement. It would help to get her an attorney of her own. Give her a break in response for full testimony or make her eat a false entry on bank books charge (venue issues aside)?

J.A. 4290.

In a supplemental memorandum, Drake argued that the prosecutor's email was evidence that the government had misled her about her status before the grand jury. J.A. 708-09. In response, the government argued that the email indicated only that the investigation team was discussing the possibility that she could become a target. J.A. 4482-83.

At a hearing, the district court questioned the prosecutor about the May 2013 email. J.A. 782-83. The prosecutor stated that the email reflected that the investigation team was discussing the possibility that Drake could become a defendant in the case, but that at that time, she was not considered a target. J.A. 783-85. As to whether Drake had been prejudiced by any misstatement about her status, the government told the court that it did not intend to introduce Drake's grand jury testimony during its case in chief. J.A. 799.

---

[4] The "Five Guys system" refers to five of the nominee lines of credit set up for Harrison's benefit. J.A. 4295.

- 14 -

At the hearing, the district court said that, based on the May 2013 email, "it is reasonable to conclude that Ms. Drake and her counsel were readily misled by a representation that Ms. Drake was neither a target nor a subject of the investigation."  J.A. 806.  However, the court clarified that it was not suggesting that "the prosecutor went so far as to intentionally commit these acts or to intentionally mislead in terms of what occurred."  J.A. 808.  The court also said that it believed that any misrepresentation was not prejudicial.  J.A. 807.

The district court then issued an opinion denying Drake's motion to dismiss.  J.A. 812.  The court found, based on the May 2013 email, that the government's representation during Drake's 2013 grand jury testimony that she was not a target or subject of the investigation was "misleading."  J.A. 848.  The court acknowledged that the terms "target" and "subject" have "no inherent constitutional or statutory significance."  J.A. 837.  The court looked to the Department of Justice's U.S. Attorneys' Manual,[5] which defined "target" as "a person to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime, and who, in the judgment of the prosecutor, is a putative defendant."  *Ibid.*  The Manual defined "subject" as "a person whose conduct is within the scope of the grand jury's investigation."  J.A. 838.  The district court reasoned that

---

[5] In 2018, the U.S. Attorneys' Manual was renamed the Justice Manual.  *See* U.S. Dep't of Justice, Justice Manual, https://www.justice.gov/jm/justice-manual.

- 15 -

the prosecutor's statements in the May 2013 email indicated that, at that time, the government considered Drake "a putative defendant as to a bank recordkeeping felony," making her a target.  J.A. 848.

But the district court concluded that any misstatements about Drake's status before the grand jury did not prejudice her constitutional rights.  J.A. 862-78.  Thus, the court denied Drake's motion to dismiss.  J.A. 878.

Approximately two weeks before trial, the government filed a motion in limine regarding the anticipated testimony of C.G.  J.A. 5050.  The government sought to limit cross-examination on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  J.A. 5053-54.  In April 2018, Drake had provided the government with discovery, which included ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓

In its motion, the government acknowledged that the defense could properly inquire into ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to show potential bias.  J.A. 5058.  The government argued, however, that ▓▓▓▓▓▓▓▓

- 16 -

████████████████████████████ would not be probative of her truthfulness and would be unfairly unprejudicial.  J.A. 5056-62.

At the pretrial conference, the district court did not definitively rule on the government's motion in limine, instead waiting to see whether the defense could lay a foundation regarding ████████████████ ████████████.  J.A. 979-80.  The court said that it would probably "grant some pretty wide latitude in terms of Ms. Drake's cross-examination" of C.G.  J.A. 980.  Ultimately, the government chose not to call C.G. at trial.

## VI.    Trial

The government called about 30 witnesses, including Corriher and several employees of GrandSouth and Compensation Management with knowledge of Drake's management of Harrison's factoring lines of credit. *E.g.*, J.A. 1817 (Corriher); J.A. 1065 (Julie Akers); J.A. 2192 (Lesley Cannon); J.A. 2849-50 (Angela Holland); J.A. 2926 (Katherine Miller); J.A. 2991 (Cyndy Ayers).  The government also introduced documents showing Drake's use of nominees to record transactions on the factoring lines.  *E.g.*, J.A. 5237 (credit transaction form for "NC Global" initialed by Drake); J.A. 5308 (bank record of wire payment to "Medaloni Inc." posted by Drake); J.A. 5684 (wire transfer against multiple nominee accounts, initialed by Drake).

The government elicited testimony about the non-standard wire transfer form that Drake used to advance factoring funds for Harrison's

- 17 -

benefit. *E.g.*, J.A. 2212. However, on several occasions, the district court
precluded the government from eliciting additional testimony regarding
whether the procedures applied to Harrison's factoring lines deviated from
GrandSouth's standard practice. *See* J.A. 1091-93 (precluding Akers from
testifying whether GrandSouth's factoring relationship with Harrison was
"normal"); J.A. 2216 (precluding Cannon from testifying whether "any
other factoring clients [had] a wire request form" like the form used for
Harrison's accounts); J.A. 2993 (precluding Ayers from testifying how the
wire form used for Harrison "compare[d] to the ones that [she] used in
[her] [factoring] accounts"). The government also did not call Y.S., who
had testified before the grand jury about ███████████████████████████
██████████████████████████████████████████████████████████████████

████████████████████████████ And as stated, the government did not call C.G.,
who had testified before the grand jury about, among other things, ██████
██████████████████████████████

VII.    *Rule 29 Motions*

At the close of the government's case, the defendants moved for a
judgment of acquittal under Federal Rule of Criminal Procedure 29.
Drake's counsel argued that there was insufficient evidence that Drake
intended to conceal Harrison's interest in the nominee factoring lines or
circumvent the bank's legal lending limit. J.A. 3814-15, 3824-26. When
pressed by the district court, counsel acknowledged that it "would change
everything" had the government presented evidence that "Drake

- 18 -

destroyed records at the direction of Doug Corriher," as C.G. had testified
before the grand jury.  J.A. 3827-28.  But, as counsel noted, that evidence
did "not come in."  J.A. 3828.  Opposing the Rule 29 motion, the
government argued that the evidence supported an inference that Drake
knew that the nominees were being used to fraudulently conceal
Harrison's interest in the factoring lines.  J.A. 3829, 3832-36.

The district court denied Earnest's and Taylor's Rule 29 motions,
concluding that there was sufficient evidence for the jury to find that they
acted with criminal intent.  J.A. 3904-07.  But the court granted Drake's
Rule 29 motion on all counts.  J.A. 3907, 3911-12.  The court acknowledged
that the government had presented "substantial evidence" that Drake
participated in the transactions associated with the nominee lending
scheme, J.A. 3908, but found insufficient evidence that Drake knew that
those transactions were fraudulent, J.A. 3908-11.  The court noted,
however, that the sufficiency of the evidence as to the two conspiracy
charges against Drake (Counts 1 and 29) was a "closer call."  J.A. 3910.

The district court made clear that its Rule 29 ruling was based on the
evidence admitted at trial, and conceded that it was "certainly possible, as
the Government argued," that the court had "made mistakes in evidentiary
rulings."  J.A. 3912; *see also* J.A. 3841 (district court acknowledged that it
had "sustained [defense] objections as to what was unusual in comparison
to what other factoring clients were doing").  The court also emphasized
that, despite its decision to grant Drake's Rule 29 motion, it was "very

- 19 -

impressed with the Government's candor to the Court during the course of this trial as well as [the prosecutors'] review of the evidence and their presentation of the evidence." J.A. 3913. The court recognized that, had the government elected to present the testimony of C.G., the court "would have been compelled" to deny Drake's Rule 29 motion and submit the case to the jury. *Ibid.* The court "commend[ed] counsel for the Government for the manner in which they prosecuted this case as to [Drake]." *Ibid.*

At the close of the evidence, Earnest and Taylor renewed their motions for a judgment of acquittal. J.A. 4186. The district court granted Taylor's motion as to one of the conspiracy charges but otherwise denied the defendants' motions. J.A. 4226. After two days of deliberations, the jury acquitted Earnest and Taylor on all counts. J.A. 75-76.

*VIII. Hyde Amendment Claim*

Drake filed an application for attorney's fees under the Hyde Amendment, Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997). J.A. 4261. Drake argued that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Corriher allegedly "declined to implicate Ms. Drake in any wrongful conduct" before trial. J.A. 4273. She claimed that the government made misrepresentations to the court about the weight of the evidence provided by C.G. and Y.S. during their grand jury testimonies. J.A. 4276. Drake also reasserted her claim that the government misled her about whether she was a target or subject of the grand jury investigation. J.A. 4278-79.

- 20 -

Drake also filed a "Request for Discovery" related to her application for attorney's fees, requesting broad categories of documents related to the government's investigation and prosecution. J.A. 4349-55. Drake's discovery request included several interrogatories, asking the government to describe its communications about "the decision to indict and maintain the prosecution of Ms. Drake" and the decision not to call C.G. and Y.S. at trial. J.A. 4356-57. Drake also asked whether "anyone" had "raised questions or concerns" about her indictment or prosecution. J.A. 4357.

Opposing Drake's fee application, the government argued that she had not satisfied the Hyde Amendment's demanding standard of showing that the prosecution was "vexations, frivolous, or in bad faith." J.A. 5142. The government identified evidence supporting an inference that Drake acted with criminal intent, including Drake's use of nominees to record factoring transactions that benefited Harrison. J.A. 5148-57. The government also cited evidence of Drake's concealment of bank fraud, including C.G.'s and Y.S.'s grand jury testimonies. J.A. 5157-59. The government argued that, in deciding whether to prosecute Drake, it was justified in relying on this evidence, as well as other evidence that the district court had excluded at trial. J.A. 5159-61.

The government also objected to Drake's discovery request, noting that the Hyde Amendment contains no provision for a court to order the production of documents. J.A. 4372. The government further argued that, even if the Hyde Amendment could be interpreted as authorizing

- 21 -

discovery, Drake had not shown the requisite "good cause" for her discovery demands.  J.A. 4373.

The district court denied Drake's application for attorney's fees.  J.A. 6602.  The court found that the prosecution was not "vexatious, frivolous, or in bad faith," because there was "no doubt that a crime occurred and that the activities of Drake furthered the commission of that offense."  J.A. 6621-22.  The court cited C.G.'s grand jury testimony about ▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌  J.A. 6622.  The court found "that the Grand Jury and the Government rightly concluded, based on C.G.'s testimony and the evidence of Drake's substantial participation in the transactions at issue, that the evidence supported a finding of probable cause."  J.A. 6623.

The court also rejected Drake's *Brady* claim based on Corriher's purported failure to incriminate her, finding that the government was not obligated "to provide Drake with an assessment of the weight of the evidence discovered in its investigation, beyond fulfilling its duty under *Brady* to provide exculpatory evidence."  J.A. 6626.  The court also found "that any statements the Government made regarding its characterization of Drake's status in the Grand Jury proceedings do not support a finding of bad faith relevant to an analysis of the Hyde Amendment," noting that any inaccurate statements about Drake's status did not prejudice her.  J.A. 6628.

Finally, the court denied Drake's request for discovery.  The court observed that "the text of the Hyde Amendment does not provide for

- 22 -

discovery." J.A. 6631. And the court found that, even if it could order discovery, Drake had not made a sufficient showing to justify further discovery. J.A. 6632-33. The court pointed out that "thorough and comprehensive discovery," including volumes of documents, hearings, and testimony, had already been provided in the case. *Ibid.*

## SUMMARY OF THE ARGUMENT

I.     The district court did not abuse its discretion in denying Drake's application for attorney's fees under the Hyde Amendment. Drake cannot overcome the "daunting obstacle" of showing that the prosecution was "vexatious, frivolous, or in bad faith." *In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000). The prosecution was not "vexatious" because it was supported by probable cause, and it was not "frivolous" because it had a reasonable prospect of success. As the district court found, the government proved that the nominee lending arrangement between GrandSouth and Harrison was fraudulent, and that Drake facilitated the fraud by making false entries in the Bank's records. *E.g.*, J.A. 6609, 6617-18, 6621-22. The prosecution of Drake and other bank officers for their participation in the nominee lending scheme was well founded, as courts have upheld criminal convictions for similar conduct.

Nor is there any evidence that the prosecution was conducted in "bad faith." Although the district court found that the government inaccurately told Drake that she was not a target of the grand jury

- 23 -

investigation, the court did not find any intentional misrepresentation. And the court found that Drake was not prejudiced by any such misrepresentation, *e.g.*, J.A. 877; that the government fully complied with (and even exceeded) its criminal discovery obligations, *see* J.A. 844, 6624-27; and that the government presented its evidence at trial with candor and professionalism, J.A. 3913.  Thus, viewing the case "as an inclusive whole," *United States v. Manzo*, 712 F.3d 805, 810 (3d Cir. 2013), the prosecution was conducted in good faith.

Drake is incorrect that the district court "employed an erroneous legal standard."  The court did not, as Drake asserts (Br. 10), find "that the grand jury's issuance of an indictment was sufficient probable cause to defeat Drake's claim."  The district court properly considered evidence presented to the grand jury, but it did not say that, merely because the grand jury indicted Drake, she necessarily could not recover under the Hyde Amendment.  Instead, the court independently analyzed the record as a whole and concluded that the prosecution was supported by probable cause.

II.    The Hyde Amendment does not provide for compelled discovery on a claim for attorney's fees.  The Amendment provides only that the district court "may receive evidence" relevant to the government's position underlying the prosecution.  18 U.S.C. § 3006A, statutory notes. The Amendment's legislative history and persuasive case law confirm that the "may receive evidence" clause was intended to permit the government

- 24 -

to submit confidential materials relevant to its decision to prosecute. It was not intended to grant a defendant broad access to the government's internal deliberations on the case.

Even if the Hyde Amendment did authorize discovery, Drake has not shown the "good cause" that would be necessary to justify further discovery in this case. 18 U.S.C. § 3006A, statutory notes. Drake has cited no evidence of vexatious, frivolous, or bad-faith conduct by the government. Instead, Drake seeks information about the government's internal deliberations on trial strategy. Drake's discovery requests are improper under any interpretation of the Hyde Amendment and, in any event, are not material to the resolution of her claim.

ARGUMENT

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DRAKE'S APPLICATION FOR ATTORNEY'S FEES

A.   *Standard of Review*

This Court reviews the district court's denial of an award of attorney's fees under the Hyde Amendment for an abuse of discretion. *In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000). "Deference to the district court['s denial of attorney's fees] is warranted because that court has a fresh recollection of the government's conduct that [an appellate] court's review of the cold record simply cannot provide." *United States v. Isaiah*, 434 F.3d 513, 519 (6th Cir. 2006).

- 25 -

B.    *Drake Has Not Met the Hyde Amendment's High Standards for Recovery*

The Hyde Amendment provides that the district court "may award" reasonable attorney's fees to a prevailing criminal defendant "where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust."  Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997), *reprinted in* 18 U.S.C. § 3006A, statutory notes.  The plain language of the Hyde Amendment requires "a lot more" than a showing that the defendant prevailed.  *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999).  "A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct—a prosecution brought vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous."  *Ibid.*  Mere "negligence" or "lack of judgment" by the government does not satisfy this standard.  *In re 1997 Grand Jury*, 215 F.3d at 437.

The claimant bears the burden of establishing that the government's position was "vexatious, frivolous, or in bad faith."  *Id.* at 436.  As a result, the Hyde Amendment "places a daunting obstacle" in the path of defendants who seek to recover attorney's fees.  *Ibid.* (quoting *Gilbert*, 198 F.3d at 1302-03).  And that burden is made even "more difficult" by the manner in which courts assess what constitutes the "position" of the United States within the meaning of the Hyde Amendment.  *United States v. Manzo*, 712 F.3d 805, 810 (3d Cir. 2013).  "In determining whether a

- 26 -

position is vexatious, frivolous or in bad faith, courts" do not employ a
"'count-by-count analysis,'" but instead "'make only one finding, which
should be based on the case as an inclusive whole.'" *Ibid.* (quoting *United
States v. Heavrin*, 330 F.3d 723, 730 (6th Cir. 2003)).

Here, the district court did not abuse its discretion in finding that
Drake had not met her "daunting" burden of demonstrating that the
government's position was vexatious, frivolous, or in bad faith. *E.g.*, J.A.
6627.

    1.    *The prosecution was neither vexatious nor frivolous*

For purposes of the Hyde Amendment, a prosecution is "vexatious"
if it is "without reasonable or probable cause or excuse." *In re 1997 Grand
Jury*, 215 F.3d at 436 (cleaned up). A prosecution is "frivolous" if it is
"groundless . . . with little prospect of success; often brought to embarrass
or annoy the defendant." *Ibid.*

Several factors demonstrate that the prosecution in this case was
supported by probable cause and was not "groundless." Initially, viewing
the prosecution "as a whole," *Isaiah*, 434 F.3d at 519, the government
effectively proved that bank fraud and tax fraud occurred in connection
with Harrison's factoring arrangement at GrandSouth. As the district court
found:

> . . . there was both a tax scheme executed by Harrison as well as
> related misappropriation and fraud as to the factoring loans
> issued by GrandSouth Bank to various entities controlled by
> Harrison. At Drake's trial, the Government fairly established
> the irregular and fraudulent nature of the factoring loans made

- 27 -

> to the nominee companies and the conversion and diversion of
> the proceeds of those various loans for the benefit of Harrison.

J.A. 6609.  The prosecution of the bank defendants for their role in this

nominee lending scheme was well founded, as courts have upheld criminal

convictions for similar conduct.  *See, e.g.*, *United States v. Vinson*, 852 F.3d

333, 353 (4th Cir. 2017) (misapplication of bank funds occurred where bank

officer concealed that loans "were being made to straw borrowers in order

to circumvent the bank's loans-to-one-borrower limit"); *United States v.*

*Markert*, 732 F.3d 920, 926-28 (8th Cir. 2013) (upholding convictions for

bank fraud and misapplication of bank funds based on use of nominee

loans); *United States v. Waldroop*, 431 F.3d 736, 741 (10th Cir. 2005)

(recognizing that concealing the true beneficiary of a nominee loan may

constitute bank fraud).  Moreover, this prosecution resulted in the

conviction of one defendant, Corriher, with whom Drake worked closely at

GrandSouth.

    This record does not support a finding that the prosecution of the

defendants, including Drake, was frivolous or devoid of probable cause.

Although the district court ultimately concluded that the trial evidence was

insufficient to establish Drake's criminal intent beyond a reasonable doubt,

*e.g.*, J.A. 3911, that end-of-trial, fact-intensive determination does not

indicate that the prosecution was baseless.  *See United States v. Lindberg*, 220

F.3d 1120, 1125 (9th Cir. 2000) ("the government's lack of direct evidence as

to Lindberg's knowledge does not demonstrate that its case was baseless");

- 28 -

*United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1184 (9th Cir. 2003) ("Although the Government's case was not strong, no evidence in the record suggests that the Government's position was brought to embarrass or annoy Appellants.").

An examination of the specific evidence of Drake's involvement in the scheme confirms that the prosecution was well founded. As the district court found, even a "cursory review" of the evidence demonstrated "that Drake, in her position at GrandSouth Bank, was involved in or in fact administratively executed many of the criminal transactions" associated with the nominee lending scheme. J.A. 6609-10. As a GrandSouth account executive, Drake "was largely responsible for the day-to-day administration of the factoring lines that were an integral part of the Harrison scheme." J.A. 6617. Drake routinely made "material" and "false" entries in GrandSouth's books and records that concealed Harrison's interest in the factoring lines of credit. J.A. 6618.

Additional trial evidence supported an inference that Drake knew that the use of the nominees served to fraudulently conceal Harrison's interest in the factoring lines. Drake routinely corresponded with Harrison's company — not any of the nominee companies — regarding the advancement of funds for Harrison's benefit. *E.g.*, J.A. 5561 (Drake's email to Compensation Management employee Kathy Miller regarding all the "freakin' accounts" she handled for Harrison). Drake even visited Harrison's office when the factoring relationship was established, further

- 29 -

showing that Drake knew that Harrison was the true beneficiary.  J.A. 1066, 1817.  Nevertheless, Drake continually recorded accounts receivable and advances belonging to Compensation Management as though they belonged to the nominee companies.  *E.g.*, J.A. 1890-91 (Corriher testimony); J.A. 5564 (email with Miller).  She regularly shuffled factoring funds across the various nominee lines of credit, effectively treating all the funds as belonging to Harrison.  *E.g.*, J.A. 3626, 3749-52, 5684, 5686.  And she helped Harrison obtain new factoring advances in order to pay off old, unpaid invoices that had been used to secure prior factoring advances. *E.g.*, J.A. 3657-60.

The government justifiably relied on this evidence.  "Fraudulent intent may be established by circumstantial evidence and by inferences deduced from facts and situations."  *United States v. Celesia*, 945 F.2d 756, 759 (4th Cir. 1991) (cleaned up).  And similar circumstantial evidence is frequently used to show intent to commit the offenses charged here.[6]  In *United States v. Krepps*, 605 F.3d 101, 109 (3d Cir. 1979), the court upheld convictions for misapplication of bank funds (18 U.S.C. § 656) and falsifying bank records (18 U.S.C. § 1005) where the defendant falsified bank records to conceal his interest in certain loans.  "[A] jury may plausibly have determined that Krepps intended to deceive the bank's

---

[6] Although we cite case law involving the specific offenses charged here, this Court, as noted above, need not conduct a "count by count" analysis of whether the charges were well founded.  *Isaiah*, 434 F.3d at 519.

officers or those appointed to examine its books when he omitted from the bank records any reference to his being the beneficiary of the loan." *Ibid.* In *Isaiah*, the Sixth Circuit found sufficient circumstantial facts "to establish probable cause that Isaiah intended to defraud the bank and join the conspiracy," where Isaiah, among other things, "wrote checks payable to people she had never met." 434 F.3d at 519. Likewise, Drake's continual recording of Harrison's factoring transactions in the names of individuals "she had never met" was circumstantial evidence of fraudulent intent.

To be sure, the district court concluded that this evidence was insufficient to prove, beyond a reasonable doubt, that Drake acted with criminal intent. Accordingly, the court granted Drake's motion for a judgment of acquittal. J.A. 3911-12. But as Drake acknowledges (Br. 22), that does not mean that she has met the Hyde Amendment's heightened standard for recovery. "The standard for granting a judgment of acquittal at trial is lower than that for an award of attorney's fees and costs pursuant to the Hyde Amendment." *United States v. Pritt*, 77 F. Supp. 2d 743, 748 (S.D. W. Va. 1999); *see also United States v. Sherburne*, 249 F.3d 1121, 1127 (9th Cir. 2001) ("To say in hindsight that a case could not be proved beyond a reasonable doubt is hardly the same as showing that the case was unfounded and intended to harass.").

And in this case, Drake doesn't even come close to closing the gap between the judgment-of-acquittal and the Hyde Amendment standards, because the district court recognized that it was a "close[] call" whether to

- 31 -

grant Drake's Rule 29 motion on two conspiracy charges.  J.A. 3910.  If it
was a "close call" whether the government's evidence was sufficient to
sustain a guilty verdict, then it cannot be said that the government's case
was "vexatious" or "frivolous."  *See also Isaiah*, 434 F.3d at 520 (upholding
the denial of attorney's fees where the district court indicated that "the
question of Isaiah's intent was a close one").

Although the admitted trial evidence discussed above is enough to
demonstrate that the prosecution was not vexatious or frivolous, the Court
should also consider non-admitted evidence.  "The government [i]s entitled
. . . to rely on the evidence subsequently suppressed in making its
prosecutorial decision . . . ."  *United States v. Knott*, 256 F.3d 20, 35 (1st Cir.
2001).  As stated, the district court precluded several witnesses from
testifying whether the procedures Drake applied to Harrison's factoring
lines were "normal" or "unusual" vis-à-vis other factoring clients.  *E.g.*, J.A.
1091, 3841.  Had the district court admitted this testimony, it would have
bolstered the government's case against Drake, since "disregard for the
bank's routine procedures" could support an inference of fraudulent intent.
*United States v. Cauble*, 706 F.2d 1322, 1355 (5th Cir. 1983).

The anticipated testimony of C.G. further demonstrates that the
government had a sufficient basis to prosecute.  C.G.'s testimony that
Drake destroyed banking records in response to the investigation of
GrandSouth was substantial evidence of her criminal intent.  Indeed, the
district court recognized that, had the government offered this testimony at

- 32 -

trial, the court would have been compelled to deny Drake's Rule 29 motion
and submit the case to the jury. J.A. 3913. The district court's finding that
the government possessed sufficient evidence to survive a Rule 29 motion,
even though all that evidence was not admitted, precludes a finding that
the prosecution was vexatious or frivolous. *Cf. Pritt*, 77 F. Supp. 2d at 747
("If a court denies a defendant's motion for acquittal at trial as to all counts,
the prosecution cannot have been frivolous as a matter of law."). Likewise,
the court's commendation of the government for its professionalism and its
"review of the evidence and [] presentation of the evidence" in this case,
J.A. 3913, indicate that the prosecution was well founded. *Cf. Manchester
Farming*, 315 F.3d at 1183 (prosecution was not "vexatious" even though
"the Government's performance was significantly below desirable
standards").

Drake argues (Br. 22) that the prosecution was frivolous because
"without C.G." the government had no case. She claims that Corriher "did
not inculpate her in the conspiracy" and that none of the other witnesses
"linked her to any criminal knowledge or activity." *Ibid.*

Drake's argument fails on several fronts. First, Drake improperly
relies on her post-trial assessment of how the government's evidence
turned out. "[T]he test for awarding fees under the Hyde Amendment
should not be an exercise in 20/20 hindsight based solely on
reasonableness." *Sherburne*, 249 F.3d at 1127. Accordingly, Drake cannot
demonstrate that the prosecution was baseless by attacking the trial

- 33 -

testimony of government witnesses.  Such an approach ignores the "fluid" nature of the trial process, which involves, among many other variables, "uncertainties associated with witnesses' testimony."  *Ibid.*

Second, Drake's post-trial assessment of the government's evidence is not only legally misplaced, but also factually inaccurate.  It is not true that neither Corriher nor any other witness "linked [Drake] to any criminal knowledge or activity."  Br. 22.  Although no witness directly accused Drake of committing a crime, several witnesses provided circumstantial evidence that Drake knew that the nominee lending scheme was fraudulent.  Corriher, for example, testified about Drake's responsibilities as the account executive for Harrison's factoring lines, as well as Drake's visit to Harrison's office.  J.A. 1638, 1642, 1817.  Other GrandSouth employees testified that Drake had a central role in administering the factoring lines controlled by Harrison.  J.A. 2192 (Lesley Cannon); J.A. 2991, 2993 (Cyndy Ayers); J.A. 3278-79 (William Timanus).  Cannon further testified that Drake used a non-standard wire request form to advance factoring funds, one which listed several clients, corresponding to the nominal beneficiaries of Harrison's factoring arrangement.  J.A.2212, 2226-27, 2230; *see also* J.A. 5684 (example of wire transfer authorized by Drake).

Compensation Management employees also testified that they regularly interacted with Drake regarding the use of nominees to record payments and authorize factoring advances controlled by Harrison.  J.A. 2849-50 (Angela Holland); J.A. 2925-35 (Katherine Miller).  This testimony,

as well as the other evidence discussed above, linked Drake to the criminal activity and provided probable cause. Even considering only the admitted trial evidence, the district court concluded that it was a "close[] call" whether the evidence was sufficient to prove Drake's guilt beyond a reasonable doubt. J.A. 3910. Drake therefore is wrong in claiming (Br. 23) that the government "surely knew that it could not prevail" at trial.

Contrary to Drake's suggestion (*see* Br. 21-22), there is no reason to disregard C.G's anticipated testimony in determining whether the government had a sufficient basis to prosecute. Because courts assess the basis for prosecution "from the perspective of the government *at the time*" the prosecutorial decision is made, *Knott*, 256 F.3d at 35, C.G.'s anticipated testimony—which directly implicated Drake in the destruction of evidence of bank fraud—is properly considered.

To the extent that Drake is arguing (Br. 18-19, 21-22) that the government should have abandoned its prosecution of her once it decided not to call C.G. at trial, she is incorrect. As demonstrated above, even without C.G.'s testimony, the remaining evidence against Drake provided probable cause. Moreover, the government's decision to continue the prosecution, even after dropping C.G. as a witness, is too small a part of this case to support a Hyde Amendment claim. Courts examine the case "as an inclusive whole" to determine whether the "position" of the United States was "vexatious" or "frivolous" within the meaning of the Hyde Amendment. *Manzo*, 712 F.3d at 810. The investigation and prosecution of

- 35 -

this case spanned approximately seven years.  Any disagreement with how the government reassessed its case against Drake after having dropped a single trial witness does not cast doubt on the prosecution as a whole.

Finally, Drake asserts (Br. 24), without analysis, that the prosecution was vexatious because "the government lacked a reasonable basis for its prosecution" and displayed a "willful lack of candor to the court and disinterest in learning the truth."  By failing to support these assertions "with citations to the authorities and parts of the record on which appellant relies," Fed. R. App. P. 28(a)(8)(A), Drake has waived any argument based on these assertions.  *See also Johnson v. United States*, 734 F.3d 352, 360 (4th Cir. 2013).  Regardless, the government did have a "reasonable basis" to prosecute given the evidence described above.

### 2.     *The prosecution was not in bad faith*

"Bad faith," within the meaning of the Hyde Amendment, "is not simply bad judgment or negligence."  *In re 1997 Grand Jury*, 215 F.3d at 436 (cleaned up).  Rather, "it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *Ibid.*[7]

---

[7] Drake asserts (Br. 24) that "bad faith" is a "subjective determination," but the case law holds the contrary.  *See United States v. Shaygan*, 652 F.3d 1297, 1313 (11th Cir. 2011) ("[A] finding of bad faith under the Hyde Amendment cannot rest on evidence of displeasure or subjective ill-will alone."); *Manzo*, 712 F.3d at 811 ("Courts engage in an objective inquiry when determining whether a prosecution was pursued in

(continued…)

Drake's "bad faith" argument (Br. 25-26) relies on the government's representations about her status before the grand jury. However, any misstatement by the government was not consciously wrong and, in any event, was too inconsequential to support a Hyde Amendment claim.

Although the district court found that the government's representation about Drake's status during her May 2013 grand jury testimony was "misleading," *e.g.*, J.A. 848,[8] the court clarified that it was not "suggest[ing]" that "the prosecutor went so far as to . . . intentionally mislead," J.A. 808. The court concluded that the government's representation of Drake's status was inconsistent with the definitions of "target" and "subject" in the U.S. Attorneys' Manual, J.A. 837-38, an internal guidance manual that confers no individual rights.[9]

The district court's findings do not suggest bad faith on the part of the government. The court found only that the government's

---

'bad faith.'"). Regardless, even if "subjective ill-will" were enough to support a sanction under the Hyde Amendment, *contra Shaygan*, 652 F.3d at 1311, there is no evidence of any such ill-will here.

[8] The district court's finding that the government's representation about Drake's status was "misleading" would be reviewed only for clear error. The government does not here argue that the court's finding was clearly erroneous.

[9] The Justice Manual (formerly the U.S. Attorneys' Manual) provides "internal DOJ guidance" and "may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." U.S. Dep't of Justice, Justice Manual § 1-1.200 (2018); *accord In re Grand Jury Subpoena*, 646 F.3d 159, 169 (4th Cir. 2011).

- 37 -

determination of when Drake became a "target" of the investigation was
incorrect. Such a "prosecutorial mistake" cannot justify a sanction under
the Hyde Amendment. *United States v. Monson*, 636 F.3d 435, 439 (8th Cir.
2011); *see also Catano v. United States*, 248 F. Supp. 2d 1158, 1161 (S.D. Fla.
2003) (finding no "bad faith" even if the prosecutor "may have been
mistaken" in his representations of the evidence before the grand jury).

Additional facts in this case demonstrate the absence of bad faith. As
the district court found, Drake was not prejudiced by any
misrepresentation about her status before the grand jury because the
government — as it promised in the pretrial hearing on Drake's motion to
dismiss — did not introduce her grand jury testimony at trial. J.A. 876-78,
6629-31. The government also exceeded its discovery obligations in this
case by voluntarily producing the May 2013 internal email on which Drake
relies (Br. 5, 25). The district court recognized that the government
"appropriately disclosed" this email. J.A. 844. And as stated, the district
court at trial commended the government's overall "candor" and
professionalism in presenting its case. J.A. 3913. This record shows good
faith, not bad, on the part of the prosecution.

Drake fails to demonstrate that the district court abused its discretion
in finding that the prosecution was not conducted in bad faith. She first
claims (Br. 25) that the government, during the grand jury proceedings,
"acquiesce[d]" in a conflict of interest by "allow[ing]" her to be represented
by counsel for the Bank after the government "determined that she was a

- 38 -

target" of the investigation. But Drake fails to explain how any such "acquiescence" in conflicted representation could constitute an actionable claim under the Hyde Amendment. As the district court correctly found, J.A. 6630, there is no constitutional right to conflict-free counsel at grand jury proceedings. *Moran v. Burbine*, 475 U.S. 412, 428 (1986); *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010); *cf. United States v. Ramsey*, 785 F.2d 184, 193 (7th Cir. 1986) (finding no constitutional violation where "the only prejudice resulting from the failure of a court to raise disqualification issues is that suspects freely testified before the grand jury"); *id.* ("[T]he prosecutor did not need to ensure that the witnesses before the grand jury obtained good advice from conflict-free counsel."). Nor was it the government's place to dictate Drake's choice of counsel.

Regardless, the government did not acquiesce in any conflict of interest. Indeed, in the May 2013 email on which Drake relies, the prosecutor recognized that it "would help to get [Drake] an attorney of her own" in the event the government decided "to treat [her] as a target." J.A. 4290. Although the district court found that the government erred in determining that she was not a target, that does not suggest prosecutorial bad faith.

Moreover, the district court properly found that any error was harmless because the government never introduced Drake's grand jury testimony at trial. J.A. 6629. *Cf. United States v. Winter*, 663 F.2d 1120, 1152 (1st Cir. 1981) (upholding denial of motion to suppress grand jury

- 39 -

testimony where the defendant "offered no evidence that his testimony
was, in fact, used" at trial), *abrogated on other grounds by Salinas v. United
States*, 522 U.S. 52 (1997).  Drake neither identified any testimony that
"might have been subjected to her Fifth Amendment privilege," J.A. 6629,
nor "presented evidence regarding legal harm she suffered as a result of
[her counsel's] alleged conflict[] of interest" during the grand jury
proceedings, J.A. 6629-30.  The district court correctly concluded that
Drake's allegations of prejudice were "unfounded."  J.A. 6630.

Drake wrongly claims (Br. 25), without citation, that the government
has "admitted subterfuge" with respect to its representations of Drake's
status before the grand jury.  Although the district court found that the
government mischaracterized Drake's status before the grand jury, there
was no finding, admission, or evidence of intentional deception.

Drake also claims (Br. 25-26), again without citation, that the district
court "express[ed] its concern that the government had misled the court in
its pleadings."  Because Drake does not support this assertion with any
citation to the record, the government is unable to fully respond.  In its
order denying Drake's motion to dismiss, the district court did indicate
that it was "not impressed" with the government's argument "that Drake
was not a target [of the grand jury investigation] in light of the May 5, 2013,
email."  J.A. 878.  But the fact that the district court rejected one of the
government's arguments below does not mean that the government had
"misled the court in its pleadings."

- 40 -

Drake also notes (Br. 26) that the North Carolina State Bar has a pending complaint against one of the prosecutors related to the government's representation of Drake's status before the grand jury. But Drake wrongly characterizes this "complaint" as "evidence of bad faith." At the risk of "stating the obvious," "a complaint is merely an accusation" and is not "evidence of anything." *United States v. Bailey*, 696 F.3d 794, 801 (9th Cir. 2012) (discussing SEC complaint).

Finally, Drake's repeated attacks (Br. 26) on the credibility of grand jury witness C.G. are not relevant to whether the prosecution was conducted in bad faith. Drake speculates that "additional discovery" might uncover evidence of bad faith related to C.G.'s anticipated testimony, *ibid.*, but such speculation cannot support a Hyde Amendment claim. And as demonstrated below, the district court properly denied Drake's request for discovery.

In sum, there is no evidence that any member of the prosecution team acted in bad faith during these proceedings. But even if there were, that alone would not justify a sanction under the Hyde Amendment. In considering a Hyde Amendment claim, courts examine the entire case to determine whether "the government's position underlying the prosecution" was in bad faith. *Gilbert*, 193 F.3d at 1299. "[T]he statute does not allow an award for any *instance* of vexatious, frivolous, or bad-faith conduct. An award is allowed only where the court finds that *the position of* the United States was vexatious, frivolous, or in bad faith." *United States v.*

- 41 -

*Schneider*, 395 F.3d 78, 90 (2d Cir. 2005) (first emphasis added).  Here, there can be no serious argument that the prosecution as a whole was brought in bad faith, given the undisputed bank fraud and tax fraud that occurred at GrandSouth and the evidence of Drake's involvement in that fraud.  The district court did not abuse its discretion in rejecting Drake's claim; on the contrary, it properly determined that the prosecution was not brought in bad faith.[10]

## C.   *The District Court Applied the Proper Legal Standard*

Drake's primary argument on appeal (Br. 13) is that the district court "employed an erroneous legal standard" when denying her application for attorney's fees.  According to Drake, the district court held that the fact that the grand jury indicted Drake was, by itself, sufficient to deny her claim. Br. 15; *see also* Br. 10 (stating, without citation, that "the District Court held that because a grand jury had found probable cause to indict Drake, this finding meant that her prosecution was not frivolous, vexatious or in bad faith").

Drake mischaracterizes the district court's ruling and ignores its independent evaluation of the evidence.  The court's opinion demonstrates

_____

[10] Were this Court to reverse the district court's determination that the prosecution was not vexatious, frivolous, or in bad faith, the government reserves the right to litigate whether Drake meets the additional eligibility requirements for an award of attorney's fees under the Hyde Amendment, including the procedures and limitations of 28 U.S.C. § 2412.  (The government also reserved this right below.  *See* J.A. 5140-41 n.1.)

- 42 -

that it did not apply a "flat rule" under which no defendant who is
indicted by grand jury can recover under the Hyde Amendment. *See James
v. Jacobson*, 6 F.3d 233, 240 (4th Cir. 1993). Instead, the court's extensive
analysis "reflected a true exercise of discretion" in denying Drake's fee
application. *Id.* at 239.

In its 33-page opinion, the district court summarized the evidence in
this case, which it found provided "more than sufficient probable cause" to
justify investigating and prosecuting the people who facilitated Harrison's
nominee lending scheme. J.A. 6611. The court also reviewed the particular
evidence implicating Drake, noting that "Drake was largely responsible for
the day-to-day administration" of Harrison's factoring lines of credit and
that her actions "furthered and promoted Harrison's unlawful scheme."
J.A. 6617. The court cited evidence that Drake "made or directed" entries
in GrandSouth's books and records that were "material" and "false" in that
they concealed Harrison's interest in the factoring lines. J.A. 6618. The
court also cited the grand jury testimony of C.G., which provided
"circumstantial evidence of fraud and intent to defraud." J.A. 6623. After
this thorough review of the evidence, the court concluded that the
government's prosecution of Drake was not vexatious, frivolous, or in bad
faith because there was "no doubt that a crime occurred and that the
activities of Drake furthered the commission of that offense." J.A. 6621-22.

Moreover, the district court considered and rejected Drake's Hyde
Amendment claims based on "alleged misrepresentations and non-

- 43 -

disclosure of *Brady* material," J.A. 6624-27, and alleged misrepresentations regarding Drake's status before the grand jury, J.A. 6628-31, without relying on the fact of Drake's indictment.  Instead, the court concluded that Drake's *Brady*-based claim failed because *Brady* did not "impose an obligation to provide [her] with an assessment of the weight of the evidence," J.A. 6626, and rejected her claim based on the alleged misrepresentation of her status before the grand jury because of a lack of prejudice, J.A. 6631.

The district court's robust analysis makes clear that it did not simply conclude "that the finding of probable cause that undergirds an indictment [is] enough to overcome any claim" under the Hyde Amendment.  Br. 15.  If the court had believed that, then most of its lengthy opinion would have been superfluous.

To be sure, the district court, in concluding that the prosecution was supported by probable cause, relied in part on evidence that was presented to the grand jury, most notably the testimony of C.G.  J.A. 6622-23.  The court noted that the grand jury found "probable cause to believe that Drake committed an offense against the United States after hearing [C.G.'s testimony] and other evidence."  J.A. 6622.  But these aspects of the court's analysis do not suggest that, just because the grand jury indicted Drake, she could not recover under the Hyde Amendment.  Rather, the court determined, based on its own review of the evidence, that "the Grand Jury and the Government *rightly* concluded, based on C.G.'s testimony and the

- 44 -

evidence of Drake's substantial participation in the transactions at issue, that the evidence supported a finding of probable cause." J.A. 6623 (emphasis added).

This case is distinguishable from the Sixth and Ninth Circuit cases that Drake cites (Br. 15-16). In *Manchester Farming*, the Ninth Circuit concluded that the district court made a "disturbing finding" that "because the grand jury indicted Appellants, the Government's case was not frivolous." 315 F.3d at 1184. Similarly, in *Isaiah*, the Sixth Circuit, citing *Manchester Farming*, declined to follow the district court in relying on the fact "that a grand jury returned an indictment" to uphold the district court's finding of probable cause. *Isaiah*, 434 F.3d at 520 n.1. In this case, the district court made no "finding" that because there was a grand jury indictment, there could be no recovery under the Hyde Amendment. The court simply reached the same conclusion as the grand jury—that the prosecution was supported by probable cause.

The trial record further demonstrates that the district court did not merely rely on the grand jury indictment to deny Drake's claim. As stated, when granting Drake's motion for a judgment of acquittal, the court noted that, had the government introduced C.G.'s testimony at trial, the government's evidence would have been sufficient to submit the case to the jury. J.A. 3828. In other words, the district court found that, had all the government's evidence been introduced and admitted, it would have been sufficient not only to secure an indictment, but also to sustain a guilty

- 45 -

verdict.  Plainly, the district court did not "rely solely on the existence of an indictment" to deny Drake's claim under the Hyde Amendment.  Br. 18. Drake's attempt to attribute legal error to the district court fails.

## II.  THE DISTRICT COURT PROPERLY DENIED DRAKE'S REQUEST FOR DISCOVERY

### A.    *Standard of Review*

Whether the Hyde Amendment authorizes discovery is a question of law that this Court reviews de novo.  *United States v. Turner*, 389 F.3d 111, 119 (4th Cir. 2004).

Assuming that the Hyde Amendment authorizes discovery, a district court's determination that a claimant had not shown good cause for discovery would be reviewed for an abuse of discretion.  *See United States v. Truesdale*, 211 F.3d 898, 907 (5th Cir. 2000) ("The district court . . . did not abuse its discretion in ruling on Appellants' [Hyde Amendment claim] without first affording them an opportunity for discovery or a hearing.").

### B.    *The Hyde Amendment Does Not Provide for Discovery*

The language of the Hyde Amendment, its legislative history, and applicable case law demonstrate that the Amendment does not authorize compelled discovery.

Nothing in the language of the Hyde Amendment suggests that a defendant may compel the government to produce evidence related to a claim for attorney's fees.  Instead, the Amendment states that the court "may receive" certain evidence that is not already in the criminal record:

- 46 -

> To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal.

18 U.S.C. § 3006A, statutory notes.

Congress's choice of this non-mandatory, "may receive evidence" language is significant, given that other criminal discovery provisions explicitly impose an obligation on the government to produce evidence. *See, e.g.*, Fed. R. Crim. P. 16(a)(1)(A), (B) & (E) (detailing what evidence the government "must" provide).

The Hyde Amendment's legislative history confirms that Congress did not intend the "may receive evidence" clause to authorize the compelled production of evidence. The Amendment was modeled on the Equal Access to Justice Act, 28 U.S.C. § 2412. *See Gilbert*, 198 F.3d at 1300. The EAJA provides that, in a civil proceeding, a prevailing party's claim for attorney's fees against the United States "shall be determined on the basis of the record." 28 U.S.C. § 2412(d)(1)(B).

During debate on the Hyde Amendment, members of the House expressed concern that, in a criminal case, limiting the inquiry to "the record" could be unfair to the government because:

> There may be evidence that was relied upon in good faith by the prosecution in coming to its decision to prosecute, but was later suppressed at trial; there may be disclosure or required disclosure and compromise of confidential sources or law enforcement techniques. . . .

- 47 -

143 Cong. Rec. H7786-04, H7793 (daily ed. Sept. 24, 1997) (remarks of
Representative Rivers), *quoted in Truesdale*, 211 F.3d at 907.  In response to
these concerns, Congress added the "may receive evidence" clause to the
Hyde Amendment.  *Truesdale*, 211 F.3d at 907.  Thus, Congress gave the
district court discretion to receive confidential or other non-record
materials in order to permit the government to more fully defend its
position.  That is a far cry from authorizing the court to order the
government to produce internal documents and deliberative
communications, on top of the evidence already produced during
discovery.  If Congress had intended the Hyde Amendment to work such a
sea change in the government's discovery obligations, it would have used
different language.  But "[n]othing in the text or legislative history of the
Hyde Amendment indicates that Congress intended to modify the law
relating to discovery in criminal cases."  *Gilbert*, 198 F.3d at 1305.

Two federal courts of appeals have addressed the meaning of the
"may receive evidence" clause.  Although the courts in both cases declined
to decide whether the Hyde Amendment authorizes discovery, both courts
expressed agreement with the government's argument that it does not.

In *Truesdale*, the Fifth Circuit, after reviewing the legislative history of
the Hyde Amendment, rejected the argument "that Congress intended for
the claimant to have access to evidence except such evidence which is
confidential, and such evidence is to be presented to the court in camera."
211 F.3d at 907.  Instead, the court agreed with the government that "the

- 48 -

provision for in camera review of evidence was included to enable the government to defend itself against Hyde Amendment motions and at the same time protect confidential information." *Ibid.* Ultimately, the Fifth Circuit did not "determine the situations under which discovery or a hearing is allowed or required, assuming either is allowed at all," because the claimants had not preserved their claim for discovery below. *Ibid.*

In *United States v. Schneider*, 395 F.3d 78, 91 (2d Cir. 2005), the court stated that "the position of the government, and the Fifth Circuit in *Truesdale*, may have merit." The court noted that, unlike other discovery provisions, the Hyde Amendment contains no language "mandating disclosure"; providing that the court may "order," "compel," or "require" the production of evidence; or allowing a party to "obtain" disclosure. *Ibid.* The court noted that the language authorizing the court to "receive" evidence says "nothing about authorization to order its production." *Ibid.* "In short," the *Schneider* court concluded, "nothing in the words of the statute suggests that the court has the power to order the government to produce materials, either to the defendant or to the court." *Id.* at 92.

The Sixth and Ninth Circuit cases that Drake cites (Br. 29) are not to the contrary. Neither circuit has squarely addressed whether the Hyde Amendment authorizes discovery. Instead, the courts denied the claimants' discovery requests on the narrower ground that they had not shown "good cause." *See United States v. Johnson*, 659 Fed. App'x 311, 316 (6th Cir. 2016) (applicant had not shown "good cause" for evidentiary

- 49 -

hearing); *United States v. Capener*, 608 F.3d 392, 405 (9th Cir. 2010) (declining to decide the "exact scope" of the "may receive evidence" clause and affirming the district court's finding that "Capener had failed to show good cause"); *United States v. Lindberg*, 220 F.3d 1120, 1126 (9th Cir. 2000) ("The district court did not abuse its discretion in finding that Lindberg had failed to show good cause.")[11]; *United States v. Anderson*, 74 Fed. App'x 768, 770 (9th Cir. 2003) ("the district court did not abuse its discretion in deciding that Anderson had not shown the good cause necessary to warrant discovery of the grand jury testimony").

The district court in *United States v. Gardner*, 23 F. Supp. 2d 1283 (N.D. Okla. 1998), did, as Drake notes (Br. 29-31), espouse the view that the Hyde Amendment authorizes the compelled production of documents, but its reasoning is unpersuasive. In that case, the defendant was investigated by the IRS and later charged with tax and bankruptcy fraud. *Id.* at 1285-86. Before trial, the government elected to dismiss all counts. *Id.* at 1286. The defendant filed an application for attorney's fees and a discovery request

---

[11] The Ninth Circuit's statement in *Lindberg* that the Hyde Amendment "allows the district court to order the production of documents 'for good cause shown,'" 220 F.3d at 1126, was not a conclusion that the Hyde Amendment, in fact, authorizes the compelled production of documents. This statement is *dicta*; the court made it in passing when concluding that the claimant had not shown "good cause"; the court did not address whether, as an initial matter, the Hyde Amendment authorizes discovery at all. *See id.* The Ninth Circuit in *Capener*, 608 F.3d at 407, cited *Lindberg* but nevertheless recognized that the scope of the "may receive evidence" clause was an open question.

- 50 -

for internal IRS reports, Department of Justice documents, and depositions of IRS agents and members of the U.S. Attorney's Office. *Id.* at 1295-96. The court rejected the government's argument that "under the Hyde Amendment, a court is limited to matters on file or in the trial transcript and that in extraordinary cases a court may only receive from the Government (but not order the production of) the items listed in the parenthetical portion of the statute." *Id.* at 1296. The court instead concluded that the Hyde Amendment "expressly contemplates an expansion of the record traditionally available to the Court for the purpose of assessing an applicant's claim." *Id.* at 1296. The court ordered the government to produce internal IRS and Department of Justice documents pertaining to the investigation and prosecution. *Id.* at 1297. However, the court rejected the defendant's request "to conduct depositions of IRS agents and United States Attorneys," finding "no authority to support the view that Hyde Amendment applicants should have either sweeping access to sensitive materials or broad powers to compel testimony." *Id.* at 1296.

*Gardner* is unpersuasive and should not be followed. First, this 1998 decision was one of the first to apply the Hyde Amendment, and the district court did not have the benefit of the appellate courts' subsequent analyses in *Truesdale* (2000) and *Schneider* (2005). And on the merits, the *Gardner* court's logic is faulty. It does not follow that, because the Hyde Amendment "expressly contemplates an expansion of the record," *id.* at

- 51 -

1296, the statute therefore authorizes a court to order the production of documents. As discussed, although the Hyde Amendment allows the court to "receive" certain materials not in the record, it does not provide for the compelled production of any materials.

## C.    *In Any Event, Drake Has Not Shown Good Cause for Discovery*

Even if the Hyde Amendment authorized discovery, Drake would have to show "good cause." 18 U.S.C. § 3006A, statutory notes. Courts that have entertained the possibility of discovery under the Hyde Amendment have recognized that, to show good cause, the claimant would need to present some evidence that supported a finding of government liability. *See Johnson*, 659 Fed. App'x at 316 ("good cause is not shown . . . when the applicant . . . does not present any evidence to support his allegations of bad faith"); *Lindberg*, 220 F.3d at 1126 ("Lindberg has failed to point to any evidence that the government was motivated by improper considerations."); *Capener*, 608 F.3d at 407 (Capener "failed to present any evidence to the district court supporting his allegations of bad faith on the part of the prosecutors."). A claimant cannot seek discovery under the Hyde Amendment in the hopes of "mak[ing] his case by requiring the government to disclose its confidential materials to the court." *Schneider*, 395 F.3d at 92.

- 52 -

Drake has not identified any evidence[12] to justify further discovery. Instead, Drake proposes broad inquiries into the government's internal deliberations that are not authorized by the Hyde Amendment. *See Gardner*, 23 F. Supp. 2d at 1296 (denying "sweeping access to sensitive materials" or the power to compel testimony). Drake's proposed discovery also is not material to the resolution of her claim.

First, Drake wants (Br. 26, 28) to know why the government did not call C.G. at trial and why it continued its prosecution of Drake after dropping C.G. as a witness. But Drake does not allege, much less substantiate, any improper conduct in connection with the government's decision not to call C.G. Indeed, this decision benefited Drake, as it tipped the district court's balance in favor of her motion for a judgment of acquittal. J.A. 3913. The district court recognized as much and commended the prosecutors' professionalism in choosing not "to present evidence that they weren't comfortable with for whatever reason simply to survive a Rule 29 motion." *Ibid.* Drake's curiosity about why the government made that choice falls well short of the "good cause" that would be necessary for discovery.

---

[12] As discussed, Drake's unsupported accusations (Br. 25-26) that the government "admitted subterfuge" and "misled" the district court in its pleadings are not evidence, much less evidence that the prosecution was conducted in bad faith.

- 53 -

Also, further inquiry into C.G.'s anticipated testimony is not material to Drake's claim. As argued above, even if C.G.'s testimony is removed from consideration, the remaining evidence is enough to establish probable cause for the prosecution. Thus, why the government chose not to call C.G. would be "too insignificant to form a basis for Hyde Amendment liability." *Schneider*, 395 F.3d at 90.

Second, Drake wants (Br. 28) to discover "whether the government asked [Corriher] about Drake's involvement" in the nominee lending scheme and "what he said." There is no need for further inquiry into what Corriher told the government. As Drake acknowledged, the government provided "agents' notes" of its "debriefings" of Corriher. J.A. 4273; *see also* J.A. 5169 (government opposition referring to "interview reports" of Corriher provided to Drake). And Corriher testified at trial and was cross-examined by Drake's counsel, J.A. 2084, so Drake already knows "what he said" about her, *see* Br. 28.

As the district court found, the government complied with its obligations under *Brady v. Maryland* as to Corriher's testimony. J.A. 6626. Drake did not identify any specific exculpatory evidence she alleged was withheld; instead, she claimed that the government "should have alerted [her] to what [she] regards as deficiencies in the Government's case based on the evidence the Government *did* disclose to her." J.A. 6625-26. But as the district court properly concluded, the government had no further

- 54 -

obligation "to provide Drake with an assessment of the weight of the evidence" provided by Corriher.  J.A. 6626.

Finally, Drake argues (Br. 31) that the district court abused its discretion by relying on *Truesdale* because, in that case, the Fifth Circuit denied discovery on the ground that the claimants had failed to move for discovery in the district court.  But the district court here did not cite *Truesdale* for the proposition that discovery may be denied when the claimant fails to preserve her claim in the district court.  The court cited *Truesdale* for the proposition that "the text of the Hyde Amendment does not provide for discovery," such that it was not clear whether the court even "ha[d] discretion to order discovery."  J.A. 6631-32.  As discussed, *Truesdale* supports the government's argument that the Hyde Amendment does not authorize compelled discovery.  The district court's legal analysis was sound, and it did not abuse its discretion.

- 55 -

CONCLUSION

The district court's denial of Drake's application for attorney's fees under the Hyde Amendment should be affirmed.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Gregory S. Knapp
S. ROBERT LYONS
  *Chief, Criminal Appeals &*
  *Tax Enforcement Policy Section*
KATIE S. BAGLEY
JOSEPH B. SYVERSON
GREGORY S. KNAPP
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 972*
  *Washington, D.C. 20044*
  *(202) 307-3350*

*Of Counsel:*
SANDRA J. HAIRSTON
  *United States Attorney*

DATED:  June 9, 2022

- 56 -

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a 14-point, proportionally spaced typeface (Book Antiqua) using Word for Microsoft 365.

/s/ Gregory S. Knapp
GREGORY S. KNAPP
*Attorney*

DATED:  June 9, 2022

- 57 -

CERTIFICATE OF SERVICE

I certify that on June 9, 2022, I electronically filed the foregoing
document with the Clerk of Court using the CM/ECF system, which will
send notification of such filing to all registered CM/ECF participants.

/s/ Gregory S. Knapp
GREGORY S. KNAPP
   *Attorney*